Receipt 06-1195

# ORIGINAL

FILED
APR 12 2006
U.S. COURT OF FEDERAL CLAIMS

ECF

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ISMAEL JOHN, JACKSON ADING, JAMES GIDEON, KUNIO JOSEPH, HARRY JACKSON, BOAZ DAVID, SAM LEVAI, BALIKEN JACKSON, DAVID OBET, KOSIMA JOHANNES, JINET LANGRUS, EBEL JOSEPH, GEORGE YOSHITARO, ISAHO LUTHER, BIKENJI PAUL, NEPTALI PETER, and MOSES ABRAHAM, For themselves and For a Class Consisting of the People of Enewetak, | ) | No. 06-289 L |
| Plaintiffs, | ) | |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

COMPLAINT

NATURE OF ACTION

1. This Complaint seeks just compensation under the Fifth Amendment to the United States Constitution for several separate takings by defendant of property rightfully belonging to the plaintiffs: (a) The taking on December 21, 1947 of the land and lagoon that comprises Enewetak Atoll. This taking lasted under a series of temporary takings until October 1, 1980 when defendant permitted Plaintiffs to resettle and reinhabit the southern islands of the atoll. (b) The taking that began on October 1,

1980 for over half the land mass and lagoon of Enewetak Atoll and will continue in whole or in part for the next 20 to 50 years. (e) The taking of plaintiffs' just compensation and implied-in-fact contract claims by defendant's inadequate funding of the Nuclear Claims Tribunal.

## JURISDICTION

2 This court has jurisdiction pursuant to 28 U.S.C. § 1491.

3. The people of Enewetak, the class of plaintiffs for which this claim is filed, were citizens of the United States Trust Territory of the Pacific Islands but are now citizens of the Marshall Islands. All plaintiffs were members of the Enewetak community in December 1947, when all of the inhabitants of Enewetak Atoll were removed from Enewetak Atoll by defendant to Ujelang Atoll prior to the commencement of a series of nuclear weapons tests conducted by defendant on Enewetak Atoll, or are either (i) direct descendants of such members or (ii) otherwise recognized as members of the Enewetak people by traditional law and custom. All plaintiffs possess land rights on Enewetak Atoll.

4. The people of Enewetak are governed locally by the Enewetak/Ujelang Local Government Council (hereinafter "Enewetak/Ujelang Council"), whose membership is determined in accordance with the Constitution of the Enewetak/Ujelang Local Government. The Enewetak/Ujelang Council consists of a Mayor, thirteen Council members and two Iroij (chiefs). The Enewetak/Ujelang Council is a political subdivision within the Republic of the Marshall Islands. The people of Enewetak are represented by a Senator in the Nitijela.

5. Plaintiff Ismael John is the Senator for the people of Enewetak.

6. Plaintiff Jackson Ading is the Mayor of the people of Enewetak.

7. Plaintiffs James Gideon, Kunio Joseph, Harry Jackson, Boaz David, Sam Levai, Baliken Jackson, David Obet, Kosima Johannes, Jinet Langrus, Ebel Joseph, George Yoshitaro, Isaho Luther, Bikenji Paul, are members of the Enewetak/Ujelang Council.

8. Plaintiff Neptali Peter is Iroij of the ri-Enewetak, Plaintiff Moses Abraham is Iroij of the ri-Enjebi.

CLASS ACTION ALLEGATIONS

9. This action is brought and may properly be maintained as a class action under Rule 23 of this Court.

10. The named plaintiffs bring this suit on their own behalf and on behalf of the class they seek to represent.

11. The class the named plaintiffs seek to represent is composed of all persons recognized as members of the Enewetak people by traditional law and custom. This class consists of all living persons who were members of the Enewetak community at the time of the 1947 evacuation of Enewetak Atoll, all living descendants of those members, and all other persons who by traditional law and custom are recognized as members of the Enewetak people. This class is so numerous that the joinder of all its members is impracticable. There are currently more than 2000 members of the Enewetak people.

12. The questions of law and fact raised by this Complaint are common to the class, and the claims of the named plaintiffs are typical of the claims of the class. The named claimants will adequately and fairly protect the interests of the class and they are represented by counsel experienced in class action litigation.

13. Defendant has acted and refused to act on grounds generally applicable to the class, and defendant's actions have generally affected the entire class. The common questions of law and fact involved in this action predominate over any questions affecting only individual members, and class action treatment is superior to other available methods for the fair and efficient adjudication of this claim.

## INTRODUCTION AND BACKGROUND

### A. Location of Enewetak

14. Enewetak Atoll is located in the extreme northwestern part of the Marshall Islands. It is one of 29 atolls and 5 islands comprising the Marshall Islands, which are scattered over 357,000 square miles north of the equator in the central Pacific Ocean. A map of the Marshall Islands is attached as Exhibit A.

15. The Marshall, Caroline, and Mariana Islands (which collectively are known as Micronesia) were the geographical components of the Trust Territory of the Pacific Islands, which consisted of more than 2,000 islands and atolls dispersed throughout an ocean area approximately the size of the continental United States.

### B. U.S. Governmental Authority over the Marshall Islands and Enewetak Atoll

16. In 1885, Germany seized control of the Marshall Islands from Spain, which had exercised nominal control over Micronesia since the late 1600s. Germany purchased Spain's remaining holdings in Micronesia in 1899 and controlled the islands until Japan seized them at the outbreak of World War I. Japan administered Micronesia under a League of Nations Mandate until World War II, when the islands were occupied by the United States in 1944.

17. Shortly after the United States invaded Majuro Atoll in the Marshall Islands on January 30, 1944, Admiral Chester W. Nimitz, Commander in Chief of the United States Pacific Fleet and United States Military Governor of the Marshall Islands, issued Proclamation No. 1, pursuant to which the United States assumed all powers of government in the Marshall Islands. Proclamation No. 1 became effective as to Enewetak Atoll in February 1944, when the atoll was occupied by United States military forces.

18. On July 18, 1947, the United States entered into an agreement with the United Nations under which Micronesia became a United Nations strategic trust territory administered by the United States. See Congressional Joint Resolution, 61 Stat. 397; Trusteeship Agreement for the Former Japanese Mandated Islands ("Trusteeship Agreement"), 61 Stat. 3301, T.I.A.S. No. 1665.

19. The Trusteeship Agreement recognized certain fiduciary obligations of the United States to the people of the Trust Territory, including the Enewetak people. The Trusteeship Agreement, inter alia, obligated defendant to:

> . . . promote the economic advancement and self-sufficiency of the inhabitants . . . [Article 6(2)];
>
> . . . protect the inhabitants against the loss of their lands and resources . . . [Article 6(2)];
>
> . . . improve [their] means of transportation and communication . . . [Article 6(2)];
>
> . . . protect the rights and fundamental freedoms of all elements of the population without discrimination . . . [Article 6(3)];
>
> . . . protect the health of the inhabitants . . . [Article 6(3)].

20. On July 18, 1947, President Truman terminated the military government of the Trust Territory and delegated civilian administration of the Trust Territory to the Secretary of the Navy. Executive Order No. 9875. In 1951, administrative responsibilities were transferred to the Secretary of the Interior by Executive Order No. 10,265. During 1952 and 1953, the President transferred responsibility for administration of parts of the Trust Territory back to the Secretary of the Navy. Executive Orders Nos. 10,408 and 10,470. Not until 1954 did Congress begin to legislate to implement the Trusteeship Agreement and then it merely stated that until it should provide further for the government of the Trust Territory all governmental authority was vested in the President. See 48 U.S.C. § 1681. In 1962, the President redelegated his authority for civil administration of the entire Trust Territory to the Secretary of the Interior. Executive Order No. 11,021.

21. In each of the Executive Orders described and referenced in paragraph 20, the President ordered the civilian administration to carry out the obligations assumed by the United States under the terms of the Trusteeship Agreement. The Trusteeship Agreement also constituted a part of the Trust Territory Code, the organic law made applicable to the Trust Territory by the United States.

22. The executive authority of the Government of the Trust Territory was vested in the High Commissioner of the Trust Territory. The High Commissioner and other subordinate Trust Territory officials acted under the general supervision and direction of the Secretary of the Interior, subject to the authority of the President and pursuant to Acts of Congress. See Department of the Interior Orders Nos. 2918 (December 27, 1968, as amended March 24, 1976), 3027 (September 29, 1978), and 3039

(April 25, 1979). The High Commissioner was appointed by the President with the advice and consent of the United States Senate.

C. Political Status Negotiations on the Compact of Free Association

23. As negotiations regarding the future political relationship between Micronesia and the United States progressed, the Trust Territory fragmented politically into four governmental entities: the Northern Mariana Islands, Palau, the Marshall Islands, and the Federated States of Micronesia.

24. In Department of the Interior Secretarial Order No. 3027, the Secretary of the Interior established procedures for Palau, the Marshall Islands, and the Federated States of Micronesia to develop local constitutions. In Order No. 3039, the Secretary of the Interior recognized a local government for the Marshall Islands, under a constitution of the Marshall Islands adopted by plebiscite on May 1, 1979. Under this local governmental structure, the Marshall Islands exercised certain powers of self-government under the administration of the United States. Pursuant to Order No. 3039, the U.S. High Commissioner maintained an absolute veto power over all enactments of the Marshall Islands legislature, however, and continued to exercise, under the general supervisory authority of the Secretary of the Interior, "all authority necessary to carry out the obligations and responsibilities of the United States under the 1947 Trusteeship Agreement."

