**BEFORE THE NUCLEAR CLAIMS TRIBUNAL**

**REPUBLIC OF THE MARSHALL ISLANDS**

| | |
|---|---|
| In the Matter of<br>the People of Enewetak, et al.,<br>Claimants for Compensation | NCT No. 23-0902 |

## MEMORANDUM OF DECISION AND ORDER

On July 16, 1990, the People of Enewetak filed this class action claim with the Marshall Islands Nuclear Claims Tribunal, for damages to land resulting from or arising out of, the Nuclear Testing Program conducted by the United States between 1946 and 1958. The Tribunal has jurisdiction to hear this claim under Section 5(a) of the Marshall Islands Nuclear Claims Tribunal Act 1987, as amended ("NCTA")[1] which gives the Tribunal the duty and responsibility to "decide claims by and disburse compensation to the Government and citizens and nationals of the Marshall Islands under Section 123 for existing and prospective loss of damage to person or property which are based on, arise out of or are in any way related to the Nuclear Testing Program. . ." The question of damages was heard in stages, with the loss of use portion of the claim being heard on January 24 and 27, 1997, and the rehabilitation and other consequential damages portion being heard on April 14 through April 22, 1999.

The issues of fact and law were narrowed in this case through an extended process of filings of prehearing statements which formed the basis for establishing contested and uncontested issues. Based upon that process, the following uncontested factual background has been established.

[1] 42 MIRC 105(a).

**EXHIBIT E**

**I. Factual Background**

Enewetak atoll is a low-lying coral atoll located in the northwestern corner of the Marshall Islands, approximately 600 miles from the capital, Majuro. The atoll consists of about 40 islands surrounding a lagoon of about 388 square miles. In February, 1944, U.S. troops captured Enewetak from the Japanese. In July, 1947, Micronesia became a United Nations strategic trust territory administered by the United States. In June of 1946, the U.S. began the conduct of the United States Nuclear Testing Program in the northern Marshall Islands. In December, 1947, the people of Enewetak were removed from Enewetak Atoll and transported to Ujelang Atoll. Representatives of the U.S. government represented to the people that the relocation would be temporary, in the likely time frame of three to five years, at which time they could return to Enewetak. At the time of removal, the acreage of the atoll was 1,919.49 acres. During the people's absence, forty-three atomic devices were tested at Enewetak. On October 1, 1980, the claimants returned to Enewetak. At that time, 815.33 acres were returned to their use. Another 949.8 acres were not available for use, and an additional 154.36 acres had been vaporized.

**II. Framework of compensation analysis**

In the Compact of Free Association, the Government of the United States and the Government of the Marshall Islands made provision for the "just and adequate settlement" of claims of Marshallese citizens resulting from the U.S. nuclear testing program in the northern Marshall Islands between June 30, 1946 and August 18, 1958.[2] The framework for this settlement was more fully set out in the related agreement ("Section 177 Agreement") to implement this section of the Compact.[3] The Section 177 Agreement required the establishment of a Claims Tribunal to "render final determination upon all claims past, present and future, of the Government, citizens and nationals of the Marshall Islands which are based on, arise out of, or are in any way related to the Nuclear Testing Program" and to make awards

---

[2]Compact of Free Association, Section 177.

[3]Agreement between the Government of the United States and the Government of the Marshall Islands for the Implementation of Section 177 of the Compact of Free Association.

taking into account "the validity of the claim, any prior compensation made as a result of such claim, and such other factors as it may deem appropriate."[4] This language is echoed at Section 123(12) of the NCTA.[5] The Section 177 Agreement further provides: "In determining any legal issue, the Claims Tribunal may have reference to the laws of the Marshall Islands, including traditional law, to international law and, in the absence of domestic or international law, to the laws of the United States."[6] The NCTA directs that in claims for property loss or damage: "The amount of compensation shall be determined on a case by case basis, taking into consideration, among other things, the amount of property owned, the nature of the ownership interest, and the extent of the loss or damage."[7] In the event the Tribunal determines the claimants suffered loss or damage to person or property, the award order shall "*fully compensate* the people for loss or damage to person or property"[8] (emphasis added.)

The goal of compensation, where there has been harm to property, should be to make the owner whole through the award of proper damages. A general statement for determination of damages to land may be found at the Restatement (Second) Torts §929, Harm to Land from Past Invasions:

> (1) If one is entitled to a judgment for harm to land resulting from a past invasion and not amounting to a total destruction of value, the damages include compensation for
>
> (a) the difference between the value of the land before the harm and after the harm, or at his election in an appropriate case, the cost of restoration that has been or may be reasonably incurred,
>
> (b) the loss of use of the land, and
>
> (c) the discomfort and annoyance to him as an occupant.

This is not an eminent domain proceeding nor a claim under constitutional provisions for just compensation for a taking of property for a public use. Neither the U.S. nor R.M.I. government is a party

---

[4]Section 177 Agreement, Article IV, Section 2.

[5]42 MIRC 123(12).

[6]Section 177 Agreement, Article IV, Section 3.

[7]42 MIRC 123(15).

[8]42 MIRC 123(17)(b)(iii).

to this action, and consequently certain elements in a determination of just compensation are not present. Nonetheless, principles of just compensation, to the extent that they aid in a determination of what is necessary to make claimants whole, may be referenced by this Tribunal where appropriate.

Both the United States and Marshall Islands Constitutions prohibit the taking of private property for public use without just compensation.[9] In the U.S. Constitution, this prohibition is found in the Fifth Amendment, where it states in relevant part: ". . . nor shall private property be taken for public use, without just compensation."[10] In the Marshall Islands Constitution, this prohibition is found in the fifth section of Article II, where it states in part: "Before any land right or other form of private property is taken, there must be a determination by the High Court that such taking is lawful and an order by the High Court providing for prompt and just compensation." That Section of the Marshallese Constitution[11] provides additional protection for land rights and provides how a determination of just

---

[9]Representatives of the U.S. government committed that the relocated inhabitants of Enewetak would "be accorded all rights which are the normal constitutional rights of citizens under the Constitution . . ." (See Claimants's Exhibits 24, 25, 26 and 27.)

[10]The Fifth Amendment in its entirety reads:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, ir in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; *nor shall private property be taken for public use, without just compensation.* (Emphasis added)

Fifth Amendment, Constitution of the United States.

[11]Article II, Section 5 of the Marshallese Constitution reads in its entirety:

> (1) No land right or other private property may be taken unless a law authorizes such taking; and any such taking must be by the Government of the Republic of the Marshall Islands, for public use, and in accord with all safeguards provided by law.
> (2) A use primarily to generate profits or revenues and not primarily to provide a public service shall not be deemed a "public use."
> (3) Land rights shall not be taken if there exist alternative means, by landfill or otherwise, of achieving at non-prohibitive expense the purpose to be served by such taking.
> (4) Before any land rights or other form of private property is taken, there must

compensation is to be made, based in part on the "unique place of land rights in the life and law of the Republic."

**III. Loss of Use**

The people of Enewetak were denied the use of their land for a period of years. They are entitled to compensation for this loss. No claim is made that there was a permanent taking or that the United States took ownership of the property in question.[12] Consequently it is appropriate to analyze the damage in terms of the lost use to claimants. The U.S. Supreme Court examined the question of the appropriate measure of damages for such lost use in Kimball Laundry Co. v United States (1949) 338 US 1. That case involved the damages suffered by the owners of a laundry taken on a temporary basis by the government during World War II. The Court determined:

---

> be a determination by the High Court that such taking is lawful and an order by the High Court providing for prompt and just compensation.
>
> (5) Where any land rights are taken, just compensation shall include reasonably equivalent land rights for all interest holders or the means to obtain the subsistence and benefits that such land rights provide.
>
> (6) Whenever the taking of land rights forces those who are dispossessed to live in circumstances reasonably requiring a higher level of support, that fact shall be considered in assessing whether the compensation provided is just.
>
> (7) In determining whether compensation for land rights is just, the High Court shall refer the matter to the Traditional Rights Court and shall give substantial weight to the opinion of the latter.
>
> (8) An interest in land or other property shall not be deemed "taken" if it is forfeited pursuant to law for nonpayment of taxes or debt or for commission of crime, or if it is subjected only to reasonable regulation to protect the public welfare.
>
> (9) In construing this Section, a court shall have due regard for the unique place of land rights in the life and law of the Republic.

