UNITED STATES COURT OF CLAIMS

FILED
SEP 1 5 1982
COURT OF CLAIMS

JOHANNES PETER; BINTON ABRAHAM; HERTES JOHN; ISHMAEL JOHN; DAVY ONIL; SAM LEVAI; MASAO LUKAS; SAIMIN ANNINE; SAUL ABRAHAM; JOHNNY LAVIN; HIRAM JOHN; ALIK JORAM; JORLANG HESIA; TIRA GEORGE; BOAS OBET; ARNO EDWARD; NEPTALI PETER; JOHN ABRAHAM; ATWAR ABNER; EDWARD ABNER; INEKO ABNER; JARINA ABNER; JOULIK ABNER; KALINTA ABNER; MALON ABNER; ROSA ABNER; SEIKO ABNER; MOSES ABRAHAM; OSCAR ABRAHAM; RINA ABRAHAM; ROS ABRAHAM; SASEL ABRAHAM; TELLSY ABRAHAM; MISCO ABRAM; JACKSON ADING; JACKSON ADING; ALWINA AIJOK; DENEM AILE; NERIA AILE; KON ALBIOS; MERIA ALBIOS; ALBIOS ALBIOUS; HEJIWAN ALBIOUS; LITA ANNINE; ADELMO ARUO; ALMI ARUO; BOB ARUO; MARTHA ATONEJ; BILIMON BENJAMIN; JIMEKO BENJAMIN; RWEE BENJAMIN; WISE BOKTOK; NEWAI BRUJI; NEWAN BRUJI; BOAZ DAVID; NORMA DAVID; OBET DAVID; ABNER EDWARD; ALVO EDWART; BAB EDWART; FRANK EFRAM; ANKELLA ELISA; ELENORA ELISA; HELTHY ELISA; JESTA ELISA; JOBI ELISA; JONOLING ELISA; JORBI ELISA; JOSI ELISA; SAMSON ELISA; TOBI ELISA; WALTEN ELISA; WALTER ELISA; YOSTARO ELISA; WELLY ELISHA; ALEXANDER EPISAN; LIMENIKI EPISAN; LEKMUALIKOJANI ERINE; JOSEPH ERNEST; METLINA ERNEST; TARMI EZRA; MERITA G; JOSEN GEORGE; LIONE GEORGE; PRINCELA GEORGE; RARIJILLA GEORGE; SENITA GEORGE; BENJAMIN GIDEON; BENSMON GIDEON; BILMON GIDEON; JAMES GIDEON; JENNY GIDEON; MERLY GIDEON; NEIWAR GIDEON; PILIMON GIDEON; AKNETA GIDEON;

No. 461-82 L

DEFENDANT'S EXHIBIT 1

NEW

SEND TO FILE PROMPTLY AFTER ACTION THIS ITEM AUTHORIZES JACKETING OF FILE MATERIAL DO NOT FILE IN OFFICE FILE

90-1-23-2342
DEPARTMENT OF JUSTICE
44 SEP 16 1982
LANDS
RECORD

LANDS GEN. LIT. SEC. GENERAL TRIAL UNIT

NETWE GIDION; TIEKO GIDION; MERLINE HAMROS; YOTA HAMROS; ESTER HARRIS; ROSA HARRY; EIKO HENRY; SETAO HENRY; ALBIOS HER; ESTER HER; ROSTED HERMIOS; JIMMY IBAN; NAMIKO IBAN; SABOT IBAN; DRUSIE IJO; KILEON IJO; SALMON IJO; EMEN ILE; JUSENA INOK; LEMENYEN INOK; MERIAN INOK; ERITA ISHIA; HARRY JACKSON; JONATHAN JACKSON; MERLY JACKSON; ROSIE JACKSON; SITELLA JACKSON; JORKI JAMES; MISKAI JAMES; MEJKAI JEMES; NAMIKO JERION; WILMA JERION; RENNY JELOR; JOJONI JERILONG; AIKO JETA; NIOSE JETAO; YULINA JETAO; MITA JIMEON; SENORITA JIMEON; TORA JIMMY; BETTY JITIAM; ELPER JITIAM; ERINE JITIAM; JELINA JITIAM; JELNIA JITIAM; JITIAM JITIAM; LUCKY JITIAM; MALOMI JITIAM; MATHEW JITIAM; NATHAN JITIAM; TAKEO JITIAM; TINE JITIAM; MINA JOANEJ; RENTON JOANEJ; ELIKENA JOB; ERZA JOB; INOK JOB; JACOB JOB; KARMY JOB; KTRIN JOB; MEDIEN JOB; ELISA JOBI; NAPTALI JOHANES; NERAI JOHANES; NERUJI JOHANES; PETER JOHANES; SRUDEL JOHANES; TOKKO JOHANES; ALFRED JOHANNES; BILA JOHANNES; MORBY JOHANNES; TOREKA JOHANNES; AKIEN JOHN; AKING JOHN; ANAKO JOHN; BALIKON JOHN; BENJI JOHN; ELINOR JOHN; EONEAN JOHN; ERIMIOS H. JOHN; GLORINTA JOHN; HERTIEN JOHN; ISMAEL JOHN; JETAK JOHN; LORIA JOHN; MARY JOHN; MARGROSE JOHN; MISHAEL JOHN; ROSELINDA JOHN; ROSKET H. JOHN; YOSTER JOHN; NOSIKA JONATHAN; TAREKO JONATHAN; EBEL JOSEPH; ESTILA JOSEPH; JENE JOSEPH; KUNIO JOSEPH; LINDA JOSEPH; SMITH JOSEPH; KENJI KATION; DORTHY KEN; KARE KEN; KATIOS KEN; NOMIKO KEN; NEITA KEN; NOJI KEN; NOSHI KEN; RIDA KEN; ROSHITA KEN; THOMSON KEN; TIMOTHY KEN; TOKIKO KEN; BURUJI KILION; JAN KILION; MJRK KILON; RUDY KATION; SALLY KILON; SEBE KILION; TAKAJI

KILION; WILLAM KILON; ZEBEDY KILION; MARAME KITION; TOPIK KITION; ALBIOS KON; MERJO KON; TOKIKO KON; KEN LEPPO; MAJI LEPPO; ERINE J. LIBAI; JOHNNY LING; KENYE LING; RITEN LOMJEROK; ELINA LORENJI; SAM LUK; YOJKO LUK; ALEE LUKAS; BURNIKO LUKAS; ELIJENA LUKEY; GIDEON LUTHER; MARTHA LUTHER; TONIS LUTHER; CHARLETTE MAKORORO; LOMBWE MARK; JERRY MARTIN; ULIA MATAN; MAYOMI MATTHEW; NETA MORBY; ROSE MOSES; JEKO NEPTALI; TOSHIRO NEPTALI; DOROTHY NOSIE; ANEJ OBET; DAVID OBET; MATAN OBET; PAUL OBET; RUTH OBET; YULA OBET; MYER ONIL; TELENJA ONIL; NATHAN OPET; ADRINO PAUL; AJILA PAUL; BALIK PAUL; DRIKJALMIN PAUL; LINA PAUL; TAKIEO PAUL; TOMIKO PAUL; AKEO PETER; BILA PETER; ERPIN PETER; JOHANES PETER; SUENA PETER; SWITSEO PETER; TOM PETER; JIMA RENTON; EMLI RENTON; MINA RENTON; LENJEN SAM; YOSHIKO SAM; ARBELLA SAMSON; SAIMON SAMSON; RIKO SAREM; RINA SAUL; JONATHAN SMITH; MONIKA SMITH; JERRY TAKASHI; ISAAC TIRA; JONTAKO TIRA; TAMAR TIRA; LIMEJO TAKLIK; SUANIA TOMI; ANTONIO UIN; TINA WELLY; ROSLIE WILLY; ATHELMA YOSHITARO; GEORGE YOSHITARO; and LUTHER ZAKIOUS, collectively known as the PEOPLE OF ENEWETAK,

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant.

