**UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **ISMAEL JOHN, et al., for Themselves and for a Class Consisting of the People of Enewetak,** | ) | |
| **Plaintiffs,** | ) | **No. 06-289 L** |
| **v.** | ) | **Hon. Christine O.C. Miller** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

December 18, 2006

**DAVOR PEVEC**
Attorney at Law
American Savings Bank Tower
1001 Bishop Street, Suite 1360
Honolulu, Hawaii 96813
Fax: 310-402-5983
Phone: 808-599-5655
Email: dzpevec@aol.com

Attorney for Plaintiffs

Of Counsel:

**JON VAN DYKE**
2515 Dole Street
Honolulu, Hawaii 96822
Fax: 808-956-5569
Phone: 808-956-8509
Email: jvandyke@hawaii.edu

## TABLE OF CONTENTS


MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS……….. 1

I. STATEMENT OF FACTS AND PROCEDURAL HISTORY…………………………… 1

II. QUESTIONS PRESENTED……………………………………………………………… 10

III. ARGUMENT…………………………………………………………………………… 10

A. The Court Has Statutory Subject Matter Jurisdiction Over the Claims, Which is Not Validly Withdrawn in the Compact Act………………………………… 10

1. The Prior Litigation Left the Door Open for Plaintiffs to Return to this Court if the NCT Failed to Award Just Compensation, Notwithstanding Article XII……………………………………………………… 10

2. Absent a Valid Settlement and Release or the Payment of Just Compensation, It is Unconstitutional to Eliminate All Jurisdiction Over Takings Claims………… 13

3. No Court Has Decided Whether Jurisdiction-Stripping is Constitutional In the Absence of a Valid Settlement or the Payment of Just Compensation…………… 19

4. Because Just Compensation Has Not Been Paid, the Constitutionality of Jurisdiction-Stripping Depends on Whether There Has Been a Valid Settlement and Release of Claims……………………………………………………… 21

(a) The release violates the federal government's fiduciary obligations and is invalid under federal common law……………………… 23

(b) The RMI's espousal of private claims is unenforceable under international law……………………………………………………… 25

5. The Compact Act Can Be Construed to Avoid Unconstitutionality…………… 28

B. The Prior Dismissal of Plaintiffs' Claims for Lack of Jurisdiction Does Not Bar the Present Claims…………………………………………………………… 31

1. The Prior Litigation Did Not Decide Whether the Compact Validly Stripped Jurisdiction If the Compact Process Failed to Provide Just Compensation…………………………………………………………………… 32

2. The Prior Litigation Was Not Dismissed on the Merits, So There is No Claim Preclusion………………………………………………………………… 32

3. The Claims Alleged in the Complaint Were Reserved in the Earlier Litigation........ 33

C. The Adjudication of Takings Claims is a Core Judicial Function, Not a Non-Justiciable "Political Question."........ 34

D. Plaintiffs' Claims Are Not Barred By The Statute Of Limitations Under 28 U.S.C. Sec. 2501........ 37

1. In The Compact And Section 177 Agreement, Congress Intended To Accept Responsibility And Provide Just Compensation For Nuclear Damage Claims Without Regard To Any Limitations Period Or Other Procedural Barriers........ 38

2. The Language in *Peter* on the Statute of Limitations Is Not Binding Under the Doctrine of Collateral Estoppel or Issue Preclusion, Because This Issue Was Not Addressed by the Federal Circuit on Appeal and Hence Is Not a "Final" Ruling or One that Is "Necessary to the End Decision Then Made."........ 39

3. Plaintiffs' Implied-In-Fact Contract Claims Are Not Barred By The Statute Of Limitations, Because They Were To Be Determined By The Alternative Tribunal And Because The Breaches Are Continuing, As Alleged In The Amended Complaint........ 41

4. The Statute of Limitations Did Not Accrue on Counts III - VI Until Issuance of the 2000 NCT Final Decision, As All Events Necessary to Fix Defendant's Liability Had Not Occurred........ 42

5. If the Statute of Limitations Accrued Prior to 2000, it was Equitably Tolled........ 45

E. Plaintiffs' Counts III Through VI Do State Claims Upon Which Relief May Be Granted........ 46

1. Standard of Review........ 47

2. Under RCFC 12(b)(6), Plaintiffs Have Alleged the Proper Factual Predicate For Their Fifth Amendment Takings Claims........ 47

3. Under RCFC 12(b)(6), Plaintiffs Have Alleged the Proper Factual Predicate For Their Breach of Implied Contract Claims........ 48

IV. CONCLUSION........ 50

# TABLE OF AUTHORITIES

*CASES* Page

*Alliance of Descendants of Texas Land Grants v. United States*,
37 F.3d 1478 (Fed. Cir. 1994) .................................................... 43
*Almendarez-Torres v. United States*, 523 U.S. 224 (1998) .................... 28
*Alperin v. Vatican Bank*, 410 F.3d 532 (9th Cir. 2005) ........................ 35
*Anaheim Gardens v. United States*, 444 F.3d 1309 (Fed. Cir. 2006) .......... 44
*Angel v. Bullington*, 330 U.S. 183 (1947)). .................................. 29
*Antolok v. United States*, 873 F.2d 369 (D.C. Cir. 1989) ........................ *passim*
*Applegate v. United States*, 35 Fed. Ct. 406 (1996) ............................ 48
*Arakaki v. Lingle*, 423 F.3d 954 (9th Cir. 2005),
*judgment vacated on other grounds*, 126 S.Ct. 2859 (2006) .............. 35, 36
*Arizona v. California*, 530 U.S. 392 (2000) ................................ 40
*Arkansas Val. Ry. v. United States*, 68 F.Supp. 727 (Ct.Cl. 1946) .......... 18
*Baker v. Carr*, 369 U.S. 186 (1962). ........................................ 36
*Baltimore & Ohio Ry. Co. v. United States*, 298 U.S. 349 (1936) .......... 17
*Bartlett v. Bowen*, 816 F.2d 695, (D.C. Cir. 1987) ............................ 15
*Battaglia v. General Motors Corp.*, 169 F.2d 254, 257 (2d Cir. 1948) ........ 15
*Bell v. Hood*, 327 U.S. 678 (1946) ............................................ 33
*Bingaman v. Dept. of the Treasury*, 127 F.3d 1431 (Fed. Cir. 1997) .......... 29
*Blanchette v. Connecticut Gen. Ins. Corp.*, 419 U.S.102 (1974) .............. 16, 30
*Case No. A/18 Concerning the Question of Jurisdiction Over*
*Claims of Persons with Dual Nationality* (U.S.-Iran Claims Tribunal,
April 6, 1984), 23 ILM 489, 501 (1984)) ................................ 28
*Central States Pension Fund v. Hunt Truck*, 296 F.3d 624 (7th Cir. 2002) .... 34
*Chisolm v. House*, 183 F.2d 698 (10th Cir. 1950) ............................... 24
*Clark v. Martinez*, 543 U.S. 371 (2005) ........................................ 30
*Conley v. Gibson*, 355 U.S. 41 (1957) ........................................ 47
*Correlated Dev. Corp. v. United States*, 556 F.2d 515 (Ct. Cl. 1977) ........ 48
*Dames & Moore v. Regan*, 453 U.S. 654 (1981) ................................ *passim*
*Davis v. George B. Newton Coal Co.*, 267 U.S. 292 (1925) .................. 17
*Ditmars v. Camden Trust Co.*, 76 A.2d 280 (N.J. Super 1950) .............. 23
*D.R. Smalley & Sons, Inc. v. United States*, 372 F.2d 505 (Ct. Cl. 1967) ..... 48
*Do-Well Machine Shop, Inc. v. United States*,
870 F.2d 637 (Fed. Cir. 1989) .................................................. 33
*Doe v. United States*, 463 F.3d 1347 (Fed. Cir. 2006) ........................ 33
*El-Shifa Pharmaceuticals Indust. Co. v. United States*,
378 F.3d 1346 (Fed. Cir. 2004) ............................................ 37
*Environmental Defense Fund v. EPA*, 369 F.3d 193 (2d Cir. 2004) .......... 29
*Gelb v. Royal Globe Insurance Co.*, 798 F.2d 38 (2d Cir. 1986) .............. 40
*Griffin v. United States*, 110 Ct.Cl. 330, 77 F.Supp. 197
*certiorari granted* 335 U.S. 883, *reversed on other grounds*
336 U.S. 641, *rehearing denied* 337 U.S. 920 ................................ 44
*Gross v. German Foundation Industrial Initiative*,

456 F.3d 363 (3rd Cir. 2006) ………………………………………… 35, 36
*Gulf Power Company v. United States,*
187 F.3d 1324 (11th Cir. 1999) …………………………………. 18
*Hamdan v. Rumsfeld*, 126 S.Ct. 2749 (2006) …………………………. 29
*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) …………………………….... 29
*Hicks v. Quaker Oats Co.*, 662 F.2d 1158 (5th Cir. 1981) ……………… 41
*Hornback v. United States*, 405 F.3d 999 (Fed. Cir. 2005) ……………… 33
*Hughes v. United States*, 71 U.S. 232 (1866) …………………………. 33
*I.K. Frazer v. United States*, 288 F.3d 1347 (Fed. Cir. 2002) ……………. 45
*In re Estate of Amuso*, 176 N.Y.S. 2d 175 (N.Y. Surr. Ct. 1958) ………… 23
*International Refugee Organization v. Republic S.S. Corp.*,
189 F.2d 858 (4th Cir. 1951) ………………………………………… 41
*Irwin v. Dept. of Veterans Affairs*, 498 U.S. 89 (1990) ………………….. 45
*Jacobs v. United States*, 290 U.S. 13 (1933) ………………………….. 16
*Japan Whaling Ass'n. v. Am. Cetacean Soc.*, 478 U.S. 221 (1986) ……….. 36
*Japanese War Notes Claimants Association v. United States*,
373 F.2d 356 (Ct. Cl. 1967) ………………………………………… 44
*Juda v. United States*, 6 Cl. Ct. 441, (1984) ………………………….. 4
*Juda v. United States*, 13 Cl.Ct. 667, 689 (1987) ………………………….. *passim*
*Jung v. Assn of Am. Medical Colleges*,
339 F. Supp. 2d 26 (D.D.C. 2004) ………………………………….. 19
*Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995) ………………………….. 35
*Kearns v. Gen. Motors Corp.*, 94 F.3d 1553 (Fed. Cir. 1996) ………….. 29
*Kohl v. United States*, 91 U.S. 367 (1875) ………………………….. 16
*Kroeger v. U.S. Postal Serv.*, 865 F.2d 235 (Fed. Cir. 1988) ………….. 40
*Kwan v. United States*, 272 F.3d 1360 (Fed. Cir. 2001) ……………… 36
*Lagenegger v. United States*, 756 F.2d 1565 (Fed. Cir. 1985) ……………. 35, 36
*Lins v. United States*, 688 F.2d 784 (Ct. Cl. 1983) ……………….…. 44
*Liston v. Gottsegen*, 348 F.3d 294 (1st Cir. 2003) ………………………. 23, 24
*L.S.S. Leasing Corp. v. United States*, 695 F.2d 1359 (Fed. Cir. 1982) …… 44
*Lynch v. United States*, 292 U.S. 571 (1934) ………………………. 16
*Maas v. Lonstorf*, 194 F. 577, 587 (6th Cir. 1912) ………………………. 24
*Martin v. Henley*, 452 F.2d 295 (9th Cir. 1971) …………………………... 41
*Martin v. Hunter's Lessee*, 14 U.S. 304 (1816) …………………………... 36
*Mavromatis Palestine Concessions*, PCIJ, Ser. B., No. 3 (1924) ………… 26
*Mayer/Berkshire Corp. v. Berkshire Fashions, Inc.*,
424 F.3d 1229 (Fed Cir. 2005) ………………………………. 29
*Meinhard v. Salmon*, 249 N.Y. 458 (1928) …………………………... 24
*Meinhardt v. Unisys Corp.*, 74 F.3d 420 (3d Cir. 1996) …………………... 24
*Ministry of Defense v. Elahi*, 126 S.Ct. 1193 (2006) …………………... 37
*Monongahela Navigation Co. v. United States*,
148 U.S. 312 (1893) ………………………………………… 17, 18
*Moran Towing & Transportation Co. v. Navigazione Libera Tristina*,
*S.A.*, 92 F.2d 37 (2d Cir.), *cert. denied*, 302 U.S. 744 (1937)) ……… 41
*Morgan v. DOE*, 424 F.3d 1271 (Fed. Cir. 2005) ………………………. 29
*Morgan Guaranty Trust Co. v. Republic of Palau*,

