conducted in the Northern Marshall Islands between June 30, 1946, and August 18, 1958.

Section 177(b) requires that the two governments enter into a separate agreement providing "for the just and adequate settlement of all such claims which have arisen in regard to the Marshall Islands and its citizens and which have not as yet been compensated or which in the future may arise" (App. 869). Section 177(c) further obligates the United States to provide $150 million to the Marshall Islands for the purposes of funding that agreement, known as the Section 177 Agreement, and incorporates the agreement into the Compact (App. 869).

**D. The Section 177 Agreement**

The Section 177 Agreement, signed in conjunction with the Compact on June 25, 1983, has created a comprehensive, integrated compensation plan "to provide, in perpetuity, a means to address past, present and future consequences of the Nuclear Testing Program" (App. 332). Article I obligates the United States to pay to the Republic of the Marshall Islands $150 million to establish a claims settlement fund (App. 332), while Article II specifies the distribution of investment proceeds to the compensation programs (App. 333). It provides $30 million to the Government of the Marshall Islands, over 15 years at $2 million per year, to conduct health care and radiological surveillance (App. 333). It provides $183.75 million to the peoples of Bikini, Enewetak, Rongelap and Utrik "in payment of claims arising out of the Nuclear Testing Program for loss or damage to property and person" (App. 334-335).[10]

In addition, the Agreement establishes a Claims Tribunal with jurisdiction "to render final determination upon all claims past, present and future, of the Government, citizens and nation-

---

[10] These funds will be disbursed to distribution authorities for each atoll, over a 15-year period, as follows: (1) $75 million to the people of Bikini, now numbering approximately 1300, in yearly amounts of $5 million; (2) $48.75 million to the 1900 people of Enewetak in yearly amounts of $3.25 million; (3) $37.5 million to the 450 people of Rongelap at $2.5 million per year; and (4) $22.5 million to the 800 people of Utrik at $1.5 million per year. The precise manner of distribution is to be determined by each respective community (App. 334-335).

als of the Marshall Islands which are based on, arise out of, or are in any way related to the Nuclear Testing Program" (App. 338). Article II provides $45.75 million to the Tribunal for such claims, to be disbursed over 15 years at approximately $3 million per year. From the fifteenth year on, a minimum of 75 percent of annual Fund proceeds are committed to Tribunal awards (App. 336).

Article X, entitled "Espousal," affirms that the Agreement constitutes the espousal and settlement by the Marshall Islands of all claims. It provides (Sec. 1, App. 342):

> This Agreement constitutes the full settlement of all claims, past, present and future, of the Government, citizens and nationals of the Marshall Islands which are based upon, arise out of, or are in any way related to the Nuclear Testing Program, and which are against the United States, its agents, employees, contractors and citizens and nationals, and of all claims for equitable or any other relief in connection with such claims including any of those claims which may be pending or which may be filed in any court or other judicial or administrative forum, including the courts of the Marshall Islands and the courts of the United States and its political subdivisions.

Finally, Article XII of the Agreement, entitled "United States Courts," provides that (App. 343):

> All claims described in Articles X and XI of this Agreement shall be terminated. No court of the United States shall have jurisdiction to entertain such claims, and any such claims pending in the courts of the United States shall be dismissed.

**E. Approval of the Compact by the Marshall Islands and United States.**

The Compact was presented to the people of the Marshall Islands for a vote in a September 1983 plebiscite, monitored by international observers from the United Nations Trusteeship Council. 13 Cl. Ct. at 673 (App. 7). The Marshall Islanders approved the Compact by a 58 percent vote. *Ibid.*

The President transmitted the Compact to the 98th Congress on March 30, 1984, and, when action was not completed that year, to the 99th Congress on February 20, 1985. 13 Cl. Ct. at 673 (App. 7). The Congress approved the Compact of Free Association Act, designated as House Joint Resolution No. 187, in December 1985, and the President signed the Act on January 14, 1986. Pub. L. No. 99-239, 99 Stat. 1770 (1986).

