tion 177 Agreement to condition the withdrawal of the United States' consent to suit on a judicial determination that the Marshall Islands validly espoused those claims under Article X. As the Claims Court found, however, that position ignores both the plain wording of Section 103(g), which ratifies, but does not condition, the final settlement of claims and concurrent withdrawal of United States court jurisdiction, as well as legislative history showing that Congress rejected this very condition. 13 Cl. Ct. at 684-685 (App. 18-19). As discussed in Section IV of this brief, the Republic of the Marshall Islands has validly espoused and settled its nationals' claims. The Claims Court, nevertheless, correctly held that that "Article XII is not made contingent upon a judicial determination of the validity of espousal in Article X." 13 Cl. Ct. at 686 (App. 20).

**A. Section 103(g) on its face does not condition Article XII on judicial review of espousal.**

It is inconceivable that Congress would have amended and conditioned a major diplomatic claims settlement affecting foreign policy and defense interests[24] without simply and directly stating that Article XII is made contingent on valid espousal under Article X. Section 103(g), however, states no such condition. Indeed, the plain language of Section 103(g) does not require, direct, or even allow judicial review of the validity of Marshall Islands espousal, either as a condition for withdrawal of jurisdiction, or for any other purpose. As the court in *Antolok II* stated in rejecting the same argument appellants make here (App. 1413, citations omitted):

> [T]he language of Section 103(g) * * * clearly deprives this Court of jurisdiction, and where the langauge of a statute is clear it is improper to rely on legislative history to interpret the statute. If Congress wanted to first have courts test the Compact, it could have said so; instead Congress stripped the court of jurisdiction.

While appellants seek to draw inferences from the second sentence of Section 103(g)(2), neither that sentence in isolation,

[24] Representative Jim Leach described the Compact as "one of the significant foreign policy initiatives of the decade." 131 Cong. Rec. E3588 (July 29, 1985).

nor Section 103(g) as a whole, support their assertion. As the Claims Court stated, the Marshall Islands and the United States "unquestionably intended that the Section 177 Agreement would be a complete settlement of all claims arising from the nuclear testing program." 13 Cl. Ct. at 684 (App. 18). Articles X and XII of the Agreement operate together to accomplish that end by settling the underlying claims and terminating the related court cases. Nowhere does the Agreement state that Article XII is contingent on a judicial determination of a valid Article X espousal.

The meaning and purpose of Section 103(g) is straightforward. Section 103(g)(1) expressly ratifies the approach adopted in Articles X and XII, stating that "[i]t is the intention of the Congress * * * " that the Section 177 Agreement " * * * constitute a full and final settlement of all claims described in Articles X and XI * * * , and that any such claims be terminated and barred except insofar as provided for in the Section 177 Agreement" (App. 839). Section 103(g)(2), in turn, states that "[i]n furtherance of the intention of Congress as stated in paragraph (1)," the Section 177 Agreement is "ratified and approved" (App. 839). Congress' endorsement of final settlement under the Section 177 Agreement could not be more clearly stated. There is no language, no inference, nor any recognition whatsoever that claims may yet be litigated in any case contingent on judicial approval of Article X.

The final sentence of Section 103(g)(2), relied on by appellants, provides that the jurisdictional limitations in Article XII "are enacted solely and exclusively to accomplish the objective of Article X of such Agreement and only as a clarification of the effect of Article X, and are not to be construed or implemented separately from Article X" (App. 839). That clause, however, does not, as appellants argue, condition Article XII on judicial determination that there has been a valid espousal under Article X. It simply confirms that the provisions are to be implemented together, as already required by the terms of the Agreement itself, and that dis-

---

25 Similarly, Article X, Section 2 obligates the Marshall Islands government to terminate legal proceedings in its courts arising from the nuclear testing program (App. 342). These reciprocal undertakings were deemed an essential part of the Section 177 Agreement, to ensure that the settlement would not be disrupted as a result of ongoing litigation.

missal of court actions is to occur in order to achieve a "full and final settlement."

Thus, the second sentence states, for example, that Article XII is enacted solely to accomplish "the objective" of Article X, which, under Section 1 of Article X, is the "Full Settlement of All Claims" (App. 342).[25] Article XII also "clarifies," by concurrent dismissal of the court actions, the "effect" of Article X, which is the settlement of all claims. Finally, the statement that Articles XII and X are not to be "construed or implemented separately" means only that these provisions operate together to implement the agreed-on settlement.