25. In 1976, the Northern Mariana Islands attained Commonwealth status. 34. See Public Law 94-241 (March 24, 1976). The Marshall Islands, the Federated States of Micronesia, and Palau separately negotiated new political relationships with the United

States. All three initialed Compacts of Free Association in October and November 1980 which defined their future relationships with the United States.

26. It took another six years before the Marshall Islands actually achieved the political status of free association. The Reagan administration delayed negotiations for nearly a year while it conducted a comprehensive policy review, and the nuclear provisions of the Compact took another three years to negotiate. The final version of the Compact was signed on June 25, 1983 and was approved in a plebiscite by the Marshallese that September, and President Reagan submitted the Compact to Congress in 1984. After making extensive modifications, Congress approved a final version in December 1985. The President signed the Compact of Free Association Act into law on January 14, 1986 (Pub. L. No. 99-239, 99 Stat. 1990) and by proclamation dated November 3, 1986, he declared the Compact to be in effect. Today, the Republic of the Marshall Islands (RMI) is a freely associated state.

## STATEMENT OF THE CASE

### A. Enewetak and Its Early History

27. The approximately 40 islands of Enewetak Atoll have a combined land area of approximately 2.75 square miles. The two largest islands are Enewetak Island, in the southeast quadrant of the atoll, which has a land area of 321.86 acres, and Enjebi Island, on the north rim, which has a land area of 290.58 acres. The islands of the atoll enclose a lagoon area of approximately 388 square miles. A map of Enewetak Atoll is attached as Exhibit B hereto.

28. The Enewetak people have traditionally been divided into two more or less separate and distinct communities located on the two largest islands on the atoll: the

ri-Enjebi, situated on Enjebi Island on the northern part of the atoll, and the ri-Enewetak, located on Enewetak Island, across the lagoon in the southeast quadrant of the atoll. The traditional settlement pattern of both communities was dispersed; residents were located on separate land parcels and were scattered along the length of the lagoon beach. Members of the two communities historically have intermarried and cooperated in certain economic activities, and now elect a common council. Nevertheless, the Enewetak people continue to maintain their hereditary ties to one or another of the two groups.

29. The people of Enewetak have always maintained a deep emotional attachment to their home islands and ancestral land. Under traditional Enewetak land tenure law and custom, every individual was - and still is - born with land rights in the islands of Enewetak Atoll and, collectively with the other members of the community, rights to the atoll's lagoon and its resources. Land is regarded as a commodity that cannot be sold, even to other members of the Enewetak community, but may only be passed from generation to generation. Ties to the land are therefore unusually strong. Throughout Enewetak history, land rights have never been sold or given away to outsiders except through fear of physical force or other sanction.

30. Prior to their removal from Enewetak Atoll in 1947, the people of Enewetak relied almost exclusively upon non-intensive agriculture, lagoon fishing, and various gathering activities for their material needs. Beginning in the early twentieth century, the people of Enewetak also produced copra (dried coconut meat) as an export crop for occasional purchases of imported items. The people remained economically self-sufficient and their life-style changed little from the time they first settled on Enewetak Atoll (probably in the fifth or sixth century) until World War II.

B. World War II and United States Occupation

31. During World War II, the Japanese made Enewetak Atoll a strategic base, fortifying the atoll and constructing an airfield on Enjebi. Several thousand Japanese military personnel occupied the atoll.

32. In February 1944, United States troops captured Enewetak Atoll from the Japanese.

33. Because of the military campaign, the people of Enewetak were severely in need of food, shelter, clothing, and medical attention when the American forces occupied the atoll. Indeed, eighteen Enewetak people had been killed during the battle for the atoll. The commanders of United States forces on the atoll therefore took the following measures to aid the people of Enewetak and to maintain order during the presence of active military operations on the atoll:

(a) On February 17, 1944, the Marine Corps gathered the inhabitants of Enjebi Island, who had all moved to unoccupied islands along the east fringe of the atoll, into a temporary camp and gave them food and medical supplies.

(b) On February 18, 1944, the inhabitants found on Enewetak Island were sent out to the U.S.S. Cambria to be given food and to be questioned. Later they were returned to shore and given shelter in a huge bomb crater. Food was sent ashore and its distribution assigned to the two chiefs. In the following days the military beachmaster had the crater enlarged, had a tarpaulin erected to provide temporary shelter, and issued the people blankets, clothing, food, and cooking utensils. As other Enewetak people were found on the atoll, they were brought to this shelter.

(c) On February 24, 1944, the inhabitants of this camp were moved to Aomon Island, also part of Enewetak Atoll. On February 25, the inhabitants of Enjebi were transferred to Aomon. Eventually, the total population of the atoll was gathered in the camp on Aomon.

(d) On February 24, 1944, the military government officers posted the proclamation issued by Admiral Nimitz described in paragraphs 17 and 159. On February 25, the officers held a meeting with the people of Enewetak in which the officers told the people that (i) they must all live on Aomon Island for the time being; (ii) they must not build fires at night; and (iii) they must cooperate to conserve food supplies and to develop indigenous food sources. The military officers also arranged to make the services of a doctor available to the people.

34. After July 4, 1944, when the Army unit left the atoll, the Navy continued feeding, clothing, and housing the Enewetak people on Aomon Island and adjacent Bijire Island. The Navy continued to provide and maintain all the supplies of food, clothing, housing, and other provisions until June 1946, when the Enewetak people were first removed from the atoll. During that time, the United States also organized efforts to redevelop indigenous food sources, restored a school, and provided medical care in a military hospital on Enewetak.

35. During the period February 1944 to late 1945, the United States military government controlled the access of the Enewetak people to the atoll. The Enewetak people were permitted to reside on Aomon and Bijire Islands, but many of the other islands in the atoll either were strictly off-limits to them or could be visited or resided on only with permission of the military government. The United States military government

also restricted access of the Enewetak people to large portions of the lagoon. During this period, the United States used portions of these islands and the lagoon for various military purposes, including storage of supplies, location of buildings, rifle target practice, marching, and training.

C. First Removal from Enewetak Atoll

36. In June 1946 the entire population of Enewetak Atoll was removed from the atoll prior to the commencement of Operation Crossroads, the first series of atomic tests at Bikini Atoll, Enewetak Atoll's eastward neighbor in the Marshall Islands. The United States officials who were in charge of Operation Crossroads decided that the evacuation was a necessary precaution against the possibility of damage to Enewetak Atoll and its people resulting from the tests. The people of Enewetak were transported by the Navy to Kwajalein Atoll on June 14, 1946. From June 14 to July 30, 1946, the Enewetak people were housed in temporary facilities there and provided with food and other supplies by the Navy. On July 25, 1946, after the detonation of atomic weapons at Bikini Atoll on June 30, Enewetak Atoll was declared safe. On July 30, 1946, the Enewetak people were returned to Aomon and Bijire Islands at Enewetak Atoll.

37. The people of Enewetak never consented or otherwise agreed to be evacuated from Enewetak Atoll and/or relocated to Kwajalein Atoll. Rather, they submitted to the operation in the face of statements and actions by United States officials which led them reasonably to believe that these officials were ordering them to relocate from their homes, that they were given no choice whether to relocate or not, that their objections would not be heard or considered, and that their cooperation was necessary to avoid the use of force by the United States. At no time were the Enewetak people

planning to move anywhere or desirous of moving anywhere, but were looking forward to improving conditions on their home islands.

38. During the period of residence of the Enewetak people on Kwajalein, United States officials directing the operation, through their actions and statements, as specified further in paragraph **90**, led the Enewetak people to believe, and the Enewetak people did in fact reasonably believe, the following:

(a) that their removal from Enewetak Atoll would be temporary;

(b) that they would be able to return to their homes on Enewetak at the conclusion of the temporary use of their atoll in connection with the Bikini atomic tests;

(c) that Enewetak Atoll would be returned to them in as good condition as when they were removed from it;

(d) that their temporary relocation was necessary in order to protect them against harm to their health resulting from operations being conducted on Bikini Atoll; and

(e) that throughout their relocation their needs for food, shelter, and other necessities would be fully met by the United States.

D. <u>Second Removal from Enewetak Atoll</u>

39. In June 1947, President Truman authorized planning for Operation SANDSTONE, a series of nuclear tests designed to develop a new series of weapons. On December 1, 1947, Enewetak Atoll was chosen to be the site for those tests.

40. On November 25, 1947, President Truman issued a Directive to the Secretary of Defense for the removal of the Enewetak people from Enewetak Atoll "preliminary to the carrying out of tests of atomic weapons early in 1948, and in accordance with the enclosed memorandum addressed to the president by the Chairman of the Atomic Energy Commission." President Truman's Directive and the AEC memorandum is attached as Exhibit C.