[12]The most straight forward statement of this is that of the Captain John P.W. Vest, who had been appointed Governor of the Marshall Islands, in describing his meeting with the people of Enewetak prior to their relocation:

> I told them they would be able to return to Enewetak fairly soon after the tests were completed; perhaps in three to five years. It certainly was not in my mind that it would be longer than that, or that the taking of Enewetak for the testing program was permanent. At the time it was my understanding, and I believe their understanding as well as a result of our discussions, that the people of Enewetak would be able to return to Enewetak Atoll after the testing was concluded, and that the likely time frame for this return was three to five years.

(Affidavit of John P.W. Vest, Claimants' Exhibit 9.)

> But it was known from the outset that this taking was to be temporary, and determination of the value of temporary occupancy can be approached only on the supposition that free bargaining between petitioner and a hypothetical lessee of that temporary interest would have taken place in the usual framework of such negotiations. We agree with both lower courts, therefore, that *the proper measure of compensation is the rental that probably could have been obtained*, and so this Court has held in the two recent cases dealing with temporary takings. United States v. General Motors Corp. 323 US 373, 89 L ed 311, 65 S Ct 357, 156 ALR 390; United States v. Petty Motor Co. 327 US 372, 90 L ed 729, 66 S Ct 596.[13] (Emphasis added.)

To address the value of this lost use, Claimants and the Defender of the Fund offered a joint appraisal[14] report conducted by a team of appraisers consisting of two appraisal firms, one selected by Claimants and one selected by the Defender of the Fund. No objection was raised to the qualifications of the firms and the Tribunal found them to be qualified as experts on the matter of valuation of the property in question.

A. Methodology.

The value of the loss of use may be calculated by multiplying the relevant annual rental value times the affected acreage times the period of years use of the land was lost to the owners. The period of loss has two elements: 1) past loss, which began on December 12, 1947 and ran until the date of the valuation, and 2) future loss, which began on the date of valuation and continues until such time in the future as the affected property is returned to the people of Enewetak in usable condition, determined by the parties to be 30 years from the effective date of the valuation or May 17, 2026. Additionally, adjustment must be made for the deferred nature of the compensation for past loss and a discount for future loss.

B. Annual Rental Value.

The appraisers acknowledged that there are circumstances in the Marshall Islands property ownership situation that create challenges to traditional appraisal methods. These include a customary

---

[13]Kimball Laundry Co. v United States (1949) 338 US 1, 93 L Ed 1765, 69 S Ct 1434 (7 ALR2d 1280, 1287-8).

[14]This joint approach was authorized by the Tribunal in the interest of efficiency and economy in the determination of claims.

system of land tenure that is collective in nature and does not include the concept of market value. Ownership of land by foreigners is forbidden by law. As declared by claimants:

> The people of Enewetak have always maintained a deep emotional attachment to their home islands and ancestral land. Under traditional Enewetak land tenure law and custom, every individual was – and still is – born with land rights in the islands of Enewetak Atoll and, collectively with other members of the community, rights to the atoll's lagoon and its resources. These rights provide security to the members of the community. Land is traditionally regarded as a commodity that is not to be sold, even to other members of the Enewetak community, but may only be passed from generation to generation. Each individual is identified with the land that is his birthright, and ties to the land are unusually strong. Throughout Enewetak history land has been regarded as sacred. It has never been sold to outsiders except through fear of physical force or other sanction.[15]

Nonetheless, as time has gone by, the transfer of use rights or possessory interests in land for money has gained a measure of social acceptance and from these transfers the appraisers developed a data base of comparable transactions.

The appraisers determined the islands should be categorized as rural, with a highest and best use of agricultural and residential uses. Two elements of their analysis of comparables bear notice. First is that for the category of rural lands which were deemed to be comparable for the purposes of their market analysis, there was no significant difference in pricing on the basis of the size of the parcel. As noted in their report: "An island or large weto rented for about the same price per acre as a small parcel."[16] Indeed, the appraisers reiterated their point in a post-hearing submission to the Tribunal. "We confirm that is was and remains our conclusion that the historic per acre rental rates (including the 'National Rate') in the Marshall Islands do not vary by size or location."[17] Second is that for rural lands

---

[15]Paragraph 20, CLAIM, In the Matter of the People of Enewetak, NCT No. 23-0902, filed July 16, 1990.

[16]*Appraisal Report of the Loss in Value in Enewetak Atoll, Republic of the Marshall Islands,* jointly prepared by The Hallstrom Group, Inc. and Raymond A. Lesher & Co, Ltd. Claimants' Exhibit 1, Defender of the Fund's Exhibit A (hereafter "Joint Appraisal,") p. 22

[17]"Response to Questions Regarding the Joint Appraisal of Enewetak Atoll," from Raymond Lesher and James Hallstrom to Tribunal Members, dated January 31, 1997, filed March 12, 1997

(which all of Enewetak was determined to be) the rental rate was similar regardless of the rural use, e.g., residential or agricultural.[18] James Hallstrom, one of the appraisers who authored the joint report, testified at the loss of use hearing that while consideration was given to including values from outside the Marshall Islands, this approach was rejected because it would have required a considerable degree of subjective adjustments for location. Only Marshall Island transactions were considered as they were more directly germane.

Over 470 transactions were collected to be reviewed for comparability with the property at issue. Of these, some 174 of the properties were determined to be comparable to the subject. Despite this extensive database, there was a relative scarcity of transactions in the early years of the lost use. This problem was addressed through trending analysis from which the annual rates could be derived. This analysis combined two different approaches. One approach utilized a pure exponential trend fit to the database. The other approach utilized an exponential fit for the first twenty years of the period of lost use and subsequently incorporated the government rental rate because of its acceptance as a fairly determined rate of rent and its widespread use as a benchmark for private lease agreements. In both cases, the use of an exponential curve was justified on the basis that "its relatively low statistical deviation from the data [compared to other different curves tested] . . . more accurately simulat[ed] market activity over time."[19] This correlated approach resulted in annual rental values ranging from $41 per acre in 1947 to $4,105 per acre in 1996.

The valuation must additionally recognize the effect of the lost use of the proceeds from the annual rentals. Adjustment for past loss is made by adding an interest component to the annual proceeds, which was compounded using the average annual U.S. Treasury 30-year bond rate as the benchmark rate of investment.[20]

---

(hereafter "Response Letter.")

[18]Joint Appraisal, p. 22.

[19]Response Letter (f.n. 15.)

[20]Joint Appraisal, p. 27.

C. Acreage and period of lost use.

In this case, the parties have agreed on the relevant land areas and period of lost use.[21] They are as follows:

| | |
|---|---|
| 12/21/1947 to 09/30/1980 | 1,919.49 acres |
| 10/01/1980 to 01/24/1997[22] | 1,104.16 acres |
| 01/24/1997 to 5/16/2026[23] | 1,104.16 acres. |

Included in the loss of use calculations is the acreage of the vaporized islands. Although arguably these islands were permanently lost upon their vaporization, the Tribunal is persuaded to treat them as temporarily lost for the following reasons. First, in the context of this class action, the vaporized islands must be regarded as a part of an environmental whole which consists of the entire atoll ecosystem. Thus, although a portion of the atoll was damaged through the destruction of the vaporized islands, the atoll as a whole is the relevant unit for characterization of the loss. Secondly, the problems with determining a fee simple value in the Marshall Islands where such transactions are virtually unknown and not subject to market analysis preclude the evaluation of such a loss.

Based upon the annual rental rates, the affected acreage and number of years to the date of the hearing, the rental values for past lost use (including interest) amount to $304,000,000.[24]

These values must be further adjusted for compensation already received by the People of Enewetak. The Defender of the Fund initially put forth nineteen items of prior compensation to be

---

[21]Claimants' Exhibit 3, Defender's Exhibit C.

[22]Date of the hearing on loss of use.

[23]Although Claimants' Exhibit 3, Defender's Exhibit C adjusted past loss to the date of the hearing on loss of use, no adjustment was made to the period of future lost use.