## PETITION

### NATURE OF ACTION

1. This petition asserts claims against the United States arising from its actions with respect to Enewetak Atoll in the Trust Territory of the Pacific Islands and the people of Enewetak. These claims are for just compensation, breach of implied-in-fact contract, breach of obligations under the Trusteeship Agreement for the Trust Territory of the Pacific Islands, and breach of express contract.

### JURISDICTION

2. This Court has jurisdiction pursuant to 28 U.S.C. § 1491.

### PLAINTIFFS

3. Plaintiffs collectively make up a community known as the people of Enewetak. Each plaintiff is a member of that community. All were members of the Enewetak people in December 1947, when all of the inhabitants of Enewetak Atoll were evacuated to Ujelang Atoll prior to the commencement of a series of nuclear weapons tests conducted by the United States on Enewetak Atoll, or are either (i) direct descendants of such members or (ii) members of the Enewetak people by marriage to or adoption by a member.

4. The people of Enewetak are citizens of the Trust Territory of the Pacific Islands (hereinafter "Trust Territory") and of the Marshall Islands.

5. All plaintiffs possess land rights on Enewetak Atoll, as recognized by Marshallese and Enewetak law and custom, and by the law of the Trust Territory.

6. The people of Enewetak are governed by two Chiefs (or Iroij), each representing one of the two Enewetak subcommunities (see paragraph 25), a Magistrate, an elected Council of twelve members, one of whom is Chief Councilman, and a Scribe. There is also a Senator, who represents Enewetak in the Nitijela, the legislature of the Marshall Islands government. Each of these officers and all of the members of the Enewetak Council are named plaintiffs in this action.

7. Plaintiff Johannes Peter is Iroij of the dri-Enewetak. Plaintiff Binton Abraham is Iroij of the dri-Engebi.

8. Plaintiff Hertes John is the Magistrate for the people of Enewetak.

9. Plaintiff Ishmael John is the Senator for the people of Enewetak.

10. Plaintiff Davy Onil is the Chief Councilman of the Council of the people of Enewetak.

11. Plaintiff Sam Levai is the Scribe for the people of Enewetak.

12. Plaintiffs Masao Lukas, Saimin Annine, Saul Abraham, Johnny Lavin, Hiram John, Alik Joram, Jorlang Hesia, Tira George, Boas Obet, Arno Edward, and Neptali Peter comprise, with Chief Councilman Onil, the Council of the people of Enewetak.

13. A list of the names of all of the other plaintiffs is attached as Exhibit A.

## INTRODUCTION AND BACKGROUND

### A. Location of Enewetak

14. Enewetak Atoll is located in the extreme northwestern part of the Marshall Islands. It is one of 29 atolls and 5 islands comprising the Marshall Islands, which are scattered over 357,000 square miles north of the equator in the central Pacific Ocean. A map of the Marshall Islands is attached as Exhibit B.

15. The Marshall, Caroline, and Mariana Islands (which collectively are known as Micronesia) are the

geographical components of the Trust Territory, which consists of more than 2,000 islands and atolls dispersed throughout an ocean area approximately the size of the continental United States.

B. Administration of the Marshall Islands

16. In 1885, Germany seized control of the Marshall Islands from Spain, which had exercised nominal control over Micronesia since the late 1600s. Germany purchased Spain's remaining holdings in Micronesia in 1899 and controlled the islands until Japan seized them at the outbreak of World War I. Japan administered Micronesia under a League of Nations Mandate until World War II, when the islands were occupied by the United States in 1944.

17. Shortly after the United States invaded Majuro Atoll in the Marshall Islands on January 30, 1944, Admiral Chester W. Nimitz, Commander in Chief of the United States Pacific Fleet and United States Military Governor of the Marshall Islands, issued Proclamation No. 1, pursuant to which the United States assumed all powers of government in the Marshall Islands. Proclamation No. 1 became effective as to Enewetak Atoll in February 1944, when the atoll was occupied by United States military forces.

18. On July 18, 1947, the United States entered into an agreement with the United Nations under which Micronesia became a United Nations strategic trust territory administered by the United States. See Congressional Joint Resolution, 61 Stat. 397; Trusteeship Agreement for the Former Japanese Mandated Islands ("Trusteeship Agreement"), 61 Stat. 3301, T.I.A.S. No. 1665. The Trusteeship Agreement confers certain powers upon the United States over the Trust Territory and in return imposes certain obligations upon the United States for the benefit of the citizens of the Trust Territory in the administration of the Trust Territory.

19. On July 18, 1947, President Truman terminated the military government of the Trust Territory and delegated civilian administration of the Trust Territory to the Secretary of the Navy. Executive Order No. 9875. In 1951, administrative responsibilities were transferred to the Secretary of the Interior by Executive Order No. 10265. During 1952 and 1953, the President transferred responsibility for administration of parts of the Trust Territory back to the Secretary of the Navy. Executive Orders Nos. 10408 and 10470. Not until 1954 did Congress begin to legislate to implement the Trusteeship Agreement and then it merely stated that until it should provide further for the government of the Trust Territory all governmental authority was vested in the

President. See 48 U.S.C. § 1681. In 1962, the President redelegated his authority for civil administration of the entire Trust Territory to the Secretary of the Interior. Executive Order No. 11021.

20. In each of the Executive Orders described and referenced in paragraph 19, the President ordered the civilian administration to carry out the obligations assumed by the United States under the terms of the Trusteeship Agreement. The Trusteeship Agreement also constitutes a part of the Trust Territory Code, the organic law applicable to the Trust Territory.

21. The executive authority of the Government of the Trust Territory is vested in the High Commissioner of the Trust Territory. The High Commissioner and other subordinate Trust Territory officials act under the general supervision and direction of the Secretary of the Interior, subject to the authority of the President and pursuant to Acts of Congress. See Department of the Interior Orders Nos. 2918 (December 27, 1968, as amended March 24, 1976), 3027 (September 29, 1978), and 3039 (April 25, 1979). The High Commissioner is appointed by the President with the advice and consent of the United States Senate.

22. In 1969, negotiations commenced between the Government of the United States and the inhabitants of the Trust Territory regarding the future political relationship between Micronesia and the United States. During the course of these negotiations, four governmental entities -- the Northern Mariana Islands, Palau, the Marshall Islands, and the Federated States of Micronesia -- were established for the purpose of developing local governmental institutions.

23. In Department of the Interior Secretarial Order No. 3027, the Secretary of the Interior established procedures for Palau, the Marshall Islands, and the Federated States of Micronesia to develop local constitutions. In Order No. 3039, the Secretary of the Interior recognized a local government for the Marshall Islands, under a constitution of the Marshall Islands adopted by plebescite on May 1, 1979. Under this local governmental structure, the Marshall Islands exercises certain powers of self-government under the administration of the United States. Pursuant to Order No. 3039, the U.S. High Commissioner maintains an absolute veto power over all enactments of the Marshall Islands legislature, however, and continues to exercise, under the general supervisory authority of the Secretary of the Interior, "all authority necessary to carry out the obligations and responsibilities of the United States under the 1947 Trusteeship Agreement."

## STATEMENT OF THE CASE

### A. Enewetak and Its Early History

24. The approximately 40 islands of Enewetak Atoll have a combined land area of approximately 2.75 square miles. The two largest islands are Enewetak Island, in the southeast quadrant of the atoll, which has a land area of 321.86 acres, and Engebi Island, on the north rim, which has a land area of 290.58 acres. The islands of the atoll enclose a lagoon area of approximately 388 square miles. A map of Enewetak Atoll is attached as Exhibit C hereto.

25. The Enewetak people have traditionally been divided into two more or less separate and distinct communities located on the two largest islands on the atoll: the dri-Engebi, situated on Engebi Island on the north rim, and the dri-Enewetak, located on Enewetak Island, across the lagoon in the southeast quadrant of the atoll. The traditional settlement pattern of both communities was dispersed; residents were located on separate land parcels and were scattered along the length of the lagoon beach. Members of the two communities historically have intermarried and cooperated in certain economic activities, and now elect a common council. Nevertheless, the Enewetak people continue to maintain their hereditary ties to one or another of the two groups.