924 F.2d 1237 (2d Cir. 1991) ........................................ 27
*Panevezys-Saldutiskis Ry. Case*, PCIJ, se. A/B, No. 76 (1939) ............. 26
*People of Enewetak v. United States*,
864 F.2d 134, 136 (Fed. Cir. 1988) ........................................ *passim*
*People of Saipan v. Dept. of the Interior*,
356 F. Supp. 645 (D. Haw. 1973) ........................................ 27
*Pepper v. Litton*, 308 U.S. 295 (1939) ........................................ 23
*Peter v. United States*, 6 Cl. Ct. 768 (1984) ................................ *passim*
*Peter v. United States*, 13 Cl. Ct. 691, 692 (1987) ........................ 8, 42
*Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211 (1995) ........................ 19
*Reich v. Collins*, 513 U.S. 106 (1994) ........................................ 38
*Republic of Austria v. Altmann*, 541 U.S. 677 (2004) ........................ 26
*Ruckelshaus v. Monsanto*, 467 U.S. 986, 1018 (1984) ........................ 16, 30
*Rust v. Sullivan*, 500 U.S. 173 (1991) ........................................ 28
*Sarei v. Rio Tinto, PLC*, 456 F.3d 1069 (9th Cir. 2006) ........................ 35
*Sanchez-Llamas v. Oregon*, 126 S.Ct. 2669, (2006) ........................ 36
*Schillinger v. United States*, 155 U.S. 163 (1894) ........................ 16
*Seaboard Air Line Ry. Co. v. United States*, 261 U.S. 299(1923) ........... 17
*Seminole Nation v. United States*, 316 U.S. 286, 297 (1942) ............... 24
*Siegemund v. Shapland*, 324 F.Supp. 2d 176 (D. Me. 2004) ............... 24
*Spruill v. Merit Sys. Prot. Bd.*, 978 F.2d 679 (Fed. Cir. 1992) ............... 33
*Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989) ............... 24
*The Loewen Group v. United States*, 42 I.L.M. 811 (ICSID 2003) ........... 26
*United States v. Clarke*, 445 U.S. 253, 257 (1980) ........................ 26
*United States v. Dickinson*, 331 U.S. 74 (1947) ........................ 45
*United States v. Klein*, 80 U.S. 128 (1871) ........................ 19
*United States v. Munoz-Flores*, 495 U.S. 385 (1990) ........................ 37
*United States v. New River Collieries Co.*, 262 U.S. 341(1923) ............. 18
*United States v. Sioux Nation*, 448 U.S. 371 (1980) ........................ 19, 25
*United States v. Sioux Nation of Indians*,
601 F.2d 1157 (Ct.Cl. 1979) ........................................ 25
*United States v. White Mountain Apache Tribe*, 537 U.S. 465 (2003) ........ 23
*United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994) ............... 28
*Vink v. Hendrikus Johannes Schif, Rolkan, N.V.*,
839 F.2d 676 (Fed. Cir. 1988) ........................................ 33
*Walker v. United States*, 105 Ct.Cl. 553,
64 F.Supp. 135 (Ct.Cl. 1946) ........................................ 18
*Ware v. Hylton*, 3 U.S. 199 (1796) ........................................ 36
*Webster v. Doe*, 486 U.S. 592 (1988) ........................................ 29
*Williamson County Regional Planning Comm'n v.*
*Hamilton Bank of Johnson City*, 473 U.S. 172 (1985) ..................... 44
*Zadvyas v. Davis*, 533 U.S. 678 (2001) ........................................ 28
*Zoltek Corp. v. United States*, 442 F.3d 1345, (Fed. Cir. 2006) ............... 16

*STATUTES*

First Judiciary Act, 1 Stat. 73, § 25 (1789) ................................ 36

Tucker Act, 28 U.S.C. § 1491 ………………………………………... 4, 10, 20
Compact of Free Association Act of 1985
Pub. L. No. 99-239, 99 Stat. 1770 (1986) ……………………… *passim*
61 Stat. 3301 (1947) …………………………………………………….. 23

*RULES*
RCFC Rule 41(b) …………………………………………………….. 33

*OTHER*
Trusteeship Agreement for the Former Japanese
Mandate Islands, 61 Stat. 3301 T.I.A.S. No. 1665 (1947)………………. *passim*
Restatement (2d) of Trusts ……………………………………………. 23, 24
Restatement (2d) of Contracts …………………………………………… 24
Restatement (3d) of Foreign Relations ………………………………… 26, 27
Restatement (2d) of Judments …………………………………………… 33, 34
Wright, Miller & Cooper, *Federal Practice & Procedure* …………………. 33, 36, 44
Consolidated Brief of Appellee, *People of Bikini*, *Enewetak,*
*Rongelap, Utrik and Other Marshall Islands Atolls v.*
*United States* (June 24, 1988) ……………………………………….. 12, 31, 46
Transcript of the oral argument in *Dames & Moore*,
U.S. Supreme Court No. 80-2078 ………………………………………. 12
*Tomaki Juda v. United States*, Nos. 172-81L, 543-81L
and 561-82L, April 13, 1983 Transcript of Proceedings ……………….. 34
Geneva Convention of 1930 on Certain Questions
Relating to the Conflict of Nationality Laws ……………………….. 28
U.S. Dept. of State, Foreign Affairs Manual ……………………….. 26

SECONDARY AUTHORITIES

Bogart, *Trusts and Trustees* (2d ed. rev. 1980) …………………………… 23, 24
I. Brownlie, *Principles of Public International Law* (5th ed. 1998) ……….. 26
M. Duschesne, *The Continuous-Nationality of Claims Principle:*
*Its Historical Development and Current Relevance to Investor-State*
*Investment Disputes*, 36 Geo. Wash. Int'l L. Rev. 783 (2004) ……….. 26
S. Murphy, *Contemporary Practice of the United States Relating*
*to International Law*, 96 Am. J. Int'l L. 262 (2002) ………………… 26
D. Christopher Ohly, "A Functional Analysis of Claimant Eligibility,"
in *International Law of State Responsibility for Injuries to Aliens*,
(Richard B. Lillich ed., 1983) …………………………………….. 26
James Crawford, The International Law Commission's Articles on
State Responsibility (2002) …………………………………….. 26

**UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **ISMAEL JOHN, et al., for Themselves and for a Class Consisting of the People of Enewetak,** | ) | |
| | ) | **No. 06-289 L** |
| **Plaintiffs,** | ) | |
| | ) | **Hon. Christine O.C. Miller** |
| **v.** | ) | |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

## I. STATEMENT OF FACTS AND PROCEDURAL HISTORY

Enewetak Atoll is located in the extreme northwestern part of the Republic of the Marshall Islands, and was formerly a part of the United States Trust Territory of the Pacific Islands. Amended Complaint ("Am. Compl.") ¶¶17-18.

Enewetak Atoll is private property, owned by the people of Enewetak. For centuries, it was the only property owned by the people of Enewetak who relied exclusively on the atoll's resources for their needs. *Id.* ¶ 1.

The Enewetak people were removed from their ancestral homeland in 1947 so that the United States could conduct nuclear weapons tests on their land. *Id.* ¶¶ 1, 57. Enewetak Atoll was chosen as a nuclear test site by the United States so that the United States mainland would be spared the devastating effects of high-yield nuclear weapons tests. *Id.* ¶ 1.

The Enewetak people were relocated to Ujelang Atoll, an isolated, small, resource-poor atoll, 124 miles southwest of Enewetak Atoll. *Id.* ¶¶ 57, 63. The removal and relocation was effected pursuant to the November 25, 1947 Directive from President Truman to the Secretary of

Defense and was to be accomplished in accordance with the memorandum addressed to President Truman by the Chairman of the Atomic Energy Commission. *Id.* ¶¶ 52, 53. In these documents, the United States promised that the Enewetak people would be accorded U.S. Constitutional rights, would be treated as wards of the United States, would be taken care of during their displacement, and would not be subjected to greater danger from the tests at Enewetak than U.S. citizens. *Id.*¶¶ 1, 51-54.

The United States promised to care for the physical, economic, educational, cultural and other needs of the Enewetak people until it returned their atoll to them in substantially the condition in which it had taken it or paid compensation for any damages. *Id.* ¶ 191. In return for the promises of the United States, the people of Enewetak complied with the decisions and orders of the United States, abandoned their homeland and accepted temporary relocation to Ujelang Atoll without any attempt to resist, either physically or by means of petitions to the United States or to international forums. *Id.* ¶ 192.

The United States exclusively used and occupied Enewetak from 1947 to 1980 for a variety of purposes. Between April 1948 and August 1958, Enewetak Atoll was the site of 43 of the 66 high-yield nuclear tests the U.S. conducted in the Marshall Islands. *Id.* ¶¶ 76-77. The United States Department of Energy described the effects of the 43 tests as follows:

> The immense ball of flame, cloud of dark dust, evaporated steel tower, melted sand for a thousand feet, 10 million tons of water rising out of the lagoon, waves subsiding from a height of eighty feet to seven feet in three miles were all repeated, in various degrees, 43 times on Enewetak Atoll.

*Id.* ¶ 79. The tests caused the complete or partial vaporization of five of Enewetak's islands, and many other islands were heavily contaminated with radiation. The lagoon was seriously damaged. Vegetation was completely stripped from many islands, and nearly all plants of agricultural and economic value on Enewetak were totally destroyed. *Id.* ¶¶ 78-85. During this

period, the U.S. prevented the Enewetak people from returning to their homeland, while maintaining their ultimate right to return. *Id.* ¶ 88.

After their relocation on Ujelang, the health, nutrition and shelter of the people of Enewetak were virtually ignored. Conditions on Ujelang were characterized by famine, near starvation, and death from illness due to the severe limitations of the environment and resources on Ujelang. There were also polio and measles epidemics, and a period of uncontrollable infestation of rats. *Id.* ¶¶ 66-75, 144. The United States Department of Interior, in 1978, summarized some of the suffering and hardship as follows:

> During the thirty years that the Enewetak people have been displaced from their home atoll they have suffered grave privations, including periods of near starvation, in their temporary home on Ujelang Atoll. The people have cooperated willingly with the U.S. Government and have made many sacrifices to permit the United States to use their home islands for atomic testing purposes.

*Id.* ¶ 88.

In 1972, the U.S. announced that it would resettle the Enewetak people on Enewetak Atoll. However, the U.S. did not begin radiological cleanup of Enewetak until 1977. The radiological cleanup activity that began in 1977, ended in 1980. *Id.* ¶¶ 90-92. The cleanup activity caused further damage to Enewetak Atoll because radioactive soil, plants and other material were dug up, bulldozed or scraped off the land. *Id.* ¶ 97. Virtually all food bearing plants were removed during the cleanup. Unfortunately, the cleanup activity only made portions of Enewetak Atoll habitable. The northern half of the atoll, including the major residential island of Enjebi, remains uninhabitable due to radiation contamination. *Id.* ¶¶ 91-93. Runit Island, the fifth largest island in the atoll, was not cleaned up and is totally unusable because its soil is heavily contaminated with plutonium. *Id.* ¶ 133. During the cleanup, a crater on the northern tip of Runit Island was filled in with over 110,000 cubic yards of plutonium

contaminated material and is now a nuclear waste storage site with no long-term stewardship program in place to ensure that its contents do not pose a health risk to the residents of Enewetak Atoll. *Id.* ¶ 95.

In October 1980, after 33 years of exile marked by starvation, epidemics, and near complete isolation from the rest of the world, the Enewetak people were finally permitted to return to their atoll. *Id.* ¶¶ 66-75, 99, 144. It was not until their return to Enewetak in 1980 that the Enewetak people could, for the first time, determine the duration of the taking and become aware of the nature and extent of the damages to their atoll. *Id.* ¶¶ 88, 99.

After becoming aware of the duration of the taking, the continued taking of the northern islands of Enewetak Atoll, and the damages inflicted on their atoll, the plaintiffs, on September 15, 1982, filed a Complaint in this Court seeking, *inter alia*, compensation from the U.S for the temporary taking of their Atoll, and compensation for the breach of an implied-in-fact contract. *Id.* ¶ 101. Two other groups of Marshall Islanders also filed actions in this Court for damages relating to the nuclear testing program: the people of Bikini and the peoples of other Northern Marshall atolls and islands directly downwind from the test sites. *Id.* ¶ 102.

The government moved to dismiss all three cases, which this Court denied. In *Juda v. United States*, 6 Cl. Ct. 441, (1984) ("*Juda I*") this Court held that the Bikinians had stated claims under the Tucker Act, 28 U.S.C. § 1491, for takings in violation of the Fifth Amendment and for breach of an implied-in-fact contract that created fiduciary obligations to the people of Bikini. *Id.* ¶ 104. In the Enewetak case, this Court held that the complaint properly stated a claim under the Tucker Act for breaches of an implied-in-fact contract that imposed fiduciary obligations on the United States, and that this claim was not barred by the statute of limitations or by sovereign immunity, but it also concluded that the claim of the Enewetak people for the

taking of their atoll was barred by the statute of limitations. *Peter v. United States*, 6 Cl. Ct. 768 (1984) ("*Peter I*"). Am. Compl. ¶ 105. That ruling with respect to the taking claims was appealed by plaintiffs on the grounds that the taking was temporary and plaintiffs had no way of knowing the extent and duration of the taking until they were permitted to return to Enewetak in 1980. *Id.*

While the *Juda* and *Peter* cases were pending, the United States was negotiating the future political status of its wards, the people of the Marshall Islands. The people of the Marshall Islands were wards of the United States since 1947 when the Marshall Islands, together with the rest of Micronesia, were administered by the United States pursuant to the terms of a United Nations Trusteeship Agreement ("Trusteeship Agreement"). *Id.* ¶ 21. The Trusteeship Agreement granted the U.S. "full powers of administration, legislation, and jurisdiction" over the Trust Territory of the Pacific Islands and the right to fortify the islands and close off parts of them for security purposes. *Id.* ¶ 22. At the same time, it required the U.S. to promote the economic, social, and educational advancement of the inhabitants; to promote their political advancement toward self-government or independence; to protect their health; and to protect them "against the loss of their land and resources." *Id.* Under the Trusteeship Agreement, the people of Enewetak and the other inhabitants of the Marshall Islands became citizens of the Trust Territory of the Pacific Islands with passports reflecting this status. They remained citizens of the Trust Territory until 1990, when the Trusteeship terminated. *Id.* ¶ 28.

During the trusteeship, U.S. executive authority over the Trust Territory of the Pacific Islands was vested in a U.S. High Commissioner, appointed by the President and who, beginning in 1951, served under the direction of the Secretary of the Interior. The first proclamation issued by the High Commissioner, in 1947, announced that he exercised "all powers of government and

jurisdiction . . . and final administrative responsibility" over the Trust Territory and its inhabitants. Any local laws inconsistent with the Trusteeship Agreement, Interior Department Orders or Executive Orders, or any directive of the High Commissioner, would be null and void. *Id.* ¶ 27.

During the entire trusteeship period, defendant maintained strict control over the Trust Territory. The Trust Territory Government could not communicate directly with foreign governments, and the High Commissioner maintained control over budget, accounting, and other relations with U.S. government agencies. *Id.*¶ 30.

The political status negotiations resulted in a Compact of Free Association between the United States and the Marshall Islands. President Reagan signed the Compact of Free Association Act ("Compact Act") into law on January 14, 1986 (Pub. L. No. 99-239, 99 Stat. 1770) and by proclamation dated November 3, 1986, declared the Compact to be in effect. *Id.* ¶ 38.

In Section 177(a) of the Compact, the United States accepted "responsibility for compensation owing to citizens of the Marshall Islands . . . for loss or damage to property of the citizens of the Marshall Islands . . . resulting from the nuclear testing program which the Government of the United States conducted in the Northern Marshall Islands between June 30, 1946 and August 18, 1958." *Id.* ¶ 108.