The Act states that the Compact, which is set forth as Title II, "is hereby approved," and that "Congress hereby consents to the subsidiary agreements," including the Section 177 Agreement (App. 830). Title I discusses interpretation and policies regarding the Compact (App. 830). Appellants rely in this litigation on the final sentence of Section 103(g)(2). Section 103(g) provides in its entirety (App. 839):

> (g) ESPOUSAL PROVISIONS. -- (1) It is the intention of the Congress of the United States that the provisions of section 177 of the Compact of Free Association and the Agreement between the Government of the United States and the Government of the Marshall Islands for the Implementation of Section 177 of the Compact (hereafter in this subsection referred to as the "Section 177 Agreement") constitute a full and final settlement of all claims described in Articles X and XI of the Section 177 Agreement, and that any such claims be terminated and barred except insofar as provided for in the Section 177 Agreement.
>
> (2) In furtherance of the intention of Congress as stated in paragraph (1) of this subsection, the Section 177 Agreement is hereby ratified and approved. It is the explicit understanding and intent of Congress that the jurisdictional limitations set forth in Article XII of such Agreement are enacted solely and exclusively to accomplish the objective of Article X of such Agreement and only as a clarification of the effect of Article X, and are not to be construed or implemented separately from Article X.

On May 26, 1986, the United Nations Trusteeship Council declared that the peoples of the Marshall Islands "have freely ex-

ercised their right to self-determination * * * and have chosen free association with the United States of America"; and that the United States "has satisfactorily discharged its obligations under the terms of the Trusteeship Agreement" (Trusteeship Council Res. 2183, App. 1221). The United States and the Marshall Islands on October 10, 1986, executed an agreement that the Compact enter into force on October 21, 1986. 13 Cl. Ct. at 676 (App. 10). The United States notified the Secretary General of the United Nations on October 23, 1986, that the Compact had entered into force (App. 1237). Finally, on November 3, 1986, the President issued Proclamation No. 5564, announcing that the United States "has fulfilled its obligations under the Trusteeship Agreement," and that the Agreement "is no longer in effect as of October 21, 1986" (App. 1242).[11]

The United States and the Marshall Islands have subsequently exchanged diplomatic notes of formal recognition, and established diplomatic missions headed by representatives who are ranked with other ambassadors (App. 1316). The United States Senate confirmed the President's nominee as the United States diplomatic representative to the Marshall Islands on June 3, 1987. 13 Cl. Ct. at 677 (App. 11).

## SUMMARY OF ARGUMENT

Appellants ask the Court to strike from the Compact of Free Association a claims settlement agreement entered into between the United States and the Republic of the Marshal Islands to provide, in perpetuity, a compensation fund to resolve all consequences arising from the nuclear testing program. Under the terms of the Section 177 Agreement, entered as an integral part of establishing formal diplomatic relations, the United States has paid to the Marshall Islands $150 million, which has been permanently invested to fund health care programs, to provide com-

[11] Appellants contended below that the Trusteeship Agreement had not been terminated, and, in *Juda* and *Peter*, that the Compact was not in effect. 13 Cl. Ct. at 678 (App. 12). The Claims Court rejected both arguments, holding that the Compact went into effect on October 21, 1986. *Id.* at 682-683 (App. 16-17). Appellants do not challenge this holding, and now concede that the Compact is "in effect" (Br. 4, 59).

pensation to the four major Marshall Islands atolls for local determination, and to establish a Claims Tribunal for final adjudication of all claims.

As appellants acknowledge (Br. 21, 54), the critical element of their challenge is the contention that the Republic of the Marshall Islands invalidly espoused and settled the claims of its nationals. Indeed, if the Marshall Islands' espousal has been valid, appellants' remaining arguments -- that Congress conditioned withdrawal of jurisdiction on a judicial determination of valid espousal, and that a withdrawal of jurisdiction, absent valid espousal, fails constitutional requirements -- are moot, and the Court need not reach those assertions (Br. 21, 54).

The Supreme Court has held, however, that appellants' very espousal argument, which contests the authority of sovereign governments to settle claims incident to diplomatic recognition, and the United States' authority to recognize foreign governments for purposes of settlement, raises a nonjusticiable political question. *United States v. Belmont*, 301 U.S. 324, 328-332 (1937); *United States v. Pink*, 315 U.S. 203, 226-230 (1942). As discussed in Part I below, two district courts have dismissed the identical challenge to the Compact's claims settlement on this basis (see App. 1326, 1410).