Section 103(g)(2), then, merely confirms the unified and complementary approach agreed to by the United States and Marshall Islands to achieve final settlement. Articles X and XII work together to achieve that settlement. For Congress, "in furtherance" of a "full and final settlement," to acknowledge in Section 103(g)(2) that dismissal of court actions is to occur in conjunction with settlement of underlying claims, as already required by the terms of the Section 177 Agreement which Congress "approved and ratified," falls far short of requiring courts to adjudicate the validity of an international claims settlement.[26]

**B. Congress rejected the very provision appellants ask this Court to add to the Compact Act.**

As the Claims Court found, Congress, in fact, rejected language which would have conditioned Article XII's withdrawal of jurisdiction on judicial review of espousal. 13 Cl. Ct. at 684-685 (App. 18-19). That version of paragraph (2), which the House had passed on July 25, 1985, would have provided (App. 740):

> (2) If, notwithstanding the enactment into law of this joint resolution, a United States court of competent

---

[26] Appellant's further assertion (Br. 21, 25) that the Agreement's indemnification clause (Art. XI, App. 342-343) "recognizes" that espousal may be invalid, and that such doubts "must have been shared by the Administration," is wholly incorrect. That clause, like all indemnification clauses, provides basic legal protection against unforseen contingencies. It hardly constitutes an admission of doubt as to espousal, and is of no aid to appellants assertion that Article XII is conditioned on espousal.

> jurisdiction determines that the provisions of Article X of the [Section 177 Agreement] are invalid as a matter of international law or for any other reason, the provisions of Article XII * * * shall not, of themselves, prevent any court of the United States otherwise having jurisdiction over claims described in Articles X and XI * * * from entertaining such claims; and the time between the effective date of the Compact and any subsequent final judicial determination of invalidity of Article X * * * shall not be included in any calculations regarding applicable statute of limitations * * *.[27]

In passing the Compact Act, Congress retained the House-passed paragraph (1) of Section 103(g), which affirmed "full and final settlement," but altered paragraph (2) entirely. Congress made it explicitly clear, for example, by adding to paragraph (2) an introductory first sentence, that "[i]n furtherance of the intention of Congress as stated in paragraph (1)," the Section 177 Agreement is "ratified and approved" (App. 839). And it rewrote the now-second sentence entirely, removing the statement that courts may disregard Article XII if Article X is found invalid, and even any reference to the validity of espousal, judicial review, or to statute of limitations considerations which might result from judicial review of espousal.[28]

Appellants assert (Br. 28) that these changes "can be explained by the desire not to seem to be inviting the courts to upset Article X." These sweeping revisions to Section 103(g)(2),

---

[27] Congressman Seiberling proposed this alternative in a June 5, 1985, draft of what was then denominated as Section 5(n) (App. 368-369). In addition to expressly conditioning Article XII on judicial determination of a valid espousal, the original Seiberling proposal also contained no paragraph (1), declaring the "intention of Congress" that the Section 177 Agreement "constitute a full and final settlement" and that claims "be terminated and barred" except as provided in the Agreement (compare Seiberling proposal at App. 368-369 to House-passed version above, and to Sec. 103(g) as enacted, at App. 839).

[28] While appellants contend (Br. 26 n.37) that the tolling clause is "irrelevant," that clause was an integral part of the Seiberling proposal. The statute of limitations language, in fact, had relevance only as a means of implementing the proposed condition for Article XII, and its deletion further demonstrates that Congress expressly rejected such a condition.

however, are a complete rejection of the Seiberling proposal, which would have done just that. As the court stated in *Antolok II*, "Congress' rejection of the amendment signals an intent to block court review of the Compact" (App. 1414).

Having failed to achieve passage of his alternative, Congressman Seiberling, minutes before the House adopted the Compact Act, asserted in a floor statement that (App. 811):

> [T]he House bill also included language specifying that should article X of the section 177 subsidiary agreement be held invalid, article XII of that agreement would have no effect; while this language has been somewhat revised, the new version is to the same effect.

While appellants rely extensively on this language, a single floor statement cannot prevail over the plain langauge of Section 103(g) as passed. *United States v. James*, 478 U.S. 597 (1986); *Gemsco v. Walling*, 324 U.S. 244, 260 (1945).[29] And by Congressman Seiberling's own admission, his earlier version, "specifying" the conditional nature of Article XII, was removed. His last minute attempt to save his position by asserting that the adopted version "is to the same effect" is simply unpersuasive.