41. The memorandum attached to President Truman's Directive described the rights of the Enewetak people and the responsibilities and obligations assumed by the United States. The memorandum, <u>inter alia</u>, states,:

> (a) They [the Enewetak people] will be accorded all rights which are the normal constitutional rights of the citizens under the Constitution, but will be dealt with as wards of the United States for whom this country has special responsibilities.
>
> (b) The displacement of local inhabitants [the Enewetak people] will be kept to a minimum required for their own safety and well being and will not be accomplished merely for considerations of convenience.
>
> (c) The displacement of local inhabitants [the Enewetak people] will be effected by agreements reached with them regarding resettlement, including fully adequate provisions for their well being in their new locations.
>
> (d) The Atomic Energy Commission and the Secretary of Defense will undertake to supply to the State Department evidence sufficient to demonstrate in an international forum that in conducting such experimentation in Eniwetok (sic), the United States is not thereby subjecting the local inhabitants of the Trust Territory of the Pacific to perceptibly greater danger than, say, the people of the United States.

42. In a dispatch from Admiral Ramsey, the Chief of Naval Operations, dated 5 December 1947, the rights of the Enewetak people and the responsibilities and obligations of the United States were summarized as follows:

> Pursuant to orders from the President the Secretary of Defense has directed SECNAV to effect the evacuation of the natives of Eniwetok (sic). In recommending this action the Atomic Energy Commission stated that the inhabitants of the atoll would be accorded the normal constitutional rights accruing to U.S. citizens under the constitution and treated as wards of the United States; and that adequate provision would be made for them in their new location.

A copy of the dispatch is attached as Exhibit D.

43. The United States decided to remove the Enewetak people to Ujelang Atoll. That atoll had been developed as a commercial copra plantation1 using wage laborers from the Eastern Carolines, during the German and Japanese colonial periods. It was abandoned during World War II, however, and was uninhabited at the beginning of December 1947. Ujelang Atoll is small, resource poor, remote, and isolated.

44. In December 1947, John P.W. Vest, Captain, U.S. Navy, and the United States Governor of the Marshall Islands, arrived on Enewetak Atoll and informed the Enewetak people that within days they would have to leave their atoll and that they would be moved. Captain Vest understood and communicated to the Enewetak people that the use of Enewetak would be temporary and that the Enewetak people would be able to return to their homeland within 3 to 10 years.

45. In December 1947, the entire population, carrying what they could of their personal belongings, left Enewetak Atoll aboard a U.S. Navy LST vessel. On December 21, 1947, the Enewetak people arrived at Ujelang Atoll.

46. The people of Enewetak never consented or otherwise agreed to be evacuated from Enewetak Atoll and/or relocated on Ujelang Atoll. Rather, they submitted to the relocation and the taking of their home atoll in the face of statements and actions by United States officials which led them reasonably to believe that these officials were ordering them to relocate from their homes, that they were given no choice whether to relocate or not, that their objections would not be heard or considered, and that their cooperation was necessary to avoid the use of force by the United States. At no time were the Enewetak people planning to move anywhere or desirous of moving anywhere, but were looking forward to improving conditions on their home islands.

47. During the period of the removal of the Enewetak people to Ujelang Atoll and afterwards, United States officials, through their actions and statements, as specified in paragraphs 40-42, 44 and further specified in paragraphs 162-166, led the Enewetak people to believe, and the Enewetak people did in fact reasonably believe, the following:

(a) that their removal from Enewetak Atoll would be temporary;

(b) that they would be accorded the normal constitutional rights accruing to U.S. citizens under the Constitution;

(c) that they would be able to return to their homes on Enewetak at the conclusion of the temporary use of their atoll by the United States;

(d) that Enewetak Atoll would be returned to them in as good condition as when they were removed from it;

(e) that their temporary relocation was necessary in order to protect them against harm to their health resulting from operations on their atoll;

(f) that they would not be subjected to any greater dangers from the nuclear tests than citizens of the U.S.; and

(g) that throughout their relocation their needs for food, shelter, and other necessities would be fully met by the United States.

48. The people of Enewetak never consented or otherwise agreed to remain on Ujelang Atoll. Rather, they remained in residence there until the United States permitted them to return to Enewetak Atoll in the face of statements and actions by United States officials which led them reasonably to believe that these officials would not permit them to return to Enewetak Atoll until the conclusion of its use and occupancy by the United States.

49. The people of Enewetak never intended to convey, and never in fact conveyed, any right, title, or interest in Enewetak Atoll to the United States.

50. During the period of their residency on Ujelang Atoll, United States officials, through their actions and representations, continued to lead the Enewetak people to believe, and the Enewetak people did in fact reasonably believe, the accuracy of the information set forth in paragraph 47.

E. Conditions on Ujelang

51. Ujelang Atoll is the westernmost and most geographically isolated of the inhabited atolls and islands comprising the Marshall Islands. It lies 124 miles southwest of Enewetak Atoll and 617 miles west of Majuro, the capital and the major commercial port for the Marshall Islands. Ujelang Atoll has 0.67 square miles of dry land area and 25.47 square miles of lagoon surface area, much less than Enewetak Atoll's 2.75 square miles of dry land area and 388 square miles of lagoon surface area. Ujelang Island, the

largest of the atoll's islands, is rocky and unproductive as compared with the principal islands of Enewetak Atoll.

52. As described in paragraph 43, Ujelang Atoll was uninhabited at the time the Enewetak people moved there, and no one had been living there for several years. Useless brush had grown up everywhere and there were no breadfruit trees.

53. During the period just before and shortly after the Enewetak people moved to Ujelang, United States Navy personnel constructed temporary housing, rain catchments, and several other buildings there. All United States personnel left Ujelang shortly thereafter, leaving some food supplies, but also leaving the Enewetak people completely isolated from the rest of the world except through infrequent and irregular visits by Trust Territory field trip ships. The Enewetak people remained isolated on Ujelang until they were able to return to Enewetak in 1980.

54. Ujelang's resources were inadequate to supply the Enewetak people with a regular supply of food and other material necessities. This lack of resources, combined with the infrequent and irregular ship visits, resulted in periods of extreme hunger and material deprivations. The inadequacy of export resources and the lack of incentive to produce trade goods caused by the infrequent and uncertain ship visits resulted in severe shortages of imported rice, flour, and materials for repair of buildings and boats.

55. By 1952, most of the Enewetak people's sailing canoes were rendered unusable by a severe shortage of sailcloth, paint, fishing net material, and hooks. In response to the Enewetak people's repeated request's for these materials, a special field trip ship arrived in December 1952, but brought only enough sailcloth for two canoes, paint that was unsuitable for the canoes, and little else of use.

56. Production of copra - the chief export crop - gradually diminished during the period on Ujelang. The inadequacy of Ujelang's resources and the infrequency and unreliability of field trip ship visits created food shortages that induced the people to eat the coconuts instead of making copra to sell.

57. In the mid-1960s there was a great increase in the island's rat population, which fed off and destroyed the stored copra and the supplies of imported rice and flour. The proliferating rat population became a menace to the children and adults on Ujelang, who had to sleep in wooden boxes for protection.

58. By 1967, food was so short that the people on Ujelang had only enough for one meal each day. The housing supply was greatly deteriorated because of the lack of materials for maintenance and repair, and several buildings had been destroyed by a typhoon.

59. On October 20, 1967, a Trust Territory ship arrived to find the people on Ujelang with no copra to sell and no money to buy needed food and supplies. Almost all of the nearly 300 people of the atoll boarded the ship and demanded transport to Majuro to protest to the government that they were starving. A Trust Territory official, after seven hours of efforts to persuade the people to leave the ship, radioed for food and agreed to stay on Ujelang until the supply ship returned. The supply ship returned with food on November 3, 1967.

60. In December 1967, the High Commissioner of the Trust Territory began a small-scale relief effort for the Enewetak people, but by November 1968 the people on

Ujelang were totally out of rice, flour, sugar, and other imported goods. Ten deaths resulted from very serious measles and chicken pox epidemics in 1968.

61. In June 1972, a typhoon destroyed the breadfruit crop on Ujelang. On August 30, 1972, a supply ship found that the Enewetak people had been out of rice, flour, sugar, and canned meat for over two weeks.

62. The specific instances of deprivation described in paragraphs 54-61 are only illustrative. Deprivation of these and other types were repeatedly suffered by the people of Enewetak during the time they were on Ujelang.

63. The suffering and hardship of the Enewetak people while on Ujelang was noted by the U.S. Department of Interior in a letter to the President of the US Senate dated January 14, 1978 which stated in relevant part:

> The people of Enewetak Atoll were removed from their home atoll in 1947 by the U.S. Government in order that their atoll could be used in the atomic testing program. The people were promised that they would be able to return home once the U.S. Government no longer had need for their islands. . . During the thirty years that the Enewetak people have been displaced from their home atoll they have suffered grave privations, including periods of near starvation, in their temporary home on Ujelang Atoll. The people have cooperated willingly with the U.S. Government and have made many sacrifices to permit the United States to use their home islands for atomic testing purposes.

F. U.S. Use and Occupancy of Enewetak

64. The United States exclusively used and occupied Enewetak Atoll from 1947 to 1980 under a series of temporary takings and for a variety of purposes including nuclear weapons testing, intercontinental ballistic missile testing, high energy rocket testing, cratering experiments, and the study of marine biology. During this period, the

U.S. prevented the Enewetak people from returning to Enewetak, while maintaining their ultimate right to return.