[24]The calculation of this number is found in Claimants' Exhibit 5 and Defender's Exhibit E. The exact calculation was $304,257,512, which the appraisers rounded to the nearest million dollars.

considered by the Tribunal.[25] In its ORDER,[26] the Tribunal recognized eleven of these items as potentially appropriate for consideration and granted the Defender the opportunity to present evidence on those items. Two additional items were denied with the provision that the Defender could bring them forward for reconsideration if additional information relating to them became available. The parties resolved their differences on these issues via stipulation which provided for valuation of six of the items.[27] The items of prior compensation are as follows: payment made to the people of Enewetak on or about November 19, 1956 in the amount of $175,000; payment made to the people of Enewetak on or about August 19, 1969 in the amount of $1,020,000; payment made to the people of Enewetak on or about September 30, 1976 in the amount of $750,000; payment made to the people of Enewetak on or about December 18, 1978 in the amount of $750,000; annual payments of $3,250,000 from 1987 through 1999 pursuant to the Section 177 Agreement;[28] and the amount of $10 million for resettlement of Enjebi Island.

The stipulation also provided for valuation of the use of Ujelang by the people of Enewetak from December 21, 1947 to September 30, 1980.[29] The annual per acre value for the use of Ujelang was determined to be fifty-eight percent of the annual per acre value of Enewetak. This reduction was based upon the relative scarcity of resources in Ujelang and the relative lack of access to off-island resources

---

[25]MOTION TO CONSIDER THE PRIOR COMPENSATION TO CLAIMANTS STATED IN EXHIBIT “A” AS A SETOFF AGAINST ANY AWARD OF DAMAGES, filed by the Defender of the Fund on June 16, 1997.

[26]ORDER AND MEMORANDUM OF DECISION, filed November 28, 1997.

[27]Items 1, 3, 5, 6, 7, and 19 from Exhibit “A” of Defender’s June 16, 1997 MOTION.

[28]Article II, Section 3.

[29]In entering the stipulation, the claimants maintain their position that the use value of Ujelang should not be considered as prior compensation or an offset by the Tribunal (STIPULATION, filed March 17, 2000.) The Tribunal ruled in its DECISION AND ORDER of December 6, 1999 that the use of “Ujelang will be taken into consideration by the Tribunal as an item of prior compensation.”

because of poor transportation to the atoll. These factors affect the highest and best use of the atoll. While Enewetak was determined to have the highest and best use of agricultural/residential uses, the lack of resources and transportation preclude such use in Ujelang.[30] This conclusion is reinforced by the absence of activity on Ujelang at the present time, even in light of the scarcity of land in the Marshall Islands.

Except for the Enjebi Trust Fund,[31] these items of prior compensation are set off against the annual past loss of use values in the year received by the Enewetak people. This has the effect of reducing the overall value of past lost use not only by the actual amount of the past payments, but also by reducing the interest on the net annual lost use value. In the case of Ujelang, the annualized use value for each year between 1947 and 1980 (when the people returned to Enewetak) is set off against the respective annual loss of use values for Enewetak.[32]

The value of past lost use, adjusted for prior compensation, is $149,000,000.[33]

D. Compensation for Future Denied Use.

To determine the compensation for future loss of use, the appraisers utilized an income capitalization approach. As described in the Report: "This method is used to convert a single year's income into an indication of present value by dividing the most current stabilized income by an appropriate rate of return." This rate of return was determined to be eight per cent, based upon data from

---

[30]See *Ujelang Atoll Consultation, Republic of the Marshall Islands*, prepared by the Hallstrom Appraisal Group January 11, 200, and filed with the Tribunal by Claimants in response to Tribunal order of December 6, 1999.

[31]The parties stipulated that the $10 million Enjebi Trust Fund would be set off against the restoration award.

[32]The calculations are contained in Table 7A-1, part of the STIPULATION filed with the Tribunal on March 17, 2000.

[33]*Ibid.*

Marshall Islands transactions, as well as making reference the rate used in other Pacific islands.[34]

Claimants suggested alternatively that the value of future lost use be calculated as the "annual rental for land not available (presently 949.8 acres) at the minimum rate of $3,000 per acre per year until the lands become fully usable by the people of Enewetak, plus interest of at least 6.86% on such annual rental until paid."[35] Although the Tribunal perceives the rationale behind the reasoning for this calculation, such an approach would result in an open ended decision. The Tribunal is charged with the final determination of all claims past, present and future arising out of the nuclear testing program. Leaving undecided the question of how long the future lost use would last, is not consistent with the Tribunal's responsibility to make a final determination in this claim.

In the joint appraisal report the present value of the future rents for 1305.78 acres was (as of May 17, 1996) $67,000,000. This acreage was subsequently adjusted downward by stipulation of the parties to 1104.16 acres and the effective date of the appraisal was adjusted to the date of the hearing, January 24, 1997. However, the calculations for the loss of future use were not adjusted to reflect these changes. Because those calculations were based on a time period of thirty years, with a constant annual rental value, adjusted to present value, the $67,000,000 may be adjusted by the ratio of the actual acreage (1104.16) to the initial joint appraisal acreage (1305.78). That calculation gives a value for loss of future use of 1104.16 acres for thirty years of $56,654,811. Additionally, Claimants are additionally due $3,250,000 annually in 2000 and 2001 under Section 177 Agreement. This is compensation not yet paid and must be set off against the future loss of use portion of the award.

The value for lost future use, adjusted for anticipated Section 177 payments, is $50,154,811.

**IV. Restoration**

A. Restoration as appropriate remedy.

Under the Restatement (Second) Torts analysis at §929(1)(a), the injured party who suffered damage to land is entitled to compensation for "the difference between the value of the land before the

---

[34] Joint Appraisal, p. 28.

[35] Claimants' Exhibit 15.

harm and after the harm, or at his election in an appropriate case, the cost of restoration that has been or may be reasonably incurred." An initial issue is whether the appropriate measure under this subsection is the cost of restoration or the difference in value of the land before and after the harm. The Defender of the Fund raised this issue in the MOTION TO LIMIT CATEGORIES OF DAMAGES CLAIMANTS MAY BE AWARDED AND METHODS OF VALUING DAMAGES FOR CERTAIN CATEGORIES OF DAMAGES.[36] In Paragraph 7 of that MOTION, the Defender asks that the Tribunal "limit the valuation of damages pertaining to all permanent and proven damage and injury such as described in Paragraph 1, as claimant may properly plead and prove, to the value fixed as the difference between the fair market value immediately before the injury to the real property and the value immediately after the injury and interest thereon from the date of the injury." Although both parties submitted legal argument on the issue, the Tribunal found that the record was too undeveloped as to the underlying factual issues to allow a meaningful ruling on the legal issue and that aspect of the MOTION was denied without prejudice.[37] Although Defender has not renewed this aspect of the MOTION, the Tribunal will set out its reasoning for determining that the cost of restoration, rather than the difference in value before and after the injury, is the appropriate measure of damage in this instance.

In the commentary to the cited Restatement provision, it is noted:

> Even in the absence of value arising from personal use, the reasonable cost of replacing the land in its original position is ordinarily allowable as the measure of recovery. . . . If, however, the cost of replacing the land in its original condition is disproportionate to the diminution in the value of the land caused by the trespass, unless there is a reason personal to the owner for restoring the original condition, damages are measured only by the difference between the value of the land before and after the harm. . . . [I]f a building such as a homestead is used for a purpose personal to the owner, the damages ordinarily include an amount for repairs, even though this might be greater than the entire value of the building. So, when a garden has been maintained in a city in connection with a dwelling house, the owner is entitled to recover the expense of putting the garden in its original condition, even though the market value of the premises has not been decreased by the defendant's invasion.[38]

This suggests that unless the cost of restoration is disproportionate to the difference in value before and

---

[36]Filed June 2, 1995.

[37]DECISION AND ORDER, filed August 11, 1995.

[38]*Restatement (Second) Torts*, Comment on Subsection (1), Clause (a), *b. Restoration.*

after the injury to the land, such cost is an allowable measure of damage. Even when such disproportionality exists, if there is a personal reason for the cost of repair, these costs may be allowed. Case law supports this approach. See Heninger v. Dunn (Cal. App. 1980) 162 Cal. Rptr. 104, Orndorff v. Christiana Community Builders (Cal. App. 1980) 217 Cal. App. 3d 683. Further, if market value does not adequately capture the value or if is not possible to ascertain the market value of the land, the diminution in market value is not an appropriate measure of damage. See Trinity Church v. John Hancock Mutual Life Insurance Co. (Mass. 1987) 502 N.E. 2d 532, Denoyer v. Lamb (Ohio App. 1984) 490 N.E. 2d 615, Feather River Lumber Co. v. United States (9th Cir. 1929) 30 F.2d 642, 644.