26. The people of Enewetak have always maintained a deep emotional attachment to their home islands and ancestral land. Under traditional Enewetak land tenure law and custom, every individual was -- and still is -- born with land rights in the islands of Enewetak Atoll. Land is regarded as a commodity that cannot be sold, even to other members of the Enewetak community, but may only be passed from generation to generation. Ties to the land are therefore unusually strong. Throughout Enewetak history, land rights have never been sold or given away to outsiders except through fear of physical force or other sanction.

27. Prior to their removal from Enewetak Atoll in 1947, the people of Enewetak relied almost exclusively upon nonintensive agriculture, lagoon fishing, and various gathering activities for their material needs. Beginning in the early twentieth century, the people of Enewetak also produced copra (dried coconut meat) as an export crop for occasional purchases of imported items. The people remained economically self-sufficient and their life-style changed little from the time they first settled on Enewetak Atoll (probably in the fifth or sixth century) until World War II.

B. <u>World War II and United States Occupation</u>

28. During World War II, the Japanese made Enewetak Atoll a strategic base, fortifying the atoll and constructing an airfield on Engebi. Several thousand Japanese military personnel occupied the atoll.

29. In February 1944, United States troops captured Enewetak Atoll from the Japanese.

30. Because of the military campaign, the people of Enewetak were severely in need of food, shelter, clothing, and medical attention when the American forces occupied the atoll. Indeed, eighteen Enewetak people had been killed during the battle for the atoll. The commanders of United States forces on the atoll therefore took the following measures to aid the people of Enewetak and to maintain order during the presence of active military operations on the atoll:

(a) On February 17, 1944, the Marine Corps gathered the inhabitants of Engebi Island, who had all moved to unoccupied islands along the east fringe of the atoll, into a temporary camp and gave them food and medical supplies.

(b) On February 18, 1944, the inhabitants found on Enewetak Island were sent out to the U.S.S. Cambria to be given food and to be questioned. Later they were returned to

shore and given shelter in a huge bomb crater. Food was sent ashore and its distribution assigned to the two chiefs. In the following days the military beachmaster had the crater enlarged, had a tarpaulin erected to provide temporary shelter, and issued the people blankets, clothing, food, and cooking utensils. As other Enewetak people were found on the atoll, they were brought to this shelter.

(c) On February 24, 1944, the inhabitants of this camp were moved to Aomon Island, also part of Enewetak Atoll. On February 25, the inhabitants of Engebi were transferred to Aomon. Eventually, the total population of the atoll was gathered in the camp on Aomon.

(d) On February 24, 1944, the military government officers posted the proclamation issued by Admiral Nimitz described in paragraphs 17 and 85. On February 25, the officers held a meeting with the people of Enewetak in which the officers told the people that (i) they must all live on Aomon Island for the time being; (ii) they must not build fires at night; and (iii) they must cooperate to conserve food supplies and to develop indigenous food sources. The military officers also arranged to make the services of a doctor available to the people.

31. After July 4, 1944, when the Army unit left the atoll, the Navy continued feeding, clothing, and housing the Enewetak people on Aomon Island and adjacent Bijire Island. The Navy continued to provide and maintain all the supplies of food, clothing, housing, and other provisions until June 1946, when the Enewetak people were first removed from the atoll. During that time, the United States also organized efforts to redevelop indigenous food sources, restored a school, and provided medical care in a military hospital on Enewetak.

32. During the period February 1944 to late 1945, the United States military government controlled the access of the Enewetak people to the atoll. The Enewetak people were permitted to reside on Aomon and Bijire Islands, but many of the other islands in the atoll either were strictly off-limits to them or could be visited or resided on only with permission of the military government. The United States military government also restricted access of the Enewetak people to large portions of the lagoon. During this period, the United States used portions of these islands and the lagoon for various military purposes, including storage of supplies, location of buildings, rifle target practice, marching, and training.

C. First Removal from Enewetak Atoll

33. In June 1946 the entire population of Enewetak Atoll was removed from the atoll prior to the commencement of Operation Crossroads, the first series of atomic tests at Bikini Atoll, Enewetak Atoll's eastward neighbor in the Marshall Islands. The United States officials who were in charge of Operation Crossroads decided that the evacuation was a necessary precaution against the possibility of damage to Enewetak Atoll and its people resulting from the tests. The people of Enewetak were transported by the Navy to Kwajalein Atoll on June 14, 1946. From June 14 to July 30, 1946, the Enewetak people were housed in temporary facilities there and provided with food and other supplies by the Navy. On July 25, 1946, after the detonation of atomic weapons at Bikini Atoll on June 30, Enewetak Atoll was declared safe. On July 30, 1946, the Enewetak people were returned to Aomon and Bijire Islands at Enewetak Atoll.

34. The people of Enewetak never consented or otherwise agreed to be evacuated from Enewetak Atoll and/or relocated to Kwajalein Atoll. Rather, they submitted to the operation in the face of statements and actions by United States officials which led them reasonably to believe that these officials were ordering them to relocate from their

homes, that they were given no choice whether to relocate or not, that their objections would not be heard or considered, and that their cooperation was necessary to avoid the use of force by the United States. At no time were the Enewetak people planning to move anywhere or desirous of moving anywhere, but were looking forward to improving conditions on their home islands.

35. During the period of residence of the Enewetak people on Kwajalein, United States officials directing the operation, through their actions and statements, as specified further in paragraph 86, led the Enewetak people to believe, and the Enewetak people did in fact reasonably believe, the following:

(a) that their removal from Enewetak Atoll would be temporary;

(b) that they would be able to return to their homes on Enewetak at the conclusion of the temporary use of their atoll in connection with the Bikini atomic tests;

(c) that Enewetak Atoll would be returned to them in as good condition as when they were removed from it;

(d) that their temporary relocation was necessary in order to protect them against harm to their health resulting from operations being conducted on Bikini Atoll; and

(e) that throughout their relocation their needs for food, shelter, and other necessities would be fully met by the United States.

D. Second Removal from Enewetak Atoll

36. In June 1947, President Truman authorized planning for Operation Sandstone, a series of nuclear tests designed to develop a new series of weapons. On December 1, 1947, Enewetak Atoll was chosen to be the site for those tests.

37. When the United States chose Enewetak Atoll as the site for Operation Sandstone, it decided to remove the Enewetak people to Ujelang Atoll. That atoll had been developed as a commercial copra plantation, using wage laborers from the Eastern Carolines, during the German and Japanese colonial periods. It was abandoned during World War II, however, and was uninhabited at the beginning of December 1947.

38. In December 1947, John P.W. Vest, Captain, U.S. Navy, and the United States Governor of the Marshall Islands, arrived on Enewetak Atoll and informed the Enewetak people that within days they would have to leave their atoll and that they would be moved. In December 1947, the entire population, carrying what they could of their personal belongings, left Enewetak Atoll aboard a U.S. Navy LST vessel. On December 21, 1947, the Enewetak people arrived at Ujelang Atoll.

39. The people of Enewetak never consented or otherwise agreed to be evacuated from Enewetak Atoll and/or relocated on Ujelang Atoll. Rather, they submitted to the relocation and the taking of their home atoll in the face of statements and actions by United States officials which led them reasonably to believe that these officials were ordering them to relocate from their homes, that they were given no choice whether to relocate or not, that their objections would not be heard or considered, and that their cooperation was necessary to avoid the use of force by the United States. At no time were the Enewetak people planning to move anywhere or desirous of moving anywhere, but were looking forward to improving conditions on their home islands.

40. During the period of the removal of the Enewetak people to Ujelang Atoll and afterwards, United States officials directing the operation, through their actions and statements, as specified further in paragraphs 88-92, led the Enewetak people to believe, and the Enewetak people did in fact reasonably believe, the following:

(a) that their removal from Enewetak Atoll would be temporary;

(b) that they would be able to return to their homes on Enewetak at the conclusion of the temporary use of their atoll by the United States;

(c) that Enewetak Atoll would be returned to them in as good condition as when they were removed from it;

(d) that their temporary relocation was necessary in order to protect them against harm to their health resulting from operations on their atoll; and

(e) that throughout their relocation their needs for food, shelter, and other necessities would be fully met by the United States.