In a separate agreement ("Section 177 Agreement"), the United States, pursuant to Section 177(b) of the Compact Act, agreed to the establishment of a Nuclear Claims Tribunal ("Tribunal" or "NCT") that would "render final determination upon all claims past, present and future, of the Government, citizens and nationals of the Marshall Islands which are based on, arise out of, or are in any way related to the Nuclear Testing Program. . ." *Id.* ¶¶108-109.

The Section 177 Agreement also provided for the establishment of a $150 million trust fund, the income from which was earmarked for nuclear-affected atolls, for the Tribunal, and for other programs related to the legacy of the nuclear testing program. $45.75 million of income from the trust fund was to be made available to the Tribunal over a 15-year period to pay out awards, and after 15 years, at least 75% of the income earned by the trust fund was to be made available to the Tribunal "for disbursement in payment of monetary awards made by the Claims Tribunal in subsequent years." *Id.* ¶ 110.

By its own admission, defendant made no effort to calculate the magnitude of the damages and injuries inflicted upon the people of Enewetak and other Marshall Islanders in deciding the amount of the payments authorized under the Section 177 Agreement. Asked by the House Interior Committee for "documents which reflect the calculations" the Administration made "to determine how much should be paid to each group of claimants," the Administration responded that "no [such] documents exist." *Id.* ¶ 111.

In conjunction with the establishment of the Tribunal, Article X of the Section 177 Agreement, entitled "Espousal," states: "This Agreement constitutes the full settlement of all claims, past and future, of the Government, citizens and nationals of the Marshall Islands which are based upon, arise out of, or are in any way related to the Nuclear Testing Program and which are against the United States, its agents, employees, contractors and citizens and nationals. . . ." Article XII of the Section 177 Agreement, provides:

> All claims described in Articles X and XI of this Agreement shall be terminated. No court of the United States shall have jurisdiction to entertain such claims, and any such claims pending in the courts of the United States shall be dismissed.

The people of Enewetak were not parties either to the negotiations on the Compact or the Section 177 Agreement. *Id.* ¶ 112.

Following enactment of the Compact of Free Association and Section 177 Agreement ("Compact Agreements") in 1986, defendant renewed its motion to dismiss, and this Court held that the Compact withdrew jurisdiction over certain proceedings including the then pending takings claims and breach of contract claims arising from the nuclear testing program. *Id.* ¶ 114. This Court further held that plaintiffs' constitutional challenges to the alternative claims procedures set up in the Section 177 Agreement were "premature" because the Agreement provided an alternative method of compensation – the Nuclear Claims Tribunal: "[T]he settlement procedure, as effectuated through the Section 177 Agreement, provides a 'reasonable' and 'certain' means for obtaining compensation. Whether the settlement provides 'adequate' compensation, cannot be determined at this time." *Juda v. United States,* 13 Cl.Ct. 667, 689 (1987) ("*Juda II*"). *Id.* ¶¶ 114-115. The *Juda II* opinion was adopted in *Peter v. United States,* 13 Cl. Ct. 691, 692 (1987) ("*Peter II*").

On appeal, the U.S. Court of Appeals for the Federal Circuit affirmed this decision:

> The [Compact] and the section 177 Agreement, provide, in perpetuity, a means to address past, present and future consequences, including the resolution of individual claims, arising from the United States nuclear testing program in the Marshall Islands. . . . [W]e are unpersuaded that judicial intervention is appropriate at this time on the mere speculation that the alternative remedy may prove to be inadequate.

*People of Enewetak v. United States,* 864 F.2d 134, 136 (Fed. Cir. 1988). Am. Compl. ¶ 120.

Moreover, in *Juda II,* this Court said that "Congress has recognized and protected plaintiffs' rights to just compensation for takings and for breach of contract." *Juda II,* 13 Cl.Ct. at 689. Consequently, the *Juda II* opinion (which was endorsed by the Federal Circuit in *People of Enewetak*) said that Congress ensured that plaintiffs' rights had not disappeared through any statute of limitations or any other procedural barrier. Am. Compl. ¶ 121. In addition, the ruling of this Court in *Peter* regarding the dismissal of plaintiffs taking claim on statute of limitations

grounds, although appealed, was specifically not addressed by the Federal Circuit: "Because we affirm the decision of the Claims Court to dismiss appellants' complaints for lack of subject matter jurisdiction, *we need not address other issues.*" *People of Enewetak,* 864 F.2d at 136 n. 4. (emphasis added) Am. Compl. ¶ 121.

In 1990, the people of Enewetak filed claims before the Nuclear Claims Tribunal, seeking damages for the loss of Enewetak Atoll, the costs of a radiological cleanup of the Atoll and consequential damages suffered as a result of their relocation and losses. *Id.* ¶ 122. On August 3, 2000, the Tribunal issued a final decision awarding plaintiffs a total of $385,894,500[1] for property and consequential damages, after deducting for compensation and restoration funds already received by plaintiffs under Article IV, Section 2 of the Section 177 Agreement. *Id.* ¶¶ 135, 141, 146. However, due to Congress' overall inadequate funding of the Tribunal, as well as other awards it has issued under its Article IV jurisdiction, the Tribunal has been able to pay out a total of only $1,647,483 on plaintiffs' Tribunal award—or 0.375% of the actual award. *Id.* ¶¶ 148-149. As of August, 2006, the remaining funds available to the Tribunal for its award payments and internal administrative expenses was less than $1.8 million. *Id.* ¶ 151.

In September 2000, the Marshall Islands government filed a petition with the U.S. Congress, requesting additional funds to cover unpaid Tribunal awards due to "Changed Circumstances" pursuant to Article IX of the Section 177 Agreement. *Id.* ¶ 163. To date, Congress has not acted on the petition, although a January 24, 2005 State Department letter advised Congress that the petition should be denied. *Id.* ¶ 166. Accordingly, it is clear that the alternative remedy established by Congress has been inadequate to satisfy plaintiffs'

---

[1] The $ 385,894,500 award was broken down into three categories: $244 million for past and future loss of Enewetak Atoll; $107.81 million for restoration costs for a radiological cleanup of the atoll; and $33,814,500 for hardships suffered by the People of Enewetak as a result of their relocation to Ujelang. Am. Compl. ¶ 146.

constitutional and contract claims, and that this Court should intervene to ensure that plaintiffs receive fair compensation for their considerable sacrifices.

## II. QUESTIONS PRESENTED

1. Does this Court have jurisdiction to determine whether the award of the Nuclear Claims Tribunal provides just compensation for plaintiffs' takings claims under the Fifth Amendment and/or adequate compensation for plaintiffs' breach of implied contract claims?

2. Whether plaintiffs' claims are barred by the political question doctrine?

3. Whether plaintiffs' claims are barred by the statute of limitations?

4. Whether plaintiffs' claims are subject to dismissal under Rule 12(b)(6) for failure to allege the elements of a Fifth Amendment taking or for failure to establish the existence of an implied-in-fact contract for the payment of adequate compensation?

## III. ARGUMENT

### A. The Court Has Statutory Subject Matter Jurisdiction Over the Claims, Which is Not Validly Withdrawn in the Compact Act.

The Tucker Act, specifically 28 U.S.C. § 1491(a)(1), confers jurisdiction on this Court "to render judgment upon any claim against the United States founded upon either the Constitution, * * * or upon any express or implied contract with the United States." Each of the claims in the amended complaint fall within that statutory grant of subject matter jurisdiction. The question before the Court is whether Congress validly repealed that grant of jurisdiction with regard to claims described in Article X of the Section 177 Agreement by enacting the Compact of Free Association Act (Compact Act), Pub. L. 99-239, 99 Stat. 1770 (1986), and whether the claims alleged in the complaint are covered by Article X.

#### 1. The Prior Litigation Left the Door Open for Plaintiffs to Return to this Court if the NCT Failed to Award Just Compensation, Notwithstanding Article XII.

The government's contention that the prior litigation in this Court and the Federal Circuit closed the door to the claims presented in the Amended Complaint ignores the Federal Circuit's holding that such claims were "premature," *People of Enewetak*, 864 F.2d at 136 (*citing Juda II*, 13 Cl.Ct. at 689), until the adequacy of the Nuclear Claims Tribunal remedy could be determined. The Federal Circuit said that it was "unpersuaded that judicial intervention is appropriate *at this time* on the mere speculation that the alternative remedy *may prove to be inadequate*." 864 F.2d at 136 (emphasis added). The *People of Enewetak* opinion adopted the language in *JudaII*, which explained that Article XII terminated "proceedings" but did not extinguish the basic claims involved. *Juda II*, 13 Cl.Ct. at 686. The Court's statement that *"[w]hether the settlement provides "adequate" compensation cannot be determined at this time," id.,* indicates that this Court has remained ready – at the appropriate time (*i.e.*, once the procedure had run its course, as it now has) -- to determine whether the settlement has been adequate. *See also Antolok v. United States*, 873 F.2d 369, 378 (D.C. Cir. 1989) (dismissing claims under the FTCA, but recognizing a remedy in this Court under the Tucker Act for "an uncompensated or inadequately compensated taking").

The prior decisions were guided (as this Court must be) by the Supreme Court's decision in *Dames & Moore v. Regan*, 453 U.S. 654 (1981), which also involved the termination of certain claims (albeit against Iran, rather than the United States) in favor of proceedings before a tribunal established by an international agreement. Just as the government conceded and the Court concluded in *Dames & Moore* that the agreement with Iran necessarily preserved jurisdiction over takings claims, the United States was careful in the prior litigation not to argue that Congress could constitutionally eliminate takings jurisdiction if – as has proven to be the case – the alternative remedy proved to be inadequate. *See* Consolidated Brief of Appellee,

*People of Bikini, Enewetak, Rongelap, Utrik and Other Marshall Islands Atolls v. United States* (June 24, 1988) ("Fed. Cir. Brief") at 45. As shown in section III.A.2, *infra*, any other conclusion would render Article XII unconstitutional and unenforceable.

In *Dames & Moore*, the Supreme Court took up on certiorari before judgment the constitutionality of an agreement between the United States and Iran that resulted in the release of the hostages held at the United States Embassy, and provided a non-judicial forum – the U.S.-Iran Claims Tribunal – to hear claims by United States citizens against Iran. The agreement terminated any United States judicial proceedings against Iran and its assets. Even though Iran made an open-ended commitment to pay judgments, the adequacy of the Tribunal was in dispute, and Dames & Moore argued that the extinguishment of its rights of action against Iran in favor of proceedings before the Tribunal constituted a taking by the United States. Even though claimants were arguably better off with the Tribunal remedy than they were with uncollectible rights of action against Iran, neither the government nor the Court thought those rights of action could be eliminated without a right of judicial redress against the United States.

At oral argument, the Supreme Court obtained a concession from the U.S. Solicitor General that claimants who were dissatisfied with the Tribunal award could sue in this Court, which would retain its jurisdiction to hear takings claims against the United States based on the extinguishment of the rights of action against Iran.[2] Although the Court concluded that it was then premature to decide whether there was a valid takings claim – the adequacy of the Tribunal

---

[2] Transcript of Oral Argument (QUESTION: "If there's still a taking, you think there's a remedy for it? MR. LEE: "That is correct, and that remedy is the Tucker Act."); *id.* ("Is there a remedy [if just compensation is not paid]? And the answer to that, it seems to me, as I read the treaty exception of the Tucker Act that there is." QUESTION: "That's the United States position, not just Mr. Lee's, I take it?" MR. LEE: "That is correct."). This Court is respectfully requested to take judicial notice of the transcript of the oral argument in *Dames & Moore*, U.S. Supreme Court No. 80-2078, pursuant to Federal Rules of Evidence 201(b).

process being untested – it was not premature to determine the availability of a United States judicial forum to hear a takings claim. 453 U.S. at 689 ("the possibility that the President's actions may have the effect of taking Petitioner's property, make ripe for adjudication the question whether petitioner will have a remedy at law under the Tucker Act "). The Court held that the Court of Claims would have jurisdiction, *id.*, thus avoiding the grave constitutional question that would have been posed by a scheme that created a non-judicial remedy and extinguished judicial power to determine just compensation. *See also id*. at 691 (Powell, J., concurring in part and dissenting in part) (agreeing that those whose claims are not paid in full have the right to bring takings actions in the Court of Claims).

To argue, as the government does in its motion to dismiss, that the prior litigation determined that there is no place for the plaintiffs in this court, even after they have exhausted the remedy provided in the Section 177 Agreement and established that they could not obtain just compensation is inconsistent with *Dames & Moore*, with the government's position in that case and in the prior litigation. It is unsupported by the language of the Court's prior decision in *Juda II* and the Federal Circuit's decision in *People of Enewetak*.

**2. Absent a Valid Settlement and Release or the Payment of Just Compensation, It is Unconstitutional to Eliminate All Jurisdiction Over Takings Claims.**

There is no reason to think that Congress intended to defy the Fifth Amendment or *Dames & Moore* when it approved the Compact. Article XII of the Section 177 Agreement provides, *inter alia*, that "[n]o court of the United States shall have jurisdiction to entertain such claims [described in Articles X and XI of the Section 177 Agreement], and any such claims pending in the courts of the United States shall be dismissed." The legal effect of Article XII of the Section 177 Agreement depends on Section 103(g)(2) of the Compact of Free Association

Act, *codified at* 48 U.S.C. § 1903(g)(2). That provision "ratifie[s] and approve[s]" the Section 177 Agreement between the United States and the Republic of the Marshall Islands on the following terms:

> It is the explicit understanding and intent of Congress that the jurisdictional limitations set forth in Article XII of such Agreement are enacted solely and exclusively to accomplish the objective of Article X of such Agreement and only as a clarification of the effect of Article X, and are not to be construed or implemented separately from Article X.

The plain text of § 103(g)(2) thus makes the withdrawal of jurisdiction in Article XII of the Section 177 Agreement operative only to effectuate what Congress understood to be a "full and final settlement" of all claims against the United States, § 103(g)(1), and was intended to be implemented only in conjunction with such a settlement.