Moreover, the Republic of the Marshall Islands *has* validly espoused its nationals' claims. As discussed in Part IV, agreements settling the claims by nationals of one government against another government are established international practice. As the Claims Court recognized, the Republic of the Marshall Islands gradually assumed sovereign authority from the first days of Trusteeship until, through constitutional self-government, it became the legally recognized successor to the Trust Territory Government. That government had full authority to espouse the claims of its inhabitants, and, under the Compact, it validly settled and extinguished those claims under long-standing principles of international law.

In addition, the Claims Court correctly held that Congress did not condition Article XII's withdrawal of United States court jurisdiction on a judicial determination of valid Marshall Islands espousal. The plain language of Section 103(g) of the Compact

Act neither requires nor allows for judicial review of that espousal. Congress, in fact, rejected alternative langauge which expressly would have imposed such a condition, and, as addressed in Part II, appellants may not ask the Court instead to so-condition the Compact.

The Claims Court also correctly held that the Section 177 Agreement meets all Fifth Amendment requirements. The court found that Congress' ratification of settlement, including Article XII's withdrawal of jurisdiction in implementation of settlement, was a valid exercise of Congress' authority to grant, or restrict, the United States' consent to suit under the Tucker Act. *Gold Bondholders Protective Council v. United States*, 676 F.2d 643, 646 (Ct.Cl. 1982). Moreover, the Compact and Section 177 Agreement provide a permanent alternative remedy, with substantial and regenerating funding, for compensating all claims, as necessary, in perpetuity. As the Claims Court found, that program must be allowed to operate as intended, and cannot be challenged judicially until it has "run its course."

Finally, as discussed in Part V below, the Just Compensation Clause does not extend to citizens of the United Nations Trust Territory, which was a unique political entity where the duties of the administering authority were defined expressly and solely by the Trusteeship Agreement. The Claims Court initially determined that the taking claims should be dismissed on this basis, but subsequently held, despite ruling that the Trust Territory was not United States territory, nor Trust Territory citizens United States citizens, that the Fifth Amendment applies to the United States wherever it acts. Reversal of that overbroad holding, which fails to account for the trusteeship relationship here, provides an alternative ground for affirming dismissal of the taking claims below.

## ARGUMENT

### I. A CHALLENGE TO SETTLEMENT TERMS NEGOTIATED AS AN INTEGRAL PART OF DIPLOMATIC RECOGNITION RAISES A NON-JUSTICIABLE POLITICAL QUESTION

While appellants casually assert (Br. 55) that these appeals, if successful, would do nothing more than "simply remit" their

claims to the Claims Court, appellants, in fact, are asking this Court to invalidate an international claims settlement agreement that has been entered between sovereign governments as an integral part of establishing diplomatic recognition and a full restructuring of their political relations.[12] Moreover, appellants assert (Br. 54-55), as the basis for the result they seek, that the Republic of the Marshall Islands, despite United States recognition of its sovereignty, has no authority to espouse and settle the claims of its own nationals.

As discussed below, however, the Supreme Court has held that the authority of sovereign governments to settle claims of their nationals incident to diplomatic recognition and redefined political relations is a nonjusticiable political question committed to the foreign relations powers of the political branches. *United States v. Belmont*, 301 U.S. 324, 328-332 (1937); *United States v. Pink*, 315 U.S. 203, 226-230 (1942). Relying on such precedent, two district courts have dismissed challenges to the Compact's settlement terms identical to those raised here. *Antolok v. United States*, No. 85-2471 (D.D.C. June 16, 1987) (App. 1326) ("*Antolok I*"); *Antolok v. Brookhaven National Laboratories*, No. CV 82-2364 (C.D. Calif. Jan. 11, 1988) (App. 1406) ("*Antolok II*").[13]

While the Claims Court did not reach the political question issue in dismissing appellants' complaints,[14] the political question doctrine thus provides an alternative, and fundamental, ground for affirming the decisions below.[15]

---

[12] Appellants specifically ask the Court to strike Article X from the Section 177 Agreement (Br. 55), which provides that the Agreement "constitutes the full settlement of all claims, past, present and future" arising from the testing program (App. 342). Appellants also ask the Court to strike Article XII, which withdraws consent to suit for such claims in United States courts (App. 343).