Moreover, other members contradicted Congressman Seiberling's floor interpretation. Congressman Solarz, Chairman of the House Foreign Affairs Subcommittee on Asia and the Pacific and a House sponsor of the Compact Act, stated that same day that "the compact settles all nuclear claims resulting from our nuclear weapons testing program * * * ." 131 Cong. Rec. H11836 (Dec. 11, 1985) (App. 818). Senator McClure, chairman of the lead Senate committee on the Compact and floor manager of the Act, stated two days later that Section 103(g) "reiterates the provisions of Section 177 of the Compact which provides that there is full and final settlement of all nuclear effects claims." 131 Cong. Rec. S17651 (Dec. 13, 1985) (App. 823). Senator McClure

---

[29] There is a clear presumption that Congress, in selecting the statutory language it did, meant what it enacted. *Ampex Corp. v. United States*, 620 F.2d 853, 862 (Ct. Cl. 1980). Views of individual members, in particular, cannot overcome statutory language which is clear on its face. *General Elec. Co. v. United States*, 610 F.2d 730, 734 (Ct. Cl. 1979).

added that, given concern over protracted litigation, "both the House and Senate agreed that an explicit endorsement of the resolution was important" (*ibid.*). Finally, Congressman Lagomarsino, another Compact sponsor, endorsed this view, stating (132 Cong. Rec. E66-E67, Jan. 23, 1986) (App. 899):

> Upon personally reviewing the Congressional Record with respect to the Compact, I discovered that last minute questions were raised. * * *. Senator McClure also refers to Senate and House agreement to expressly endorse the espousal provisions in Section 103(g). * * *. As a member of both the Foreign Affairs and Interior and Insular Affairs Committees * * * I participated in the agreement. * * *. I can confirm that it was the intent of Congress that the section 177 be fully implemented strictly in accordance with its terms, and that the final version of Section 103(g) represents our rejection of earlier versions of that provision.

Congressman Seiberling, as appellants note, was a principal architect of important parts of the Compact. On this issue, however, his position simply did not prevail. Section 103(g) did not, as appellants assert, "amend" the Section 177 Agreement.[30] Rather, as Congress stated, Section 103(g) "ratified and approved" the Section 177 Agreement as a "full and final settlement of all claims."

## III. THE COMPACT'S CLAIMS SETTLEMENT MEETS FIFTH AMENDMENT REQUIREMENTS

Appellants challenge the constitutionality of the claims settlement agreement on the assertion that the United States settled nuclear testing claims for less than full value by providing inade-

---

30 Appellants' observation (Br. 24-25 n.35) that the Compact was resubmitted to the Marshall Islands legislature to affirm trade and tax revisions added by the Compact Act fails to acknowledge that the Nitijela resolution accomplishing this end contains no reference to Section 103(g), or any recognition that the Marshall Islands government considered that provision to be an "amendment." (See Nitijela Res. No. 62 N.D.-2 at App. 997- 1012). Section 103(g) was not included with these other revisions because neither the Marshall Islands nor the United States viewed it as altering the Compact or Section 177 Agreement.

quate compensation. Thus, appellants assert that Article XII's withdrawal of jurisdiction, in implementation of settlement, unconstitutionally will take their Fifth Amendment just compensation claims and implied-in-fact contract claims to the extent that there ultimately proves to be a shortfall in compensation provided under the Section 177 Agreement (Br. 33-34 and n.45).[31]

The Claims Court held, however, following extensive analysis of the Compact and binding precedent in this Court and the Supreme Court, that the claims settlement agreement meets all constitutional requirements. 13 Cl. Ct. at 690 (App. 24). The court found that Congress' ratification of the settlement, and specifically Article XII, was a valid exercise of its authority to withdraw consent of the United States to suit under the Tucker Act. 13 Cl. Ct. at 688-689 (App. 22-23). The Compact and Section 177 Agreement establish a complex, permanent mechanism for compensating claimants, which in the best judgment of the Executive, the Congress, and the Marshall Islands government, "provides a means for final discharge of constitutional obligations for just compensation." 13 Cl. Ct. at 689 (App. 23).

**A. The claims settlement creates a comprehensive, permanent means of resolving all past, present and future nuclear testing claims.**

Appellants' constitutional challenge proceeds from the presumption that an international Compact, to which two governments have committed themselves and their resources, will not provide the just remedy it promises. That presumption is wholly incorrect.

[31] It should be noted, however, that appellants did not amend their complaints following Compact approval to allege that the Compact and Section 177 Agreement unconstitutionally deprived them of their underlying claims (see amended complaints. at App. 109, 193, 246). Thus, the complaints do not assert the claims raised on appeal. It should also again be noted that the constitutional issue does not arise unless the Marshall Islands government is found not to have validly espoused its nationals' claims. As appellants state (Br. 21), '[i]f espousal under Article X is valid, the withdrawal of jurisdiction operates, and claimants are remitted to the fund administered by the Claims Tribunal for any compensation they may receive."