65. Between April 1948 and August 1958, Enewetak Atoll was the site of 43 atomic and thermonuclear (hydrogen) bomb tests. The tests began with Operation SANDSTONE, in April and May 1948, a series of three atomic weapons blasts ranging in strength from 18 to 49 kilotons. Operation GREENHOUSE, held in April and May 1951, included four atomic tests. In November 1952, the atoll was the site for Operation IVY, which included the world's first thermonuclear explosion, estimated at 10.4 megatons (750 times greater than the Hiroshima bomb), as well as a "high yield" 500" kiloton atomic bomb explosion. In Operation REDWING, held from May through July 1956, 12 atomic and hydrogen bomb tests were conducted. In Operation HARDTACK, held from May through August 1958, 22 thermonuclear devices were exploded.

66. The tests listed in paragraph 60 were detonated in the air, on towers, on the surface of islands and reefs, on barges, and underwater. Some of the "ground zeros," or surface level explosions, were on the islands themselves, some were on the reef, some were in the lagoon, and one was in the ocean nearby. In addition, two plutonium experiments were conducted on the island of Runit in which the devices did not fully detonate but instead sprayed chunks of plutonium across the island.

67. The U.S. Department of Energy described the devastating effects of the nuclear tests as follows:

> The immense ball of flame, cloud of dark dust, evaporated steel tower, melted sand for a thousand feet, 10 million tons of water rising out of the lagoon, waves subsiding from a height of eighty feet to seven feet in three miles were all repeated, in various degrees, 43 times on Enewetak Atoll.

See, U.S. DOE, Enewetak Radiological Support Project, Final Report, NVO-213, September 1982.

68. Nuclear testing on Enewetak ended with the last Operation HARDTACK test on August 18, 1958. On August 22, 1958, President Eisenhower announced a suspension of further atmospheric testing, to take effect October 31. The Nuclear Test Ban Treaty, which banned atmospheric and underwater testing, entered into force on October 17, 1963.

69. During the 1960's, Enewetak was the target and impact area for tests of Intercontinental Ballistic Missiles fired from Vandenberg Air Force Base in California.

70. In 1968 and 1970, two test firings of a developmental HEUS rocket motor were conducted on Enjebi Island by the U.S. The rocket motors tested each contained 2,500 pounds of propellant of which 300 pounds was beryllium. Beryllium is toxic to man when inhaled and lodged in the lungs. The first test, in April 1968, resulted in an unexpected explosion which scattered propellant, including beryllium, over the western tip of Enjebi. The second test in January 1970 fired successfully scorching the land but did not result in an explosion.

71. The Pacific Cratering Experiments Program (PACE) of the United States Defense Nuclear Agency and the Air Force occurred in the 1970's and involved the detonation of charges of high explosives to provide a means of predicting the impact of nuclear detonations upon strategic defense installations. This resulted in twelve detonations of 1,000 pound charges, drilling of over 190 holes into various islands of the atoll from 200 feet to 300 feet in depth, movement of 185,000 cubic yards of soil, and the digging of 86 trenches on various islands each 7 feet deep.

72. In October 1972, the United States District Court for the District of Hawaii granted a preliminary injunction to the people of Enewetak under the National Environmental Policy Act prohibiting further work on PACE until adequate environmental impact studies were conducted. People of Enewetak v. Laird, 353 F. Supp. 811 (D. Hawaii 1973). On June 8, 1973, the Air Force terminated the PACE program on Enewetak.

73. The nuclear testing program, missile testing, rocket test firings, and the cratering experiments program caused serious damage to Enewetak Atoll. Five islands in the atoll - Bokombako (sometimes referred to as Elugelab), Louj (sometimes referred to as Lidilbut), Bokaidrik, Boken(including a small unnamed islet to the west of Boken), and Eleleron - were completely or partially vaporized by the nuclear tests. The remaining islands on the north half of the atoll, where the nuclear testing, rocket test firings and cratering experiments occurred, were severely damaged. The major residential island of Enjebi, was heavily contaminated with radioactivity, as was the island of Runit. Debris and wreckage -- radioactive and nonradioactive -- littered many of the islands. The atoll's lagoon was seriously damaged. Large bomb craters covered many of the islands. The entire atoll was agriculturally devastated: vegetation was completely stripped from many of the islands, and nearly all plants of agricultural and economic value on the atoll were totally destroyed.

74. Prior to 1980, the Enewetak people had no way of determining the extent of the damages to their atoll because they were isolated on Ujelang Atoll and were prevented by the U.S. from returning to Enewetak.

G. Partial Rehabilitation and Resettlement of Enewetak Atoll

75. On April 18, 1972, Franklin Williams, the United States Special Representative to the Micronesian Political Status Talks, announced that the United States would return Enewetak Atoll to the people of Enewetak by the end of 1973.

76. In October 1973, the United States Atomic Energy Commission published a radiation survey of the atoll which proposed a plan for a nuclear cleanup operation. From 1972 until 1977, various United States government agencies engaged in studies and planning for radiological cleanup and rehabilitation programs.

77. From May 1977 to April 1980 the United States undertook cleanup efforts. Some members of the Enewetak community participated in the cleanup operation, and for that purpose resided on Enewetak Atoll temporarily and periodically during that period. In October 1980, the Enewetak people returned to Enewetak Atoll.

78. Despite the cleanup efforts, the Enewetak people have been able to resettle only the southern portion of the atoll. The northern islands, including the major residential island of Enjebi, remain off limits because of concerns that the remaining radioactivity (principally from cesium and strontium) renders these islands dangerous for habitation, agriculture, and many other uses for a period estimated to be approximately twenty years to fifty years.

79. The Enjebi island members of the Enewetak community are still unable to return to their home island of Enjebi and to their other northern islands because of concerns of residual radiation contamination.

80. Notwithstanding the cleanup effort, the islands listed in paragraph 73, which before the testing were productive and economically valuable, have been totally or partially vaporized.

81. Notwithstanding the cleanup operation, and in part as a result of this operation, Runit Island has been rendered totally unusable. It presently contains more than 110,000 cubic yards of plutonium-contaminated soil and debris that during the cleanup operation were collected from throughout the atoll, mixed with cement and water to form a slurry, placed in a bomb crater on Runit, and covered by a concrete dome 18 inches thick and 370 feet in diameter. Runit is expected to be extremely radioactive and dangerous for at least the next 24,000 years and therefore requires a long-term stewardhip program similar to long-term stewardship programs, including a regular monitoring regime, for waste sites containing radioactive material required in the United States.

82. The cleanup efforts did not repair the damage to the atoll' s lagoon set forth in paragraph 73.

83. In connection with the cleanup efforts, extensive amounts of plant material and topsoil that were contaminated with plutonium were removed, doing further longterm damage to the agricultural productivity of the atoll. Agriculture, livestock raising, and certain foraging activities are now limited to the southern islands. As a result of these changes, the people of Enewetak are dependent for their diet upon a supplemental food program conducted by the United States, and will remain so for several years to come.

84. Notwithstanding the cleanup effort, public concern about the radioactivity level of food produced on Enewetak Atoll threatens to reduce the ability of the Enewetak people to market their agricultural product, particularly copra, as a cash export crop. In

addition, public concern about the radioactivity level at Enewetak continues to threaten any type of economic development.

85. The Enewetak people were unable at any time prior to 1980 to resettle their atoll and determine the full extent and duration of their claim.

H. 1980s U.S. Claims Court Cases

86. After their return to Enewetak in 1980, the Enewetak people were, for the first time, able to determine the duration of the temporary taking and the extent of the damages, although the full effects of harmful radiation on their atoll has yet to be determined.

87. On September 15, 1982, plaintiffs filed a Complaint in this court seeking, inter alia, compensation from the U.S for the temporary taking of their Atoll, and compensation for the breach of an implied-in-fact contract. See Johannes Peter, et al., v. United States, Docket No. 461-82L.

88. In 1981 two other groups of Marshall Islanders sought compensation from the U.S. for damages relating to the nuclear testing program: the people of Bikini (Tomaki Juda, et al., v. United States, Docket No. 172-81L) and the peoples of other Northern Marshall atolls and islands directly downwind from the test sites (twelve cases consolidated under the lead case Limojwa Nitol, et al., v. United States, Docket No. 453-81L).

I. Procedural history of the Claims Court Cases

89. The cases filed in the Claims Court in 1981 and 1982 were suspended for more than a year "in order to avoid interference with the [Micronesian political status] negotiations, and to permit the parties to explore diplomatic resolution of the claims."

Juda v. United States, supra, 6 Cl. Ct. 441, 445 (Cl. Ct. 1984). The Court terminated the suspension in 1983, rejecting the Government's political question argument and noting that the "impact on foreign policy [of letting the cases proceed] is not clear, and at best is very indirect," adding that these are "money claims which are the grist of the judicial mills, particularly the function of this court." Transcript of proceedings in Juda, (April 13, 1983).

90. The court denied the U.S. Government's motions to dismiss in all three cases. In Juda, the court held that the Bikinians had stated claims under the Tucker Act for takings in violation of the Fifth Amendment and for breach of an implied-in-fact contract that created fiduciary obligations to the people of Bikini. The court also held that the claims were not barred by sovereign immunity or the statute of limitations. Juda v. United States, supra. As to the takings claim, the court held that "[a]ll restraints of the Bill of Rights are applicable to the United States wherever it has acted." Id. at 458.