In the present case, both of these conditions are met. There are personal reasons for restoration of the damaged land. These reasons are persuasively set forth by Claimants' expert, Dr. Lawrence Carrucci in his report to the Tribunal:

> For Marshall Islanders in general, and Enewetak people in particular, land is a part of one's person and one's entire identity. It is an integral part of a person's sense of who they are in the world and how their life makes sense as part of a certain culture. One's sense of self, both personal and cultural, is deeply embedded in a particular parcel of land on a particular atoll. . . . Not only is land hyper-valued because it is scarce, land is extremely highly valued because it represents the collective labor of generations of people who have worked the land, transforming it from bush into habitable space [footnote omitted.] Both one's labor and one's physical person, at death, are embedded in land in a manner that irrevocably erases any distinction European's [sic] or Americans might make that would separate one's person and the clan or family land that one inhabits. While Europeans live and die, Enewetak people are but the most visible snippet of a very active group, a clan of relatives who share a totem-like identity, a clan or jowi. Not only does that group represent the continuity of life from ancient times until the current day (jowi), it is manifest in a second visible form, the family land that is the realization of generation upon generation of continuous human occupation that has made untended earth into soil through toil and the physical substance of persons embedded in the molecular structure of that soil.[39]

The shortcomings of a market approach to value, particularly with reference to fee simple rights, are set out in the appraisal report filed jointly by Claimants and the Defender of the Fund:

---

[39] Ien Entaan im Jerata: Times of Suffering and Ill Fortune: An Overview of Daily Life on Ujelang and Enewetak since 1946, Laurence M. Carucci, Ph. D. and Mary H. Maifeld, M.A., R.D., A Report Submitted to the Marshall Islands Nuclear Claims Tribunal in behalf of the People of Enewetak, March, 1999, Claimants' Exhibit 147.

> Traditionally, Marshallese do not sell land rights which are acquired by birthright. Hence, there is an absence of a real estate market, and while the Marshallese customary system of land tenure has not only precluded the development of a normal market, it fosters an attitude about land which does not include the concept of market value.[40]

This point was reinforced in a post hearing submission by the joint appraisal team, where it was stated: "In the history of the Marshall Islands, there has never been any kind of established real estate market to justify such an approach. 'Fee simple' value cannot be derived, nor could anyone sell their birthright ownership."[41] Thus, the diminution in value approach to damages cannot be applied because there is no market in fee simple property to provide comparable values to assess the loss. Further, such a market approach would not provide a true measure of loss because it would not account for the deeply personal reasons of the Enewetak people for restoring their land.

Further support for the cost of restoration approach is found in U.S. environmental statutes. Although these laws may not be applicable by their terms to the Marshall Islands, the Section 177 Agreement provides "In determining any legal issue, the Claims Tribunal may have reference to the laws of the Marshall Islands, including traditional law, to international law and, in the absence of domestic or international law, to the laws of the United States."[42] The Tribunal has referenced U.S. law in a variety of contexts in the past. It has modeled its personal injury compensation program on the "Downwinders Program," devised to compensate civilians affected by the nuclear testing in Nevada and references the U.S. directly in its regulations for the purposes of determining conditions deemed caused by the Nuclear Testing Program.[43] It has adopted certain policies and criteria of the Comprehensive

---

[40]Joint Appraisal, p. 15.

[41]Response Letter, p. 3.

[42]Section 177 Agreement, Article IV, Section 3.

[43]NCT Regulation, Section 224(a), *Comparability with United States Compensation Schemes:*

> Section 220 shall be deemed to include any medical condition(s) not otherwise specifically listed or described for which a claimants would be entitled to compensation in the United States under either the Radiation-Exposed Veterans Compensation Act of 1988, as amended 38 U.S.C. 101 et seq. Note and/or the Radiation Exposure Compensation Act of 1990, as amended.

Environmental Response, Compensation, and Liability Act (CERCLA) in setting a radiation clean-up standard in the land claims consolidated for that purpose.[44] The Tribunal notes this for the purpose of observing the predisposition toward clean up as a remedy in dealing with hazardous waste in the U.S.[45] The preference for restoration by the U.S. is evidenced in the past U.S. attempts to restore the atoll for the claimants' use.

B. Establishment of Radiation Standard for Restoration.

The Tribunal considered the issue of radiation protection standards for application in clean up and restoration of lands contaminated by the Nuclear Testing Program in a special proceeding which consolidated the various class action claims for damage to property. The Tribunal accepted the position of the IAEA[46] that

> As a basic principle, policies and criteria for radiation protection of populations outside national borders from releases of radioactive substances should be at least as stringent as those for the population within the country of release.[47]

Under this reasoning, the Tribunal adopted the current standards[48] of the U.S. that would apply to

---

[44]MEMORANDUM OF DECISION AND ORDER, filed December 21, 1998.

[45]For a discussion of this legislative concern for restoration as a remedy in U.S. environmental statutes, see Cross, Natural Resource Damage Valuation, 42 Vanderbilt Law Review 269, 327-334.

[46]The International Atomic Energy Agency (IAEA) operates under the auspices of the United Nations. It serves as an international forum for scientific and technical cooperation for the peaceful development and safety of nuclear power. While one of its most important responsibilities is to monitor nuclear materials that pass internationally, it is also charged with establishing safety standards for health and property.

[47]Claimants' Exhibit 1 (filed for the consolidated hearing on radiation protection standards on November 18, 1998).

[48]These standards have undergone significant development over time, based in part upon a greater understanding of the health effects of radiation. This enhancement in scientific knowledge is a circumstance which has changed, particularly since the time the Compact of Free Association was

Enewetak, were it within the United States. Those standards, established by the U.S. Environmental Protection Agency, are described in an EPA document entitled "Establishment of Cleanup Levels for CERCLA Sites with Radioactive Contamination," wherein it is stated:

> Cleanup should generally achieve a level of risk with the $10^{-4}$ to $10^{-6}$ carcinogenic risk range based on the reasonable maximum exposure for an individual. . . .
>
> If a dose assessment is conducted at the site (footnote omitted) then 15 millirem per year (mrem/yr) effective dose equivalent (EDE) should generally be the maximum dose limit for humans.[49]

This standard addresses the additional risk created by the contamination, so the 15 millirem level is over and above existing background levels of radiation.

C. Application of Standard.

The parties introduced evidence relating to whether this 15 mrem standard is currently exceeded in Enewetak. The expert testimony[50] of both sides was in agreement that the major pathway or source of radiation exposure to residents of Enewetak would be ingestion of locally grown foods. This pathway

---

negotiated.

[49]Claimants' Exhibit 11 (filed for the consolidated hearing on radiation protection standards on November 18, 1998), p. 5.

[50]The expert witnesses for claimants were Dr. John Mauro and Dr. Hans Behling, from Sanford Cohen and Associates (hereafter "SCA".) In addition to their testimony, claimants filed a two volume report, *Regarding The Potential Radiation Doses and Health Risks to a Resettled Population of Enewetak Atoll and An Evaluation of the Costs and Effectiveness of Alternative Strategies for Reducing the Doses and Risks* by Drs. Mauro, Behling and Anigstein. *Part 1: Statement Before the Nuclear Claims Tribunal* was admitted as Claimants' Exhibit 45, while *Part 2: Technical Background Document* was admitted as Claimants's Exhibit 46. The expert witnesses for the Defender of the Fund were Dr. George Levin and Dr. Michael Uziel (hereafter "Enviropro.) In addition to their testimony, the Defender filed *Cleanup Standards & Conceptual Remediation Alternatives of Nuclear Waste at Enewetak Atoll, the Republic of the Marshall Islands,* authored by Dr. Uziel of Enviropro, Inc., which was admitted as Defender of the Fund's Exhibit SS.

is of particular significance in Enewetak because the soil of the atoll allows a relatively high uptake of certain radionuclides by local plants. Both sides agreed that the primary radionuclide of concern was Cesium 137. Application of U.S. standard computer analysis provided that a concentration of cesium in the soil between .32 and .35 picocuries/cubic gram (including background) would result in an annual effective dose equivalent of 15 millirem assuming a local only diet.. The Tribunal believes a local diet is an appropriate assumption for this determination. While the Tribunal recognizes that it may not be likely that the entire population will adhere to a local food only diet, even if available, the Tribunal accepts the EPA reasoning that protection should be extended not just to the average member of the community, but to those who could be characterized as having "high end risk." This concept is captured by the "reasonably maximally exposed individual."[51]

This concentration is the target for any clean-up effort. The parties are in relatively close agreement on this issue. Assuming a local diet, SCA found a cesium concentration of .247 to .274 pCi/g (depending on the methodology utilized for determination of exposure) above background[52] would result in an exposure of 15 mrem/year to the reasonably maximally exposed individual. With background added in, that would amount to a range between .327 and .354 pCi/g. Envirpro determined a concentration of .35 pCi/g would lead to an exposure of 15 mrem/yr based upon a local food only diet. The parties developed their remediation scenarios utilizing this concentration target.