41. The people of Enewetak never consented or otherwise agreed to remain on Ujelang Atoll. Rather, they remained in residence there until the United States permitted them to return to Enewetak Atoll in the face of statements and actions by United States officials which led them reasonably to believe that these officials would not permit them to return to Enewetak Atoll until the conclusion of its use and occupancy by the United States.

42. The people of Enewetak never intended to convey, and never in fact conveyed, any right, title, or interest in Enewetak Atoll to the United States.

43. During the period of their residency on Ujelang Atoll, United States officials, through their actions and representations, continued to lead the Enewetak people to believe, and the Enewetak people did in fact reasonably

believe, the accuracy of the information set forth in paragraph 40.

E. Conditions on Ujelang

44. Ujelang Atoll is the westernmost and most geographically isolated of the inhabited atolls and islands comprising the Marshall Islands. It lies 124 miles southwest of Enewetak Atoll and 617 miles west of Majuro, the administrative center and the major commercial port for the Marshall Islands. Ujelang Atoll has 0.67 square miles of dry land area and 25.47 square miles of lagoon surface area, much less than Enewetak Atoll's 2.75 square miles of dry land area and 388 square miles of lagoon surface area. Ujelang Island, the largest of the atoll's islands, is rocky and unproductive as compared with the principal islands of Enewetak Atoll.

45. As described in paragraph 37, Ujelang Atoll was uninhabited at the time the Enewetak people moved there, and no one had been living there for several years. Useless brush had grown up everywhere and there were no breadfruit trees.

46. During the period just before and shortly after the Enewetak people moved to Ujelang, United States Navy personnel constructed temporary housing, rain catchments, and several other buildings there. All United States personnel

left Ujelang shortly thereafter, leaving some food supplies, but also leaving the Enewetak people completely isolated from the rest of the world except through infrequent and irregular visits by Trust Territory field trip ships.

47. Ujelang's resources were inadequate to supply the Enewetak people with a regular supply of food and other material necessities. This lack of resources, combined with the infrequent and irregular ship visits, resulted in periods of extreme hunger and material deprivation. The inadequacy of export resources and the lack of incentive to produce trade goods caused by the infrequent and uncertain ship visits resulted in severe shortages of imported rice, flour, and materials for repair of buildings and boats.

48. By 1952, most of the Enewetak people's sailing canoes were rendered unusable by a severe shortage of sailcloth, paint, fishing net material, and hooks. In response to the Enewetak people's repeated requests for these materials, a special field trip ship arrived in December 1952, but brought only enough sailcloth for two canoes, paint that was unsuitable for the canoes, and little else of use.

49. Production of copra -- the chief export crop -- gradually diminished during the period on Ujelang. The inadequacy of Ujelang's resources and the infrequency and

unreliability of field trip ship visits created food shortages that induced the people to eat the coconuts instead of making copra to sell.

50. In the mid-1960s there was a great increase in the island's rat population, which fed off and destroyed the stored copra and the supplies of imported rice and flour. The proliferating rat population became a menace to the children and adults on Ujelang, who had to sleep in wooden boxes for protection.

51. By 1967, food was so short that the people on Ujelang had only enough for one meal each day. The housing supply was greatly deteriorated because of the lack of materials for maintenance and repair, and several buildings had been destroyed by a typhoon.

52. On October 20, 1967, a Trust Territory ship arrived to find the people on Ujelang with no copra to sell and no money to buy needed food and supplies. Almost all of the nearly 300 people of the atoll boarded the ship and demanded transport to Majuro to protest to the government that they were starving. A Trust Territory official, after seven hours of efforts to persuade the people to leave the ship, radioed for food and agreed to stay on Ujelang until the supply ship returned. The supply ship returned with food on November 3, 1967.

53. In December 1967 the High Commissioner of the Trust Territory began a small-scale relief effort for the Enewetak people, but by November 1968 the people on Ujelang were totally out of rice, flour, sugar, and other imported goods. Ten deaths resulted from very serious measles and chicken pox epidemics in 1968.

54. In June 1972, a typhoon destroyed the breadfruit crop on Ujelang. On August 30, 1972, a supply ship found that the Enewetak people had been out of rice, flour, sugar, and canned meat for over two weeks.

55. The specific instances of deprivation described in paragraphs 47-54 are only illustrative. Deprivation of these and other types were repeatedly suffered by the people of Enewetak during the time they were on Ujelang.

F. Enewetak Proving Grounds

56. Between April 1948 and August 1958, Enewetak Atoll was the site of 43 atomic and thermonuclear (hydrogen) bomb tests. The tests began with Operation SANDSTONE, in April and May 1948, a series of three atomic weapons blasts ranging in strength from 18 to 49 kilotons. Operation GREENHOUSE, held in April and May 1951, included four atomic tests. In November 1952, the atoll was the site for Operation IVY, which included

the world's first thermonuclear explosion, estimated at 10.4 megatons (750 times greater than the Hiroshima bomb), as well as a "high yield" 500 kiloton atomic bomb explosion. In Operation REDWING, held from May through July 1956, 12 atomic and hydrogen bomb tests were conducted. In Operation HARDTACK, held from May through August 1958, 22 thermonuclear devices were exploded.

57. The tests listed in paragraph 56 were detonated in the air, on towers, on the surface of islands and reefs, on barges, and underwater. Some of the "ground zeros," or surface level explosions, were on the islands themselves, some were on the reef, some were in the lagoon, and one was in the ocean nearby. In addition, two plutonium experiments were conducted on the island of Runit in which the devices did not fully detonate but instead sprayed chunks of plutonium across the island.

58. Nuclear testing on Enewetak ended with the last Operation HARDTACK test on August 18, 1958. On August 22, 1958, President Eisenhower announced a suspension of further atmospheric testing, to take effect October 31. The Nuclear Test Ban Treaty, which banned atmospheric and underwater testing, entered into force on October 17, 1963.

59. Through much of the 1960s, after the prohibition of atmospheric and underwater testing, the atoll's lagoon was used as a "catcher's mitt" target for test missiles fired from Vandenberg Air Force Base in California.

60. In September 1971, the United States Defense Nuclear Agency and the Air Force developed plans for an operation known as the Pacific Cratering Experiments (PACE) on Enewetak Atoll, a program designed to test the "cratering" effect of nuclear blasts by simulating such blasts with high explosives. Between September 1971 and October 1973, the United States conducted preparations for PACE, including stripping vegetation and topsoils from one of the islands. In October 1972, the United States District Court for the District of Hawaii granted a preliminary injunction to the people of Enewetak under the National Environmental Policy Act prohibiting further work on PACE until adequate environmental impact studies were conducted. People of Enewetak v. Laird, 353 F. Supp. 811 (D. Hawaii 1973). On June 8, 1973, the Air Force terminated plans for the PACE program on Enewetak.

61. The nuclear testing program and the preparations for PACE inflicted serious damage to Enewetak Atoll. Five islands in the atoll -- Bokombako (sometimes referred to as Elugelab), Louj (sometimes referred to as Lidilbut), Bokaidrik,

Boken (including a small unnamed islet to the west of Boken), and Eleleron -- were completely or partially vaporized by the nuclear tests. The remaining islands on the north half of the atoll, where the nuclear testing had actually occurred, including the major residential island of Engebi, were heavily contaminated with radioactivity, as was the island of Runit. Debris and wreckage -- radioactive and nonradioactive -- littered many of the islands. The atoll's lagoon was seriously damaged. Large bomb craters covered many of the islands. The entire atoll was agriculturally devastated: vegetation was completely stripped from many of the islands, and nearly all plants of agricultural and economic value on the atoll were totally destroyed.