The words of section 103(g)(2) were carefully chosen by Congress to leave the doors of this courthouse open to claims within the scope of the Tucker Act in the absence of a valid settlement agreement: "The new language is intended to make clear that court-stripping provisions of article XII of the section 177 agreement have no independent force or effect and their sole function is to implement the provisions of article X. Thus, if article X is valid, espousal stands, and if article X is invalid, claims covered by the espousal provisions will remain justiciable in U.S. courts, regardless of article XII." 131 Cong. Rec. H11,829 (daily ed. Dec. 11, 1985) (remarks of Rep. Seiberling explaining resolution of House-Senate conference) quoted in *Juda II,* 13 Cl. Ct. at 685. By conditioning the withdrawal of jurisdiction in this way, Congress sought to avoid enacting an unconstitutional revocation of judicial power to order the "just compensation" guaranteed whenever the United States takes private property for its own use under the Fifth Amendment. Congress may well have "assumed espousal was valid and effective," *id.*, but that has nothing to do with whether Congress intended to withdraw

jurisdiction over nuclear-testing claims described in Article X if that assumption proved to be incorrect. Congress did not condition the effectiveness of Article XII on a *prior* judicial review of the "espousal" provision in Article X (as the House version of section 103(g)(2) arguably required), but it did insist that the two stand or fall together when such review occurred.

If section 103(g)(2) were construed, contrary to its plain terms, to deny any court of the United States – whether state or federal and including the Supreme Court -- all jurisdiction to award "just compensation" for private property taken by the United States, it would be unconstitutional. If Congress could prohibit any court from enforcing the Fifth Amendment, it could do precisely what the Fifth Amendment expressly forbids. Congress could abrogate contracts or deprive landowners of the use of their property by regulation without having to pay a dime in compensation, provided that it withdrew all jurisdiction to award just compensation at the same time that it authorized the taking. *Dames & Moore* proves that it makes no difference in the analysis that the dispute in this case arises in an arguably international context.

A blanket prohibition of all jurisdiction by *any* United States court (such as Article XII of the Section 177 Agreement purports to impose) does not implicate the long debated authority of Congress to make regulations and exceptions to legislatively conferred jurisdiction pursuant to Article III, § 2. *Bartlett v. Bowen*, 816 F.2d 695, 703-04 (D.C. Cir. 1987) ( "little question" that eliminating jurisdiction of state and federal courts to review constitutionality is unconstitutional); *Battaglia v. General Motors Corp.*, 169 F.2d 254, 257 (2d Cir. 1948) ("[T]he exercise of Congress of its control over jurisdiction is subject to compliance with at least the requirements of the Fifth Amendment. That is to say, while Congress has the undoubted power to give, withhold, and restrict the jurisdiction of courts other than the Supreme Court, it must not so exercise that power as to deprive any person of life, liberty, or property without due process of law or to take

private property without just compensation."). While Congress could eliminate *this* Court's jurisdiction over takings claims, it must provide some judicial forum for such claims.[3] *See Kohl v. United States*, 91 U.S. 367 (1875) (district court necessarily had jurisdiction over condemnation action prior to conferral of jurisdiction on the Court of Claims in the Tucker Act). Article XII of the Section 177 Agreement, however, does not provide any judicial forum empowered to award just compensation. Article X establishes an alternative remedial process, but at the end of the day if such an alternative process fails to provide just compensation, a judicial remedy must remain available.

The federal government cannot set a cap on just compensation for taking private property and deprive the courts of jurisdiction to determine the adequacy of the payment in an international agreement any more than Congress can do so by legislation or the President by executive fiat. The Supreme Court has repeatedly rebuffed legislative efforts to dictate what constitutes just compensation. For example, in *Jacobs v. United States*, 290 U.S. 13 (1933), the Court held that the failure of Congress to authorize payment of interest on property taken as a

[3] The United States cannot avoid takings liability by invoking sovereign immunity to claims for just compensation for taking private property. The Fifth Amendment establishes the federal government's monetary liability, so there can be no sovereign immunity to just compensation awards. *See United States v. Clarke*, 445 U.S. 253, 257 (1980) (claims for just compensation are grounded in the Constitution). Although there is *dicta* in *Lynch v. United States*, 292 U.S. 571, 582 (1934), suggesting that the United States could withdraw consent to be sued for a taking, the Supreme Court has never so held, and it has repeatedly adopted constructions of federal statutes to avoid that question, including in *Lynch*. Examples include *Ruckelshaus v. Monsanto*, 467 U.S. 986, 1018 (1984); *Dames & Moore v. Regan*, 453 U.S. 654, 686-87 (1981); and *Blanchette v. Connecticut Gen. Ins. Corp.*, 419 U.S. 102, 126 (1974). The only authority cited in support of the *Lynch dicta* is *Schillinger v. United States*, 155 U.S. 163, 171-72 (1894), in which the patent infringement claims are properly classified as governmental torts, not takings. *See Zoltek Corp. v. United States*, 442 F.3d 1345, 1350-53 (Fed. Cir. 2006). *Antolok* involved statutory tort claims, not constitutional takings claims, and consequently did not consider the extinguishment of all jurisdiction over claims for just compensation. *See* 873 F.2d at 374; *id.* at 393 (Wald, J., concurring in the judgment). *See also Juda II*, 13 Cl. Ct. at 688 (United States is not obligated to provide a judicial remedy when it "creates rights in individuals against itself."). The *Juda* court erred in extending that reasoning to takings. *See* 13 Cl. Ct. 689-90.

result of dam construction by the TVA did not prevent a court from awarding interest as just compensation, because the obligation to pay arose from the Constitution, not from a statute. The Court has repeatedly recognized that it is for a court, not the political branches, to determine what just compensation is due.[4]

In *Monongahela Navigation Co. v. United States*, 148 U.S. 312, 327 (1893), Congress enacted a statute severely limiting the amount of compensation it would provide for the condemnation of a lock and dam of the Monongahela Navigation Company. The statute mandated that plaintiff's franchise to collect tolls for passage along the river not be considered in determining the sum to be paid by the United States. The Supreme Court soundly rejected the government's position that Congress, through legislation, could have the final say in determining the amount of compensation due under a Fifth Amendment taking.

> By this legislation congress seems to have assumed the right to determine what shall be the measure of compensation. But this is a judicial, and not a legislative, question. The legislature may determine what private property is needed for public purposes; that is a question of a political and legislative character. But when the taking has been ordered, then the question of compensation is judicial. It does not rest with the public, taking the property, through congress or the legislature, its representative, to say what compensation shall be paid, or even what shall be the rule of compensation. The constitution has declared that just compensation shall be paid, and the ascertainment of that is a judicial inquiry.

The Court concluded:

> The right of the legislature to determine what is the 'just compensation' it ought to pay…or to extinguish any part of such 'compensation' by prospective conjectural

4 Other examples include: *Seaboard Air Line Ry. Co. v. United States*, 261 U.S. 299, 304 (1923) (explaining that "[j]ust compensation is provided for by the Constitution and the right to it cannot be taken away by statute. Its ascertainment is a judicial function."). *Davis v. George B. Newton Coal Co.*, 267 U.S. 292, 301 (1925) ("'the ascertainment of compensation is a judicial function'"); *Baltimore & Ohio Ry. Co. v. United States*, 298 U.S. 349, 368 (1936) ("The just compensation clause may not be evaded or impaired by any form of legislation....[W]hen [an owner] appropriately invokes the just compensation clause, he is entitled to a judicial determination of the amount. The due process clause assures a full hearing before the court or other tribunal empowered to perform the judicial function involved.").

> advantage, or in any manner to interfere with the just powers and province of courts and juries in administrating right and justice, cannot for a moment be admitted or tolerated under our constitution. If anything can be clear and undeniable, upon principles of natural justice or constitutional law, it seems that this must be so.

148 U.S. at 327-328. Similarly, in *United States v. New River Collieries Co*., 262 U.S. 341, 343-44 (1923), the Court struck down the government's determination that compensation for coal taken during war time under the Lever Act should be paid based on the lower prices of domestic coal, rather than the considerably higher prices of exported coal, opining that "[t]he ascertainment of compensation is a judicial function, and no power exists in any other department of the government to declare what the compensation shall be or to prescribe any binding rule in that regard."

As the Eleventh Circuit recently explained, "it is ultimately the responsibility of the judicial branch to ensure that the compensation awarded for a taking satisfies the constitutional standard of just compensation" and that "if Congress (or the executive branch) attempts to impose a limitation on the measure of compensation for a taking, a court must evaluate that standard to see if it is consistent with the constitutionally mandated level of just compensation, and a court is not bound to follow that standard in making judicial determinations of the compensation due if the standard fails to secure just compensation."). *Gulf Power Company v. United States*, 187 F.3d 1324, 1333 (11th Cir. 1999) (citing *Monongahela Navigation, Co., supra*). [5]

Wholly apart from whether limitations on jurisdiction violate the Fifth Amendment just compensation guarantee, Congress also cannot legislate the outcome of pending litigation by

---

[5] *Accord Walker v. United States*, 105 Ct.Cl. 553, 64 F.Supp. 135, 139 (Ct.Cl. 1946) (stating definitively that "[t]he determination of just compensation under the Fifth Amendment is exclusively a judicial function. This is now undisputed and requires no citation of authority."); *Arkansas Val. Ry. v. United States*, 68 F.Supp. 727 (Ct.Cl. 1946) (stating that "the determination of just compensation under the Fifth Amendment is exclusively a judicial function").

requiring dismissal for separation of powers reasons. *United States v. Klein*, 80 U.S. 128 (1871) (Congress cannot preclude jurisdiction to determine the effect of a pardon on a pending appeal of property claim against the United States); *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 225-228 (1995) (Congress cannot reopen final judgments). *Klein*, like this case, involved an attempt by Congress to dictate by legislation the outcome of claims litigation against the government. The statute was an unconstitutional infringement on the powers of the judiciary because "it prescribed a rule of decision in a case pending before the courts, and did so in a manner that required the courts to decide a controversy in the Government's favor." *United States v. Sioux Nation*, 448 U.S. 371, 404-05 (1980) (describing holding of *Klein*).

Congress can eliminate substantive legal rights it has created, it must do so directly, not by dictating the outcome of litigation, as Article XII attempts to do. *See Jung v. Assn of Am. Medical Colleges*, 339 F. Supp. 2d 26, 41-42 (D.D.C. 2004) (concluding that Congress had altered substantive antitrust law, not interfered with judicial decision making). But – as explained above – Congress has no legislative control whatsoever over takings claims, which derive from the Constitution, not from legislation. Congress cannot extinguish constitutionally-based takings claims by directing courts to dismiss them for lack of jurisdiction.

**3. No Court Has Decided Whether Jurisdiction-Stripping is Constitutional In the Absence of a Valid Settlement or the Payment of Just Compensation.**

No court has yet adjudicated the constitutionality of extinguishing all judicial review of takings claims against the United States absent a valid settlement and release of the claims or adequate compensation by the Nuclear Claims Tribunal. In the earlier litigation, both the Federal Circuit and the D.C. Circuit concluded that it was premature to decide that question, until the alternative compensation scheme established in the Compact of Free Association had run its

course. *People of Enewtak*, 864 F.2d at 136-37 ("we are unpersuaded that judicial intervention is appropriate at this time on the mere speculation that the alternative remedy may prove to be inadequate."); *Antolok*, 873 F.2d at 378 (Challenge to the constitutionality of the remedial scheme created in the Compact is not properly before the court because, "[i]f there is an uncompensated or inadequately compensated taking, the plaintiffs' remedy is in the Claims Court under the Tucker Act, 28 U,.S.C. § 1491(a), not in the District Court under the Federal Tort Claims Act."); *Juda II*, 13 Cl. Ct. at 689 ("premature" to decide whether the Compact framework provides adequate compensation).

The Federal Circuit affirmed the dismissal of claims filed prior to approval of the Compact on the understanding that Congress had established an alternative means to provide just compensation and that it was unnecessary to decide whether that alternative remedy was constitutionally adequate "in advance of the exhaustion of the alternative provided." People of Enewetak, 864 F.2d at 137. The Court of Appeals explained that "[i]n section 177 of the Compact the United States Government accepted responsibility for just compensation owing for loss or damage resulting from its nuclear testing program." *Id* at 135. The court referred to the payment of "an initial sum of $150,000,000, with additional financial obligations over fifteen years for the settlement of all claims," and referred in a footnote to the Changed Circumstances provision of Article IX of the Section 177 Agreement, which allows for additional compensation if previously undiscovered injuries render the original amount "manifestly inadequate." *Id.* at 135-36. The court noted a recent appropriation by Congress as evidence "that its alternative provision for compensation be adequate." *Id.* Nothing in the Federal Circuit's opinion suggests that if the Nuclear Claims Fund established in the Section 177 Agreement proved "manifestly inadequate" to compensate the Marshallese for their injuries to person and property and that the

United States declined to pay additional compensation, that the Court would uphold the constitutionality of withdrawing jurisdiction over takings claims.

We now know that the Nuclear Claims Tribunal could not award just compensation to the Plaintiffs, the people of Enewetak, and the other affected Marshallese. We also know that the federal government did not fulfill its promise to "accept liability" for takings by appropriating additional funds or otherwise paying compensation. Accordingly, the question of the constitutionality of jurisdiction-stripping in the absence of a valid settlement and release of claims is now ripe for decision.

**4. Because Just Compensation Has Not Been Paid, the Constitutionality of Jurisdiction-Stripping Depends on Whether There Has Been a Valid Settlement and Release of Claims.**

The text and legislative history of section 103(g)(2) show that Congress intended to effectuate a settlement, not to extinguish constitutional claims for just compensation. Although the final version of section 103(g) deleted specific references in the House version of the Compact Act to judicial scrutiny of the validity of the agreement by the RMI to release the claims of private parties, the statute explicitly conditions the withdrawal of jurisdiction on the existence of a settlement. "It is clear that section 103(g) links Article X "Espousal" with Article XII, "United States Courts" in the Section 177 Agreement." *Juda II*, 13 Cl. Ct. at 684. Withdrawing jurisdiction over claims that have been validly settled and released is perfectly constitutional. Withdrawing jurisdiction to the enforce claims in the absence of a valid release is not.

The settlement on which Congress premised section 103(g)(2) was not with the plaintiffs in this case or any of the Marshallese with claims against the United States. It was a settlement with the Republic of the Marshall Islands ("RMI"), a government established by the United

States in the exercise of its trust authority and without sovereign status or standing under international law until *after* the execution of the Compact and the Section 177 Agreement.[6] Therefore, a necessary element of any argument for the constitutionality of jurisdiction-stripping based on a settlement and release of claims depends on the enforceability against the private plaintiffs of the RMI's release of their claims. It is up to the government to show that a release by the RMI can be enforced in this Court to release the plaintiffs' claims, invoking the international law of espousal.