[13] As indicated in the statement of related cases, appeals are pending in the *Antolok* actions.

[14] While the Claims Court stated preliminarily during an April 23, 1987, hearing that, "[o]n the political question issue, I believe that Plaintiffs prevail" (App. 1311), the court did not finally rule on the issue, and dismissed on other grounds.

[15] This Court may affirm on an alternative ground where the Court is not required to engage in its own fact finding. See *International Medical Prosthetics Re-*

**A. These appeals challenge foreign policy decisions that are beyond the scope of the judiciary.**

That certain political decisions are, by their nature, committed to the political branches has been recognized since *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), in which Chief Justice Marshall acknowledged a class of cases that involve a "mere political act of the executive." *Id.* at 165-166. The political question doctrine is founded on the separation of powers, *Baker v. Carr*, 369 U.S. 186, 210-211 (1962), and precludes judicial review when any one of several "formulations" arise (*id.* at 217), which have been grouped, in *Goldwater v. Carter*, 444 U.S. 996, 998 (1979) (Powell, J. concurring), into three relevant inquiries:

> (i) Does the issue involve resolution of questions committed by the text of the Constitution to a coordinate branch of Government? (ii) Would resolution of the question demand that a court move beyond areas of judicial expertise? (iii) Do prudential considerations counsel against judicial intervention?

**B. Foreign policy decisions as to diplomatic recognition and claims settlement are committed to the political branches.**

The Supreme Court has repeatedly emphasized that the "conduct of foreign relations is committed by the Constitution to the political departments of the Federal Government." *United States v. Pink*, 315 U.S. at 222-223; *United States v. Belmont*, 301 U.S. at 327-328; *Baker v. Carr*, 369 U.S. at 211. As stated in *Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.*, 333 U.S. 103, 111 (1948):

> [T]he very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. They are delicate, complex, and involve large elements of prophecy. * * * They are decisions of a kind for which the Judiciary has neither the aptitude, facilities nor

*search Associates, Inc. v. Gore Enterprise Holdings, Inc.*, 787 F.2d 572, 573 n.2 (Fed. Cir. 1986). No such fact finding is required in this case.

responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.

Accord, *e.g.*, *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-589 (1952); *Johnson v. Eisentrager*, 339 U.S. 763, 789 (1950).

While not every case touching on foreign affairs lies beyond judicial review,[16] the diplomatic decisions challenged here fall squarely within the foreign relations powers of the political branches. These appeals hinge on appellants' claim that the Republic of the Marshall Islands has no authority to espouse and settle the claims of its nationals (Br. 54-61). However, the United States has, under the terms of the Compact, recognized the Marshall Islands government as having sovereign authority to conduct its own foreign relations, including claims settlement. Thus, appellants challenge not only the settlement authority of the Marshall Islands, but the very authority of the United States to recognize a particular foreign government as having the capacity to act.[17]

Questions involving the recognition of foreign governments, however, "so strongly def[y] judicial treatment that without executive recognition a foreign state has been called 'a republic of whose

[16] As the Court counseled in *Baker*, 369 U.S. at 217, the doctrine "is one of 'political questions,' not one of 'political cases.'"

[17] Appellants argued below that the Trusteeship Agreement had not been terminated, the Compact was not in effect, and the Marshall Islands government lacked the necessary sovereignty to espouse its nationals' claims. 13 Cl. Ct. at 678; see in *Juda*, Pltffs Mem. in Opp. to Deft's Amended Motion to Dismiss at 10-15 (Dec. 22, 1986). Thus, appellants sought to nullify the claims settlement by invalidating the entire Compact. Appellants now assert (Br. 54) that the espousal issue does not raise questions of sovereignty or United States recognition of the Marshall Islands, but instead only whether a process of international law was properly followed. Indeed, appellants now ask (Br. 55) that the structure and benefits of the Section 177 compensation plan remain intact while appellants are allowed, through judicial nullification of Articles X and XII, to litigate their claims as well. While appellants no longer characterize their arguments in terms of sovereignty, however, their challenge to espousal and claims settlement on appeal raises the identical issue for purposes of the political question doctrine -- whether such a challenge by foreign nationals to their government's authority to settle claims, and to the United States determination that their government holds that capacity, raises a question that United States courts may decide.

existence we know nothing.'" *Baker v. Carr*, 369 U.S. at 212. As stated in *Guaranty Trust Co. v. United States*, 304 U.S. 126, 137-138 (1938):

> What government is to be regarded here as representative of a foreign sovereign state is a political rather than a judicial question, and is to be determined by the political department of the government. Objections to its determination as well as to the underlying policy are to be addressed to it and not to the courts. Its action in recognizing a foreign government and in receiving its diplomatic representatives is conclusive on all domestic courts.