The objective of the Agreement is "to create and maintain, *in perpetuity*, a means to address past, present and future consequences of the Nuclear Testing Program, including the resolution of resultant claims" (App. 331, emphasis supplied). As the cornerstone funding, the United States on October 30, 1986, immediately after the Compact took effect, paid $150 million to the Marshall Islands government to create the compensation Fund established by Article 1 (App. 1241).[32] The Agreement requires, however, that the Fund be permanently invested, with an investment goal of at least $18 million per year (App. 332), and with all distributions for compensation programs and claims adjudication to come from the proceeds (App. 332). The Fund's principal may be drawn only if proceeds will not meet annual distribution schedules (App. 336).[33] The Section 177 Agreement's funding structure is thus designed to operate as long as necessary until all consequences of the nuclear testing program are addressed. The United States and Marshall Islands drafted the Agreement to provide continuous funding to *resolve*, not avoid, those consequences.

It is, of course, conceivable that the Fund could become depleted because of radical long-term investment difficulties, or substantial unforseen damages. The Agreement expressly provides as to "Changed Circumstances," however, that (App. 341-342):

---

[32] In fact, Congressman Seiberling characterized this amount as "a substantial price tag in these austere times" (App. 810). As the Claims Court noted, claimants thereupon entered into agreements based on the Section 177 Agreement, borrowing over $9 million by collateralizing their initial payments under the Agreement. 13 Cl. Ct. at 677 (App. 11; see also, App. 1261-1265).

[33] As appellants note (Br. 44 n.47), disbursements were made from the Fund during its initial year in light of the recent stock market "correction" affecting all investors. That disbursement in no way impairs, nor do appellants suggest that it impairs, the long-term peformance and viability of the Fund. Indeed, prior to the stock market disruption, the Fund was achieving an annual return of 20 percent. The amounts disbursed have since been partially restored, and it is anticipated will be fully restored in the near future. The Fund continues to operate as a long-term investment program, providing "a perpetual means of addressing the special and unique circumstances" arising from the nuclear testing program (App. 332).

> If loss or damage to property and person of the citizens of the Marshall Islands, resulting from the Nuclear Testing Program, arises or is discovered after the effective date of this Agreement, and such injuries were not and could not reasonably have been identified as of the effective date of this Agreement, and if such injuries render the provisions of this Agreement manifestly inadequate, the Government of the Marshall Islands may request that the Government of the United States provide for such injuries by submitting such a request to the Congress of the United States for its consideration. It is understood that this Article does not commit the Congress of the United States to authorize and appropriate funds.[34]

In any case, it was the best judgment of the United States and Marshall Islands government that the compensation plan as structured in the Agreement will equitably address all consequences of the nuclear testing program. The Agreement is designed to operate "in perpetuity," is currently operating effectively to address long-term needs, and fulfills the intent that complex problems stemming from the testing program be resolved on a permanent basis.

Consistent with these objectives, the Section 177 Agreement structures compensation in several different forms. It provides $2 million per year, over 15 years, for health care programs, and an additional $3 million over three years for medical surveillance and radiological monitoring (App. 333-334). It also provides $183.75 million, over 15 years, in direct payment to distribution authorities for Bikini, Enewetak, Rongelap and Utrik (App. 334-335), which may be placed in trust "to provide a perpetual source of income

[34] Senator McClure, Senate floor manager of the Compact, stated as to this provision: "[T]here is a continuing moral and humanitarian obligation on the part of the United States to compensate any victims -- past, present or future -- of the nuclear testing program. For this reason, I fully expect that if new claims develop Congress should and will provide any assistance required, absent compelling contradictory evidence" (App. 463).

[35] The large majority of claimants in these actions are from Bikini, Enewetak, Rongelap and Utrik, which atolls, under the Section 177 Agreement, are making distributions and extending medical and other benefits to a collective population

for its respective recipients" (App. 336). These provisions thus recognize that atoll residents were relocated, and affected, as a community, and that unique community needs exist which are best addressed by local atoll distribution authorities.[35]

Finally, the Section 177 Agreement establishes a Claims Tribunal for final adjudication of all claims, to provide "an additional long-term means for compensating claims" (App. 338). The Agreement allocates $45.75 million over 15 years "as necessary for whole or partial payment of monetary awards" (App. 335). In addition, as distribution to individual atoll authorities comes to a close at the end of the initial 15-year period, the Agreement commits from that point forward at least 75 percent of annual Fund proceeds, or a projected $13.5 million per year, for claims awards (App. 336).