91. In the Enewetak case, the court held that the complaint properly stated a claim under the Tucker Act for breaches of an implied-in-fact contract that imposed fiduciary obligations on the United States, but it also held that the statute of limitations barred the takings claims. Peter v. United States, 6 Cl. Ct. 768 (1984). That ruling with respect to the taking claims was appealed by plaintiffs on the grounds that the court erred in dismissing the takings claims because the taking was temporary and plaintiffs had no way of knowing the extent and duration of the taking until 1980 when they were permitted to return to Enewetak

92. In the other 12 cases, the court held that the complaints properly stated claims under the Tucker Act for an unlawful taking. Nitol v. United States, 7 Cl. Ct. 405 (1985).

I. Provisions of the Compact and the Section 177 Agreement re nuclear claims.

93. While the Juda, Peter, and Nitol cases were pending in the Court of Claims, the Compact of Free Association went into effect.

94. Section 177(a) of the Compact provides that the U.S. Government "accepts the responsibility for compensation owing to citizens of the Marshall Islands . . . for loss or damage to property and person" resulting from the U.S. nuclear testing program. Section 177(b) provides that the United States and the Marshall Islands would negotiate a separate agreement for the "just and adequate settlement of all such claims." Compact of Free Association Act of 1985 (the "Compact Act"), Pub. L. No. 99-239, 99 Stat. 1770 (1986), Tit. II, Sec 201, Art. VII, §§ 177(a), (b).

95. Pursuant to Section 177(b), the governments negotiated a separate "Agreement Between the Government of the United States and the Government of the Marshall Islands for the Implementation of Section 177 of the Compact of Free Association" ("Section 177 Agreement"). This agreement established a $150 million trust fund, the income from which was earmarked, in part, for distribution to the peoples of Bikini, Enewetak, Rongelap and Utrik and the Nuclear Claims Tribunal. $3.25 million per year for a 15 year period was earmarked for the Enewetak people, of which 52% was deposited in a perpetual trust fund and the remainder distributed to the Enewetak people on a per capita basis.

96. About $3 million per year of the income of the $150 million trust fund went to a Nuclear Claims Tribunal, which was established to have "jurisdiction to render final determination upon all claims past, present and future, of the Government, citizens and nationals of the Marshall Islands which are based on, arise out of, or are in any way related to" the U.S. nuclear testing program. Section 177 Agreement, Art. IV §1(a).

97. Article X, Section 1, of the Section 177 Agreement, entitled "Espousal," purports to extinguish all claims of Marshall Islanders related to the U.S. nuclear testing program. It provides:

> This Agreement constitutes the full settlement of all claims, past, present and future, of the Government, citizens and nationals of the Marshall Islands which are based upon, arise out of, or are in any way related to the Nuclear Testing Program, and which are against the United States, its agents, employees, contractors and citizens and nationals, and of all claims for equitable or any other relief in connection with such claims including any of those claims which may be pending or which may be filed in any court or other judicial or administrative forum, including the courts of the Marshall Islands and the courts of the United States and its political subdivisions.

98. Article XII of the Section 177 Agreement, entitled "United States Courts," provides:

> All claims described in Articles X and XI of this Agreement shall be terminated. No court of the United States shall have jurisdiction to entertain such claims, and any such claims pending in the courts of the United States shall be dismissed.

99. In the event that these two articles proved ineffective to settle the Claims Court cases and withdraw jurisdiction over them, Article XI of the Agreement provides

that the Marshall Islands shall indemnify and hold harmless the United States for any liability it may incur on Article X claims, up to $150 million.

100. Although the Compact of Free Association Act incorporates the Section 177 Agreement by reference, the Congressional statute modified to some extent the effect of these (and other) provisions of the Compact. In particular, Section 103(g) alters the effect of Articles X and XII. It reiterates the "intention" to achieve a "full and final settlement of all claims," but it conditions the jurisdictional withdrawal of jurisdiction in Article XII on the validity of Article X.

J. Court's ruling on the effect of the Section 177 Agreement on claims

101. When the Compact went into effect, the court directed the parties in the Juda, Peter and Nitol cases to submit briefs on whether Congress had withdrawn the consent of the United States to be sued in the U.S. Claims Court. In a memorandum of decision in the Juda case filed November 10, 1987, the court dismissed the complaint on the ground that Article XII of the Compact Section 177 Agreement amends the Tucker Act, thus withdrawing the United States' consent to be sued for these claims. Juda v. United States, 13 Cl. Ct. 667, 689 (1987). Similar orders were filed in the Peter (13 Cl. Ct. 691 (1987)) and Nitol cases (13 Cl. Ct. 690 (1987)).

102. The court in Juda asserted that the Section 177 Agreement establishes an alternative procedure for compensation of property. The court said:

- [I]n none of these cases has Congress abolished plaintiffs' claims. The Compact recognizes the United States obligation to compensate for damages from the nuclear testing program and the Section 177 Agreement establishes an alternative tribunal [the Nuclear Claims Tribunal] to provide such compensation.
- Whether the compensation in the alternative procedures . . is adequate is dependent upon the amount and type of

compensation that ultimately is provided through those procedures.

- Whether the settlement provides 'adequate' compensation cannot be determined at this time.
- This alternative procedure for compensation cannot be challenged judicially until it has run its course. Juda v. United States, 13 Cl. Ct. at 688, 689.

K. Appeal of Claims Court Dismissal

103. Appeal of the Claims Court decisions were brought by the Enewetak people and other Marshall Islanders (the Peter and Nitol plaintiffs). See, People of Enewetak, Rongelap, and other Marshall Islands Atolls v. United States, 864 F. 2d 134 (Fed. Cir. 1988). The people of Bikini (the Juda plaintiffs) also appealed the Claims Court decisions, but during the pendency of the appeal, they voluntarily dismissed the Juda case as part of a $90 million settlement with the United States.

104. The Enewetak people appealed the dismissal on several grounds, including the ground that the compensation provided under the Compact was inadequate and did not constitute just compensation under the Constitution.

105. The United States Court of Appeals for the Federal Circuit noted the responsibility accepted by the United States under the Compact. It said: "Under section 177 of the Compact, the United States government accepted responsibility for the just compensation owing for loss or damage resulting from its nuclear testing program." People of Enewetak, 864 F. 2d at 135.

106. The Court of Appeals in affirming the ruling of dismissal of the Claims Court reached a conclusion similar to that of the Claims Court: "[P]ursuant to Article XII of the section 177 Agreement, the consent of the United States to be sued in the Claims Court, on appellants' claims arising from the nuclear testing program conducted by the

United States in the Marshall Islands, had been withdrawn in conjunction with the establishment of an alternative tribunal to provide just compensation." Id. at 136.

107. The adequacy of the $150 million dollar settlement amount in the 177 Agreement was the principle issue on appeal. The Court of Appeals indicated that the challenge to the adequacy under the Compact was premature. The Court said: "Congress intended the alternative procedure [the Nuclear Claims Tribunal] to be utilized, and we are unpersuaded that judicial intervention is appropriate at this time on the mere speculation that the alternative remedy may prove to be inadequate." Id.

I. Claim in the Nuclear Claims Tribunal

108. After dismissal of their Complaint in the U.S. courts, the plaintiffs, on July 16, 1990, filed a class action (the "Enewetak Claim") in the Nuclear Claims Tribunal (hereinafter "Tribunal") which was the alternative forum agreed upon by the United States and the Marshall Islands to determine the nature and extent of the damages resulting from the nuclear testing program and to provide just compensation.

109. The Tribunal was formally established in 1987 when, pursuant to the Section 177 Agreement, the Marshall Islands legislature, the Nitijela, passed the Nuclear Claims Tribunal Act (the "NCTA"). Section 7 of the NCTA states: "It is the express intent of the Nitijela that this Chapter be interpreted so as to comply with the requirements for the establishment of a claims tribunal as set forth in the Section 177 Agreement."

110. Since the United States government accepted responsibility for the just compensation owing for loss or damage resulting from its nuclear testing program under

section 177 of the Compact, the Tribunal concerned itself with assessing the validity, nature and extent of damages resulting from the nuclear testing program

111. The proceedings in the Tribunal were adversarial in nature with a statutorily prescribed Defender of the Fund defending claims against the $150 million trust fund with authority, pursuant to Section 18 of the NCTA, to assert a number of defenses, including inter alia, defenses concerning the validity of the claim, the nature and extent of the damages, the quantification of damages, and other defenses deemed proper by the Defender of the Fund.

112. In the Enewetak Claim, the Defender of the Fund opposed certain claims by the claimants, presented his own evidence on the quantification of restoration and hardship damages, secured the assistance of an appraisal expert for the appraisal of Enewetak, secured the assistance of health physicists to present testimony to the Tribunal on radiation cleanup standards and quantification of radiological remediation, secured the assistance of an engineer to address resettlement costs, and secured the assistance of an anthropologist to address the hardship experienced by the Enewetak people as a result of their exile from their homeland. The Defender of the Fund also had an opportunity to cross-examine claimants' witnesses and rebut any testimony presented by claimants.