D. Radiological Cleanup Costs.

The parties presented a number of alternative approaches to how the standard could be met. The basic techniques considered were removal of contaminated soil, application of potassium to the soil to reduce the plant uptake of cesium, and phytoremediation (the use of plants to strip the radioactive contaminants from the soil.) While phytoremediation is a promising, developing technology, its effectiveness in Enewetak cannot be evaluated. It is clear that the concept is valid, because the uptake of Cs-137 from the soil by food plants is the major pathway for exposure to residents. However, the

---

[51]Claimants' Exhibit 83.

[52].08 pCi/g.

application of the technique for cleanup of radioactive contaminants has not been demonstrated in the coral atoll environment and there is no reliable data to assess costs associated with such a clean up effort. In contrast, considerable testing has been done on the application of potassium to the soil to block the uptake of Cs-137 in this environment.[53] The reports cited by SCA indicate potassium applications reduce the cesium uptake by a factor of ten. Where concentrations are higher, this technique would be ineffective. Additionally, potassium does not "clean-up" the soil, it simply blocks the uptake of the cesium. Applications would have to continue until natural processes (primarily radioactive decay) reduced the radioactivity to acceptable levels.

Soil removal is a tested technology, and was utilized by the U.S. in Enewetak in past cleanup efforts. However, it involves the excavation and disposal of significant volumes of contaminated soil. An important drawback to this alternative is the attendant ecological disruption which results from the removal of the topsoil from the environment. Both SCA[54] and Enviropro[55] remark on this problem. Nonetheless, based upon our review of the proposed alternatives, it is clear that soil removal must be at least a component of the cleanup strategy.

The estimates of volume of contaminated soil involved range from approximately 1.5 million cubic meters[56] to about 1.9 million cubic meters.[57] SCA devised a unit cost analysis for costs of cleanup based upon, in part, extensive analysis conducted by the Bikini Atoll Rehabilitation Committee. The

---

[53]Claimants' Exhibit 46 contains an eleven page appendix assessing the effectiveness of potassium spreading in the critical environment. The references include articles by Dr. William Robison, relating to his work with potassium applications on Bikini Atoll.

[54]Claimants' Exhibit 45 at p. 90.

[55]Defender of the Fund's Exhibit SS at p. 49.

[56]Enviropro, Defender of the Fund's Exhibit SS, Table 4.2.2-2.

[57]Claimants' Exhibit 45, p. 46.

unit cost for removal and replacement[58] of soil on Enewetak was estimated to be $101 per cubic meter. However, that does not include the cost of disposal of the contaminated soil. Off island disposal unit costs ranged from $262/cubic meter[59] to $13,790/cubic meter[60], while on-island disposal costs ranged from $9.09/cubic meter[61] to $377/cubic meter[62]. Clearly, any reduction in the volume of soil removed would result in significant cost reduction as well as reduction in the attendant ecological disruption. One such reduction may be achieved by acknowledgment of the shielding and dilution effect contributed by replacement fill. Based on this reasoning, SCA estimates the volume of soil needed to be removed would be reduced to about 470,000 cubic meters.[63] As noted above, the application of potassium may be an effective technique for reduction of exposure, but only up to certain concentrations of Cs-137. If that strategy is utilized in conjunction with soil removal, the volume of soil which would have to be removed is reduced to approximately 223,000 cubic meters.[64] This works out to a cost for soil removal of $22 million.[65]

While the material costs for application of potassium over the required amount of time are relatively modest, there are other associated costs. SCA reports:

> In addition to the basic cost of treating soil with potassium/fertilizer, a sound soil management program is imperative. For Enewetak Atoll, such a program would require the full-time oversight of a qualified agronomist and the support of at least two field

---

[58]The replacement soil is from dredging the lagoon. There is no significant organic component, and consequently this replacement soil may not be regarded as constituting a return to agricultural productivity.

[59]At Envirocare, Utah (Claimants' Exhibit 46, Table 4-11, p. 4-34.)

[60]At Barnwell, South Carolina, (Claimants' Exhibit 46, Table 4-11, p. 4-34.)

[61]Dumped in the lagoon, (Claimants' Exhibit 46, Table 4-11, p. 4-34.)

[62]Entombed in a crater with concrete dome, (Claimants' Exhibit 46, Table 4-11, p. 4-34.)

[63]Claimants' Exhibit 45, Case #2, Table 14a, p. 54.

[64]Claimants' Exhibit 45, Case #3, Table 14a, p. 54.

[65]Claimants' Exhibit 45, Case #3, Table 14b, p. 55.

> technicians. All soils would be subjected to standard tests that ensure the proper soil treatment quantities of potassium or potassium fertilizer. More importantly, all soil and food crop samples would also be subjected to radioanalytical tests that assess the persistence of Cs-137 in soil and in food crops and provide quantitative data for demonstrating the effectiveness of suppressing plant uptake of Cs-137.
>
> As a final test for ensuring the effectiveness of Cs-137 in food crops, the resettled population group would be requested to undergo an annual in vivo-bioassay (i.e., whole body count with potential urinalysis).[66]

These costs are imperative to insure the safety of the returning residents and are properly included in the cost of cleanup. Both SCA[67] and Enviropro[68] agree that the length of time for application of the potassium treatment would be on the order of 100 years. SCA estimates the present day cost[69] of potassium treatment in Enewetak over this time period would be $15.5 million.[70]

A necessary component of the clean up effort is radiological surveys. While past surveys at Enewetak have gathered much data, they are neither current, nor complete in regard to the support of the clean up effort. A characterization survey consisting of field measurements and laboratory analysis is required to provide information as to the exact location and nature of the contamination to allow compliance with guideline levels. An on-going remedial action support survey will be needed to support the clean up effort while it is being performed. Finally, a survey to insure that areas subjected to remediation have met required clean-up levels must be conducted. The cost of these surveys is $4.51 million.

As noted above, a major component of the cost of soil removal is disposal. The parties

---

[66]Claimants' Exhibit 46, p. 4-46.

[67]"Due to the 30 year half-life and persistence of Cs-137 in the soil, soil treatments may be required as long as 100 years." Claimants' Exhibit 46, p. 4-39.

[68]"Our assessment indicates that the technology will require implementation betweeen a minimum of 64 years and a maxium estimate of 127 years." Defender of the Fund's Exhibit XXX, p. 52.

[69]The hundred year cost is discounted at 7% per year.

[70]Claimants' Exhibit 45, Table 27, p. 85.

considered a number of disposal options, including lagoon dumping, ocean dumping, disposal (with no waste stabilization) on an uninhabited island in the atoll, use of contaminated soil as back fill to extend atoll land mass, construction of a causeway, crater entombment, and disposal in the U.S. SCA provides unit cost estimates for each of these alternatives.[71] Enviropro determined the cost under four different disposal scenarios: two causeway scenarios - direct fill and cement mix; dumping in the Marianas Trench; and shipping the soil to Nevada for storage. While it is difficult to directly compare the two parties' expert analyses, it may generally be observed that disposal in the U.S. will be more expensive than local disposal of the contaminated soil. Additionally, while dumping the contaminated soil in the lagoon may be the most inexpensive alternative, it may be ruled out on the basis of legal and political concerns about ocean dumping of radioactive waste. The same is true of dumping in the Marianas Trench.