G. Partial Rehabilitation and Resettlement of Enewetak Atoll

62. On April 18, 1972, Franklin Williams, the United States Special Representative to the Micronesian Political Status Talks, announced that the United States would return Enewetak Atoll to the people of Enewetak by the end of 1973.

63. In October 1973, the United States Atomic Energy Commission published a radiation survey of the atoll which proposed a plan for a nuclear cleanup operation. From 1972 until 1977, various United States government agencies engaged

in studies and planning for radiological cleanup and rehabilitation programs.

64. From May 1977 to April 1980 the United States undertook cleanup efforts. Some members of the Enewetak community participated in the cleanup operation, and for that purpose resided on Enewetak Atoll temporarily and periodically during that period. In April 1980, the Enewetak people as a whole returned to permanent residence on Enewetak Atoll.

65. Despite the cleanup efforts, the Enewetak people have been able to resettle only the southern portion of the atoll. Several of the northern islands, including the major residential island of Engebi, remain off limits (except for occasional visits) by order of the Department of the Interior because of Department of the Interior concerns that the remaining radioactivity (principally from cesium and strontium) renders these islands dangerous for habitation, agriculture, and many other uses for a period estimated by the United States to be approximately thirty years.

66. Notwithstanding the cleanup effort, the islands listed in paragraph 61, which before the testing were productive and economically valuable, have been totally or partially vaporized.

67. Notwithstanding the cleanup operation, and in part as a result of this operation, Runit Island has been rendered totally unusable. It presently contains more than 110,000 cubic yards of plutonium-contaminated soil and debris that during the cleanup operation were collected from throughout the atoll, mixed with cement and water to form a slurry, placed in a bomb crater on Runit, and covered by a concrete dome 18 inches thick and 370 feet in diameter. Runit is expected to be extremely radioactive and dangerous for at least the next 240,000 years.

68. The cleanup efforts did not repair the damage to the atoll's lagoon set forth in paragraph 61.

69. In connection with the cleanup efforts, extensive amounts of plant material and topsoil that were contaminated with plutonium were removed, doing further long-term damage to the agricultural productivity of the atoll. Plants that were replaced during the cleanup have not yet matured to the food-producing stage; these plants will not yield even minimal amounts of food for several years, and will not yield foods in substantial amounts for at least 8-10 years. Furthermore, agriculture, livestock raising, and certain foraging activities are now limited to the southern islands. As a result of these changes, the people of Enewetak are

dependent for their diet upon a supplemental food program conducted by the United States, and will remain so for several years to come.

70. Notwithstanding the cleanup effort, public concern about the radioactivity level of food produced on Enewetak Atoll threatens to reduce the ability of the Enewetak people to market their agricultural product, particularly copra, as a cash export crop, even after the plants of the atoll reach food producing stage.

## COUNT I
## UNLAWFUL TAKING OF ENEWETAK ATOLL

71. Plaintiffs reallege paragraphs 1-70.

72. Between December 1947 and April 1980, defendant engaged in a total or partial taking of the land and lagoon of Enewetak Atoll without providing just compensation to the people of Enewetak as required by the Fifth Amendment of the United States Constitution. This taking began in December 1947, when defendant compelled the people of Enewetak to move from their atoll in preparation for nuclear tests. This taking continued as a matter of law until April 1980, when defendant completed the cleanup and rehabilitation operations, as set forth in paragraphs 63-64, and first permitted the people of Enewetak to return and begin to resettle their atoll.

73. At the time of the taking by the United States, plaintiffs were the sole owners of property interests in Enewetak Atoll.

74. Plaintiffs had no way of determining the extent of the damage to their atoll until operations to resettle and reinhabit the atoll were concluded in April 1980. Nor, until April 1980, did plaintiffs have any way of knowing the duration of the taking, which defendant had indicated would not be permanent.

75. As a result of this taking, plaintiffs were totally deprived of the use, occupancy, and enjoyment of Enewetak Atoll between December 1947 and April 1980 without just compensation.

76. As set forth in paragraph 61, five islands of Enewetak Atoll were totally or partially vaporized by the nuclear testing undertaken by defendant. These islands were not returned to the people of Enewetak in 1980, and thus have been permanently taken without just compensation.

77. As set forth in paragraph 67, the nuclear testing and cleanup operations undertaken by the United States have resulted in the permanent uninhabitability and unusability of Runit. This island was not returned to the people of

Enewetak in 1980, and thus has been permanently taken without just compensation.

78. As set forth in paragraph 65, the United States has refused to allow the people of Enewetak to reinhabit Engebi and other northern islands of Enewetak Atoll, because of concern about the possible hazards to health caused by radiation levels there. These islands were not returned to the people of Enewetak in 1980, and have not been returned since then by the United States, which takes the position that these islands will not be inhabitable for approximately the next 30 years. These islands thus have been taken without just compensation.

79. As set forth in paragraphs 61, 68, and 69, this taking has caused permanent damage to the atoll's lagoon, and at least temporary damage to its vegetation and its ecology. Plaintiffs' property interests in those resources have been impaired and thus have been taken without just compensation.

80. As set forth in paragraphs 69 and 70, this taking has impaired the ability of the atoll to sustain food production and of the plaintiffs to market its products. Plaintiffs' property interests in those resources have been impaired and thus have been taken without just compensation.

COUNT II
BREACH OF IMPLIED-IN-FACT CONTRACT

81. Plaintiffs reallege paragraphs 1-70.

A. Formation of the Implied-in-Fact Contract

82. Plaintiffs' acquiescence in their removal from Enewetak Atoll in 1947 was based upon an implied-in-fact contract with defendant. The understanding and agreement of the parties that constitute this contract arose from the entire course of dealing between the parties beginning in 1944, from the circumstances of the occupation and administration of the Marshall Islands in general and Enewetak Atoll in particular by the United States beginning in 1944, and from the circumstances of the removal of the Enewetak people from the atoll, all of which resulted in certain mutual understandings by the Enewetak people and the United States governing their relationship and mutual obligations.

83. The United States' pre-invasion disruption of shipping and its bombardment and invasion of Enewetak Atoll in February 1944 resulted in destruction of vegetation and other economic resources and hunger to the inhabitants, as well as injuries and deaths occurring during the invasion. As set forth in paragraphs 30-32, the United States, upon taking the islands, provided the Enewetak people with food, clothing,

shelter, and medical attention, organized efforts to redevelop their indigenous food sources, and controlled the access of the Enewetak people to the atoll. This conduct in these circumstances formed part of the basis for the people of Enewetak's later belief that the United States would alleviate any hardships its actions imposed on them, and evidences the intention of the United States to do so and its recognition that it had undertaken such a duty in these circumstances.

84. During the United States' invasion of Enewetak and the period of occupation thereafter, the United States was required by the international law of belligerent occupation, as reflected in the customs and usages of civilized nations and in international agreements, to respect private property and the rights of individuals, except as absolutely required by military necessity. As administering authority of the territory of the former Japanese mandate, the United States was required by Chapter XI of the United Nations Charter, which became effective on October 24, 1945, to promote to the utmost the well-being of the inhabitants and to ensure their political, economic, social, and educational advancement, their just treatment, and their protection against abuses. Upon information and belief, the United States, during its invasion and occupation of Enewetak Atoll, recognized its obligations under international law. The United States' initial treatment

of the Enewetak people after the invasion was thus based upon its understanding of its duties under international law, which required the United States to protect the people of Enewetak against confiscation of property and any physical, social, and economic deprivations that might arise out of actions of the United States.

85. Shortly after the 1944 invasion, the people of Enewetak were put on notice by the posting on Aomon Island, as set forth in paragraph 30, of Proclamation No. 1 of Admiral Nimitz, that:

> It is the policy of the United States Forces not to make war upon the civilian inhabitants of these islands but to permit them to continue their normal lives and occupations in a peaceable manner, so far as war necessities and their own behavior permit.
>
> * * *
>
> Your existing personal and property rights will be respected and your existing laws and customs remain in force and effect, except to the extent that it is necessary for me in the exercise of my powers and duties to change them.
>
> * * *
>
> So long as you remain peaceable and comply with the orders of the United States Forces of occupation, you will be subject to no greater interference than is made necessary by war conditions, and may go about your normal occupations without fear.