The government's motion does not seek dismissal on the basis of a release of its liability by the RMI or otherwise directly rely on the RMI's espousal and release of claims.[7] Release is an affirmative defense that must be pleaded in an answer, Rule 8(c), not presented in a motion to dismiss. Rule 12(b). Consequently, it would be premature to fully brief the reasons for finding the RMI's purported release in the Section 177 Agreement invalid. For purposes of deciding the government's motion to dismiss for lack of jurisdiction, the Court should assume the release is invalid and should decide whether Congress could constitutionally withdraw all jurisdiction over the claims on that assumption.

An assumption that the release is invalid is well-founded. For the reasons outlined below, the government's effort to rely on a release by the RMI would fail for three independent reasons: (a) the release utterly fails the standards under the common law of the United States for the release of a trustee by a trust beneficiary; (b) the release is invalid because the RMI cannot espouse for injuries that occurred to the Marshallese before the RMI had international

---

[6] President Reagan proclaimed the Compact effective on November 3, 1986. Am. Comp. ¶ 38. The Trusteeship did not terminate until 1990. Am. Comp. ¶ 28.

[7] The government refers to the release in connection with its claim preclusion argument, discussed at page 32, *infra,* and its motion to dismiss for failure to state a claim, discussed at page 49, *infra*.

sovereignty and while the United States itself was the international sovereign with espousal power on behalf of the Marshallese; and (c) the release is invalid because the RMI cannot espouse claims while domestic remedies remain available to its nationals.

**(a) The release violates the federal government's fiduciary obligations and is invalid under federal common law.**

The Compact and the Section 177 Agreement were not the product of arms-length negotiations between international sovereigns. Throughout the negotiations, the United States was the trustee, and the RMI was its ward. The Section 177 Agreement violates the black letter requirements for the release of a trustee by a beneficiary. [8]

Congress enacted the United Nations Trusteeship Agreement into domestic law. 61 Stat. 3301 (1947). The Trusteeship Agreement created legally enforceable trust obligations, including the explicit duty to conserve private property used by the United States. *See United States v. White Mountain Apache Tribe*, 537 U.S. 465, 473-74 (2003) (statute holding land in trust imposed a duty to conserve property used by the United States. *See also* Restatement (2d) of Trusts § 176 (1957) (general duty of a trustee to conserve the corpus of the trust). Article 6, section 2 and 3 of the Trusteeship Agreement required the United States as trustee to protect the health and the property of the Marshallese. The transactions of a fiduciary with a beneficiary are "subjected to rigorous scrutiny," with the burden resting on the fiduciary "not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the [beneficiary]." *Pepper v. Litton*, 308 U.S. 295, 306 (1939). As a trustee, the United States was obligated to deal fairly with the RMI and the Marshallese; it could not take advantage of its

[8] The burden of proving the validity of a release is on the fiduciary. *Liston v. Gottsegen*, 348 F.3d at 303. (applying Massachusetts law); *Ditmars v. Camden Trust Co.*, 76 A.2d 280 (N.J. Super 1950); *In re Estate of Amuso*, 176 N.Y.S. 2d 175 (N.Y. Surr. Ct. 1958); Bogart, Trust and Trustees § 943, n.6.

superior knowledge or superior bargaining power, but in fact it did both. *See Seminole Nation v. United States*, 316 U.S. 286, 297 n.12 (1942) (quoting *Meinhard v. Salmon*, 249 N.Y. 458, 464 (1928) (Cardozo, Ch. J.).

More specifically, the release of claims by a beneficiary against a trustee is deemed invalid as a matter of federal common law if (1) the beneficiary did not know his rights or did not know material facts the trustee knew or should have known, (2) the release was induced by the trustee's improper conduct, or (3) the transaction involved a bargain with the trustee which was not fair and reasonable to the beneficiary. Restatement (2d) of Trusts § 217(2) (1959) (release invalid if the beneficiary did not know its rights or material facts the trustee knew or should have known, the release was induced by the trustee's improper conduct, or the transaction was not fair and reasonable to the beneficiary); Restatement (2d) of Contracts § 173 (contract with fiduciary is voidable unless it is on fair terms or the trust beneficiaries know all relevant facts the fiduciary knows or should know); Bogart, Trusts and Trustees § 943 (2d ed. rev. 1980) (trustee must make full disclosure, prove that the transaction is fair, and avoid concealment, misrepresentation and undue influence).

The federal courts have applied these standards to invalidate releases in favor of trustees in a variety of contexts, *e.g., Siegemund v. Shapland*, 324 F.Supp. 2d 176 (D. Me. 2004); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989); *Chisolm v. House*, 183 F.2d 698 (10th Cir. 1950); *Meinhardt v. Unisys Corp.*, 74 F.3d 420 (3d Cir. 1996). "[A] release obtained from the beneficiary through concealment or misrepresentation of essential or material facts is of no effect." *Maas v. Lonstorf*, 194 F. 577, 587 (6th Cir. 1912). At a minimum, there must be full disclosure. *Liston v. Gottsegen*, 348 F.3d 294, 303-04 (1st Cir. 2003).

The government cannot demonstrate the validity of the release given by the RMI in the Section 177 agreement. At a minimum, before seeking a release of liability, the government had a duty to determine that the payments it was offering to make were equivalent in value to the damages incurred by the Marshallese and the corresponding value of their claims.[9] But the government told Congress it had no basis for concluding that a $150 million fund would be adequate to satisfy the claims **(**Am. Comp. ¶ 111**),** and held out to the Marshallese and to the Court of Federal Claims and the Federal Circuit the prospect of additional payments, a prospect that has proved illusory.

**(b) The RMI's espousal of private claims is unenforceable under international law.**

To extinguish the claims of private parties on the basis of the Section 177 Agreement, the government must show that the RMI had valid authority to act on behalf of the Marshallese people, by invoking the international law doctrine of espousal. But the RMI's espousal would not be given effect under international law.

*First*, the RMI did not act as the agent of the plaintiffs, the people of Enewetak, when it negotiated the Section 177 Agreement. In fact, the people of Enewetak objected to the terms of

---

[9] In *United States v. Sioux Nation*, 448 U.S. 371 (1980), the Supreme Court approved the approach and language used by the Court of Claims in determining whether the United States had fulfilled its fiduciary obligations to the Sioux tribe. According to the Court, the underlying principles:

> reflect the traditional rule that a trustee may change the form of trust assets as long as he fairly (or in good faith) attempts to provide his ward with property of equivalent value. If he does that, he cannot be faulted if hindsight should demonstrate a lack of precise equivalence. On the other hand, if a trustee (or the government in its dealings with the Indians) does not attempt to give the ward the fair equivalent of what he acquires from his, the trustee to that extent has taken rather than transmuted the property of the ward.

*Id*. (quoting *United States v. Sioux Nation of Indians*, 601 F.2d 1157, 1162 (Ct.Cl. 1979)).

the Section 177 Agreement, and sought to pursue their takings litigation against the United States before this Court. Thus, the RMI prevented the people of Enewetak from exhausting their local law remedies against the United States, which is ordinarily a precondition for espousal. Restatement (3d) of Foreign Relations § 713, Comment *f; id.* § 902; *Republic of Austria v. Altmann*, 541 U.S. 677, 714 (2004) (Breyer, J., concurring).[10] An exhaustion of remedies requirement precludes a sovereign from stripping its people of domestically viable claims, as the Compact purported to do on behalf of the RMI.

*Second*, the doctrine of espousal is based on the principle that an injury to the national of a sovereign state is an affront to the sovereign, for which the sovereign is entitled to redress using the means of international diplomacy.[11] Plaintiffs and the other Marshall Islands communities affected by nuclear weapons testing were not RMI nationals for purposes of espousal at the time the claims accrued, because the RMI government was not then an international sovereign capable of invoking international remedies. Put another way, injuries to the plaintiffs were not affronts to RMI because it was not a sovereign state. *See Morgan*

[10] *See* 7 U.S. Dept. of State, Foreign Affairs Manual: Consular Affairs 613.c.(3) (identifying continuous nationality and exhaustion as prerequisites for espousal); D. Christopher Ohly, "A Functional Analysis of Claimant Eligibility," in International Law of State Responsibility for Injuries to Aliens, 281, 283, 284-86 (Richard B. Lillich ed., 1983) (explaining continuous nationality principle); James Crawford, The International Law Commission's Articles on State Responsibility, 264 (2002) (commenting on ILC Article 44 requiring continuous nationality and exhaustionn); *The Loewen Group v. United States*, 42 I.L.M. 811 (ICSID 2003) (discussing exhaustion of remedies issue in the context of NAFTA); Restatenent (3d) of Foreign Relations, § 902, *comment* k at 348.

[11] *Mavromatis Palestine Concessions*, PCIJ, Ser. B., No. 3 (1924); *Panevezys-Saldutiskis Ry. Case*, PCIJ, se. A/B, No. 76 (1939); I. Brownlie, Principles of Public International Law 483 (5th ed. 1998); M. Duschesne, The Continuous-Nationality of Claims Principle: Its Historical Development and Current Relevance to Investor-State Investment Disputes, 36 Geo. Wash. Int'l L. Rev. 783 (2004); S. Murphy, Contemporary Practice of the United States Relating to International Law, 96 Am. J. Int'l L. 262 (2002).

*Guaranty Trust Co. v. Republic of Palau*, 924 F.2d 1237,1243-44 (2d Cir. 1991) (because compact of free association is not yet effective, Palau, as a trust territory lacks the attributes of statehood and is not a foreign state for purposes of FSIA); Restatement (3d) of Foreign Relations § 201 (1987).[12] Nor was the RMI government a successor to a sovereign; the international relations of the Marshall Islands had been governed by a succession of colonial or occupying powers since the 16th century when the islands were "discovered" by Spain. Because the RMI was not a sovereign when it executed the Section 177 agreement, it could not claim to have been injured by harm to its nationals.

*Third*, the claims of the Marshallese against the United States, their trustee, were domestic claims of persons under United States sovereignty based on United States law, not international claims subject to espousal. International sovereignty over the Marshall Islands at the time of the Compact (and at the time of the nuclear testing) was exercised by the United States, as the United Nations' trustee. *People of Saipan v. Dept. of the Interior*, 356 F. Supp. 645, 655 (D. Haw. 1973) (Trusteeeship gives the United States "in practical effect the exercise of full sovereign power."). The United Nations Trusteeship Agreement explicitly makes the United States responsible for extending the diplomatic and consular protection to the Marshallese that is the basis for espousal. Am. Comp. ¶ 28. *See also Trusteeship Agreement*, Art. 11.2. The power to espouse claims under international law thus resided in the United States, which cannot invoke international law espousal to defeat its own domestic law obligations. Accepting the RMI's espousal of claims against the United States would be contrary to the specific rule that a state cannot extend its "diplomatic protection to one of its nationals against a State whose nationality

[12] The Compact with the Marshall Islands did not become effective until November 3, 1986 when President Reagan declared it effective by proclamation. Am. Comp. ¶ 38. The trusteeship for the Marshall Islands did not terminate until 1990. *Id.* ¶ 28.

such person also possesses." Geneva Convention of 1930 on Certain Questions Relating to the Conflict of Nationality Laws, Art. 4. [13] Otherwise, nationals of one state could turn domestic claims into international disputes by persuading another country to sponsor and espouse their claims.

**5. The Compact Act Can Be Construed to Avoid Unconstitutionality.**

Of course**, c**ourts read statutes to avoid declaring them unconstitutional when they can. *See, e.g., Zadvyas v. Davis*, 533 U.S. 678, 689 (2001) (referring to constitutional avoidance as a "cardinal principle" of statutory construction). The doctrine of constitutional avoidance is rooted in two important structural precepts: that courts should, when possible, refrain from invalidating legislation to minimize inter-branch conflict, *Almendarez-Torres v. United States*, 523 U.S. 224, 238 (1998), and that Congress is presumed to be mindful of the Constitution when it legislates. *Rust v. Sullivan*, 500 U.S. 173, 191 (1991) ("This canon is followed out of respect for Congress, which we assume legislates in light of constitutional limitations."); *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 73 (1994) ("we do not impute to Congress an intent to pass legislation that is inconsistent with the Constitution as construed by this Court."). Previous constructions of the Compact Act did not apply the doctrine of constitutional avoidance because the courts deemed the constitutional question that must now be decided to be premature. [14] It is time to

---

[13] To the extent this rule may be have been liberalized (*e.g., Case No. A/18 Concerning the Question of Jurisdiction Over Claims of Persons with Dual Nationality* (U.S.-Iran Claims Tribunal, April 6, 1984), 23 ILM 489, 501 (1984)), it is based to the equality of sovereign states, a principle that would not apply to the RMI vis-à-vis the United States, at the very least before the effective date of the Compact of Free Association.

[14] Without applying the doctrine of constitutional avoidance, Judge Harkins read the statute differently. *Juda II*, 13 Cl. Ct. at 686. The Federal Circuit's opinion does not refer to this question at all, however the Federal Circuit's general adoption of the *Juda* opinion could be understood to include his conclusion that Article XII could operate without a judicial determination of the validity of the RMI's settlement of private claims. 864 F.2d at 137

apply that "cardinal principle" to determine whether the Compact Act can be construed to avoid the unconstitutional result that no court of the United States would have the power to award just compensation for a taking of private property by the federal government.

The Supreme Court has consistently embraced constructions of statutes that avoid constitutionally suspect jurisdiction stripping. *See Hamdan v. Rumsfeld*, 126 S.Ct. 2749 (2006); *Hamdi v. Rumsfeld*, 542 U.S. 507, 532-33 (2004) (plurality opinion); *Webster v. Doe*, 486 U.S. 592, 603 (1988). In particular, it has done so in the precise context here: the elimination of jurisdiction to adjudicate a takings claim. *Dames & Moore v. Regan*, 453 U.S. 654, 684-85

---

(adopting the "more extensive analysis" in *Juda*). When the record is ambiguous, there is no issue preclusion. There is also no preclusion because the issues were not the same. The Federal Circuit did not consider the constitutionality of the Act or apply the canon of constitutional avoidance. *See Mayer/Berkshire Corp. v. Berkshire Fashions, Inc.*, 424 F.3d 1229, 1233 (Fed Cir. 2005) (distinguishing issues of trademark validity in an infringement suit from a cancellation proceeding).