Courts will "not stop to inquire what the 'actual' authority of those diplomatic representatives may have been." *Id.* at 139.

Moreover, the Supreme Court has expressly held that the power to recognize a foreign sovereign necessarily includes the power to negotiate and settle claims of nationals, and a diplomatic agreement accomplishing those ends conclusively binds the courts. *United States v. Belmont*, 301 U.S. at 330; *United States v. Pink*, 315 U.S. at 222-223, 229-230.[18] *Belmont* and *Pink* arose from the Litvinov Assignment, in which the United States and the Soviet Union agreed a settlement of claims and counterclaims between the two governments and their nationals in conjunction with the United States' recognition of the Soviet Union. *Belmont*, 301 U.S. at 326. The Soviet Government agreed not to enforce the nationalized claims of its citizens against American nationals, and to release and assign those claims to the United States, so that outstanding claims of other American nationals against the Soviet Union could be paid. *Ibid.*; see discussion of *Belmont* at *Dames & Moore v. Regan*, 453 U.S. 654, 682-683 (1981).

---

18 "By an act of recognition, a state commits itself to treat an entity as a state or to treat a regime as the government of a state." Restatement (Second) of the Foreign Relations Law of the United States § 94(1) at 303 (1965). Sovereignty, in the modern practice of international law, refers to the totality of international rights and duties residing in a discrete, territorial unit. Crawford, *The Creation of States in International Law* at 26-27 (1970).

The Court in *Belmont*, rejecting a New York bank's challenge to United States authority to collect funds deposited by a Russian corporation, held that "'responsibility for recognition or non-recognition *with the consequences of each* rests on the political advisors of the Sovereign and not on the judges.'" 301 U.S. at 329-330 (citation omitted, emphasis supplied). Noting that the two governments had agreed to claims settlement as an integral part of recognition and the exchange of ambassadors, the Court found (301 U.S. at 330):

> The effect of this was to validate, so far as this country is concerned, all acts of the Soviet Government here involved from the commencement of its existence. The recognition, establishment of diplomatic relations, the assignment, and agreement with respect thereto, were all parts of one transaction, resulting in an international compact between the two governments. That the negotiations, acceptance of the assignment and agreements and understandings in respect thereof were within the competence of the President may not be doubted.

As here, it was asserted in *Belmont* that the claims settlement violated the just compensation clause of the Fifth Admendment. *Id.* at 332. The Court held that "[w]hat another country has done in the way of taking over property of its nationals * * * is *not* a matter of judicial consideration." *Ibid.* (emphasis supplied). Rather, '[s]uch nationals must look to their own government for any redress to which they may be entitled." *Ibid.*

Five years later, the Supreme Court again upheld the Litvinov Assignment, in *United States v. Pink*, reaffirming *Guaranty Trust*'s holding that "'[w]hat government is to be regarded here as representative of a foreign state is a political rather than a judicial question.'" 315 U.S. at 229, quoting 304 U.S. at 137. As stated in *Pink* (315 U.S. at 229):

> That authority is not limited to a determination of the government to be recognized. It includes the power to determine the policy which is to govern the question of recognition. Objections to the underlying policy as well

> as objections to recognition are to be addressed to the political department and not to the courts.

The Court specifically found that removal of "such obstacles to full recognition" as the claims of nationals "is a modest implied power of the President who is the 'sole organ of the federal government in the field of international relations.'" 315 U.S. at 229, quoting *United States v. Curtiss-Wright Corp.*, 299 U.S. 304, 320 (1936). Indeed, the "[e]ffectiveness in handling the delicate problems of foreign relations requires no less," for:

> Unless such a power exists, the power of recognition might be thwarted or seriously diluted. No such obstacle can be placed in the way of rehabilitation of relations between this country and another nation, unless the historic conception of the powers and responsibilities of the President in the conduct of foreign affairs is to be drastically revised. It was the judgment of the political department that full recognition of the Soviet Government required the settlement of all outstanding problems including the claims of our nationals. Recognition and the Litvinov Assignment were interdependent. We would usurp the executive function if we held that that decision was not final and conclusive in the courts.