The funding provided under this substantial and diverse compensation program must, in addition, be weighed against problems of proof faced by appellants in recovering on their claims. *Dames & Moore*, 453 U.S. at 687. Appellants assert (Br. 50 and n.51) that their claims will collectively exceed $200 million, and possibly $300 million. As the Claims Court found, however, such claims "involve substantial evidentiary problems." 13 Cl. Ct. at 688 (App. 22). These cases are individual actions which have been consolidated in the Claims Court. Thus, each claimant would individually need to prove ownership of specific Marshall Islands property, its valuation, and the amount of compensation which should be paid. *Ibid.* These problems of proof "cannot be discounted." *Dames & Moore*, 453 U.S. at 687. At least "until a final unreviewable judgment is obtained," a claim for damages is contingent. *Hammond v. United States*, 786 F.2d 8, 12 (1st Cir. 1986). Appellants have only an inchoate "unilateral interest" in the asserted claims. *Ruckleshaus v. Monsanto*, 467 U.S. 986, 1005 (1984) (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161 (1980).

---

of over 3,000 people. In addition, Congress, under Sections 103(i), 103(k) and 103(l), has agreed to provide scientific support and funding to Bikini, Rongelap and Enewetak, as needed, for radiological rehabilitation and resettlement (App. 840-843). Funding for these programs will be in addition to the $150 million compensation Fund.

The studies on which appellants base their claims estimates (Br. 50 n.51) themselves reflect these difficulties. Appellants' fair market rental value estimate for Bikini Atoll, for example, is a collective valuation for the entire Atoll, and does not indicate the specific individual valuation which each claimant must prove. Nor does it account for the fact that the United States provided substitute land, and other substantial compensation, during the period of taking. In addition, the two other cited studies provide estimates, for Enewetak and Rongelap, of various clean-up and rehabilitation costs which are irrelevant to a taking valuation.[36] Sections 103(i), (k) and (l) of the Compact Act (App. 840-843), and Article VI of the Section 177 Agreement (App. 340), in fact, provide that resettlement costs will be funded from additional appropriations rather than the $150 million Fund.

These studies properly were not considered by the Claims Court, and need not be evaluated here. The critical point is that the Section 177 Agreement provides a reasonable, well funded, and appropriate response to the unique consequences of the nuclear testing program. The claims settlement negotiated between the United States and Republic of the Marshall Islands is also well within the range of other international settlements to which courts have granted deference. *Shanghai Power Co. v. United States*, 4 Cl. Ct. at 243-247. The President in *Shanghai Power* settled private claims of $144 million for approximately $20 million (*id.* at 239), while the most prominent of such settlements, the Litvinov Assignment, has resulted in payment of less than 10 percent of claims.[37] The Section 177 Agreement, by contrast,

---

[36] The cited Rongelap study, in fact, was not even prepared until six months after the Claims Court's decision, is not part of the record below, and was inserted by appellants in the Appendix prior to filing their brief. Courts of appeals must, of course, ignore such extra-record material. *In re GHB Energy Corp.*, 791 F.2d 1200, 1201-1202 (5th Cir. 1986); *Dickey v. Greene*, 729 F.2d 957, 959 (4th Cir. 1984) (*en banc*).

[37] See 1984 Annual Report of Foreign Claims Settlement Commission, Index and Table of Completed Programs. Indeed, most international settlements since World War II resulted in payment of less than 38 percent of the principal amount certified by the Foreign Claims Settlement Commission. *Ibid.*

provides a permanent funding mechanism to address all nuclear testing claims.

Thus, under the full circumstances of this claims settlement, a court could easily find that the Section 177 Agreement manifestly does not effect a taking of appellants' claims. *Shanghai Power Co.*, 4 Cl. Ct. at 241-247.[38] This Court need not, however, ever reach the taking issue. For, as the Claims Court held, Congress may withdraw the United States' consent to suit under the Tucker Act, and provide an alternative method of compensation. 13 Cl. Ct. at 689 (App. 23). Where, as here, the Executive has negotiated, and Congress has approved, a comprehensive long-term compensation plan to address all claims, claimants have not been deprived of a forum to seek redress. *Ibid.* As the Claims Court found, there is a compelling need to allow this plan, which in the best judgment of the two governments provides the most appropriate means of resolving those claims, to run its course. *Ibid.*