113. In the Enewetak Claim, the Enewetak people presented evidence on their claims for loss of use of their land, the costs to restore and remediate their property, and the hardship suffered by the Enewetak people during their period of forced relocation. Expert appraisers addressed damages for the loss of use their land. Health physicists presented evidence on radiation cleanup standards and quantification of radiological remediation. Soil and agriculture experts presented evidence on the cost of rehabilitation

of the soil and the cost of reintroduction of food bearing plants. An engineer testified as to the cost of resettling Enjebi Island by the Enejbi people. An anthropologist who resided with the Enewetak people on Ujelang and Enewetak testified to the hardships they suffered due to their exile from Enewetak and life on Ujelang, and the Enewetak people testified as to the suffering and hardship experienced by them on Ujelang and other damages they suffered as a result of the nuclear testing program.

M. The Tribunal Award

114. On April 13, 2000, the Tribunal issued a Memorandum of Decision and Order ("Enewetak Decision") in the class action property damage claim of the People of Enewetak. In deciding the first property damage claim, the Tribunal stated that "The goal of compensation, where there has been harm to property, should be to make the owner whole through the award of proper damages." In the Matter of the People of Enewetak, et al., NCT No. 23-0902, Memorandum Decision and Order ("Enewetak Decision"), April 13, 2000, at 3. A copy of the Enewetak Decision is attached as Exhibit E and incorporated by reference.

115. The Enewetak Decision addressed each of the three categories of damages sought by the Enewetak people: (1) the costs to restore and remediate their property; (2) the loss of use of their property; and (3) the hardships suffered by the Enewetak people during their period of forced relocation.

116. With regard to cost to restore and remediate Enewetak, the Tribunal first needed to establish a cleanup standard. The standard adopted by the Tribunal was the U.S. EPA cleanup standard applicable to all U.S. CERCLA sites (e.g., all DOE weapons test sites). Enewetak Decision, at 16 -17.

117. In considering the various alternatives for radiological cleanup of Enewetak to the established standard that were presented, the Tribunal considered a number of options which ranged to a high of $974 million. The Tribunal considered less costly options and acknowledged that "Soil removal is a tested technology, and was utilized by the U.S. in Enewetak in past cleanup efforts." Based on the estimated volume of contaminated soil to be removed and replaced (from dredging the lagoon), the Tribunal awarded $22.5 million for this activity. In addition, the Tribunal found that the most effective alternative for disposal of the contaminated soil was to use it to construct a causeway between two islands. The Tribunal stated that such action "more fully protects the residents from risk of harm from exposure to radiation compared to other feasible local disposal options" and awarded $31.5 million for this activity. Id. at 23.

118. Expert testimony presented to the Tribunal was in agreement that the major pathway of radiation exposure to residents of Enewetak would be ingestion of locally grown foods and that the primary radionuclide of concern was Cesium 137. The Tribunal determined that application of potassium to the soil has been shown to block the uptake of Cs-137 in the atoll's environment. Such treatment, including ongoing monitoring, will be required for approximately 100 years and the Tribunal awarded $15.5 million for this activity. It also awarded $17.7 million for soil rehabilitation and revegetation for a period of up to 50 years until the land is self sustaining. Id. at 24.

119. The Tribunal also found that on Runit, the fifth largest island in the atoll, the residual Plutonium 239 from the tests exceeds the established limit and the island remains quarantined from use. Stating that "Techniques now exist to clean up this plutonium, utilizing soil sorting methods applied at Johnston Atoll," the Tribunal

awarded $10 million for that activity. The Tribunal also awarded $4.51 million for characterization surveys to provide information as to the exact location and nature of the contaminated soil to be removed and to ensure compliance with the prescribed cleanup standard. Id. at 21.

120. On May 5, 2000, the Enewetak Decision was amended to include an additional $16.1 million as the cost to restore the soil and revegetate the 558 acres subject to soil removal as part of the radiological cleanup. The Order amending the Enewetak Decision is attached as Exhibit F and incorporated by reference.

121. The gross total awarded by the Tribunal for restoration and cleanup of Enewetak is $117,810,000. In its Decision and Order, however, the Tribunal noted that "This total must be adjusted by the amount of the Enjebi Trust Fund, which the parties stipulated to be $10,000,000." The net total awarded for restoration and cleanup after this deduction is $107,810,000.

122. For loss of use, the Tribunal decision acknowledged that "Both the United States and Marshall Islands Constitutions prohibit the taking of private property for public use without just compensation" and noted that "Representatives of the U.S. government committed that the relocated inhabitants of Enewetak would 'be accorded all rights which are normal constitutional rights of citizens under the (U.S.) Constitution.'" Id. at 4

123. The Tribunal decision referred to a U.S. Supreme Court determination of damages for lost use [Kimball Laundry Co. v United States (1949) 338 US 1] in which it concluded that "the proper measure of such compensation is the rental that probably could have been obtained." In the Enewetak claim, the Tribunal calculated the value of

the loss of use by multiplying the relevant annual rental value by the affected acreage and summing these values for the years the use of the land was lost to the owners. Id. at 9.

124. To address that value, the Tribunal relied on a joint appraisal report offered by a team of experts consisting of two appraisal firms, one selected by the claimants and one by the Defender of the Fund. While the appraisers acknowledged that there are circumstances in the Marshall Islands property ownership situation that create challenges to traditional appraisal methods, they also found that the transfer of land use rights for money has gained social acceptance and that from such transfers an analysis of comparables can be conducted on which relevant annual rental values can be based. Id. at 7-8.

125. The Tribunal decision states that "The period of loss of use had two elements: (1) past loss, which began on December 12, 1947 (the date that the people were relocated from Enewetak to Ujelang) and ran until the date of valuation, and (2) future loss, which began on the date of valuation and continues until such time in the future as the affected property is returned to the people of Enewetak in usable condition, determined by the parties to be 30 years from the effective date of the valuation or May 17, 2026." Id. at 6.

126. The Tribunal's analysis of 174 transactions determined to be comparable to the property at issue resulted in annual rental values ranging from $41 per acre in 1947 to $4,105 per acre in 1996. An adjustment for the deferred nature of the compensation for past loss of use was made by adding an interest component to the rental values, compounded using the average U.S. Treasury 30-year bond rate. Based on the annual

rental rates, the affected acreage, and number of years, the Tribunal determined rental values for past lost use (including interest) amount to $304,000,000. Id. at 9

127. The Tribunal decision also noted, however, that "These values must be further adjusted for compensation already received by the People of Enewetak." Such compensation included payments made to the people of Enewetak in the amounts of $175,000 in 1956; $1,020,000 in August 1969; $750,000 in September 1976; $750,000 in December 1978; and annual payments of $3,250,000 from 1987 through 1999 pursuant to the Section 177 Agreement. In addition, "In the case of Ujelang, the annualized use value for each year between 1947 and 1980 (when the people returned to Enewetak) is set off against the respective annual loss of use values for Enewetak. Therefore, the Tribunal determined that "The value of past lost use, adjusted for prior compensation, is $149,000,000." Id. at 10-11.

128. The Tribunal decision noted that to determine the compensation for future loss of use, the appraisers utilized an income capitalization approach. This method is used to convert a single year's income into an indication of present value by dividing the most current stabilized income by an appropriate rate of return, determined to be eight percent. The calculated value was adjusted downward to reflect the annual $3,250,000 payments to the people of Enewetak under the Section 177 Agreement for 2000 and 2001. The adjusted value of the award by the Tribunal for lost future use of Enewetak is $50,154,811. Id. at 12.

129. On August 3, 2000 the Enewetak Decision was further amended to address the effect on the award of the gap in time between the date of valuation of past and future loss of use (January 24, 1997) and the date of the award in the Enewetak Decision (April

13, 2000), and to address interest from the date of the award as amended since the Tribunal was unable to make an immediate payment on the award. The amendment resulted in an addition of $47.7 million to the award for the interest on the award from the date of valuation to date of award. The amendment further resulted in an award of post judgment interest in the amount of 7% per year on the net loss of use damages of $244 million and restoration damages of $107,810,000. The August 3, 2000 Order amending the Enewetak Decision is attached as Exhibit G and is incorporated by reference.

130. In its decision, the Tribunal noted that extensive and compelling evidence was presented regarding the hardships suffered by the people of Enewetak during their relocation to Ujelang. Conditions there were characterized by famine, near starvation, and death from illness due to the severe limitations of the environment and resources on Ujelang. There were also polio and measles epidemics, an uncontrollable infestation of rats, and infrequent and irregular field trip ship service. Enewetak Decision, at 28-29.

131. In its decision, the Tribunal stated that "the conditions suffered by those relocated go far beyond simple annoyance." In determining the appropriate amount of compensation, the Tribunal adopted an approach based on an annual amount for each person on Ujelang for each of the 33 years between 1947 and 1980. Recognizing that the period of greatest suffering was from 1956 to 1972, the Tribunal awarded an annual per person amount of $4,500 for each of those 16 years. For the remaining 17 years, preceding and following that period, the annual amount is $3,000. This means that an individual who was present on Ujelang for all 33 years will receive $123,000. Based on the annual population figures for Ujelang during 1947 to 1980 and the per annum amounts, the damages for hardship amount to $34,084,500. Id. at 32-33.

132. The net total of the Tribunal award as amended in the Enewetak claim is $385,894,500. This includes $244 million for past and future loss of use of Enewetak Atoll, $107,810,000 to restore the atoll to a safe and productive state, and $34,084,500 for the hardships suffered by the people as a result of their relocation to Ujelang. Interest on the loss of use and restoration portions of the award accumulate at the rate of 7% per annum.