While Enviropro sets out its conclusions relating to costs, the basis for its calculations were not set out in the Report, nor were they adequately explained in testimony at hearing. In contrast, SCA provided the background for determining costs through the unit cost methodology, basing its calculations on established, cited references. The calculations were reinforced through testimony, subject to cross examination, at hearing.

While the causeway alternative is not the least expensive option, it more fully protects the residents from risk of harm from exposure to radiation compared to other feasible local disposal options. The major pathway for exposure is ingestion of foods, particularly plants, which have absorbed radioactive substances from the soil. A causeway would separate the contaminated soil from agriculturally productive areas, protecting the people from exposure. While the option of on site disposal at an uninhabited island of the atoll may be less expensive, no site has been identified that would be appropriate on Enewetak or where the land owner would consent to such disposal. In the estimates of cost for such disposal, no component for compensation to the landowner for use of the land was identified. Finally, it is clear that such option is not the preferred disposal option of the people of

---

[71]Claimants' Exhibit 45, Table 22, p. 74.

Enewetak.[72] While such preference is not dispositive in consideration of disposal options, it is a factor to be considered. Crater entombment may have the virtue of precedent behind it, but rather than enhance the productivity of the community, as in the case of the causeway, it requires a site which would be withdrawn from potential productivity. Like the use of an uninhabited island, no site has been identified, nor has the cost of compensating landowners been addressed. The cost of this option, $84.7 million[73] is more than that of the causeway option favored by the Enewetak people. The Tribunal finds that the most effective disposal alternative is the causeway option, at a cost of $31.5 million.[74]

Although the primary radioactive isotope of concern is Cesium 137, on the island of Runit (the fifth largest island of the atoll), there is residual Plutonium 239, resulting from the Fig and Quince tests conducted there. Radiation levels on Runit exceed the limit and it remains quarantined from use by the people of Enewetak. Techniques now exist to clean up this plutonium, utilizing soil sorting methods applied at Johnston Atoll, and dissolving the coral soil to separate out the Plutonium for disposal. The cost of this is $10 million.[75]

E. Soil Rehabilitation and Revegetation

In addition to the costs of removal of contaminated soil and its disposal, the land must be restored to productivity. The backfill provided to replace removed soil would be dredged from the lagoon and would not contain sufficient organic material to be agriculturally productive. Enviropro acknowledges the problem, but does not provide any specific remedy, other than to note it will take 25-50 years for the land to become fertile.[76] Claimants offer two options to rehabilitate the soil. One is to import topsoil

---

[72]"A third on-island disposal option that has the support of the Enewetak people and is recommended by the authors of this statement is the use of excavated soil in the construction of a causeway." Claimant's Exhibit 45, p. 74.

[73]Claimants' Exhibit 45, Case #3, Table 14b, p. 55.

[74]Claimants' Exhibit 45, Case #3, Table 14b, p. 55.

[75]Claimants' Exhibit 45, p. 102.

[76]Defender of the Fund's Exhibit XXX, p. 49.

from off island, potentially Kosrae or Ponape. The unit cost would be $40,062/acre. The other is to rehabilitate the soil through agricultural means as described by Mr. Mateariki, in his report filed as an exhibit in this action[77] and in testimony before the Tribunal. This approach would restore the soil through natural means, utilizing local resources and involving land owners and a local work force. The method has been tested by Mr. Mateariki on Enewetak. The unit cost for this approach is estimated to be $29,000 per acre, although it is acknowledged that it would take up to 50 years to completely restore the land to the level where it is self sustaining.[78] However, the import option would not include the cost of revegetation or maintenance and care. Additionally, there is the concern that imported soil may introduce foreign pests or plants inappropriate to the Enewetak ecological system. The cost for soil rehabilitation and revegetation of affected lands is the $17.7 million requested by claimants.[79]

F. Resettlement

The parties take divergent views of resettlement as an element of compensation in this claim. Claimants' position is that the requested resettlement costs

> . . . are crucial to put the Enewetak people in a situation similar to their situation prior to their relocation in 1947. They are unable to engage in their traditional economic activities (copra production, fishing, agricultural exports, etc.) Because of the residual radioactivity on their atoll and the perception in the marketplace that it is contaminated. Until the soil rehabilitation and revegetation is complete (a process that will take decades), the Enewetak People have no means to pay for housing and other infrastructure necessary to enable them to live. Their protracted exile on Ujelang also prevented them from engaging in any economic activity, and thus precludes them from being able to pay for any of the necessary resettlement costs.

The cost of this resettlement, by claimants' calculation, is over $52 million.[80] This would provide for

---

[77] *Initial Report*, Teairki F. Mateariki, Claimants' Exhibit 130.

[78] Claimants' Exhibit 45, p. 94.

[79] Claimants' Exhibit 210.

[80] Claimants Exhibit 137, *Enewetak Atoll Revised Master Plan Concept for Enjebi Island and Upgrade and Restoration of Facilities at Enewetak, Medren and Japtan Islands*, prepared by E.P.G. Corporation.

residences and community infrastructure on Enjebi Island (once it has been restored to radiological safety) and additional upgrade of facilities on Enewetak, Medren and Japtan Islands. The Enjebi portion of the plan includes 100 residences which would consist of masonry construction, treated wood roof trusses with aluminum roofing, three to four bedrooms, two internal baths, an interior kitchen, a septic system, a water storage system, a water connection to the central distribution line, a connection to the central power plant and a salt water flushing system. There would be a central power and water plant with two 250 KW generators and two 5,000 gallon per day water makers. A power distribution system would carry electric power to residences and service areas. There would be a water storage and distribution system including two 50,000 gallon lined concrete tanks, and a fuel storage facility consisting of two 20,000 gallon diesel tanks and one 10,000 gallon mogas tank, as well as a dispensing facility at the storage area. The community infrastructure would include a 4,000 foot compacted coral runway and a new LCU ramp at the dock area. The resettlement costs include a 4,000 square foot maintenance building, a 4,000 square foot warehouse, an 864 square foot airport terminal, a 1,152 square foot port control and communications building and a 5,000 square foot field station. Also included are a number of community buildings: a 2,400 square foot council house, a 3,200 square foot multi-purpose building for community activities, a 6,000 square foot school, a dispensary, a church, a public safety building a recreation facility (outdoor basketball court, softball field, volleyball court, and soccer field), and a 6,500 square foot staff and visitors complex consisting of an eight unit apartment complex.

Although housing and facilities on the southern islands were provided in 1980, claimants assert a general upgrade and restoration of these is required as part of resettlement. This includes expanded power and water services to all residential areas, improvement of the airport, docks and fuel storage systems. The 116 houses completed in 1980, as part of the original resettlement program will require $25,000 in repairs and upgrades including repair of walls, doors and windows, new roof coating, and a new kitchen and bath.

In response, the Defender of the Fund argues that "Resettlement costs are equivalent to the

replacement value of the item at the time and place of destruction and nothing more."[81] While no evidence has been introduced as to the value of community residences and facilities in 1947 when the people of Enewetak were removed, it seems evident that value would be considerably less than the costs of resettlement set out by Claimants. This difference in approach springs from a differing understanding of what restoration entails. Claimants' position relies upon a view that restoration is not limited to a restoration of the physical conditions that existed at the time of their relocation in 1947, but rather must be extended to consider the economic condition of the community as a whole. The goal of restoration, in addition to environmental rehabilitation, must be "to create the infrastructure and conditions that will allow the Enewetak People to pursue economic opportunities with about the same possibility of success as they had prior to their relocation."[82] The Defender of the Fund takes a much narrower view, asserting that the resettlement costs are limited to replacement of those structures which were present at the time of relocation.

Little evidence has been introduced on the exact status of the Enewetak people immediately preceding their relocation. In arguing for significant resettlement costs, claimants allow the inference that they were a self-sufficient, subsistence based community in 1947. However, what evidence is available suggests that the community was in a poor, dependent condition following the hardships of war time control by the Japanese and subsequent liberation after the U.S. invasion. Dr. Carucci reports:

> Local people were thankful to be alive after surviving the strafing and invasion of the atoll. They were fed and given clothing. But, in the descriptions of Ujelang residents in the 1970s, the war did not end on Enewetak. Local people were also placed in exile on the small islet of Aoman in order to allow the United States to continue their use of the main islets of Enewetak. Subsequently they received permission to expand their settlement to the neighboring islet of Bijili and to fish the waters along the northern fringe of their own atoll. . . . In comparison to the times that would follow, this era is recalled in relatively positive terms. People were fed, clothed and given tools and

---

[81]POSTHEARING SUBMISSION RE: VALUE OF UJELANG; AWARD OF RESETTLEMENT COSTS OF ENEWETAK ATOLL, filed November 11, 1999, p. 2.