This proclamation by Admiral Nimitz also formed part of the basis of the people of Enewetak's belief that the United States would treat them fairly and would alleviate hardships its actions imposed on them, and evidences the intention of the United States to do so and its belief that such action was its duty in such circumstances.

86. In June 1946, as described in paragraphs 33 and 34, the people of Enewetak submitted to the temporary evacuation of their atoll in connection with the first United States atomic testing on Bikini Atoll. The United States transported the people of Enewetak to Kwajalein Atoll and provided them with food, supplies, and temporary housing. The Enewetak people were transported back to Enewetak Atoll in late July 1946, and found it unchanged in any relevant aspect. This experience formed an important part of the basis for the Enewetak people's later acceptance of the United States' assurances that their removal from Enewetak Atoll to Ujelang Atoll would be temporary and that when they were permitted to return to Enewetak Atoll the atoll would be returned to them in as good condition as when they were removed from it, as well as for their understanding that the United States would ensure the satisfaction of their needs during the period of their removal.

87. As set forth in paragraph 18, in July 1947, the United States approved the Trusteeship Agreement for the Pacific Islands, under which it accepted certain powers over the Trust Territory in return for certain fiduciary obligations with respect to the people of the Trust Territory. The Trusteeship Agreement did not explicitly define the duties of the United States with respect to particular transactions, but left the United States and the people of the Trust Territiory free to define the terms of their relationship as long as these did not contravene the Trusteeship Agreement. The United States' explicit assumption of the obligations set forth in the Trusteeship Agreement formed a basis for the belief of the Enewetak people that the United States, in removing them to Ujelang Atoll, was accepting responsibilities consistent with those set forth in the Trusteeship Agreement. The assumption by the United States of the obligations set forth in the Trusteeship Agreement shortly before the second evacuation also evidences the intentions and expectations of the United States concerning the obligations it was assuming in securing the 1947 evacuation of their atoll by the Enewetak people.

88. In December 1947, the people of Enewetak submitted to removal from Enewetak Atoll to Ujelang Atoll, which has a much smaller lagoon and land area and which had inadequate food and economic resources. The people of Enewetak

submitted to their removal, based upon their understanding, consistent with the events and experiences discussed in paragraphs 83-87, that the removal would be temporary and that the United States was agreeing to ensure the satisfaction of their needs.

89. Officials of the government of the United States led the people of Enewetak to believe and the people of Enewetak did in fact reasonably believe that their move to Ujelang would be temporary.

90. Upon their arrival on Ujelang, the people of Enewetak moved into shelter that had been constructed for them and received needed supplies. This provision of shelter and supplies was consistent with their understanding, and evidences the understanding of the United States, of the obligations that the United States had assumed in return for agreement by the people of Enewetak to the removal.

91. The United States, in moving the people of Enewetak to an atoll that was much smaller than Enewetak and that was inadequate to support the people, understood that it was undertaking a commitment to care for the physical, economic, educational, cultural, and other needs of the people of Enewetak until it returned their atoll in substantially the condition in which it had received it or paid compensation for any significant changes.

92. The people of Enewetak, in agreeing to move to an atoll that was much smaller than Enewetak and that was inadequate to support them, understood and expected that the United States was undertaking a commitment to care for their physical, economic, educational, cultural, and other needs until it returned their atoll in substantially the condition in which it had received it or paid compensation for any significant changes.

93. In consideration for the obligations that the United States undertook to fulfill, set forth in paragraph 94, the people of Enewetak cooperated with the decisions and orders of the United States which effected the taking of Enewetak Atoll and the transfer of the people to Ujelang Atoll. The people of Enewetak thus abandoned their homeland without any attempt to resist the decisions of the United States, either physically or by means of petition to United States or international forums. They further accepted temporary relocation to Ujelang Atoll without any such resistance even though it was clear that Ujelang Atoll did not have adequate resources to maintain the quality of life they had experienced on Enewetak Atoll.

B. Terms of the Contract

94. The contract that arose from the course of dealing between the parties and the circumstances of the removal placed obligations upon the United States toward the Enewetak people, which are in the nature of the responsibilities of a trustee or a fiduciary. These obligations included:

> (a) a duty to ensure the physical, economic, and social well-being of the people on Ujelang, which the United States knew or had reason to know had inadequate resources to provide a regular supply of food and other necessities for the Enewetak people;
>
> (b) a duty to supply needed food, shelter, and other products to the Enewetak people to supplement the inadequate resources available on Ujelang; and
>
> (c) a duty to return the Enewetak people to Enewetak Atoll, at the conclusion of the United States' need for that atoll, with compensation for any damage to the atoll.

C. Defendant's Breach

95. The United States has breached and continues to breach its contract with the Enewetak people. The United States has violated its contractual obligations to the people of Enewetak by its failure to ensure their economic and social

well-being and its failure to supply needed food, shelter, and other supplies during their residence on Ujelang. The United States has also breached its agreement with the people of Enewetak by failing to return Enewetak Atoll to them in its original condition or to compensate them for the damages to its economy and for various kinds of long-term and permanent physical and radiological damage to the atoll's land area and lagoon, as set forth in paragraphs 65-70.

D. Damages

96. As a result of the actions described in paragraph 95, the Enewetak people have lost the benefit of their contract with the United States. The failure of the United States to ensure the economic and social well-being and to supply needed food, shelter, and other supplies during their residence on Ujelang caused damages in the loss of food supplies, shelter, and other supplies not provided, and consequential damages in the form of physical distress and suffering that were reasonably foreseeable consequences from the failure to perform. The failure of the United States to return Enewetak Atoll in its original condition to the Enewetak people or to compensate them for damage caused the atoll has deprived the Enewetak people of the use, occupancy, and enjoyment of large portions of their atoll, including but not

limited to depriving them of the natural resources that formerly enabled them to live in a self-sufficient manner on Enewetak Atoll.

COUNT III
FAILURE TO COMPLY WITH TERMS OF TRUSTEESHIP AGREEMENT

97. Plaintiffs reallege paragraphs 1-70.

98. On July 18, 1947, the President of the United States, acting in his official capacity and as authorized by a joint resolution of Congress, entered into the Trusteeship Agreement (see paragraph 18). By Executive Order No. 9872, the President of the United States conferred the authority to carry out the United States' obligations under the Trusteeship Agreement upon the Secretary of the Navy. This authority and responsibility has since been transferred to the Secretary of the Interior (see paragraph 19), who has subdelegated it to the High Commissioner of the Trust Territory by Department of the Interior Secretarial Order No. 2918.

99. The Trusteeship Agreement is a bilateral contract between the United States and the United Nations under which the United States is granted substantial power over the Trust Territory and authority under international law to use the Trust Territory for certain strategic purposes. In return, the United States agreed, as specified more particularly in

paragraphs 101-103, to act as trustee for the benefit of the people of the Trust Territory, including the people of Enewetak, under certain guidelines intended to provide significant benefits and protections to those people.

100. In the Executive Orders described and referenced in paragraph 19, the President of the United States ordered that the Department of the Navy and the Department of the Interior, in the administration of the Trust Territory, carry out the obligations assumed by the United States under the terms of the Trusteeship Agreement. In each instance, the President enacted the Trusteeship Agreement as an executive department regulation, requiring those departments to carry out the obligations under the Trusteeship Agreement, as specified more particularly in paragraphs 101-103.

101. Article 6 of the Trusteeship Agreement expressly imposes certain obligations upon the United States for the benefit of the people of the Trust Territory, including the Enewetak people. In particular, the United States as administering authority is required inter alia to:

> 2. promote the economic advancement and self-sufficiency of the inhabitants, and to this end shall regulate the use of natural resources; encourage the development of fisheries, agriculture, and industries; protect the inhabitants against the loss of their lands and resources; and improve the means of transportation and communication;

> 3. promote the social advancement of the inhabitants, and to this end shall protect the rights and fundamental freedoms of all elements of the population without discrimination; protect the health of the inhabitants; . . . and institute such other regulations as may be necessary to protect the inhabitants against social abuses; and
>
> 4. promote the educational advancement of the inhabitants, and to this end shall take steps toward the establishment of a general system of elementary education; facilitate the vocational and cultural advancement of the population; and shall encourage qualified students to pursue higher education, including training on the professional level.