Moreover, both the operative facts and the legal context have changed dramatically since Judge Harkins' decision, so that his legal conclusion about the interpretation of section 103(g)(2) would not be binding on the Court, even if the issues were the same. *See Morgan v. DOE*, 424 F.3d 1271, 1274 (Fed. Cir. 2005); *id.* at 1275 (citing Restatement (2d) of Judments § 28(2)(b)); 18A Wright, Miller & Cooper, Federal Practice & Procedure § 4425 at 72 (2002). "It is not every case in which a litigant has had 'one bite at the cherry that the law forbids another. In other words, it is not every case in which the policy of stopping litigation outweighs that of showing the truth." *Kearns v. Gen. Motors Corp.*, 94 F.3d 1553, 1557 (Fed. Cir. 1996) (quoting *Angel v. Bullington*, 330 U.S. 183, 203 (1947)). The critical factual difference is that it is now clear that the plaintiffs will not receive just compensation from the NCT, so that the constitutional issue deemed premature in *Juda* is now ripe. *See Bingaman v. Dept. of the Treasury*, 127 F.3d 1431 (Fed. Cir. 1997) (relitigation permissible where consequences of applying legal rule to new facts differ). The difference in the legal context is that Judge Harkins was addressing whether Article XII went into effect without prior judicial review of the validity of the espousal, not whether the provisions were severable so that Article XII could be enforced even if Article X were to be held invalid. ("Article XII is not made contingent upon a judicial determination of the validity of espousal in Article X"), rather than whether it could constitutionally survive invalidation of Article X. *See Environmental Defense Fund v. EPA*, 369 F.3d 193, 201-03 (2d Cir. 2004). Indeed, in its briefs to the Supreme Court opposing certiorari, the government was careful not to argue that Articles X and XII could be severed if Article X proved to be invalid, confining its argument to whether Congress had required a judicial evaluation of Article X before a court could dismiss under Article XII.

(1981) (rejecting jurisdiction stripping construction of an executive order); *Ruckelshaus v. Monsanto*, 467 U.S. 986, 1018 (1984); *Blanchette v. Connecticut Gen. Ins. Corp.*, 419 U.S. 102, 126 (1974) (construing statute to avoid eliminating jurisdiction over a takings claim).

Here, the Court need do nothing more than take section 103(g)(2) of the Compact Act at face value, to conclude that Congress did not intend unconstitutionally to eliminate all judicial power to award just compensation, if the process established by the Section 177 Agreement did not do so.[15] Congress linked implementation of jurisdiction-stripping Article XII to the settlement-release provisions of Article X, showing that Congress wanted to effectuate a settlement extinguishing takings claims, which is constitutional, not to authorize the taking of private property without just compensation. Even if there are other plausible readings of section 103(g)(2), the canon of constitutional avoidance resolves any ambiguity in favor of a construction that makes the validity of Article XII jurisdiction-stripping depend on the validity of RMI's release of private claims. *See Clark v. Martinez*, 543 U.S. 371, 385 (2005).

Finally, the Compact Act can also be read to emphasize the primacy of the United States' acceptance of responsibility for compensation in Compact section 177(a). The mechanism for carrying out that responsibility was the Nuclear Claims Tribunal established in Article IV of the Section 177 Agreement. However, there is nothing in the Section 177 Agreement that allows the United States to disclaim its avowed responsibility if the damages exceed the "initial sum" paid to establish the Nuclear Claims Fund. The Federal Circuit's opinion in *People of Enewetak* does

[15] The Court in *Antolok*, acknowledged that statutes should be construed so that language chosen by Congress is not superfluous. The majority read section 103(g)(2) to "make it plain that the deprivation of jurisdiction applies not to all claims by the Marshall Islanders against the United States, but only those described in Articles X and XI of the Section 177 Agreement." *Antolok*, 873 F.2d at 375. However, section 103(g)(2) remains superfluous in that reading, because Article XII itself is explicitly limited to "claims described in Articles X and XI of this Agreement."

not treat the $150 million Nuclear Claims Fund as the exclusive means by which the United States would discharge its just compensation obligations. Indeed, in its brief to the Federal Circuit, the United States renounced the notion that the United States had no duty to provide additional funds if the Fund came up short "because of long-term investment difficulties or substantial unforeseen damages." *Fed. Cir. Brief,* at 34. The government cited the "Changed Circumstances" provision of the Section 177 agreement, *id.* at 34-35, and quoted Senator McClure's statement as floor manager in the Senate, that, "[t]here is a continuing moral and humanitarian obligation on the part of the United States to compensate any victims – past, present or future – of the nuclear testing program. For this reason, I fully expect that if new claims develop, Congress should and will provide any assistance required, absent compelling contradictory evidence." *Id.* at 35; *see also id*. at 45. It is little wonder that the Federal Circuit pointed to subsequent congressional actions as allaying concerns about the adequacy of the Nuclear Claims Fund to provide just compensation. [16] *People of Enewetak*, 864 F.2d at 135-36 (referring to the "initial sum" provided by Congress, and citing the "Changed Circumstances" provision).

**B. The Prior Dismissal of Plaintiffs' Claims for Lack of Jurisdiction Does Not Bar the Present Claims.**

The government's *res judicata* argument muddles claim preclusion, the doctrine that generally prevents a party from litigating claims that could have been brought in an earlier case

[16] The government argued that the claims could be discounted to account for difficulties in establishing them. *Fed. Cir. Brief*, at 36-37. While a party can undoubtedly agree to settle claims its own claims in light of such difficulties, the United States cannot legislatively discount *its own Fifth Amendment obligations* on that basis. The NCT decisions show that the true value of the plaintiffs' claims vastly exceed the funds provided under the Section 177 Agreement. Claims against the United States also do not present the inherent collection difficulties as claims against foreign sovereigns, so it is irrelevant that the United States has sometimes agreed to settle claims of its citizens against other governments for less than their full value.

(whether they were litigated or not) with collateral estoppel or issue preclusion, the doctrine that generally prevents a party from relitigating issues that were decided earlier. Neither doctrine helps the government here.

**1. The Prior Litigation Did Not Decide Whether the Compact Validly Stripped Jurisdiction If the Compact Process Failed to Provide Just Compensation.**

The government does not squarely argue issue preclusion. The half-hearted references in its motion to the prior resolution of the jurisdictional issue (Gov. Mem. 16, 17) do not support issue preclusion, because the prior decisions did not reach the issues now before the Court. In fact, both the Court of Federal Claims and the Federal Circuit considered it premature to decide whether Congress could eliminate jurisdiction to adjudicate nuclear testing claims if the Nuclear Claims Tribunal process did not produce just compensation. *People of Enewetak*, 864 F.2d at 136. Thus, the prior litigation does not support dismissal for lack of jurisdiction.

**2. The Prior Litigation Was Not Dismissed on the Merits, So There is No Claim Preclusion.**

As the government acknowledges, the bar of *res judicata* requires that the prior decision be a decision on the merits. (Gov. Mem. 18-19). There was no decision on the merits in the *Peter* or *Juda* litigation. *See People of Enewetak*, 864 F.2d at 136 generally and n. 4. There, the Court deemed the constitutionality of the Compact and Section 177 Agreement, as well as the other issues raised, unripe and specifically declined to address them.[17] *Id*. The *Juda* and *Peter* dismissals were pursuant to RCFC Rule 41(b). Rule 41(b) expressly provides that a dismissal for

[17] Defendant strives to meet the dismissal "on the merits" requirement for claim preclusion rather obliquely by attempting to merge the jurisdictional limitations in the Section 177 Agreement with the espousal-release provision, as if the prior dismissal had been based on a settlement. This attempt must fail, because the *Juda II* judgment was not based on the espousal-release or § 103(g) of the Compact Act. As stated above, both courts declined to address the validity of the "settlement" and release of claims. The government successfully argued that the validity of the jurisdictional provision did not depend on whether there had been a settlement.

lack of jurisdiction is not a decision on the merits: "Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision of this rule and any dismissal not provided for in this rule, *other than a dismissal for lack of jurisdiction* …operates as an adjudication upon the merits." RCFC 41(b) (emphasis added).

The distinction between jurisdictional dismissals and dismissals on the merits is firmly established. *See, Hughes v. United States*, 71 U.S. 232, 237 (1866); *Bell v. Hood*, 327 U.S. 678, 682-83 (1946); *Doe v. United States*, 463 F.3d 1347 (Fed. Cir. 2006). Jurisdictional dismissals are not claim preclusive. *See, Do-Well Machine Shop, Inc. v. United States*, 870 F.2d 637, 640 (Fed. Cir. 1989) ("A dismissal on the merits carries *res judicata* effect and dismissal for want of jurisdiction does not."); *accord, Vink v. Hendrikus Johannes Schif, Rolkan, N.V.*, 839 F.2d 676, 677 (Fed. Cir. 1988); *Spruill v. Merit Sys. Prot. Bd.*, 978 F.2d 679, 687 n.10 (Fed. Cir. 1992) (noting the difference in *res judicata* effect between a dismissal for lack of jurisdiction and a dismissal for failure to state a claim); Restatement (2d) of Judgments § 20(a) (no claim preclusion "[w]hen the dismissal is one for lack of jurisdiction"); 9 Wright, Miller & Cooper, *Federal Practice & Procedure* § 2373 & n.23; 18A Wright& Miller, *Federal Practice & Procedure* § 4427 (general discussion of preclusion); and § 4436 ("there is little mystery" that a jurisdictional dismissal is not preclusive).[18]

**3. The Claims Alleged in the Complaint Were Reserved in the Earlier Litigation.**

[18] *Hornback v. United States*, 405 F.3d 999 (Fed. Cir. 2005), the only case cited by defendant on this issue, is not applicable to the case at bar. *Hornback* involved a final appealed dismissal under the statute of limitations. Even though the statute of limitations is regarded as "jurisdictional" in the context of sovereign immunity, a final dismissal on statute of limitations grounds is considered to be on the merits. That is not the case here; in *Peter I*, the statute of limitations ruling on the taking claim was appealed. Am. Compl. ¶ 105. The Federal Circuit in *People of Enewetak*, specifically declined to address that issue on appeal. 864 F.2d at 136 n. 4. Consequently, there was no final dismissal on statute of limitations grounds.

Whatever it does, the prior judgment does not preclude the plaintiffs from returning to this Court to present the constitutional question expressly reserved as "premature" in the earlier litigation. The dismissal for lack of subject matter jurisdiction in *Peter II* and *Juda II* was a *qualified* dismissal. This Court expressly left the courthouse doors open in the event that the compensation provided by the alternative procedure should prove inadequate. *Juda II,* 13 Cl. Ct. at 688. The qualified nature of this dismissal was affirmed by the Court of Appeals for the Federal Circuit in *People of Enewetak v. United States*, 864 F.2d at 136. Because of this reservation of the opportunity to return to this Court at the conclusion of the proceedings of the Nuclear Claims Tribunal, *res judicata* has no bearing in the instant litigation. *See* Restatement (2d) of Judgments § 26(b) (no preclusion when "the court in the first action has expressly reserved the plaintiff's right to bring the second action."); 18 Wright, Miller & Cooper, Federal Practice & Procedure § 4413, pp. 31-32 (2002); *Central States Pension Fund v. Hunt Truck*, 296 F.3d 624, 627-29 (7th Cir. 2002).

**C. The Adjudication of Takings Claims is a Core Judicial Function, Not a Non-Justiciable "Political Question."**

Defendant further argues that this litigation raises a non-justiciable political question and therefore should be dismissed "because it challenges the propriety of an agreement entered into by the governments of the RMI and the United States." (Gov. Mem. 21-22). The government loses sight of the fact that the core complaint – that the United States has failed to pay just compensation for taking property – is one traditionally and historically committed to the judiciary for resolution. As this Court emphasized years ago in the *Juda I* litigation, these are "money claims which are the grist of the judicial mills, particularly the function of this court [.]" *Tomaki Juda v. United States*, Nos. 172-81L, 543-81L and 561-82L, April 13, 1983 Transcript of Proceedings at 67. And, as the Court of Appeals for the Federal Circuit noted in *Lagenegger v.*

*United States*, 756 F.2d 1565, 1569 (Fed. Cir. 1985), "consideration of land taking claims is clearly the role of the judiciary according to the Constitution, Amendment V, and ascertainment of 'just compensation' is a judicial function" It cannot be said that this Court lacks "discoverable and manageable standards" for adjudicating a takings claim.[19] Furthermore, as discussed at pages 13 to 19, *supra*, the Constitution commits the determination of just compensation to the judiciary, *not* the political branches, so it cannot be said that resolving this case encroaches on turf "textually committed" to Congress or the Executive.[20]

The most telling case in point is *Dames & Moore*, where, far from treating a dispute about whether the United States' settlement with Iran as a non-justiciable political question, the Supreme Court reached out to decide the case by an extraordinary writ of certiorari before judgment, decided it on the merits, and noted in its opinion that the United States had conceded that the Court of Claims would have jurisdiction over takings claims arising from the settlement. 453 U.S. at 689. It is inconceivable that if the Court perceived no infringement on or disrespect to the political branches in the context of takings claims arising of the settlement with Iran, that it would do so here.[21]

The government cannot demonstrate a "textually demonstrable constitutional commitment of the issue to a coordinate political department" simply because this taking claim

---

[19] *See Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995) (tort claims committed to judicial branch); *Alperin v. Vatican Bank*, 410 F.3d 532, 548-52 (9th Cir. 2005) (claims for conversion of personal property); *Sarei v. Rio Tinto, PLC*, 456 F.3d 1069, 1079-80 (9th Cir. 2006) (tort claims).

[20] There is no merit to an argument that the RMI's submission of a Changed Circumstances Petition to Congress "commits" the takings issue to Congress. *See Gross v. German Foundation Industrial Initiative*, 456 F.3d 363, 387 (3d Cir. 2006); *Arakaki v. Lingle*, 423 F.3d 954, 975-76 (9th Cir. 2005), *judgment vacated on other grounds*, 126 S.Ct. 2859 (2006).