*Id.* at 229-230 (citation omitted).

This Court, in *Shanghai Power Co. v. United States*, 4 Ct. Cl. 237, 248 (1983), aff'd without opinion, 765 F.2d 159 (Fed. Cir.), cert. denied, 474 U.S. 909 (1985), similarly affirmed a ruling that a Fifth Amendment taking challenge to a claims settlement raises a political question. As the Claims Court held, a settlement "between two nations, even one that on its face deals with nothing else, does not take place in a vacuum; it is part of the continuing and evolving diplomatic relations between the sovereigns." See also *Ozanic v. United States*, 188 F.2d 228, 231 (2d Cir. 1951), in which Judge Learned Hand held that "continued mutual amity between the nation and other powers again and again depends upon a satisfactory compromise of mutual claims; the necessary power to make such compromises has existed from the earliest times and been exercised by the foreign offices of all civilized nations." The

Claims Court here recognized that relationship as well, holding that (13 Cl. Ct. at 683, App. 17):

> The thrust of the Compact Act is to discharge United States obligations to promote the development of the Marshall Islands peoples toward self-government. The settlement of claims arising from the nuclear testing program is an integral part of the relationship of the United States and the newly emerged RMI. The settlement cannot be disregarded as if it were not essential to that relationship. To carve out the Section 177 Agreement would amount to a restructuring of the legal relationship that has been recognized by the Congress, the President and the [United Nations Trusteeship Council].[19]

As we have noted, two district courts have dismissed identical challenges to the Compact's claims settlement terms on precisely this basis. See *Antolok I* (App. 1326-1328), *Antolok II* (App. 1409-1412). The plaintiffs in those actions, many of whom also brought the instant *Nitol* action, sought damages from the nuclear testing program under the Federal Tort Claims Act (App. 3122, 1406). As here, the plaintiffs asserted, based on lack of severeignty and on the doctrine of continuous nationality, that the Marshall Islands government lacked authority to espouse their claims (App. 1326, 1328, 1409).

Both *Antolok* courts, following *Guaranty Trust* and *Pink*, held that the political question doctrine controls (App. 1326-1328, 1409). In *Antolok I*, the court held that "[s]eparation of powers requires the Court to respect the settlement provisions imple-

[19] Appellants attempted to distinguish *Belmont* and *Pink* below on the ground that those cases involved nationalization by a foreign government, rather than espousal, of the claims of its nationals. See in *Peter*, Pltffs Mem. in Opp. to Deft's Amended Motion to Dismiss at 47 n.97, December 22, 1986. The asserted source of authority upon which a foreign government settles its nationals' claims, however, is irrelevant to the political question doctrine. The pertinent issue is whether the United States has recognized sovereignty and the foreign sovereign has settled the relevant claims. *Pink*, 315 U.S. at 230. As stated in *Belmont*, 301 U.S. at 332, and in *Pink*, 315 U.S. at 226, if foreign nationals are dissatisfied with settlement of their claims, by whatever source of authority may have been asserted by their government, their remedy is with that government.

mented in conjunction with the United States' recognition of the Marshall Islands government and ratification of the Compact, not to ignore them" (App. 1328). And in *Antolok II* that the "United States' decision to recognize the government of the Marshall Islands as sovereign, and thus possessed with the capacity to espouse claims, is a matter within the executive's discretionary foreign relations power, and is a non-reviewable political question" (App. 1411).