**B. Congress, in ratifying the Compact, properly withdrew Tucker Act consent to suit.**

Appellants assert (Br. 35-44) that Congress' withdrawal of jurisdiction or consent to suit under the Tucker Act unconstitutionally deprived them of their just compensation and contract claims. The Supreme Court and this Court's predecessor have held, however, that Congress has full authority to withdraw the consent of the United States to suit. *Lynch v. United States*, 292 U.S. 571, 582 (1934); *Gold Bondholders Protective Council v.*

---

[38] Appellants assert (Br. 64-65) that the claims settlement violates fiduciary obligations similar to those owed by the United States to Indian tribes under *United States v. Sioux Nation of Indians*, 448 U.S. 371 (1980). While, as discussed in Part IV below, the unique Indian trust relationship has no application to a United Nations Trust Territory, the Section 177 Agreement fully meets the *Sioux Nation* test. That test holds that as long as the United States attempts "fairly" and "in good faith" to provide "property of equivalent value," there has been no taking. *Id.* at 416, quoting *United States v. Sioux Nation of Indians*, 601 F.2d 1157, 1162 (Ct. Cl. 1979). The United States here has provided, and funded, a complex, diverse compensation plan to address all consequences arising from the nuclear testing program. Under *Sioux Nation*, the claims settlement has effected no taking.

*United States*, 676 F.2d 643, 646 (Ct.Cl.), cert. denied 459 U.S. 968 (1982). Those cases, relied on by the Claims Court in holding that the Compact Act validly withdrew such consent under the Tucker Act, while providing an alternative means of compensating the claims asserted here, are dispositive.[39]

The claimants in *Lynch*, as appellants here, contended that an act of Congress unconstitutionally deprived them of property rights in violation of the Fifth Amendment. 292 U.S. at 575.[40] The Court held, however, that consent to sue the United States is a "privilege accorded," not "the grant of a property right protected by the Fifth Amendment." *Id.* at 581. Congress thus has the power to withdraw that privilege, a power which (*id.* at 582, citations omitted):

> applies alike to causes of action arising under acts of Congress, and to those arising from some violation of rights conferred upon the citizen by the Constitution. The character of the cause of action -- the fact that it is in contract as distinguished from tort -- may be important in determining (as under the Tucker Act) whether consent to sue was given. Otherwise it is of no significance.

Thus, while the Court found that Congress could not abrogate the underlying obligations of the United States, "[t]he rule that the United States may not be sued without its consent is all embracing." *Id.* at 581, citing Hamilton, *The Federalist*, No. 81.

---

39 While appellants also assert (Br. 32-33) that Congress may not constitutionally "terminate" claims, it is the Republic of the Marshall Islands' espousal and settlement which has extinguished the claims here, as discussed in Part IV below. The United States has settled those claims, and withdrawn the consent to sue in United States courts, while providing an alternative means of compensation, in implementation of the settlement.

40 Appellants here do not specify the constitutional basis for asserting that Congress deprived them of their underlying property claims, but allege generally (Br. 33-44) that Congress "cannot constitutionally foreclose judicial determination" of such claims by withdrawing jurisdiction or consent to sue. As noted above, the complaints do not address this issue.

While appellants attempt (Br. 42) to discount *Lynch* because the Court determined that Congress, under the statute in that case, had not withdrawn consent to sue, that case clearly establishes Congress' broad authority to grant or withdraw such consent. Appellants also attempt (Br. 42) to distinguish *Lynch* on the ground that it raised contract claims, and was not a case "involving Fifth Amendment rights." The Court held, however, as appellants, in fact, assert here (Br. 34-35 n.45), that plaintiffs' contract claims were property protected by the Just Compensation Clause. 292 U.S. at 579.

Relying on *Lynch*, the Court of Claims held in *Gold Bondholders* that Congress' withdrawal of consent to suit does not violate constitutional rights, and, in particular, does not constitute a taking of a property right in violation of the Fifth Amendment. 676 F.2d at 646. Rather, the Court found a "long-established power of Congress to withdraw its consent to sue the United States." *Ibid.*[41]

The Supreme Court has affirmed this principle in other cases as well. In *Schillinger v. United States*, 155 U.S. 163 (1894), relied on in *Lynch*, the Court declared, in a Claims Court case brought under the Tucker Act alleging an unconstitutional taking of property, that Congress has the discretion "to specify the cases and contingencies in which the liability of the Government is submitted to the courts for judicial determination." *Id.* at 166. See also *Maricopa County v. Valley National Bank of Phoenix*, 318 U.S. 357, 362 (1943); *Gibbes v. Zimmerman*, 290 U.S. 326, 332 (1933).[42]