133. On March 5, 2001 the Tribunal issued a Memorandum of Decision and Award in the class action of the Bikini people entitled In the Matter of the People of Bikini, et al., NCT No. 23-04134 (Bikini Decision). The Tribunal awarded the Bikini people a total of $563,315,500 for property and consequential damages. Of that amount, $278 million was for past and future loss of use; 251.5 million was for restoration; and $33,814,500 was for hardships suffered as a result of their relocation.

134. In February 2002, the Tribunal was able to only pay the Enewetak people and the Bikini people a sum which was 0.25% of their then respective awards. The amount received by the Enewetak people was $1,078,750 and the amount received by the Bikini people was $1,491,809.

135. In February 2003 the Tribunal was able to only pay 0.125% towards the Enewetak and Bikini awards. The amount received at that time by the Enewetak people was $568,733.00; and the amount received by the Bikini people was $ 787,370.00.

136. The total amount received by the Enewetak and Bikini people is less than one-half of one-percent of the amount awarded.

137. Since February 2003 the Tribunal has made no payment towards the Enewetak or Bikini awards. The Tribunal has exhausted the $45 million earmarked for it in the 177 Agreement by making payments towards the personal injury awards which exceed $80 million. The $150 million trust fund established pursuant to the 177 Agreement is virtually exhausted due to the payments required to be made pursuant to the 177 Agreement and payments made to persons to whom the Tribunal has awarded personal injury awards. The $150 million trust fund is now less than $5 million. The Tribunal is unable to pay all the awards made for personal injury and at the present time has no means by which to make any payment to the Enewetak people for their award.

N. Changed Circumstances Petition

138. The Compact in Article IX (the Changed Circumstances Clause) provides for possible additional compensation, if loss or damages to persons or property arose or were discovered that could no reasonably have been identified as of 1986, the effective date of the Compact, and if such injuries rendered the provisions of the Compact "manifestly inadequate."

139. On September 11, 2000, the Marshall Islands presented to the U.S. Congress a "Petition Presented to the Congress of the United States of America Regarding Changed Circumstances Arising from U.S. Nuclear Testing in the Marshall Islands." The Petition was resubmitted on November 14, 2001. The Petition details injuries and damages resulting form the nuclear testing program that have arisen, been discovered, or have been adjudicated in the Marshalls since the Compact took effect. The Petition states that these injuries and damages could not reasonably have been discovered, or could not have been determined, prior to the effective date of the Compact

and that such injuries, damages and adjudications render the terms of the Section 177 Agreement manifestly inadequate to provide just and adequate compensation for injuries to Marshallese people and for damage to or loss of land resulting from the U.S. Nuclear Testing Program.

140. The Marshall Islands requested, inter alia, that on the basis of changed circumstances the awards of the Tribunal to the Enewetak people and the Bikini people be paid by the Congress because the Tribunal did not then have the funds to pay the awards.

141. In March 2002, the Senate Energy and Natural Resources Committee and House Resources Committee requested that an interagency group (U.S. Departments of State, Energy, and Defense) evaluate the Petition and provide Congress with an assessment of its legal merits.

142. Almost three years later, in January 2005, the Administration sent a "Report Evaluating the Request of the Government of the Republic of the Marshall Islands presented to the Congress of the United States of America" regarding the Petition to Senator Bingaman. In a cover letter, the Administration, through Marc Grossman, Under Secretary of State for Political Affairs, says that the attached report of the Administration concludes that the requests in the Petition do not qualify as changed circumstances within the meaning of Article IX and therefore "there is no legal basis under the Section 177(c) settlement agreement for considering additional payments."

143. On July 19, 2005, the House Committee on Resources and the House Committee on International Relations Subcommittee on Asia and the Pacific had a joint hearing on the Marshall Islands nuclear legacy and the Petition. The Senate also had a

hearing on the Marshall Islands nuclear legacy and the Petition. At the hearings, representatives of the Marshall Island testified orally or in writing that the Tribunal awards to the Enewetak and Bikini people remain unpaid and requested that the Congress provide a mechanism to address and pay the awards.

144. The Congress has in the past expressed a willingness to provide some assistance to those who continue to suffer the effects of the testing program, but there is no indication that the Congress will act any time soon, or ever, to address and pay the Tribunal awards to the Enewetak and Bikini people.

145. The alternative tribunal was intended to provide just compensation but is unable to do so because it was not adequately funded by the United States, and all attempts over these past several years by the Enewetak people to obtain their constitutional payment through either the Tribunal or the United States executive and legislative branches have proved unsuccessful.

COUNT I

UNLAWFUL TAKING OF ENEWETAK ATOLL

146. Plaintiffs reallege paragraphs 1-145.

147. Between December 1947 and October 1980, defendant engaged in a total or partial taking of the land and lagoon of Enewetak Atoll without providing just compensation to the people of Enewetak as required by the Fifth Amendment of the United States Constitution. This taking began in December 1947, when defendant through President Truman's Directive compelled the people of Enewetak to move from their atoll in preparation for nuclear tests. This taking continued as a matter of law until

October 1980, when defendant permitted the people of Enewetak to return and resettle their atoll.

148. At the time of the taking by the United States, plaintiffs were the sole owners of property interests in Enewetak Atoll.

149. Plaintiffs had no way of determining the extent of the damage to their atoll until operations to resettle and reinhabit the atoll were concluded in October 1980. Nor, until October 1980, did plaintiffs have any way of knowing the duration of the taking, which defendant had indicated would not be permanent.

150. As a result of this taking, plaintiffs were totally deprived of the use, occupancy, and enjoyment of Enewetak Atoll between December 1947 and October 1980 without just compensation.

151. The people of Enewetak are unable to reinhabit Enjebi and other northern islands of Enewetak Atoll, because of radiation levels there. These islands were not returned to the people of Enewetak in October 1980, and have not been returned since then. These islands thus have been taken without just compensation.

152. As a result of this taking, plaintiffs, since October 1980, were totally deprived of the use, occupancy, and enjoyment of over half of the area of the land and lagoon of Enewetak Atoll from October 1980 and continuing at least 20 to 50 years. These islands thus have been taken without just compensation.

153. This taking has caused permanent damage to the atoll's lagoon, and damage to its land, vegetation and its ecology. Plaintiffs' property interests in those resources have been impaired and thus have been taken without just compensation.

154. The taking has impaired the ability of the atoll to sustain food production

and of the plaintiffs to market its products. Plaintiffs' property interests in those resources have been impaired and thus have been taken without just compensation.

## COUNT II

## BREACH OF IMPLIED IN FACT CONTRACT

155. Plaintiffs reallege paragraphs 1-145 and 147 - 154.

A. <u>Formation of the Implied-in-Fact Contract</u>

156. Plaintiffs' acquiescence in their removal from Enewetak Atoll in 1947 was based upon an implied-in- fact contract with defendant. The understanding and agreement of the parties that constitute this contract arose from the entire course of dealing between the parties beginning in 1944, from the circumstances of the occupation and administration of the Marshall Islands in general and Enewetak Atoll in particular by the United States beginning in 1944, and from the circumstances of the removal of the Enewetak people from the atoll, all of which resulted in certain mutual understandings by the Enewetak people and the United States governing their relationship and mutual obligations.

157. As set forth in paragraphs 33-35, the United States, upon taking the islands in February 1944, provided the Enewetak people with food, clothing, shelter, and medical attention, organized efforts to redevelop their indigenous food sources, and controlled the access of the Enewetak people to the atoll. This conduct in these circumstances formed part of the basis for the people of Enewetak's later belief that the United States would alleviate any hardships its actions imposed on them, and evidences the intention of the

United States to do so and its recognition that it had undertaken such a duty in these circumstances.

158. During the United States' invasion of Enewetak and the period of occupation thereafter, the United States was required by the international law of belligerent occupation, as reflected in the customs and usages of civilized nations and in international agreements, to respect private property and the rights of individuals, except as absolutely required by military necessity. As administering authority of the territory of the former Japanese mandate, the United States was required by Chapter XI of the United Nations Charter, which became effective on October 24, 1945, to promote to the utmost the well-being of the inhabitants and to ensure their political, economic, social, and educational advancement, their just treatment, and their protection against abuses. Upon information and belief, the United States, during its invasion and occupation of Enewetak Atoll, recognized its obligations under international law. The United States' initial treatment of the Enewetak people after the invasion was thus based upon its understanding of its duties under international law, which required the United States to protect the people of Enewetak against confiscation of property and any physical, social, and economic deprivations that might arise out of actions of the United States.

159. Shortly after the 1944 invasion, the people of Enewetak were put on notice by the posting on Aomon Island, as set forth in paragraph 34, of Proclamation No. I of Admiral Nimitz, that:

> It is the policy of the United States Forces not to make war upon the civilian inhabitants of these islands but to permit them to continue their normal lives and occupations in a peaceable manner, so far as war necessities and their own behavior permit.
>
> * * *

> Your existing personal and property rights will be respected and your existing laws and customs remain in force and effect, except to the extent that it is necessary for me in the exercise of my powers and duties to change them.
>
> * * *
>
> So long as you remain peaceable and comply with the orders of the United States Forces of occupation, you will be subject to no greater interference than is made necessary by war conditions, and may go about your normal occupations without fear.