[82]POSTHEARING SUBMISSION OF THE PEOPLE OF ENEWETAK ON (1) THE VALUE OF THE USE OF UJELANG AND(2) LEGAL AUTHORITY FOR RESETTLEMENT COSTS, filed November 11, 1999, p. 11.

> materials to build homes and canoes. Yet, people did not control their own lives. They could not sail from place to place at will. They could no longer fully subsist on their land. Indeed, the very shape of that land changed shape. . . [83]

This calls into question the baseline for establishing restoration.

The Tribunal agrees with claimants that the economic situation of the community is an important element of consideration in the overall structure of compensation in this case. However, it disagrees that this element of damage should be addressed through the type of resettlement costs proposed by claimants. The economic values inherent in the request for claimants' resettlement costs are addressed through the award for loss of use. As stated in the joint appraisal report, the loss of use value addresses "compensation for the economic loss to the people of Enewetak for the period that use of their land has been denied.."[84] Claimants assert they have no way to pay for housing and other infrastructure because their exile on Ujelang denied them the opportunity to conduct economic activity and thus precludes them from paying resettlement costs. This acknowledges that in the absence of this denial of economic activity, the people would expect to pay for their own housing, as is the normal course of events. The loss of use award provides compensation for this loss of economic opportunity. While the lands of the atoll may not be fully productive, claimants' award for loss of use includes compensation not only for past loss, but also for loss of future use. To allow additional compensation for resettlement costs on the order of those requested by claimants would amount to a duplicative award.

Claimants argue that these costs have already been approved by the U.S. and that consequently sets the legal standard for resettlement costs. However, to the extent that the resettlement program is an element of the overall U.S. program of direct compensation to the Enewetak people, that approach does not include compensation identified for denial of use of the land by the people. The two approaches are exclusive of each other, at least to the extent that resettlement is proposed by claimants. Claimants may not receive compensation for the economic loss attendant to the denial of use of their land, and then receive resettlement costs which are justified by those same economic losses.

---

[83]Claimants' Exhibit 147, p. 10.

[84]Joint Appraisal, p.4.

G. Restoration Damages

To summarize, the reasonable costs of clean-up and rehabilitation are as follows: soil removal -$22,500,000; potassium treatment - $15,500,000; soil disposal (causeway) - $31,500,000; Fig/Quince clean-up - $10,000,000; surveys - $4,510,000; soil rehabilitation and revegetation - $17,700,000.

The sum of these is $101,710,000. This total must be adjusted by the amount of the Enjebi Trust Fund, which the parties stipulated to be $10,000,000. Restoration damages for clean up and rehabilitation of Enewetak total $91,710,000.

**V. Hardship**

The Tribunal heard compelling testimony from individual members of the Enewetak community about the relocation to and conditions on Ujelang. In April of 1999, the Tribunal heard testimony of community members specifically addressing the hardships on Ujelang. Those testifying included Samson Yoshitaro, James Gideon, Ms. Rennie Robert, and Senator Ishmael John. The Tribunal also heard from Dr. Laurence Carucci, for the claimants and Dr. Nancy Pollock, for the Defender of the Fund. The Tribunal also heard from Mayor Neptali Peter, Councilman James Gideon, Obed, and Yoshitaro Elijah in January of 1997. Although the 1997 hearing was addressing the loss of use issue, some of the testimony related to the time on Ujelang.

The witnesses painted a bleak picture of conditions on Ujelang, particularly from the early 1950's until the 1970's. Dr. Carucci notes:

> There are a number of forms of evidence that show how serious the suffering was on Ujelang during these years. First, are many similar versions of the stories that elders told on the atoll in the mid-1970's. While stories of suffering are virtually innumerable, those that are repeated again and again focus on a number of core incidents including famine and hunger, near starvation and death from illness, food shortage and the limitations of the environment on Ujelang (fishing/collecting), the polio epidemic, the measles epidemic, the rat infestation, the time of the strike, and easing of suffering during the 1970s but with continued homesickness and desire to return to Enewetak.[85]

The testimony of the witnesses reinforced this broad statement. Samson Yoshitaro told of the food shortages, how there was so little food and supply ships so infrequent that they were forced to harvest immature pandanus and breadfruit and eat the relatively small amounts of copra they had produced for

[85] Claimants' Exhibit 147, p. 14.

sale. He told how they had no breakfast, would gather what they could for lunch and have fish and arrowroot for supper. He also related how there were so many rats that the people competed with rats for food, and that the rats would "eat your hands." James Gideon told how so much time was spent in the lagoon getting food, mainly clams, that men's hair turned reddish.[86] He told how the copra was eaten by rats because it was so long between field trip ships. Ms. Rennie Roberts testified how the women had to use flour sacks for clothes. She lived in both Arno and Ujelang as she grew up and she found greater hardships on Ujelang. She told of the polio epidemic in 1956 and 57, which she learned of from her parents and grandparents. Some mothers had to nurse two children because one mother would have no milk. Senator Ishmael John testified how the people didn't want to go from their homeland to Ujelang when they were relocated. In the early years there was not a food shortage, even though the ships were infrequent. The shortages started in 1956. From 1956 to 1972 was the worst suffering. Dr. Carucci [87] relates the following from a woman in her forties, told to him in 1978, near the end of a food shortage. Although lengthy, it is recounted in full to capture the fullness of the hardship experienced by the people:

> We, perhaps we (endeared, inclusive) are very hungry now with people sailing here and there throughout the atoll to search for food, and with everyone digging arrowroot, consuming pikukkuk (an arrowroot-based Wojlan food), and scraping coconuts too unripe for harvesting from their shells with their teeth (because the copra-stage coconuts are gone), and with everyone eliminating shit so watery it evaporates or seeps into the sand, with many people sick and some of the babies nearing death, but things are still O.K. The young ones call this a famine (nita), but in comparison with the times of the past, this is just a severe hunger.

---

[86]Dr. Carucci notes that while the people attributed this reddish-blondish hair coloring to too much time in the sun, the discolored, frazzled appearance is characteristic of malnutrition. Claimants' Exhibit 147, p. 19.

[87]Dr. Carucci has spent four years residing with Enewetak and Ujelang people conducting research. A portion of that time was spent on Ujelang in the late 1970s. He notes that "the stories Enewetak people today tell of suffering on Ujelang, . . . lack the kind of depth, elaboration, and emotion that stories of the same events had in the 1970s. And, of course, this is because the experiences of those events are far more remote [today] than they were in 1976-78. At that time, people still knew what it was like to be hungry." Claimants' Exhibit 147, p. 15.

> (Meditates) . . . Those times previously were difficult days on Wojlan, for then, the times of hunger, of real famine, were more frequent than the times of health. God have mercy on us (kapokwekej). Many children and old ones died as a result of those times of danger. Tebij, the man who is the grandfather of Paul and Mahten, well, he was one of those who died on account of the famines. And infants, well there were so many who disappeared (died), you could not count them. Their stomachs stuck out like they were bloated, and you would never think that they were hungry. Full; as you looked at them you would think they were very full. But, in fact they were hungry. And their stomachs were soft all the time, and when they deficated, it was just water, hot foamy water that winnowed away into the sand. Just like nowadays. But they would get hot fevers, then cold chills; hot fevers, then cold and sweaty. And then, in just a moment, they would be gone. Dead, they would never move again. Their life was gone. And, in those days, the wailing across the village was constant. We grieved, but there was hardly time to feel sorry for those who died, for we had to try harder and continue working or else all of the others would die as well.
>
> So, you see, when Tebij died, some members of his family had to pause and prepare for the funeral. Some women grieved, and a few of the men had to dig the grave. But, at the same time, while the men dug, others had to remain in the sea and collect food.. They had to redouble their labors because they would then fish for themselves and their own family as well as for the family of that other one, the one who had died. And, as you know, they were already in the sea from some time prior to the appearance of the sun until the sun once again dove (into the sea in the evening). There was no breakfast. The children would wake up crying, and they would never stop crying on account of their hunger. They would scrape coconut with their teeth until their stomachs were slightly filled but, at times, even the supply of coconuts were exhausted. You could scrounge around Jabonbok (the windward-most tip of Wojlan) until you were exhausted and find only one, perhaps two. Even the immature copra-stage nuts on the tallest coconuts in Jabonbok were gone, for the young men had already climbed them and stripped away their fruits.
>
> And so, the infants would just cry, because there was no milk at their mother's breasts. Only the smallest quantity (of milk), but it was of no use because it was so watery – like rainwater. And the women would have to aojek, make an arrowroot-based jello, often just with water because there were no drinking coconuts, just to keep the infants from crying. If it was a good day, perhaps a woman's husband would come home by noon with a few fish, or if (he) had bad luck, perhaps a few clams. And, as you know, during these times of famine, fishing is very difficult. Everyone is in the sea from morning until night, and even on Ane-manot or Kalo (the islets furthest from Wojlan islet) there are inadequate numbers of fish. And even the fish that remain are easily frightened.[88]