102. In moving the Enewetak people in 1947 from their home atoll to Ujelang, which had inadequate resources to sustain them, the United States undertook particularized obligations to the Enewetak people under Article 6 of the Trusteeship Agreement. These obligations, which are in the nature of the responsibilities of a trustee or a fiduciary, included, at a minimum, a duty to ensure the economic and physical well-being of the Enewetak people and to provide the food and other supplies necessary to maintain and improve that condition, as well as eventually to restore the Enewetak people to a self-sufficient state on Enewetak Atoll with compensation for any damage to the capacity of the atoll to support the Enewetak people.

103. The United States has caused extensive and permanent physical and radiological damage to Enewetak Atoll. By virtue of its actions in causing such damage, the United States has incurred obligations under Article 6 of the Trusteeship Agreement to restore the Enewetak people to as much of Enewetak Atoll as the Enewetak people, in their informed judgment of the risks, have determined to be safely inhabitable. This obligation has included, in particular, a duty to rebuild the community on the island of Engebi, along with all necessary facilities, and provision of a radiological monitoring program for that island and its inhabitants.

104. The United States has failed to meet its obligations to the Enewetak people under the Trusteeship Agreement. The United States failed to provide needed food, shelter, and other supplies to the Enewetak people during their long stay on Ujelang, has failed to compensate them adequately upon their return to Enewetak Atoll for the damage to its capacity to support them, and has refused to restore Engebi Island to the community of the dri-Engebi, despite plaintiffs' frequent requests and demands.

105. As a result of the failure of the United States to comply with its obligations under the Trusteeship Agreement, the people of Enewetak have suffered and continue to suffer

severe shortages of basic necessities and have been deprived of the use, occupancy, and enjoyment of large portions of their atoll, including but not limited to the natural resources that formerly enabled them to live in a self-sufficient manner on Enewetak Atoll.

## COUNT IV
## BREACH OF RELEASE AND RETURN OF USE AND OCCUPANCY RIGHTS TO ENEWETAK ATOLL

106. Plaintiffs reallege paragraphs 1-70.

107. On September 16, 1976, the United States entered into an agreement with the Government of the Trust Territory entitled "Agreement Terminating Rights, Title, and Interest of the United States to Enewetak Atoll" ("Agreement Terminating U.S. Rights"). A copy of this document is attached as Exhibit D hereto.

108. In the Agreement Terminating U.S. Rights, the United States purported to terminate "its use and occupancy" and "all [its] rights, title, and interest . . . in and to Enewetak Atoll."

109. Also on September 16, 1976, the Government of the Trust Territory executed a document entitled "Release and Return of Use and Occupancy Rights to Enewetak Atoll" ("Release and Return") by which the Government of the Trust Territory

purported to terminate "all its rights, title, and interest in and to Enewetak Atoll" and to "quitclaim, release, and restore to all persons who hold traditional rights to the lands of Enewetak Atoll all rights, title, interest and rights of use and occupancy in and to Enewetak Atoll." A copy of this document is attached as Exhibit E hereto.

110. By reason of the execution of the document described in paragraph 109, plaintiffs acquired rights under the Agreement Terminating U.S. Rights.

111. Under the Agreement Terminating U.S. Rights, the United States is obligated to restore and return full "use and occupancy" of all the islands of Enewetak Atoll to its traditional land holders.

112. By its failure to permit the people of Enewetak to inhabit and otherwise use Engebi Island, and several other islands in the northern portion of the Atoll, and Runit Island, as set forth in paragraphs 65 and 67, the United States has breached and continues to breach this obligation.

113. As a consequence of that breach, plaintiffs have been deprived of the use and occupancy of Engebi Island, several other islands in the northern portion of the Atoll, and Runit Island.

DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs and their class pray:

1. That the Court enter judgment for damages against defendant for the taking described in Count I in an amount to be determined, but not less than $150,000,000.

2. That the Court enter judgment for damages against defendant for breach of contract described in the Count II in an amount to be determined, but not less than $150,000,000.

3. That the Court enter judgment for damages against defendant for breach of its obligations under the Trusteeship Agreement described in Count III in an amount to be determined, but not less than $150,000,000.

4. That the Court enter judgment for damages against defendant for breach of contract described in Count IV in an amount to be determined, but not less than $50,000,000.

5. That the Court order an accounting to determine the amounts in which plaintiffs have been damaged by defendant.

6. That the Court enter judgment against defendant for the costs, including attorneys' fees, incurred by plaintiffs because of this litigation.

7. That the Court grant such other and further relief as may be just and proper.

Respectfully submitted,

David R. Anderson

David R. Anderson*/
Andrew B. Weissman
Jonathan I. Feil
Stephen J. Schnably

Wilmer, Cutler & Pickering
1666 K Street, N.W.
Washington, D.C. 20006
(202) 872-6000

Attorneys for Plaintiff

Thomas G. Mattson
Micronesian Legal Services
Corporation
P.O. Box 269
Saipan, Mariana Islands 96950

Of Counsel

*/ Counsel of Record

Dated: September 15, 1982

EXHIBIT A

OTHER PLAINTIFFS

1. John Abraham
2. Atwar Abner
3. Edward Abner
4. Ineko Abner
5. Jarina Abner
6. Joulik Abner
7. Kalinta Abner
8. Malon Abner
9. Rosa Abner
10. Seiko Abner
11. Moses Abraham
12. Oscar Abraham
13. Rina Abraham
14. Ros Abraham
15. Sasel Abraham
16. Tellsy Abraham
17. Misco Abram
18. Jackson Ading
19. Jackson Ading
20. Alwina Aijok
21. Denem Aile
22. Neria Aile
23. Kon Albios
24. Meria Albios
25. Albios Albious
26. Hejiwan Albious
27. Lita Annine
28. Adelmo Aruo
29. Almi Aruo
30. Bob Aruo
31. Martha Atonej
32. Bilimon Benjamin
33. Jimeko Benjamin
34. Rwee Benjamin
35. Wise Boktok
36. Newai Bruji
37. Newan Bruji
38. Boaz David
39. Norma David
40. Obet David
41. Abner Edward
42. Alvo Edwart
43. Bab Edwart
44. Frank Efram
45. Ankella Elisa
46. Elenora Elisa
47. Helthy Elisa
48. Jesta Elisa
49. Jobi Elisa
50. Jonoling Elisa
51. Jorbi Elisa
52. Josi Elisa
53. Samson Elisa
54. Tobi Elisa
55. Walten Elisa
56. Walter Elisa
57. Yostaro Elisa
58. Welly Elisha
59. Alexander Episan
60. Limeniki Episan
61. Lekmualikojani Erine
62. Joseph Ernest
63. Metlina Ernest
64. Tarmi Ezra
65. Merita G
66. Josen George
67. Lione George
68. Princela George
69. Rarijilla George
70. Senita George
71. Benjamin Gideon
72. Bensmon Gideon
73. Bilmon Gideon
74. James Gideon
75. Jenny Gideon
76. Merly Gideon
77. Neiwar Gideon
78. Pilimon Gideon
79. Akneta Gidion
80. Netwe Gidion
81. Tieko Gidion
82. Merline Hamros