[21] Justiciability is an element of Article III jurisdiction, and therefore one the Court must consider for itself, even if no party raises the issue.

arises in the context of an international agreement.[22] "[T]he Constitution does not provide a foreign affairs exception" to jurisdiction over taking claims. *Langenegger v. United States*, 756 F.2d at 1569. *See also Kwan v. United States*, 272 F.3d 1360, 1364 (Fed. Cir. 2001) (the political question doctrine "requires careful case-by-case analysis" not blanket application). The Constitution expressly confers judicial power over cases arising under treaties, and cases involving public consuls and ministers, so it impossible to justify a broad foreign affairs exclusion. Art. III, § 2; *see also* First Judiciary Act, 1 Stat. 73, § 25 (1789). "[I]t is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker v. Carr*, 369 U.S. 186, 211-12 (1962).

The courts have adjudicated sensitive cases involving the interpretation and constitutionality of treaties since the earliest days of the Republic, and they have continued to do so to the present. *Ware v. Hylton*, 3 U.S. 199 (1796) (adjudicating claim by British subject based on conflict between Virginia statute and a federal treaty); *Martin v. Hunter's Lessee*, 14 U.S. 304 (1816) (ejectment claim to property by British subject based on federal treaty); *Japan Whaling Ass'n. v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986) ("the courts have the authority to construe treaties and executive agreements); *Sanchez-Llamas v. Oregon*, 126 S.Ct. 2669, 2677, 2683 (2006) (addressing effect of Vienna Convention on Consular Relations and an International

[22] The availability of redress from Congress under the "Changed Circumstances" provision of the Compact does not oust the Court from jurisdiction. Congress can usually act to redress a grievance even in the absence of a specific provision in an agreement, but that has no effect on the authority of the courts to apply existing law. *See Arakaki v. Lingle*, 423 F.3d 954, 975 (9th Cir. 2005), judgment vacated on other grounds, 126 S.Ct. 2859 (2006); *Gross v. German Foundation Industrial Initiative*, 456 F.3d 363, 387 (3rd Cir. 2006), and defendant has cited no cases in support of this contention. Nor is there any pragmatic reason to defer judicial action until Congress acts on the petition filed by RMI in 2000. Nothing has happened for six years, and the State Department has taken the position that there are no changed circumstances, so it would be disingenuous for the government to hold that process out as a meaningful alternative at this time.

Court of Justice decision on domestic law); *Ministry of Defense v. Elahi*, 126 S.Ct. 1193 (2006) (per curiam) (execution of a judgment against property of Iran). This case is not about a policy decision in carrying out the government's foreign policy, but about whether it has paid constitutionally-mandated just compensation for private property it made a decision to appropriate. *Compare El-Shifa Pharmaceuticals Indust. Co. v. United States*, 378 F.3d 1346, 1364 (Fed. Cir. 2004) (declining to review President's designation of "enemy property" in the exercise of war-making powers). A takings claim presumes that the government is entitled to use property as it sees fit in pursuit of whatever policy decisions the political branches make. The judiciary's function is to make sure that when it does use private property, it pays for it.

The government is also mistaken in supposing that the Court's ordinary powers of judicial review are suspended for international agreements. Courts disapprove of actions by the political branches by holding them unconstitutional in many contexts. Those rulings do not convey disrespect for the political branches or sow confusion. They are an inevitable consequence of a governmental framework in which the actions of the political branches are constrained by the Constitution. *See United States v. Munoz-Flores*, 495 U.S. 385, 390 (1990) ("disrespect, in the sense the Government uses the term, cannot be sufficient to create a political question. If it were, every challenge to a congressional enactment would be impermissible.")

### D. Plaintiffs' Claims Are Not Barred By The Statute Of Limitations Under 28 U.S.C. Sec. 2501.

Remarkably, having persuaded the courts that takings claims were not ripe until the NCT process had run its course, the government now maintains that it is too late for the People of Enewetak to press their claims. Just as a state may not "hold out what plainly appears to be a 'clear and certain' post-deprivation remedy and then declare, only after the disputed taxes have been paid, that no such remedy exists," the federal government cannot, consistent with due

process, hold out the prospect of a later challenge to the adequacy of the NCT process and then declare that such a challenge necessarily comes too late. *Reich v. Collins*, 513 U.S. 106, 108 (1994). That, in Justice O'Connor's words, would be an unconstitutional "bait and switch." *Id.* at 111.

**1. In The Compact And Section 177 Agreement, Congress Intended To Accept Responsibility And Provide Just Compensation For Nuclear Damage Claims Without Regard To Any Limitations Period Or Other Procedural Barriers.**

The government, on pages 26 and 27 of its Memorandum, asserts that plaintiffs' taking claim for U.S. use and damage of Enewetak Atoll as described in Count 1 of the complaint should be dismissed because this Court previously, in *Peter I*, dismissed this claim as untimely filed.[23] However, that 1984 *Peter* ruling occurred 2 years prior to the effective date of the Compact of Free Association in which the United States accepted "responsibility for compensation owing to citizens of the Marshall Islands . . . for loss or damage to property of the citizens of the Marshall Islands . . . resulting from the nuclear testing program which the Government of the United States conducted in the Northern Marshall Islands between June 30, 1946 and August 18, 1958."[24] Clearly Congress intended to accept responsibility and provide just compensation without regard to any limitations period or other procedural barrier.[25] Congress' intent is further indicated in the Section 177 Agreement, in which it agreed that the Nuclear Claims Tribunal would "render final determination upon *all* claims past, present and future, of the Government, citizens and nationals of the Marshall Islands which are based on,

[23] The court's 1984 *Peter* ruling held that Plaintiffs' breach of implied-in-fact contract claim was not barred by the statute of limitations.
[24] Compact Act, Section 177(a).
[25] In *People of Enewetak*, the Federal Circuit said: "Under Section 177 of the Compact, the United States Government accepted responsibility for the just compensation owing for loss of damage resulting from its nuclear testing program." 864 F. 2d at 135.

arise out of, or are in any way related to the Nuclear Testing Program[.]"[26] (emphasis added). Accordingly, the prior ruling on the statute of limitations was superseded by an act of Congress (Section 177 the Compact and the provisions of the Section 177 Agreement). This Court in *Juda II* recognized as much when it explained that any challenge to the validity of the alternative proceeding was "premature," and noted that Congress had recognized the continued validity of Plaintiffs' claims when it established the alternative procedure in the Compact and Section 177 Agreement:

> Whether the compensation, in the alternative procedures provided by Congress in the Compact Act, is adequate is dependent upon the amount and type of compensation that ultimately is provided through those procedures. *Congress has recognized and protected plaintiffs' rights to just compensation for takings and for breach of contract.* The settlement procedure, as effectuated through the Section 177 Agreement, provides a "reasonable" and "certain" means for obtaining compensation. Whether the settlement provides "adequate" compensation cannot be determined at this time....This alternative procedure for compensation cannot be challenged judicially until it has run its course.

13 Cl.Ct. at 689 (emphasis added). In the italicized sentence – *"Congress has recognized and protected plaintiffs' rights to just compensation for takings and for breach of contract"* – the *Juda* opinion (which was endorsed by the Federal Circuit in *People of Enewetak*) said that Congress ensured that Plaintiffs' rights had not disappeared through any statute of limitations or any other procedural barrier.

**2. The Language in *Peter* on the Statute of Limitations Is Not Binding Under the Doctrine of Collateral Estoppel or Issue Preclusion, Because This Issue Was Not Addressed by the Federal Circuit on Appeal and Hence Is Not a "Final" Ruling or One that Is "Necessary to the End Decision Then Made."**

The 1984 ruling in *Peter I* on the Statute of Limitations was timely appealed prior to the effective date of the Compact and prior to the subsequent dismissal on jurisdictional grounds. Consequently, that ruling was not final and ultimately was specifically not addressed by either

[26] Section 177 Agreement, Article IV, Section 1(a).

this Court or by the Federal Circuit on appellate review.

The government cites *Kroeger v. U.S. Postal Serv.*, 865 F.2d 235, 239 (Fed. Cir. 1988) for the proposition that collateral estoppel applies when "the previous determination of that issue was necessary to the end-decision then made." But when the Federal Circuit provided appellate review of the *Peter* decision, it ruled only that this Court did not have subject-matter jurisdiction at that time – because of the alternative procedure established in the Section 177 Agreement – and explicitly stated that "we need not address other issues." *People of Enewetak*, 864 F.2d at 136 n. 4. It is impossible to contend, therefore, that the language on the statute of limitations in *Peter*, 6 Cl.Ct. at 773-76, was "necessary to the end-decision then made." The "end-decision" was, of course, made by the Federal Circuit, and its opinion explicitly said that it was not necessary to address the statute of limitations issue. Under the test that the United States acknowledges governs collateral estoppel, the doctrine simply does not apply.

In *Arizona v. California*, 530 U.S. 392, 414 (2000), the Supreme Court quoted from the *Restatement (Second) of Judgements* sec. 27, at 250 (1982) for the proposition that: "It is the general rule that issue preclusion attaches only '[w]hen an issue of fact or law is actually litigated and *determined by a valid and final judgment, and the determination is essential to the judgment*.'" (Emphasis added.) The judgment must therefore be final, and the issue of concern must have been one that was essential to that final judgment. In *Gelb v. Royal Globe Insurance Co.*, 798 F.2d 38 (2d Cir. 1986), the Second Circuit explained that to be governed by the collateral-estoppel/issue-preclusion rule, the issue of concern must have been addressed on appeal and the ruling on appeal must have rested on the court's determination regarding that particular issue: "if an appeal is taken and the appellate court affirms on one ground and disregards the other, *there is no collateral estoppel as to the unreviewed ground*." *Id.* at 45

(emphasis added; *citing Hicks v. Quaker Oats Co.*, 662 F.2d 1158, 1168 (5th Cir. 1981); *Stebbins v. Keystone Insurance Co.*, 481 F.2d 501 (D.C. Cir. 1973); *Martin v. Henley*, 452 F.2d 295, 300 (9th Cir. 1971); *International Refugee Organization v. Republic S.S. Corp.*, 189 F.2d 858, 862 (4th Cir. 1951); *Moran Towing & Transportation Co. v. Navigazione Libera Tristina, S.A.*, 92 F.2d 37, 40 (2d Cir.), *cert. denied*, 302 U.S. 744 (1937)). The Second Circuit restated this rule later in its opinion by saying that "unreviewed findings are not preclusive under our general rule," 798 F.2d at 45 n. 6, and explained that "[s]ince Gelb did not receive effective appellate review of whether he caused the Franklin Place fire, collateral estoppel does not apply to bar relitigation of this issue." *Id.* at 45. In the present case, similarly, because the appellate court in *People of Enewetak* made no review of or ruling on the statute-of-limitations issue, "collateral estoppel does not apply to bar relitigation of this issue."[27]

**3. Plaintiffs' Implied-In-Fact Contract Claims Are Not Barred By The Statute Of Limitations, Because They Were To Be Determined By The Alternative Tribunal And Because The Breaches Are Continuing, As Alleged In The Amended Complaint.**

In 1984, this Court rejected the government's contention that the statute of limitations barred plaintiffs' implied-in-fact contract claims and held: "[I]t is clear that plaintiffs are not barred by the statute of limitations from an offer of proof as to the origin, nature, and content of the alleged implied-in-fact contract. . ." *Peter I*, 6 Cl. Ct. at 776.

[27] Other appellate courts agree with this approach, and no cases have been found to the contrary. In *Hicks*, which is cited in *Gelb*, the Fifth Circuit said clearly that "the general rule is that if a judgment is appealed, collateral estoppel only works as to those issues specifically passed upon by the appellate court." 662 F.2d at 1168. Comment o to Section 27 of the *Restatement (Second) of Judgments* (1982) also states explicitly that the collateral-estoppel/issue-preclusion rule applies only to issues actually determined by an appellate court, and that it does not apply to issues considered by a lower court but ignored on appeal: "If the appellate court upholds one of these determinations [by the lower court] as sufficient and refuses to consider whether or not the other is sufficient and accordingly affirms the judgment, the judgment is conclusive as to the first determination."

The government now on page 30 of its Memorandum contends that the statute of limitations on the implied-in-fact contract claim accrued in 1982 when the claim was filed and therefore the claim expired in 1988. However, the government completely ignores the ruling in *Peter II* and *Juda II*. When the *Peter II* case was dismissed in 1987 this court held that "Congress has recognized and protected plaintiffs' rights to just compensation for takings and for *breach of contract*." *Juda II*, 13 Cl. Ct. at 689. (emphasis added) (*Juda* opinion adopted in *Peter II*, 13 Cl. Ct. at 692). This Court explained that the claims were not extinguished but needed to be pursued in the alternative tribunal agreed to by the United States. *Juda II*, 13 Cl. Ct. at 689. Thus, this Court held plaintiffs' claims unripe and held that the "alternative procedure for compensation cannot be challenged judicially until it has run its course." *Id*. The Court found plaintiffs' constitutional challenge to the Compact Act to be "premature" and made it clear that plaintiffs could return to Court after the alternative procedure "has run its course" should the compensation provided be inadequate.

The alternative procedure has now run its course and on August 3, 2000 the Nuclear Claims Tribunal rendered its final determination on the just compensation due plaintiffs. Thus, plaintiffs claim, filed herein on April 12, 2006, is not barred by the statute of limitations.[28]

**4. The Statute of Limitations Did Not Accrue on Counts III - VI Until Issuance of the 2000 NCT Final Decision, As All Events Necessary to Fix Defendant's Liability Had Not Occurred.**

---

[28] Moreover, plaintiffs allege in Count II of their Amended Complaint that defendant has breached and continues to breach an implied-in-fact contract between the United States and plaintiffs by, *inter alia*, failing to supply food, shelter, and supplies during the residence on Ujelang, by failing to return Enewetak Atoll in its original condition or to compensate them for damages, and by failing to provide compensation for the denied use of Enewetak Atoll.

For purposes of this motion, the government has acknowledged that this Court must accept the allegations in the Amended Complaint as true. Because these allegations claim that the breaches of the implied-in-fact contractual obligations are continuing, there can be no bar to these claims presented by the statute of limitations.

The government contends that the claims in Counts III to VI accrued on the effective date of the Compact, November 3, 1986, and are untimely and should be dismissed.[29] In making this contention, the government completely ignores this Court's prior ruling that plaintiffs' claims were unripe and that the "alternative procedure for compensation cannot be challenged judicially until it has run its course." *Juda II*, 13 Cl. Ct. at 689. This Court found plaintiffs' constitutional challenge to the Compact Act "premature" and made clear that plaintiffs could return to this Court after the alternative procedure "has run its course" should the compensation provided be inadequate.