In the proceedings below, appellants relied extensively on this Court's decision in *Langenegger v. United States*, 756 F.2d 1565, 1569 (Fed. Cir.), cert. denied, 474 U.S. 824 (1985), which held that the political question doctrine did not preclude a United States citizen from bringing a taking claim for land appropriated by El Salvador as the result of pressure by the United States. That case, however, involved no government-to-government settlement of the plaintiff's claims pursuant to a diplomatic agreement, no issue of El Salvador's capacity to settle claims or the United States recognition of that authority, and no question of whether foreign nationals may ask United States courts to review their government's settlement. Indeed, the Court stated (*id.* at 1569, 1570):

> We note that this case does not require a judicial determination of El Salvador's sovereignty or the appropriateness of its actions * * * nor does the case question the executive's authority to undertake any action.
>
> * * *
>
> We note again that this is a claim of narrow focus, requiring no second-guessing of the executive branch or detailed inquiry into the ulterior motives of the two governments.[20]

---

[20] Similarly, *Ramirez v. Weinberger*, 745 F.2d 1500 (D.C. Cir. 1984), vacated on other grounds *sub nom Weinberger v. Ramirez*, 471 U.S. 1113 (1985), involved a taking action by a United States citizen, and no diplomatic settlement agreement.

The Court, in fact, found that had there been an "actual extinguishment" through an international claims settlement, *Shanghai Power* would control. 756 F.2d at 1573.

Finally, appellants argued below that Congress expressed an intent that the political question doctrine did not preclude review, relying on a floor statement by Congressman Seiberling that constitutional questions "cannot be foreclosed from court review," and that "[o]ur action today in approving the compact should not alter a court's view of whether any question regarding rights of the Marshall Islanders which have already vested is a political question." 131 Cong. Rec. H11838 (Dec. 11, 1985) (see App. 820 for this colloquy in its entirety). A floor statement by one member of the House, however, cannot preclude judicial review of whether separation of powers principles render foreign policy decisions nonjusticiable. The Compact Act itself makes no such withdrawal; and the floor statement acknowledges that courts may decide the political question issue.

While Congressman Seiberling's statement contends that the political question doctrine cannot preclude review of constitutional issues, appellants' constitutional argument, as appellants fully concede (Br. 21, 54), does not even arise if the espousal and settlement by their government is valid. But it is precisely the validity of the settlement, and the nature of the relief sought here asking the Court to dismantle the settlement, which raises the determinative political question. The courts have consistently held that authority to recognize the capacity of a foreign sovereign and settle claims is exclusively committed to the political branches.

**C. To grant the relief sought in these cases would dismantle the settlement, create international uncertainty as to the Marshall Islands' authority to conduct sovereign acts, and undermine United States foreign policy.**

The political question doctrine precludes adjudication that would require courts to determine matters outside judicial expertise, or result in embarassment or confusion "from multifarious pronouncements by various departments on one question." *Baker v. Carr*, 369 U.S. at 217. These considerations are particularly critical in foreign relations matters, which frequently "turn on stand-

ards that defy judicial application," or "uniquely demand single-voiced statement of the Government's views." *Id.* at 211. In assessing such concerns, "the crucial consideration is the consequence that would flow from granting the plaintiffs the relief they seek." *Antelok II* (App. 1411-1412); *Baker v. Carr*, 369 U.S. at 211-212.

The international and bilateral foreign policy interests at stake here, and the potential consequences of striking the settlement, are substantial. As stated in the Compact, the governments have agreed to a relationship "which provide[s] a full measure of self government for the peoples of the Marshall Islands", and which recognizes that government's "capacity to conduct foreign affairs * * * in [its] own name and right" (App. 858).[21] International acceptance of that policy hinges, however, upon international recognition of the sovereign acts of the Marshall Islands government. The United States and Marshall Islands have achieved significant gains in this respect.[22] Yet the relief sought before this Court could call into question that very policy foundation. A determination by a United States court not to honor espousal, in conflict with United States policy, could lead foreign

21 This agreement represents the fulfillment of United States obligations under both the United Nations Charter and the Trusteeship Agreement to "promote the development of the inhabitants of the trust territory toward self-government or independence" (App. 278, 273). United States policy recognizing the Marshall Islands is based upon approval of the Compact and Section 177 Agreement by the Marshall Islanders in a plebiscite recognized by the U.N. Trusteeship Council as having fulfilled the Charter goal of achieving self-determination. See Hills, Compact of Free Association for Micronesia: Constitutional and International Law Issues, 18 Int'l Law 583, 602-603 (1984).