---

[41] Appellants conceded in *Nitol* below that *Gold Bondholders* is a "case in which arguably a court has refused to hear a constitutional claim on the ground that Congress has withdrawn consent to suit." Appellants thus asserted that the case was "wrongly decided." See in *Nitol*, Pltffs Mem. in Resp. to Questions Posed in the Court's Order of April 24, 1987, dated May 29, 1987. On appeal, appellants characterize that decision as holding only that a statute depriving plaintiffs of a "windfall" does not deprive them of any constitutional rights. The Court in *Gold Bondholders*, however, made no such analysis, and broadly held, on the basis of *Lynch*, that even as to constitutional claims, "Congress may withdraw its consent to sue the government at any time." 676 F.2d at 646.

[42] It should, also be noted, as the Claims Court held, that appellants' claims fall within the public rights doctrine which recognizes that the United States may

Appellants rely on *United States v. Klein*, 80 U.S. (13 Wall.) 128 (1872) and *Battaglia v. General Motors Corp.*, 169 F.2d 254 (2d Cir.), cert. denied, 335 U.S. 887 (1948). The Claims Court correctly found those cases inapposite. 13 Cl.Ct. at 687-688 (App. 21-22). The plaintiff in *Klein* had already received a favorable judgment in the Court of Claims, while here no claims have been reduced to judgment, and the Compact provides a Tribunal to adjudicate those claims. The Court of Claims in *Gold Bondholders*, in fact, expressly distinguished *Klein* as irrelevant to "the long-established power of Congress to withdraw its consent to sue the United States." 676 F.2d at 646. Similarly, *Battaglia* involved no withdrawal of consent to sue the United States since the case involved only private parties; nor was there an alternative form of compensation.[43]

In an ultimate sense, the appellants are quarrelling with the unassailable notion that the Congress has exclusive authority to define the judicial power of all lower federal courts, under Article III, §§ 1 and 8. *American Ins. Co. v. Canter*, 26 U.S. (1 Pet.) 511 (1828); *Ex Parte McCardle*, 74 U.S. (7 Wall.) 506 (1869). Article III, § 1 provides that judicial power shall be vested "in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." With respect to the Claims Court, created under Article I, Congress' authority is plenary. See 28 U.S.C. 172 (1982); S. Rep. 275, 97th Cong., 1st Sess. 7 (1981), reprinted in 1982 U.S. Code Cong. & Ad. News 11, 17. The power to establish lower federal courts necessarily includes the power to invest them with limited authority, or to withdraw the consent to

---

attach conditions to its consent to be sued. 13 Cl. Ct. at 687 (App. 21); see *Northern Pipeline Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 67-76 (1982).

43 The Supreme Court's recent decision in *Webster v. Doe*, slip op., S.Ct. No. 86-1294 (June 15, 1988), held only that the National Security Act does not preclude review of constitutional claims brought by terminated Central Intelligence Agency employees. *Id.* at 10. The only two justices to reach the issue of whether Congress could preclude lower court review of the claims raised by that case held that Congress has such authority. O'Connor, J., dissent at 1; Scalia, J., dissent at 5-10. The statute in *Webster* provided no alternative method of compensation.

suit previously granted. As stated in *Shelton v. Sill*, 49 U.S. (8 How.) 440, 448 (1850)

> * * * having a right to prescribe, Congress may withhold from any court of its creation jurisdiction of any of the enumerated controversies. Courts created by statute can have no jurisdiction but such as the statute confers.
>
> The Constitution has defined the limits of the judicial power of the United States, but has not prescribed how much of it shall be exercised by the Circuit Court; consequently, the statute which does prescribe the limits of their jurisdiction, cannot be in conflict with the Constitution, unless it confers powers not enumerated therein.

Prior to creation of the Court of Claims in 1855, persons with claims against the United States petitioned Congress for relief in the form of a private bill.[44] Congress, in determining to eliminate that *ad hoc* approach, debated whether the new tribunal should be a commission which would merely report its conclusions to Congress, or a fully independent court. See *The United States Court of Claims: A History*, 216 Ct. Cl. at 13. Congress elected to establish a permanent Article I court, with limited authority to hear particular types of claims. That power to create a judicial method of relief must necessarily include the power to withdraw or limit it. The critical point is that here, as well as a century ago, Congress has full authority to specify the forum for compensation, and may provide such compensation through a judicial forum, by commission, through claims tribunal adjudication, a private bill, or otherwise.