This proclamation by Admiral Nimitz also formed part of the basis of the people of Enewetak's belief that the United States would treat them fairly and would alleviate hardships its actions imposed on them, and evidences the intention of the United States to do so and its belief that such action was its duty in such circumstances.

160. In June 1946, as described in paragraphs 36 and 37 the people of Enewetak submitted to the temporary evacuation of their atoll in connection with the first United States atomic testing on Bikini Atoll. The United States transported the people of Enewetak to Kwajalein Atoll and provided them with food, supplies, and temporary housing. The Enewetak people were transported back to Enewetak Atoll in late July, 1946 and found it unchanged in any relevant aspect. This experience formed an important part of the basis for the Enewetak acceptance of the United States' assurances that their removal from Enewetak Atoll to Ujelang Atoll would be temporary and that when they were permitted to return to Enewetak Atoll the atoll would be returned to them in as good condition as when they were removed from it, as well as for their understanding that the United States would ensure the satisfaction of their needs during the period of their removal.

161. As set forth in paragraph 21, in July 1947, the United States approved the Trusteeship Agreement for the Pacific Islands, under which it accepted certain powers over the Trust Territory in return for certain fiduciary obligations with respect to the people of the Trust Territory. The Trusteeship Agreement did not explicitly define the duties of the United States with respect to particular transactions, but left the United States and the people of the Trust Territory free to define the terms of their relationship as long as these did not contravene the Trusteeship Agreement. The United States' explicit assumption of the obligations set forth in the Trusteeship Agreement formed a basis for the belief of the Enewetak people that the United States, in removing them to Ujelang Atoll, was accepting responsibilities consistent with those set forth in the Trusteeship Agreement. The assumption by the United States of the obligations set forth in the Trusteeship Agreement shortly before the second evacuation also evidences the intentions and expectations of the United States concerning the obligations it was assuming in securing the 1947 evacuation of their atoll by the Enewetak people.

162. In December 1947, the people of Enewetak submitted to removal from Enewetak Atoll to Ujelang Atoll, which has a much smaller lagoon and land area and which had inadequate food and economic resources. The people of Enewetak submitted to their removal, based upon their understanding, consistent with the events and experiences discussed in paragraphs 156-160, that the removal would be temporary and that the United States was agreeing to ensure the satisfaction of their needs.

163. Officials of the government of the United States led the people of Enewetak to believe and the people of Enewetak did in fact reasonably believe that their move to Ujelang would be temporary.

164. Upon their arrival on Ujelang, the people of Enewetak moved into shelter that had been constructed for them and received needed supplies. This provision of shelter and supplies was consistent with their understanding, and evidences the understanding of the United States, of the obligations that the United States had assumed in return for agreement by the people of Enewetak to the removal.

165. The United States, in moving the people of Enewetak to an atoll that was much smaller than Enewetak and that was inadequate to support the people, understood that it was undertaking a commitment to care for the physical, economic, educational, cultural, and other needs of the people of Enewetak until it returned their atoll in substantially the condition in which it had received it or paid compensation for any significant changes.

166. The people of Enewetak, in agreeing to move to an atoll that was much smaller than Enewetak and that was inadequate to support them, understood and expected that the United States was undertaking a commitment to care for their physical, economic, educational, cultural, and other needs until it returned their atoll in substantially the condition in which it had received it or paid compensation for any significant changes.

167. In consideration for the obligations that the United States undertook to fulfill, set forth in paragraph 165, the people of Enewetak cooperated with the decisions and orders of the United States which effected the taking of Enewetak Atoll and the transfer of the people to Ujelang Atoll. The people of Enewetak thus abandoned their homeland without any attempt to resist the decisions of the United States, either physically or by means of petition to United States or international forums. They further

accepted temporary relocation to Ujelang Atoll without any such resistance even though it was clear that Ujelang Atoll did not have adequate resources to maintain the quality of life they had experienced on Enewetak Atoll.

B. Terms of the Contract

168. The contract that arose from the course of dealing between the parties and the circumstances of the removal placed obligations upon the United States toward the Enewetak people, which are in the nature of the responsibilities of a trustee or a fiduciary. These obligations included:

> (a) a duty to ensure the physical, economic, and social well-being of the people on Ujelang, which the United States knew or had reason to know had inadequate resources to provide a regular supply of food and other necessities for the Enewetak people;
>
> (b) a duty to supply needed food, shelter, and other products to the Enewetak people to supplement the inadequate resources available on Ujelang; and
>
> (C) a duty to return the Enewetak people to Enewetak Atoll, at the conclusion of the United States' need for that atoll, with compensation for use of Enewetak and for any damage to the atoll.

C. Defendant's Breach

169. The United States has breached and continues to breach its contract with the Enewetak people. The United States has violated its contractual obligations to the people of Enewetak by its failure to ensure their economic and social well being and its failure to supply needed food, shelter, and other supplies during their residence on Ujelang. The United States has also breached its agreement with the people of Enewetak by failing to return Enewetak Atoll to them in its original condition or to compensate

them for the damages to its economy and for various kinds of long-term and permanent physical and radiological damage to the atoll's land area and lagoon, as set forth in paragraphs 78-83. The United States has breached its contract with the Enewetak people by failing to compensate them for the use of their atoll by the United States and failing to compensate them for the continued denied use of over half the land and lagoon of the atoll.

D. Damages

170. As a result of the actions described in paragraph 169, the Enewetak people have lost the benefit of their contract with the United States. The failure of the United States, to ensure the economic and social well-being and to supply needed food, shelter, and other supplies during their residence on Ujelang caused damages in the loss of food supplies, shelter, and other supplies not provided, and consequential damages in the form of physical distress and suffering that were reasonably foreseeable consequences from the failure to perform. The failure of the United States to return Enewetak Atoll in its original condition to the Enewetak people or to compensate them for damage caused to the atoll has deprived the Enewetak people of the use, occupancy, and enjoyment of large portions of their atoll, including but not limited to depriving them of the natural resources that formerly enabled them to live in a self-sufficient manner on Enewetak Atoll.

COUNT III

UNLAWFUL TAKING OF PLAINTIFFS' JUST COMPENSATION AND IMPLIED-IN-FACT CONTRACT CLAIMS

171. Plaintiffs reallege paragraphs 1-145, 146 – 154 and 156 170.

172. As alleged in paragraph 92, the United States accepted responsibility for the just compensation owing for loss or damage resulting from its nuclear testing program. As described in paragraph 100-105, Plaintiffs' just compensation and implied-in-fact claims pending in the Claims Court were dismissed in conjunction with the establishment of a Claims Tribunal to render final determination on Plaintiffs' claims. Plaintiffs contested dismissal on the grounds that the $150 million settlement amount in the Section 177 Agreement did not provide the reasonable, certain and adequate amount necessary to constitute just compensation. The U.S. courts held that the adequacy of the $150 million settlement amount could not be challenged until the Nuclear Claims Tribunal process had run its course. As described in paragraphs 114-132, the Tribunal carefully analyzed the nature and extent of Plaintiffs' damages and followed U.S. precedent in determining the proper and just compensation owed to Plaintiffs' for the damages they suffered as a result of the United States use and damage of their atoll.

173. The Tribunal process has run its course as intended by the U.S. and required by the U.S. courts. The $150 million settlement amount proved to be manifestly inadequate to provide the just compensation as determined by the Tribunal. Although funds which would permit payment of Plaintiffs' just compensation award were requested by the Marshall Islands through the Changed Circumstances Petition, the United States executive and legislative branches have for a period of over 4 years ignored such request making the Compact, the 177 Agreement, and the Tribunal process a mockery and a cruel hoax.

174. Plaintiffs' taking claims and implied-in-fact contract claims are property interests and the failure to provide a method to pay these claims once adjudicated

amounts to a taking in violation of the Fifth Amendment of the United States Constitution.

175. The United States by failing to adequately fund the Tribunal so that it could pay Plaintiffs award has taken Plaintiffs' taking and implied-in-fact contract claims without providing the just compensation as required by the Fifth Amendment to the United States Constitution.

176. Plaintiffs have been damaged by Defendant's taking of their claims in the amount of $385,894,500 less the payment made by the Tribunal ($1,647,483) for a total of $384,247,017, plus interest from the date of the award.

DEMAND FOR JUDGMENT

WHEREFORE, plaintiffs pray:

1. That the Court enter judgment for damages against defendant for the taking described in Count I in an amount to be determined, but not less than $384,247,017.00.

2. That the Court enter judgment for damages against defendant for breach of contract described in the Count II in an amount to be determined, but not less than $384,247,017.00.

3. That the Court enter judgment for damages against defendant for the taking described in Count III in an amount of $384,247,017.00 plus interest from the date of the Tribunal award.

4. That the Court enter judgment against defendant for the costs, including attorneys' fees, incurred by plaintiffs because of this litigation.

5. That the Court grant such other and further relief as may be just and proper.

Respectfully submitted,

Davor Pevec, Attorney of Record

Law Offices of Davor Pevec
American Savings Bank Tower
1001 Bishop Street, Suite 1360
Honolulu, Hawaii 96813
Fax: 310-402-5983
Phone: 808-599-5655
Email: dzpevec@aol.com

Attorney for Plaintiffs

Dated: April 11, 2006