These hardships were confirmed by the Defender's witness, Dr. Pollock. She notes in her report submitted to the Tribunal, about the period from the mid 1950s to 1971:

> It was a phase of great hardship for the people living on Ujelang. They experienced crop failures, shortage of fish in the lagoon . . . The infrequency and irregular field trip ships to buy their copra and sell them the food so badly needed was the second major concern reported . . . Their ability to purchase supplementary food was thus virtually non existent. "They were on the verge of starvation" [citation omitted]. As the population grew and

---

[88]Claimants' Exhibit 147, pp. 15-16.

field trip ships became more infrequent, so their plight increased through to 1971.[89] Although the hardships associated with the relocation of the people of Enewetak to Ujelang have been characterized as "discomfort and annoyance" to be consistent with the formulation for compensation in the Second Restatement of Torts, it is clear that the conditions suffered by those relocated go far beyond simple annoyance. The Defender of the Fund has suggested that this category of damage would be more appropriately addressed through the Tribunal's personal injury program. The Tribunal disagrees. The Tribunal has previously stated in ruling on the Defender's MOTION TO LIMIT CATEGORIES OF DAMAGE in this case that:

> To the extent that these damages are the result of damages to property and arise out of a loss of use to that property , they are properly considered as consequential damages. We see, in general, the damages related to relocation as falling with in this category. However, to the extent that such personal interest damages may otherwise result from the Nuclear Testing Program, such as a medical condition caused by exposure to radiation from the tests, we agree with the Defender that they should properly be pursued through a Section 23(13) or (14) action.[90]

This class action is the appropriate vehicle to address these damages because it is so closely related to the underlying subject matter of land damages. These damages, which were suffered on a community wide basis differ from those typically addressed in the personal injury program, which are basically radiogenic diseases, linked to exposure to radiation from the testing program. The injuries at issue here are those arising out of the relocation to Ujelang and the hardships endured there by the people because of its remoteness and lack of adequate resources to support the population sent there. The damages are a consequence of the loss of their land and their relocation attendant to that loss. Further, it makes sense from the point of judicial economy to consider these damages with the land damages because they arise out of the same factual situation and involve the same community of claimants. Finally, based upon the

---

[89] *A Perspective on Cultural Loss by the Enewetak People*, by Dr. Nancy Pollock, Defender of the Fund's Exhibit WW, p 4.

[90] DECISION AND ORDER, In the Matter of the People of Enewetak, NCT No. 23-0902, August 11, 1995, pp. 8-9.

NCTA, any award of this nature for personal injuries would be made to the local distribution authority[91], which will determine an appropriate distribution of the award.

The Tribunal will adopt the approach suggested by claimants for quantification of these damages, by paying an annual amount for each person on Ujelang for each of the thirty three years between 1947 and 1980 the people of Enewetak were on Ujelang. The population numbers are those set out in Claimant's Exhibit 203. Although these numbers reflect projections, they are based on data collected by Dr. Carucci, as explained in his testimony, and reflects the best numbers available to us. In determining the annual amount, it must be acknowledged that not all people suffered the same degree of hardship (as revealed by the dietary information set forth by Dr. Carucci and Mary Maifeld,)[92] and the level of hardship was not uniform over the period of years the people of Enewetak were residing on Ujelang. Nonetheless, it is clear that the remoteness of Ujelang, the relative lack of resources and scarcity of food, and the separation from the people's traditional homeland were all factors that the population on Ujelang shared. The Second Restatement on Torts requires damages to be established with certainty.

> One to whom another has tortiously caused harm is entitled to compensatory damages for the harm if, but only if, he establishes by proof the extent of the harm and the amount of money representing adequate compensation with as much certainty as the nature of the tort and the circumstances permit.[93]

Under the unique circumstances of this claim, the requisite certainty has been met. Those circumstances include the length of time that has passed between the time of the harm and the opportunity to present evidence on that harm and the fact that the delay was not the fault of the people of Enewetak. Another factor is the statutory framework under which their claim is being heard.

In determining the amount of compensation for these sufferings, the Tribunal has considered not only the cases cited by counsel, but also the Tribunal's personal injury program. Under that program, the maximum award for a claimant is $125,000 for serious medical conditions most likely to lead to

---

[91] 42 MIRC 123(17)(b)(iii).

[92] Claimants' Exhibit 147.

[93] *Restatement on Torts Second*, Section 912.

death. In order to be fair and consistent to all personal injury claimants, an individual should not receive hardship damages which exceed this amount.

As has been described by the witnesses, the relative hardships suffered on Ujelang varied with time. However, there was general agreement that the period of approximately 1956 to 1972 was the period of greatest suffering. For this period of 16 years, an annual per person amount is determined by the Tribunal to be $4,500. For the remaining 17 years, preceding and following this period, the annual amount is $3,000. This means that an individual who was present on Ujelang for all thirty three years would receive $123,000. The Tribunal acknowledges that this amount is somewhat arbitrary and cannot fully repay those who suffered on Ujelang. The Tribunal can only echo the court in <u>Mochizuki v. US</u>:

> No compensation is ever equivalent to a serious human loss. Who among us would ever trade our eyes or legs for $5,000 or $20,000 of a hundred times that much? Money damages can never undo the loss of life, false imprisonment or the passage of years. Money, however, is the medium which the law must use as it seeks to wright the wrongs. It must use this medium with the full recognition that it is never truly adequate.[94]

Based upon the annual population figures for thirty three years, starting in 1947 and ending with the return to Enewetak in 1980, and the appropriate per annum amount, the damages for the hardships during the relocation to Ujelang amount to $34,084,500.

**VI. Conclusion**

With this decision, the Tribunal makes its first award for damages to property. Through the process, the Tribunal has heard testimony from the people of Enewetak and from expert witnesses from both Claimants and the Defender of the Fund. It has reviewed voluminous reports and documents. It has had the benefit from the arguments of counsel. The Tribunal has determined that the people of Enewetak, the claimants in this case, have suffered loss and injury to their property and to their persons. While the Tribunal is charged with the determination of these damages, the claimants have suffered damage beyond that which money can compensate. The destruction and disruption of their community and the attendant life style and values cannot be compensated with an award of dollars. The passage of time and changes in culture preclude a return to the way things were half a century ago. While that

---

[94]<u>Mochizuki v. US</u>, 43 Fed.Cl. 97 (1999) at p. 97.

which was lost may be priceless, it does not mean it was without value; nor does it justify an award which is not firmly based in fairness and reasonableness.

The Tribunal has determined the amount of compensation due to the claimants in this case is **$324,949,311**. This includes $199,154,811 for past and future loss of use of Enewetak Atoll to claimants. It further includes $91,710,000 to restore Enewetak to a safe and productive state. Finally, it includes $34,084,500 for the hardships suffered by the people of Enewetak as a result of their relocation attendant to their loss of use.

**ORDER**

Based on this decision, it is hereby ORDERED that a hearing shall be set for post-judgment proceedings, including a determination of annual funding pursuant to 42 MIRC 123(17)(b)(iii)(B).

Dated this ___ day of April, 2000 at Majuro, Marshall Islands.

/s/ Oscar De Brum

OSCAR DEBRUM
CHAIRMAN

/s/ Gregory J Danz

GREGORY J DANZ
MEMBER

/s/ James Plasman

JAMES PLASMAN
MEMBER