83. Yota Hamros
84. Ester Harris
85. Rosa Harry
86. Eiko Henry
87. Setao Henry
88. Albios Her
89. Ester Her
90. Rosted Hermios
91. Jimmy Iban
92. Namiko Iban
93. Sabot Iban
94. Drusie Ijo
95. Kileon Ijo
96. Salmon Ijo
97. Emen Ile
98. Jusena Inok
99. Lemenyen Inok
100. Merian Inok
101. Erita Ishia
102. Harry Jackson
103. Jonathan Jackson
104. Merly Jackson
105. Rosie Jackson
106. Sitella Jackson
107. Jorki James
108. Miskai James
109. Renny Jelor
110. Mejkai Jemes
111. Jojoni Jerilong
112. Namiko Jerion
113. Wilma Jerion
114. Aiko Jeta
115. Niose Jetao
116. Yulina Jetao
117. Mita Jimeon
118. Senorita Jimeon
119. Tora Jimmy
120. Betty Jitiam
121. Elper Jitiam
122. Erine Jitiam
123. Jelina Jitiam
124. Jelnia Jitiam
125. Jitiam Jitiam
126. Lucky Jitiam
127. Malomi Jitiam
128. Mathew Jitiam
129. Nathan Jitiam
130. Takeo Jitiam
131. Tine Jitiam
132. Mina Joanej
133. Renton Joanej
134. Elikena Job
135. Erza Job
136. Inok Job
137. Jacob Job
138. Karmy Job
139. Ktrin Job
140. Medien Job
141. Elisa Jobi
142. Naptali Johanes
143. Nerai Johanes
144. Neruji Johanes
145. Peter Johanes
146. Srudel Johanes
147. Tokko Johanes
148. Alfred Johannes
149. Bila Johannes
150. Morby Johannes
151. Toreka Johannes
152. Akien John
153. Aking John
154. Anako John
155. Balikon John
156. Benji John
157. Elinor John
158. Eonean John
159. Erimios HJohn
160. Glorinta John
161. Hertien John
162. Ismael John
163. Jetak John
164. Loria John
165. Margrose John
166. Mary John
167. Mishael John
168. Roselinda John
169. Rosket H. John
170. Yoster John
171. Nosika Jonathan
172. Tareko Jonathan
173. Ebel Joseph
174. Estila Joseph
175. Jene Joseph
176. Kunio Joseph
177. Linda Joseph
178. Smith Joseph
179. Kenji Kation
180. Rudy Kation

181. Dorthy Ken
182. Kare Ken
183. Katios Ken
184. Neita Ken
185. Noji Ken
186. Nomiko Ken
187. Noshi Ken
188. Rida Ken
189. Roshita Ken
190. Thomson Ken
191. Timothy Ken
192. Tokiko Ken
193. Buruji Kilion
194. Jan Kilion
195. Sebe Kilion
196. Takaji Kilion
197. Zebedy Kilion
198. Mjrk Kilon
199. Sally Kilon
200. Willam Kilon
201. Marame Kition
202. Topik Kition
203. Albios Kon
204. Merjo Kon
205. Tokiko Kon
206. Ken Leppo
207. Maji Leppo
208. Erine J. Libai
209. Johnny Ling
210. Kenye Ling
211. Riten Lomjerok
212. Elina Lorenji
213. Sam Luk
214. Yojko Luk
215. Alee Lukas
216. Burniko Lukas
217. Elijena Lukey
218. Gideon Luther
219. Martha Luther
220. Tonis Luther
221. Charlette Makororo
222. Lombwe Mark
223. Jerry Martin
224. Ulia Matan
225. Mayomi Matthew
226. Neta Morby
227. Rose Moses
228. Jeko Neptali
229. Toshiro Neptali
230. Dorothy Nosie
231. Anej Obet
232. David Obet
233. Matan Obet
234. Paul Obet
235. Ruth Obet
236. Yula Obet
237. Myer Onil
238. Telenja Onil
239. Nathan Opet
240. Adrino Paul
241. Ajila Paul
242. Balik Paul
243. Drikjalmin Paul
244. Lina Paul
245. Takieo Paul
246. Tomiko Paul
247. Akeo Peter
248. Bila Peter
249. Erpin Peter
250. Johanes Peter
251. Suena Peter
252. Switseo Peter
253. Tom Peter
254. Emli Renton
255. Jima Renton
256. Mina Renton
257. Lenjen Sam
258. Yoshiko Sam
259. Arbella Samson
260. Saimon Samson
261. Riko Sarem
262. Rina Saul
263. Jonathan Smith
264. Monika Smith
265. Jerry Takashi
266. Limejo Taklik
267. Isaac Tira
268. Jontako Tira
269. Tamar Tira
270. Suania Tomi
271. Antonio Uin
272. Tina Welly
273. Roslie Willy
274. Athelma Yoshitaro
275. George Yoshitaro
276. Luther Zakious

EXHIBIT B

THE MARSHALL ISLANDS



EXHIBIT C



ENEWETAK ATOLL



# EXHIBIT D

AGREEMENT TERMINATING RIGHTS, TITLE,
AND INTEREST OF THE UNITED STATES
TO ENEWETAK ATOLL

KNOW ALL MEN BY THESE PRESENTS; that

WHEREAS, the Government of the Trust Territory of the Pacific Islands, hereinafter referred to as "Trust Territory", and the United States of America, hereinafter referred to as "United States", entered into a Use and Occupancy Agreement for Enewetak Atoll as of 1944; and

WHEREAS, the Trust Territory wishes to obtain use and occupancy of said atoll and the termination of all rights, title, and interest of the United States in or to said atoll; and

WHEREAS, the United States wishes to terminate its use and occupancy of said atoll;

NOW, THEREFORE, in consideration of the agreements of the parties, all rights, title, and interest of the United States in or to Enewetak Atoll existing at noon on the day prior to the date of signature by the last party to sign this agreement are hereby terminated.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 31st day of August, 1976.

THE UNITED STATES OF AMERICA
By [signature]
Deputy Assistant Secretary
of the Air Force (Installations)

GOVERNMENT OF THE TRUST TERRITORY
OF THE PACIFIC ISLANDS
By [signature: Peter T. Coleman]
Acting High Commissioner

16 day of Sep, 1976

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

RECORDING DATA

Received and filed at 10:30 a.m. ~~p.m.~~, this 22nd day of September, 1976, in Book 2, Page 26.

By: Okran Jamon
Assistant Clerk of Courts
Marshall Islands District

EXHIBIT E

RELEASE AND RETURN OF USE AND OCCUPANCY

RIGHTS TO ENEWETAK ATOLL

KNOW ALL MEN BY THESE PRESENTS: That

WHEREAS, by Agreement in Principle Regarding the Use of Enewetak Atoll executed November 19, 1956, the hereditary chiefs of Enewetak Atoll, Joanej and Ebream, and the majority of the people who possessed rights in Enewetak Atoll which is located in the Marshall Islands, between 11 degrees 20 minutes North Latitude to 11 degrees 46 minutes North Latitude, and 162 degrees 02 minutes East Longitude to 162 degrees 24 minutes East Longitude, agreed that the Government of the Trust Territory of the Pacific Islands shall possess full use rights to Enewetak Atoll until such time as such use rights are no longer needed; and

WHEREAS, by a Use and Occupancy Agreement the Government of the Trust Territory of the Pacific Islands assigned said use rights to the United States of America effective as of March 2, 1944; and

WHEREAS, the United States Government has now terminated all of its rights, title and interests in and to Enewetak Atoll; and

WHEREAS, the United States of America and the Government of the Trust Territory of the Pacific Islands no longer have need for full use rights to Enewetak Atoll;

Now, THEREFORE, the Government of the Trust Territory of the Pacific Islands does hereby quitclaim, release and restore to all persons who hold traditional rights to the lands of Enewetak Atoll all right, title, interests and rights of use and occupancy in and to Enewetak Atoll.

IN WITNESS WHEREOF the Government of the Trust Territory of the Pacific Islands, acting by and through its Acting High Commissioner, hereunto sets its hand and seal this 16 day of September, 1976.

GOVERNMENT OF THE TRUST TERRITORY
OF THE PACIFIC ISLANDS

By [signature]
Peter T. Coleman
Acting High Commissioner

RECORDING DATA

Filed and recorded in Book 2, at Page 21, this 22nd day of September, 1976.

By: Oktan Damon
Assistant Clerk of Courts
Marshall Islands District