Counts III – VI of plaintiffs' Amended Complaint are based on the failure of the alternative claims procedure to provide adequate compensation for the loss and damage of their lands. This failure was unknowable until after August 3, 2000 the date of the final NCT decision awarding plaintiffs $386 million in damages. Prior to that date, there had been no determination of what constituted "just compensation" in this matter, and any claims challenging the procedure would have been deemed "premature" or unripe, as was found by this Court in *Juda*, 13 Cl.Ct. at 689, and affirmed by the Federal Circuit in *People of Enewetak*, 864 F.2d at 136.

---

[29] The government's reliance on *Alliance of Descendants of Texas Land Grants v. United States*, 37 F.3d 1478, 1483 (Fed. Cir. 1994) is entirely misplaced. In that case, the court held that the takings claims of Mexican citizens accrued in 1941 when a treaty between the U.S. and Mexico released the U.S. from all claims of Mexican citizen for lands taken. Claimants' 1990 suit was barred by the statute of limitations notwithstanding the fact that they had participated in Mexican administrative hearings that concluded in 1984 when Mexico denied their claims. This Court found, and the Federal Circuit affirmed, that the 1941 treaty had extinguished their legal rights against the U.S. and that the "U.S. did not compel the claimants to wait until 1984 or 1990 to ascertain in court the legal effect of those terms. This case is easily distinguishable from the instant situation, where plaintiffs were Trust Territory citizens under a U.S. Trusteeship and had filed timely claims in this Court. When the Compact Act was enacted, plaintiffs were directed that they were legally bound to exhaust their administrative remedies prior to returning to this Court, unlike the Mexican claimants who elected to pursue an optional administrative procedure and neglected to file a timely suit in this Court.

Under well established case law, a claim against the government first accrues when all events necessary to fix the government's liability have occurred. *L.S.S. Leasing Corp. v. United States*, 695 F.2d 1359, 1365 (Fed. Cir. 1982); *Lins v. United States*, 688 F.2d 784, 786 (Ct. Cl. 1983); *Japanese War Notes Claimants Association v. United States*, 373 F.2d 356, 358 (Ct. Cl. 1967). "If disputes are subject to mandatory administrative proceedings, then the claim does not accrue until their conclusion." *Lins*, 688 F.2d at 786; *see also Anaheim Gardens v. United States*, 444 F.3d 1309, 1315-16 (Fed. Cir. 2006) (A claim for an uncompensated regulatory taking must be "ripe," meaning that it is the result of a final decision by the allegedly offending administrative agency); *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186-94 (1985).

Under 28 U.S.C. § 2501, a claim accrues when it "can be definitely ascertained and set up." *Griffin v. United States*, 110 Ct.Cl. 330, 77 F.Supp. 197, 206, *certiorari granted* 335 U.S. 883, *reversed on other grounds* 336 U.S. 641, *rehearing denied* 337 U.S. 920. In *Griffin*, where the determination of fair and reasonable compensation for carrying mail was confided by Congress to the Interstate Commerce Commission, this Court found that the amount of plaintiff's claim was not ascertainable until the Commission had given its final determination. Id.

In the case at bar, as in *Griffin*, the determination of what constitutes "fair and reasonable compensation" for the government's takings[30] and breaches of contract and fiduciary duties[31]

---

[30] The government implies that the NCT decision has no bearing on the accrual of the statute of limitations, because the NCT decision was not an action taken by the United States. Gov. Mem. at 31. However, this assertion demonstrates the government's failure to understand the basis of the instant claims. Plaintiffs' claims are that the entire scheme of the Compact and Section 177 Agreement deprived them of just compensation. The fact that the extent of this deprivation was unknowable prior to August 3, 2000 is a key element in the determination of when the claims accrued. There is no legal requirement that the U.S. take any action on that date for purposes of statute of limitations accrual, and the United States has failed to cite any authority to the contrary. It is sufficient that the U.S. established the NCT as an alternative procedure to

simply was not ascertainable prior to the date on which the NCT rendered its decision. For statute of limitations purposes, it was unripe. As the Supreme Court said in *United States v. Dickinson*, 331 U.S. 74, 748 (1947): "The Fifth Amendment expresses a principle of fairness and not a technical rule of procedure enshrining old or new niceties regarding 'causes of action'—when they are born, whether they proliferate, and when they die." Accordingly, this Court should hold that plaintiffs' claims did not accrue until August 3, 2000 the date of the final NCT decision, at the earliest.

**5. If the Statute of Limitations Accrued Prior to 2000, it was Equitably Tolled.**

Equitable tolling of the statute of limitations is available where a claimant has diligently pursued judicial remedies by filing a defective pleading within the statutory period or was induced to delay filing by the other side. *See Irwin v. Dept. of Veterans Affairs*, 498 U.S. 89, 96 (1990). There is a rebuttable presumption that equitable tolling is available in suits against the United States. *I.K. Frazer v. United States*, 288 F.3d 1347, 1352-23 (Fed. Cir. 2002). Whether equitable tolling is warranted involves factual determinations, such as the presence or absence of detrimental reliance, which are entitled to deference. Id. at 1351.

---

determine just compensation for takings and other claims acknowledged by the United States and that the compensation provided under the U.S. scheme proved woefully inadequate.

[31] The government at footnote 14 further argues that any implied in fact contract with plaintiffs was extinguished by the Compact Act and Section 177 Agreement. The government's argument further demonstrates its failure to comprehend the causes of action in the instant litigation. The breaches in plaintiffs' breach of contract claims are premised on the U.S.'s failure to provide adequate compensation for their lands resulting from the compensation provided under the entire scheme of the Compact Agreements. As in the takings claims, the extent of the damages resulting from these breaches was not ascertainable until the NCT decision was issued. Aside from the jurisdictional withdrawal in Article XII, defendant's assertion that the Compact somehow extinguished the U.S.'s implied-in-fact contract is without any support.

The *Peter* plaintiffs filed their complaint in 1982. As discussed, *supra,* the complaint was dismissed with a caveat that plaintiffs were required to exhaust their remedies before the NCT and return to this Court in the event that the compensation provided proved inadequate. This is precisely what occurred. Because of this judicial requirement that plaintiffs exhaust the NCT procedure prior to bringing a judicial challenge to the Compact Agreements, the doctrine of equitable tolling applies to the instant litigation. Moreover, the U.S. induced plaintiffs' delay when it (1) divested the courts of jurisdiction over the pending claims and mandated that plaintiffs bring their claims before the NCT, and (2) urged the court to hold that plaintiffs' action was premature and that the NCT process "must be allowed to operate as intended to address all claims." "The adequacy of the plan thus 'cannot be determined at this time,' and 'cannot be challenged judicially until it has run its course.'" *See Fed. Cir. Brief*, at 43-44.

Finally, the legislative history of the Compact Act provides clear evidence that Congress intended equitable tolling would apply to plaintiffs' claims. The statement of the floor manager for H.J.Res.187, the Compact Act, spoke directly to the point at issue:

> The House bill included language explicitly providing for tolling of the statute of limitations for the period between the effective date of the compact and any subsequent determination by a U.S. court that the espousal provisions, that is, article X of the section 177 subsidiary agreement are invalid as a matter of international law or for any other purposes. *The revised version omits this, since it is generally agreed that existing laws and judicial procedures ensure that tolling of the statute of limitations would occur under such circumstances*.

131 Cong. Rec. H11,829 (daily ed. Dec. 11,1985) (emphasis added) *quoted in Juda II*, 13 Cl. Ct. at 685. Because the instant litigation involves challenges to the espousal provisions of Article X, as foreseen by Congress, this Court should affirm that plaintiffs' claims are not barred by the statute of limitations.

### E. Plaintiffs' Counts III Through VI Do State Claims Upon Which Relief May Be Granted.

**1. Standard of Review**

Dismissal of a complaint under RCFC 12(b)(6) for failure to state a claim is proper only when "it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

**2. Under RCFC 12(b)(6), Plaintiffs Have Alleged the Proper Factual Predicate For Their Fifth Amendment Takings Claims.**

The government on page 33 of its Memorandum contends that plaintiffs, in Counts III to V, have failed to allege the occurrence of any federal government act since 1986 that has deprived them of any property interest.

Once again, as in its previous statute of limitations argument, defendant completely ignores the holding of this Court, affirmed by the Court of Appeals for the Federal Circuit, that plaintiffs' 1981 "attack on the "adequacy" of the alternative procedure provided by Congress for compensation of their claims was "premature." *People of Enewetak v. United States*, 864 F.2d at 136. "Whether the settlement provides 'adequate' compensation cannot be determined at this time." *Juda II*, 13 Cl.Ct. at 689.

Counts III and IV allege the taking of plaintiffs' taking and implied contract claims by failing to provide just compensation after exhaustion of the alternative Tribunal procedure required by this Court in *Juda II* and the Federal Circuit in *People of Enewetak*. Count V alleges that the Compact Agreements constitute a taking or as applied constitute a taking. In all three counts, it is properly alleged that defendant took property in violation of the Fifth Amendment. In all three counts, the cause of action accrued at the earliest on August 3, 2000 (or was equitably tolled until that date) the date the final NCT decision was issued. Prior to August 3, 2000, whether plaintiffs had claims for just compensation beyond the funds defendant had allocated to

the NCT, and, if so, the extent of those claims, was simply not ascertainable. *See Griffin v. United States*, *supra*, 77 F.Supp. at 206.[32]

**3. Under RCFC 12(b)(6), Plaintiffs Have Alleged the Proper Factual Predicate For Their Breach of Implied Contract Claims.**

The government's final argument appears to be a reconfiguration of its claim that any breach of an implied contract claim that may have existed was terminated in 1986 by the Compact Agreements. This argument demonstrates the government's failure to acknowledge the new causes of action in plaintiffs' complaint. By this litigation, plaintiffs contend that the Compact Agreements themselves constitute a breach of an implied-in-fact contract.

Plaintiffs' implied contract and fiduciary duty claims are distinct from the obligations the government undertook in the Compact Agreements. In the first place, the parties are not the same. The Compact is between the United States and the government of the Marshall Islands, not the people of Enewetak, who are plaintiffs here. Further, the implied contract came into existence in 1947, while the Compact was not entered into until 1986, forty years later. *Peter I,* 6 Cl. Ct. at 780. Finally, the subject matter of both agreements is substantially different. The implied contract was a series of promises by defendant to take care of the People of Enewetak and return their lands to them with compensation for any damages in consideration of their

[32] Defendant's citations in support of its argument are inapposite to the instant litigation. *See* Gov. Mem. at 34. *Applegate v. United States*, 35 Fed. Ct. 406, 422 (1996), *Correlated Dev. Corp. v. United States*, 556 F.2d 515, 522-25 (Ct. Cl. 1977) and *D.R. Smalley & Sons, Inc. v. United States*, 372 F.2d 505, 507 (Ct. Cl. 1967) all concern situations in which the federal government played no direct role in the alleged taking. In *Applegate*, the Court found that the state, not the federal government, caused the erosion, i.e., taking; in *Correlated Development*, the Court found that in injuries were caused by breaches of contract by a local housing authority, and the federal government's role was limited to an agreement to loan up to 90% of the costs of the housing projects; in *D.R. Smalley*, the Court found that the contracts at issue were between plaintiff and the state, and the federal involvement was limited to grants made to states for public works.

agreement to leave their lands and allow defendant to use them for its nuclear testing program. The 1986 Compact was primarily an attempt to settle the claims of the Marshallese people, along with a self-serving arrangement whereby defendant maintained strict control over critical military bases in the Marshall Islands, as well as control over the Marshall Islanders' foreign relations, and in return provided the Marshallese with the dubious status of "free association" and an alternative claims procedure that was woefully underfunded.

Incredibly, the government, on pages 34 and 35 of its Memorandum, suggests that this Court cannot "inquire in to the adequacy of the settlement." The adequacy of the Section 177 settlement is precisely what this Court and the Federal Circuit required the Tribunal process to determine before any resort to this Court for an uncompensated taking. The Tribunal determined plaintiffs' taking damages, such determination demonstrates the inadequacy of the settlement, and now the adequacy of the settlement must be examined by this court. This court should not be deterred from examining the adequacy of the settlement by the terms of Article X because Article X may be invalid either as a breach of the government's fiduciary duty to its ward or as a defective espousal under international law. *See* pages 21 to 28, *supra*.

Finally, at pages 34-35 of its Memorandum, the government refers to the concurring opinion of Judge Wald in *Antolok*, and asserting that her opinion bars any judicial scrutiny of Plaintiffs' claims. Judge Wald was writing only for herself, but more importantly, she was explicit in distinguishing the claim brought by the *Antolok* plaintiffs – which was for the taking of "the plaintiffs' cause of action in tort" – from the claims brought by the Plaintiffs in the present case (and in *People of Enewetak*), which are for the loss resulting from the taking of the Plaintiffs' property itself, which she described as "plaintiffs' lands, homes, and businesses." *See* 873 F.2d at 393 n. 15 (where Judge Wald makes this distinction clearly).

As this Court explained in *Juda II,* Article XII of the Section 177 Agreement terminated "proceedings" but did not to extinguish the basic claims involved." 13 Cl. Ct. at 686

This Court and Judge Wald thus agreed that the Plaintiffs' underlying property-related claims were not extinguished by the Compact. The Compact and the accompanying Section 177 Agreement required the Plaintiffs to pursue those claims in the alternative procedure provided by the Nuclear Claims Tribunal. Plaintiffs have utilized this procedure, and are now back before this Court, pursuant to the Court's own instructions in its previous opinions, because that alternative procedure proved to be inadequate.

## IV. CONCLUSION.

For the reasons provided above, the government's Motion to Dismiss should be denied.

Respectfully submitted,

s/ Davor Pevec

Davor Pevec, Attorney of Record

Law Offices of Davor Pevec
American Savings Bank Tower
1001 Bishop Street, Suite 1360
Honolulu, Hawaii 96813
Fax: 310-402-5983
Phone: 808-599-5655
Email: dzpevec@aol.com

Attorney for Plaintiffs

Dated: December 18, 2006

Of Counsel:

Jon Van Dyke
2515 Dole Street
Honolulu, Hawaii 96822
Fax: 808-956-5569
Phone: 808-956-8509
Email: jvandyke@hawaii.edu