22 Since United States recognition of the Marshall Islands, the governments of Australia, New Zealand, and Israel have established formal diplomatic relations, and the nations of the South Pacific Forum -- Fiji, Papua New Guinea, Kiribati, Niue, Cook Islands, New Zealand, Australia, Solomon Islands, Tonga, Vanuatu, and Tuvalu -- have recognized the sovereign status of the Marshall Islands. The International Civil Aviation Organization and International Maritime Organization, which are specialized agencies of the United Nations, have also recognized the Marshall Islands government for purposes of membership. These gains have been realized despite continued opposition by the Soviet Union to the Marshall Islands' free association status with the United States, while seeking its own increased influence in the region. See 13 Cl. Ct. at 682.

governments to question the authority of the Republic of the Marshall Islands to act in other areas, and undermine delicate diplomatic efforts to achieve international recognition of the post-trusteeship status of the Marshall Islands. Judicial nullification of the settlement could thus frustrate United States policy fostering Marshall Islands self-government, and undermine actions taken by the President to implement the Compact in fulfillment of the objectives of the U.N. trusteeship system. See Sec. 101(b) of Compact Act (App. 830).

The bilateral relations between the United States and Marshall Islands would likely suffer as well. Based on the determination that on-going litigation could directly impair relations, the sovereigns elected to settle claims through a comprehensive government-to-government agreement. The Section 177 Agreement, which embodies that decision, provides a carefully negotiated and effective mechanism to address in a long-term manner the complex legal, economic, political and diplomatic issues raised by the nuclear testing claims.[23] The Agreement was approved by the peoples of the Marshall Islands in a free and informed act of self-determination (13 Cl. Ct. at 673), and by the United States Congress, and represents a major and integral element of bilateral relations between the two governments. See *United States v. Pink*, 315 U.S. at 223, 228-230.

Dismantling the settlement would place the full range of on-going medical, radiological, rehabilitation, resettlement and compensation programs under the Section 177 Agreement in limbo. Indeed, the United States and Republic of the Marshall Islands would need to enter into negotiations, pursuant to Article XIII of

[23] The United States previously attempted to address the consequences of the nuclear testing program on an *ad hoc* basis under 14 separate statutes, as listed in Appendix A of the Section 177 Agreement, dealing with island rehabilitation, agricultural maintenance, medical treatment, compensation for injuries and loss of property, radiological monitoring and claims settlement (App. 344B). While the United States provided some $150 million under these statues over a two-decade period, the Section 177 Agreement, establishing an *additional* $150 million compensation program, represents the first comprehensive means of creating and maintaining "in perpetuity, a means to address past, present and future consequences of the Nuclear Testing Program, including the resolution of resultant claims" (App. 331).

the Agreement (App. 343), to determine the Agreement's continued viability. The government-to-government understandings incorporated into the Section 177 Agreement and Compact, and the political consensus in the Marshall Islands which resulted in their approval, would thus be substantially undermined. A politically viable international claims settlement, which is being implemented effectively, may well be replaced by internal political and legal tension in the Marshall Islands, and deterioration of successful relations which have developed between the two governments, because of precisely the frictions which the settlement was designed to remove. See *United States v. Pink*, 315 U.S. at 228-230.

Appellants contend (Br. 55) that the indemnification clause of the Section 177 Agreement, in which the Marshall Islands indemnifies the United States from the settled claims, for up to $150 million, would preserve the Section 177 Agreement programs intact, and nullify any adverse impact from returning these claims to litigation. The Section 177 Agreement, however, is an integrated compensation plan whose parts are not severable. The indemnity provision provides nothing more than limited protection against duplicate compensation, under both the Compact and in court, of certain claims. It does not prevent disruption to the compensation plan or Compact, mitigate diplomatic tensions which would arise between the United States and Marshall Islands, or address the resultant harm to the Marshall Islands' international standing. The end result of judicially nullifying the settlement would be that the United States' obligation to compensate those affected by the nuclear testing program, now embodied in a comprehensive diplomatic agreement, would once again become an ill-defined, politically divisive and contentious source of uncertainty between the United States and the Marshall Islands, and in the international community.

## II. THE WITHDRAWAL OF THE UNITED STATES' CONSENT TO SUIT DOES NOT DEPEND ON JUDICIAL APPROVAL OF MARSHALL ISLANDS ESPOUSAL

Appellants assert (Br. 20-32) that Congress, through Section 103(g)(2) of the Compact Act, amended Article XII of the Sec-