*First English Evangelical Lutheran Church v. County of Los Angeles*, 107 S.Ct. 2378, 2386 n.9 (1987), does not alter that power. There, the Court held in a footnote that the Fifth Amendment right to compensation is self-actuating. But that declaration is of no significance to this litigation unless Congress had declined to provide any means to compensate claims. *First English Evangeli-*

---

[44] See P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, *The Federal Courts and the Federal System* 382 (2d ed. 1973); Cowen, *The United States Court of Claims: A History*, Section One 1855- 1887, 216 Ct. Cl. 1 (1978).

*cal* does not restrict congressional power to determine, under particular circumstances and needs, what is the most appropriate method of compensation. As discussed below, Congress here, in ratifying the Compact, has determined under the complex circumstances presented by the nuclear testing program, that compensation is best provided through an alternative compensation program, for which it has appropriated substantial and regenerating funding, and which meets all constitutional requirements.

**C. The Section 177 Agreement provides an alternative method of compensation which must be allowed to operate as intended to address all claims.**

As the Claims Court held, the Section 177 Agreement does not deprive appellants of a forum for their claims. To the contrary, "Congress has recognized and protected plaintiffs' rights to just compensation for taking and for breach of contract." 13 Cl. Ct. at 689 (App. 23). The Agreement withdraws jurisdiction over appellants' judicial claims while providing a comprehensive program of health care, compensation to local atolls, and a claims tribunal, all with substantial and continuing funding.

Courts have fully recognized, as did the Claims Court here, that Congress may establish an alternate basis of compensation for particular claims, and may do so as part of an international claims settlement agreement. *Blanchette v. Connecticut General Ins. Corp.*, 419 U.S. 102, 124, 127 (1974); *Dames & Moore v. Regan*, 453 U.S. at 689-690. As a general matter, "there must be at the time of taking 'reasonable, certain and adequate provision for obtaining compensation.'" *Blanchette v. Connecticut General Ins. Corp.*, 419 U.S. at 124-125, quoting *Cherokee Nation v. Southern Kansas RR. Co.*, 135 U.S. 641, 659 (1890).

The Claims Court held that the Section 177 Agreement provides a reasonable and certain basis of compensation, a holding appellants do not contest. 13 Cl.Ct. at 689 (App. 23). Acknowledging the unique needs addressed by the Agreement, and the ongoing, long-term compensation structure created to address those needs, the court held that whether the alternative compensation program "is adequate is dependent upon the amount and type of compensation that ultimately is provided through those procedures." *Ibid.* The adequacy of the plan thus "cannot be

determined at this time," and "cannot be challenged judicially until it has run its course." *Ibid.*

Appellants assert (Br. 45-49) that alternative compensation, of any form, may be constitutionally "adequate" only if the Tucker Act is held ultimately available to litigate perceived shortfalls. No court has ever placed such a restriction on alternative claims settlements, regardless of the particular needs addressed and the specific terms of the program determined by Congress to most effectively resolve those needs. Indeed, appellants substantially overstate the holdings in *Blanchette*, *Dames & Moore*, and *Ruckelshaus v. Monsanto*, 467 U.S. 986 (1984), as *requiring* a Tucker Act remedy to validate alternative compensation programs. In those cases, the Court held only that, because Congress had preserved an ultimate Tucker Act remedy under the specific statutes at issue, the Court need not decide whether the Tucker Act must be available in those circumstances.[45] The Court certainly did not hold that the Tucker Act must ultimately be available to sustain *any* type of alternative compensation plan, as advocated here.

Only *Dames & Moore*, in fact, concerned a diplomatic claims settlement, and the alternative forum provided there took a very different form, and addressed vastly different needs, than the Section 177 Agreement here. The agreement in that case established a temporary tribunal to conduct binding arbitration to resolve claims arising from the 1979 Iranian revolution. 453 U.S. at 664-665. The tribunal was invested with limited jurisdiction, and the possibility remained that certain claims outside that jurisdiction might not be adjudicated at all, and that those claimants would have no alternative forum. As the Court stated in *Dames & Moore*, "We are confined to a resolution of the dispute presented to us. * * * We attempt to lay down no general 'guidelines' covering other situations not involved here, and attempt to confine the opinion only to the very questions necessary to decision of the case." *Id.* at 660-661.

In the Section 177 Agreement, by contrast, the United States has responded to the complex consequences of the nuclear test-

[45] See *Blanchette*, 419 U.S. at 134, 136, 148-149; *Dames & Moore*, 453 U.S. at 688-689; *Monsanto*, 467 U.S. at 1018.