ing program by negotiating a diverse compensation plan providing for health care, distribution to atolls for local determination of needs, and a mechanism for direct adjudication of *all* claims. This plan has been structured to operate permanently, and, at a base investment of $150 million, to generate sufficient proceeds to address all identified needs. In ratifying the Agreement, Congress also recognized that should changed circumstances arise which would prevent the program from functioning as planned, Congress would need to consider possible additional funding (App. 341-342).

The Claims Court's determination that it is premature to resolve appellants' Tucker Act contentions is thus wholly correct. The President, the Congress, the Marshall Islands government, and the peoples of the Marshall Islands, who approved the claims settlement, have determined that the Section 177 Agreement provides an effective and adequate remedy to address, on a long-term basis, all consequences of the testing program. As the Claims Court found, that plan must be allowed to operate. Tucker Act concerns, if they ever arise at all, can be determined only in light of the ultimate performance of the plan, whether investment goals for regeneration of funding continue to be met, local atoll use of funds, and the number of individual claims presented and proved before the tribunal.[46]

The critical point is that, unlike the *Dames & Moore* settlement or any other alternative claims compensation noted by appellants, the Section 177 Agreement is structured and financed to operate "in perpetuity" to address unique needs. There is no basis to presume that the Agreement, to which two governments have committed substantial resources, will fail to provide a just and adequate remedy. As the Claims Court correctly held, Congress has recognized and protected appellants' rights, and the compensa-

[46] Appellants assert (Br. 49) that they need not present their claims to the Tribunal even should a court construe Article XII to preserve a Tucker Act remedy. That argument is incorrect. *Dames & Moore*, 453 U.S. at 688. As stated in *Ruckelshaus v. Monsanto*, 467 U.S. at 1018 n.21: "Exhaustion of the statutory remedy is necessary to determine the extent of the taking that has occurred. To the extent that the operation of the statute provides compensation, no taking has occurred and [there is] no claim against the Government."

tion program must be allowed to "run its course." 13 Cl. Ct. at 689 (App. 23).

## IV. THE REPUBLIC OF THE MARSHALL ISLANDS HAS VALIDLY ESPOUSED AND SETTLED ITS NATIONALS' CLAIMS

As appellants acknowledge (Br. 21, 54), all of their remaining issues on appeal are moot if the Marshall Islands has properly espoused and settled appellants' claims at international law. Thus, the Court need not consider whether Article XII is conditioned on judicial determination of valid espousal, or reach appellants' claim that Article XII, absent valid espousal, is unconstitutional. As discussed below, the Marshall Islands has properly espoused and extinguished the claims of its nationals under long-standing principles of international law.

### A. The espousal meets requirements of the rule of continuous nationality.

International agreements settling claims by nationals of one state against the government of another state "are established international practice reflecting traditional international theory." L. Henkin, *Foreign Affairs and the Constitution* 262, cited in *Dames & Moore v. Regan*, 453 U.S. at 679. Where a sovereign espouses claims of its citizens, the claimant state neither represents its citizens individually nor simply asserts its citizens' claims. Rather, espousal is employed at the discretion of the claimant government, often in light of its effect upon foreign relations. Once a government decides to espouse claims resulting from the conduct of another state, it may settle claims in whatever manner it deems most effective, determining how the claim will be presented, what amount, if any, will be sought from the sovereign concerned, and whether the claims will be compromised or released. Kelso, *Espousal: Its Use in International Law*, 1 Ariz. J. of Internat'l and Comp. Law 233, 234 (1982).[47]

---

[47] As stated in Henkin, *Foreign Affairs and the Constitution* at 262-263, the United States "has sometimes disposed of the claims of its citizens without their consent, or even without consultation with them, usually without exclusive regard for their interests, as distinguished from those of the nation as a whole.

While no longer contesting the sovereignty of the Marshall Islands government, appellants contend (Br. 55-56) that their government's espousal violates the rule of continuous nationality. That doctrine provides that a sovereign may espouse a claim on behalf of its nationals against another state only where the claimant was a national of the espousing sovereign from the date the claim arose until the date the espousing sovereign presents it. I. Brownlie, *Principles of Public Interational Law*, 481-482 (3rd ed. 1979) (App. 1567-1568). The "essence" of the rule is the "desire to prevent the individual choosing a powerful protecting state by a shift of nationality." *Id.* at 482. As the Claims Court recognized, the rule prevents "abuses that otherwise might result by conversion of a strong nation into a claim agency on behalf of injured claimants, who availed themselves of liberal naturalization law for the purpose of procuring espousal of their claims." 13 Cl. Ct. at 685-686 (App. 19-20).

That rationale plainly has no application here. As discussed below, because the Republic of the Marshall Islands is the recognized successor to the Trust Territory Government, appellants have not changed their nationality within the meaning of the continuous nationality rule. Moreover, while appellants helped to establish a new government and thereby changed citizenship after their claims arose, they certainly did not do so for purposes of securing the protection of a powerful state to promote satisfaction of their claims through espousal.

Appellants were initially inhabitants of a territory under military administration, and then, pursuant to Article 11 of the Trusteeship Agreement (App. 277), citizens of the Trust Territory, over the period during which their claims arose. 13 Cl. Ct. at 677 (App. 11). Thus, appellants were not citizens of any particular State, but rather, as the United Nations Charter recognized as to trust territories, of a territory "whose peoples have not yet attained a full-measure of self-government." U.N. Charter, Art. 73 (App. 272). As the Claims Court recognized, the Republic of the Marshall Islands gradually assumed sovereign authority over the Marshall Islands from the early days of the Trusteeship until, through constitutional self-government, it became the legally recognized successor to the former Trust Territory Government (13 Cl. Ct. 677, App. 11):

> Since the 1960's, the RMI has been *statu nascendi*, a government evolving into statehood, through a series of administrative actions by the United States and the UNTC under the Trusteeship Agreement. * * * RMI's capacity for self-government, and its competency to enter a status of free association with the United States has been recognized by the UNTC, by both House of Congress, and by the President.[48]

With the entry into force of the Compact, citizens of the Trust Territory residing in the Marshall Islands became citizens of the Republic of the Marshall Islands.

The evolution of the political status achieved by the inhabitants of the Marshall Islands through their own process of self-determination does not prevent their new government from espousing their claims. Appellants neither relocated from their place of residence nor underwent naturalization in another state. The sovereign authority of their place of residence simply changed gradually from the Trust Territory Government to the Marshall Islands Government. As the successor government, whose sovereignty appellants do not challenge, the Republic of the Marshall Islands had full authority to espouse and settle claims. *Antolok II* (App. 1414-1415). See I. Brownlie at 482 (App. 1568).[49]

---

[48] Appellants incorrectly state (Br. 56) that the Claims Court "recognized" that "the traditional continuity of nationality doctrine alone is sufficient to bar the claim." The court stated that, while appellants' analysis of the continuity of nationality rule was a correct discussion of international law principles, "[t]he facts of these cases however, do not accord with the rationale for the doctrine." 13 Cl. Ct. at 686 (App. 20). Indeed, the court fully recognized the emerging nature of the Marshall Islands government, but expressly declined to resolve the espousal question in dismissing the complaints on other grounds. *Id.* at 677, 686 (App. 11, 20).

[49] Although the Marshall Islands Government had not attained its present status under the Compact at the time it negotiated the Section 177 Agreement, it ratified the Agreement after its conclusion. Under the international law doctrine of succession of states, the "successor" RMI Government thus ratified the obligation entered into by its "predecessor" government. See Zemanak, "State Succession After Decolonization," 116 *Recueil des Cours*, 181, 207 (1965) (App. 1575). As stated by Brownlie, this is in essence a "substitution or subrogation, putting the successor [government] in charge of claims belonging to the predecessor." I. Brownlie at 663 (App. 1569).

Appellants' reliance on the continuous nationality doctrine reflects another critical misconception. The doctrine operates in international law, not as a means by which claimants can challenge espousal by their own government, but as a defense available to a state presented with claims by another state. Thus, a state asked to satisfy a claim may properly refuse to recognize it on grounds that the claimant was not a national of the espousing state at all relevent times. Governments also frequently invoke the continuous nationality rule to deny requests from their own nationals to espouse claims against another state. 8 M. Whiteman, *Digest of International Law* 1233 (App. 1562).[50]

A state presented with claims by an espousing sovereign, in fact, has full discretion to recognize and settle such claims notwithstanding the fact that some or all of them do not satisfy the continuous nationality doctrine. It is well-recognized that, "[l]ike any other rule of international customary law, the rule on nationality of claims may be modified or abrogated by means of treaties." I.G. Schwarzenberger, *International Law* 592-595 (3d ed. 1957) (App. 1579-1580).[51]

States faced with a large group of espoused claims posing an impediment to their relations with another state have often agreed to dispose of them through lump sum settlement. See generally, 1 R. Lillich and B. Weston, *International Claims: Their Settlement by Lump Sum Agreements* (1975) (App. 1585). While most such

---

[50] The authority cited by appellants (Br. 56) noting that the United States generally follows the continuous nationality rule reflects these specific underlying policies. The United States recognizes the continuous nationality rule as a defense available to a government presented with claims because "a state does not have the right to ask another state to pay compensation to it" for losses by persons who were not nationals of the claiming state at the time of loss. Similarly, the doctrine allows a state "to decline" requests by its citizens to espouse. Appellants, however, can point to no United States policy which recognizes that *nationals* can assert the continuous nationality rule to invalidate a settlement acceptable to both states.

[51] Cf. D. O'Connell, 2 International Law 1120 (App. 1598), quoting Umpire Parker of the United States-German Mixed Claims Commission (2d ed. 1970) ("It is no doubt the general practice of nations not to espouse a private claim against another nation unless in point of origin it possesses the nationality of the claimant nation. * * *. But even this practice of nations may be changed by mutual agreement.").

agreements incorporate the continuous nationality rule, many agreements have varied or disregarded the rule to include within their scope claims which would not have satisfied the rule. Lump sum settlements have covered stateless persons, required that claimants have been nationals of the espousing state only when claims arose, or required claimants to have acquired nationality of the espousing state only at some point prior to settlement. *Id.* at 44-61 (App. 1586-1594).

Thus, the rule of continuous nationality does not invalidate the claims settlement. Through the Section 177 Agreement, the two governments agreed to settle all claims of present Marshallese citizens arising from the nuclear testing program, regardless of the nationality of the claimants when the claims arose. Appellants have cited no authority where a court or other tribunal has invoked the continuous nationality rule to invalidate a settlement acceptable to both sovereigns because of objections from nationals of the espousing government. The Section 177 Agreement consitutes full settlement of appellants' claims and extinguishes any further responsibility for such claims on the part of the United States.[52]

### B. Trust Territory residents are not United States citizens.

Appellants advance for the first time on appeal the argument that Marshall Islands residents were the equivalent of United States citizens for purposes of espousal. Indeed, the *Juda* plaintiffs took the position below that:

> The claimants here are not U.S. citizens; they are Trust Territory citizens. * * *. And the issue is not whether the U.S. Government can espouse; it is whether the Marshall Islands Government can espouse.[53]

---

[52] As this Court has noted, the espousal and settlement by the United States of an individual's claim against another state operates to extinguish that claim under United States law. *Shanghai Power Co. v. United States*, 4 Cl. Ct. at 249.

[53] See in *Juda*, Pltffs, Mem. in Opp. to Deft's Motion to Continue Suspension of Proceedings at 25, March 4, 1983. It should also be noted that *Nitol* plaintiffs contended in *Antolok II* that they were aliens, rather than United States citizens,

Appellants do concede on appeal that the "Marshallese were citizens of the Trust Territory" (Br. 58), but now argue that because the United States exercised extensive governing powers, appellants also were *de facto* United States citizens, whose claims cannot be espoused by any government (Br. 56-61). This Court has expressly held, however, that Trust Territory residents "are citizens of the Territory, not of the United States." *Porter v. United States*, 496 F.2d 583, 588 (Ct. Cl. 1974), cert. denied, 420 U.S. 1004 (1975).[54]

The United States fully agrees that it exercised substantial powers, in both civil administration and diplomatic protection, while administering the Trust Territory. The United Nations never intended, however, in establishing the international trusteeship system, that trusteeship residents would be regarded as citizens of the various administering authorities by virtue of delegated powers of government during the trusteeship period. Not a single aspect of either the U.N. Charter or the Trusteeship Agreement supports this drastic transformation of citizenship.

To the contrary, the Trusteeship Agreement designated the United States as "administering authority" (App. 277), not as sovereign, and Article 11 granted residents "the status of citizenship of the trust territory" (App. 280).[55] Both the U.N. Charter and Trusteeship Agreement directed the United States to promote self-government (App. 278, 273), a directive wholly in-

---

within the meaning of 28 U.S.C. 1350, which grants district court jurisdiction of certain tort actions "by an alien" (App. 1415).

[54] While appellants state (Br. 61) that the Claims Court held Marshallese residence to be "the equivalent of U.S. citizenship," in ruling that the Fifth Amendment extended to the Trust Territory, the court in that very analysis found, on the basis of *Porter*, that "citizens of the Trust Territory are not United States citizens." *Juda*, 6 Cl. Ct. at, 457. Moreover, as discussed in Part V below, the Claims Court's application of the Fifth Amendment to the United Nations Trust Territory is incorrect.

[55] Consistent with Article 11, the United States as administering authority promulgated Title 53 of the Trust Territory Code which provided for Trust Territory citizenship and immigration. Territory citizens travelled with Trust Territory passports, and were "non-immigrant aliens" under United States immigration laws.

consistent with a transfer of citizenship. Appellants' position, that the Marshall Islands government cannot conduct the fundamental act of espousal because its residents were not even its citizens, would thwart that objective.

Appellants' own citations (Br. 57-58) demonstrate the weakness of their position. Appellants contend (Br. 58) that their status is "no different" from a citizen of Hawaii who moves to the Marshall Islands, is naturalized, and whose prior taking claim is then espoused against the United States. Appellants, however, have neither relocated nor become Marshall Islands citizens by naturalization. They have resided throughout in a U.N. trust territory whose sovereign capacity has evolved gradually within the structure of the U.N. trusteeship system. 13 Cl. Ct. at 677 (App. 11). Recognition of the authority to espouse would not, as appellants identify their underlying concern (Br. 58), serve as a "pretext for intervention by [the Marshall Islands] in [the United States'] domestic affairs." It would recognize the sovereign capacity of the Marshall Islands government as the legally recognized successor to the Trust Territory Government.

Appellants also rely (Br. 59-60) on several cases holding that the Trust Territory was not a "foreign state" for purposes of applying particular United States statutes to the Territory. Those cases, however, do not involve espousal, were all decided prior to approval of the Compact recognizing the Marshall Islands' sovereign authority to espouse, and are irrelevant to determining citizenship in an evolving state under the doctrine of espousal.[56]

---

[56] Appellants also fail to acknowledge a substantial body of law holding that the Trust Territory *was* a foreign state for purposes of other United States statutes. See *Callas v. United States*, 253 F.2d 838, 840 (2d Cir.), cert. denied, 357 U.S. 936 (1958) (dismissing Federal Tort Claims Act action because "whatever administration is exercised by the United States Government is solely and wholly in the capacity of the trustee designated by the United Nations"); *McComish v. Commissioner of Internal Revenue*, 580 F.2d 1323, 1327 (9th Cir. 1978) (U.S. citizens can exclude from taxable income salaries earned in Trust Territory because it is a "foreign country"); *Aradanas v. Hogan*, 155 F. Supp. 546, 549 (D. Hawaii 1957) (Trust Territory is "foreign for immigration purposes"). As stated in *Gale v. Andrus*, 643 F.2d 826, 834 (D.C. Cir. 1980), holding the Freedom of Information Act inapplicable, to assume that United States laws apply "to a

**C. The United States breached no fiduciary relationship.**

Finally, appellants' contention (Br. 61) that the Marshall Islands' espousal results from "a breach of the fiduciary obligations of the United States" is equally without merit. Appellants assert (Br. 62-63) that such obligations arose primarily from the Trusteeship Agreement itself. The Claims Court, however, dismissed claims alleging a failure to discharge obligations under the Trusteeship Agreement, on the ground that 28 U.S.C. 1502 explicitly precludes Claims Court review "of any claim against the United States growing out of or dependent upon any treaty entered into with foreign nations." *Peter*, 6 Cl. Ct. at 778-779 (App. 57-58); *Nitol*, 7 Cl. Ct. at 416-417 (App. 72-73). Appellants failed to appeal either of those holdings, and cannot now make this argument, in a revised context, as a basis for contesting espousal.

As the Claims Court noted, the rationale for 28 U.S.C. 1502 "lies in the desire to avoid judicial interference with the conduct of foreign relations by the Executive Branch." 6 Cl. Ct. at 778, citing *Hughes Aircraft Co. v. United States*, 534 F.2d 889, 903 n.17 (Ct. Cl. 1976) (App. 57). This Court's predecessor has fully recognized that the Trusteeship Agreement was a treaty under that statute, *Kabua, Kabua v. United States*, 546 F.2d 381, 385 (Ct. Cl. 1976), cert. denied, 434 U.S. 821 (1977). Appellants thus may not challenge their government's espousal based on claimed fiduciary responsibilities arising from the Trusteeship Agreement.

Apart from the Trusteeship Agreement, appellants assert (Br. 62, 64) that the administering authority's fiduciary duties arise from "general international law" and, by analogy, from the status of Indian tribes. Those concepts, however, are inapplicable to the international trusteeship system established under the United Nations Charter. That system creates a unique political, rather than common law trust, relationship, whose rights and obligations are governed by the terms of the Trusteeship Agreement itself.

---

separate and distinct territorial government that is striving toward self-government under the stewardship of this nation" would be "to ignore entirely the purpose and limitations of the Trusteeship Agreement."

The prescribed role of the United States in the trusteeship system is that of "administering authority," not of common law trustee. Like other nations who assumed responsibility for administering trusteeships, the United States undertook the obligation to protect the right of the peoples to self-determination. That obligation is a political duty assumed by the express terms of the Agreement, not a trust duty as that term is understood in Anglo-American jurisprudence. Indeed, since the "corpus" of the trusteeship is the sovereignty of the people and their political right to self-determination:

> it would be unwise at this time to select a few desired characteristics of "trusts" and argue that they are plainly applicable in the realm of trusteeship agreements, when other common characteristics of "trusts" -- as for instance the holding of title -- may be objectionable if carried over to the international field.
> [1 Whiteman, *Digest of International Law* 843 (1963).]

Similarly, it is indisputable that "the relation of the Indians to the United States is marked by peculiar and cardinal distinctions which exist no where else * * * ." *The Cherokee Nation v. Georgia*, 5 Pet. 1, 16, 17 (1831), quoted in *Baker v. Carr*, 369 U.S. at 215. The United States and American Indian tribes enjoy a unique trust

---

[57] Appellants' contention, for example, that the Compact granted no significant foreign affairs powers is belied by the Marshall Islands government's express powers to conduct foreign affairs "relating to law of the sea," to conduct "commercial, diplomatic, consular, economic, trade, banking, postal, civil aviation, communications, and cultural relations," and to "enter into, in [its] own name and right, treaties and other international agreements with governments and regional and international organizations" (App. 858) (see also App. 318-319, demonstrating, contrary to Br. 66 n.57, that the Marshall Islands has full authority to enter into the Law of the Sea Convention). The fact, as appellants note (Br. 66 n.57), that the United States provides consular protection to Marshall Islands citizens in third countries is fully consistent with Marshall Islands sovereignty and international practice in general. See Article 8, Vienna Convention on Consular Relations, 21 UST 77, TIAS No. 6820, 596 UNTS 261. Similarly, the Compact provides the Marshall Islands with the same status as to highly migratory fish species provided to *all* other coastal nations, under the Magnuson Act, 16 U.S.C. 1801, and the Fisherman's Protective Act, 22 U.S.C. 1971. The Marshall Islands, in fact, on April 2, 1987, entered into a regional fisheries agreement with Australia, Fiji, Papua New Guinea, New Zealand and other Pacific nations.

relationship. *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759 (1985). The "special protection" afforded American Indians under American law simply has no application to United States obligations under the U.N. trusteeship system.

Finally, appellants, in arguing that a fiduciary duty existed, attempt to inject so-called "indicia of unfairness" purportedly demonstrating that such duty was violated (Br. 65-68). That discussion, however, is irrelevant and, in any case, incorrect.[57] Moreover, those assertions fail to account for the fact that the peoples of the Marshall Islands, in United Nations monitored elections, voted for the Compact and Section 177 Agreement. As the Trusteeship Council recognized, the Marshall Islanders "have freely exercised their right to self-determination * * * and have chosen free association with the United States" (App. 1221).

## V. CITIZEN OF THE MARSHALL ISLANDS MAY NOT INVOKE THE JUST COMPENSATION CLAUSE

The United States moved to dismiss the taking claims below on the ground that the Fifth Amendment's Just Compensation Clause does not extend to the citizens of the United Nations Trust Territory for the Marshall Islands. The Claims Court termed this argument "substantial," and, in fact, determined initially that the taking claims probably should be dismissed. 6 Cl. Ct. at 457-458 (App. 45-46). The court also found that the United States' governing authority under the Trusteeship stemmed from its constitutional treaty power, not the territorial clause, that the Trust Territory was not United States territory, and that Trust Territory citizens were not United States citizens, 6 Cl. Ct. at 456-457 (App. 44-45).

Despite these findings, the court went on to hold, without citing authority, that the Just Compensation Clause is "conveyed to the Marshall Islanders by the force of the Constitution and our system of government," and that "[a]ll of the restraints of the Bill of Rights are applicable to the United States wherever it has acted." *Id.* at 458 (App. 46). No court, however, has so globally extended constitutional rights, disregarding considerations of sovereignty, citizenship, and the relationship of the United States to the locality and claimants involved. Given the dispositive nature of the issues discussed in Parts I through IV, above, the Court

need not reach the question of whether the Just Compensation Clause extends to the citizens of the Marshall Islands. The Claims Court's holding, nevertheless, is impermissibly overbroad, and the Court may reverse that holding as an alternative basis for affirming dismissal of the taking claims below.

The court in *Antolok II*, in fact, held that "plaintiffs here, alien residents of the Marshall Islands, cannot reach out to the Fifth Amendment in support of their argument that the Compact is unconstitutional" (App. 1417). The court distinguished the Trust Territory relationship from cases involving alien's who are, or whose property is, in the United States, and concluded that "plaintiffs are citizens of the Marshall Islands and must look to the local law-making institutions for any injuries to plaintiffs' due process or property rights" (App. 1418).

As the Claims Court correctly held, the "political status of the Trust Territory of the Pacific Islands is unique in international law." 6 Cl. Ct. at 456 (App. 44). Territories under the United Nations trusteeship system "do not belong to the state under whose trusteeship they are placed," and the trustee "is not the sovereign of the Trust Territory." 6 Cl. Ct. at 457 (App. 45). As this Court stated, "the most persuasive view on this question is that sovereignty rests in the people of Micronesia and is held in trust for them by the administering power." *Porter v. United States*, 496 F.2d at 588 n.4.

Thus, domestic United States legal rights do not apply to the Trust Territory by force of sovereignty. Rather, United States responsibilities are defined by the terms of the Trusteeship Agreement, which is the governing legal framework of the political trust relationship. The United States agreed under that treaty to perform an international administrative role under terms approved by the United Nations. The United States entered the Agreement not as sovereign of the Trust Territory, but as a sovereign carrying out obligations arising from its designation as administering authority, in accordance with the U.N. Charter, and under authority specifically delegated by the Agreement. As stated in *Gale v. Andrus*, 643 F.2d 826, 830 (D.C. Cir. 1980), applying

United States legal protections, by their own force, to citizens of the Trust Territory "would place the United States by judicial decision in a governmental posture involving the Trust Territory that the United Nations never intended it to occupy."

As the Trusteeship Agreement itself demonstrates, the Just Compensation Clause has no role in this relationship absent express congressional extension. Article 3 grants the United States "full powers of administration, legislation, and jurisdiction * * * subject to the provisions of this agreement," and provides that the United States "may apply to the trust territory, subject to any modifications which the administering authority may consider desirable, such of the laws of the United States as it may deem appropriate to local conditions and requirements" (App. 278). Thus, the grant of governing authority is complete, while the application of domestic United States legal rights is discretionary.[58] Because the United States, as administering authority, is not sovereign in the Trust Territory, it must take affirmative steps to extend its governmental and legal system to the Trust Territory for the purposes of administering the trusteeship.[59]

Article 3's discretionary application of United States legal rights is limited by Article 7, which specifies those "fundamental freedoms" which the administering authority must guarantee. That provision stems from Article 76(c) of the United Nations Charter, which states as a "basic objective[]" of the trusteeship system the fostering of "fundamental freedoms for all" (App. 273). Article 7, in turn, provides (App. 279):

> In discharging its obligations under Article 76(c), of the Charter, the administering authority shall guarantee to the inhabitants of the trust territory freedom of conscience, and, subject only to the requirements of public order and security, freedom of speech, of the press, and

---

[58] This is confirmed by Article 12, which requires that the "administering authority shall enact such legislation as may be necessary to place the provisions of this agreement in effect in the trust territory" (App. 280).

[59] Article 13 of the Trusteeship Agreement also recognized that the United States had full authority to close areas within the Territory for national security reasons (App. 280).

of assembly; freedom of worship, and of religious teaching; and freedom of migration and movement.

These guaranteed freedoms do not make applicable the Fifth Amendment's Just Compensation Clause.

The United States exercised its extensive governing powers in the Trust Territory, to ultimately foster self-government, in a manner fully consistent with its non-sovereign political relationship to the Territory. Congress approved the Trusteeship Agreement by joint resolution as an international treaty subject to international law. See, McDougal and Lans, Treaties and Congressional-Executive and Presidential Agreements: Interchangeable Instruments of National Policy, 54 Yale L.J. (1945) 181, 203-206. And over the next three decades, Congress passed dozens of laws applicable to the Territory, pertaining to appropriations, federal property transfers, audits of federal expenditures and other adminstrative matters (see 48 U.S.C. 1682-1687), as well as addressing the consequences of the nuclear testing program (see discussion *infra* at 33 n.23 and App. 344B).[60] The Congress, in Section 171 of the Compact Act, subsequently repealed those laws, except as specified in the Compact, stating that "the application of the laws of the United States to the Trust Territory of the Pacific Islands by virtue of the Trusteeship Agreement ceases * * * " (App. 867).

The Claims Court recognized that the Trust Territory was administered under the President's treaty power under Article II, section 2, clause 2 of the Constitution, rather than the Article IV, section 3, territorial clause. 6 Cl.Ct. at 456-457 (App. 44-45). Thus, the court correctly distinguished the Trust Territory from the so-called Insular Cases, stemming from the United States' ac-

[60] The Claims Court appears to rely on 48 U.S.C. 1681 as demonstrating the applicability of constitutional protections to the Trust Territory. 6 Cl. Ct. at 458 (App. 46). That statute, however, which Congress enacted in 1954, stated that: "Until Congress shall further provide for the government of the Trust Territory for the Pacific Islands, all executive, legislative, and judicial authority necessary for the civil adminstration of the Trust Territory shall continue to be vested in such person * * * as the President of the United States may direct and authorize." Thus, the statute was enabling legislation for continued Executive adminstration of the Territory, and fully recognized that Congress could pass its own, discretionary, legislation for such purposes. See discussion in *Porter*, 496 F.2d at 588.

quisition of territories by conquest following the Spanish-American War in 1898, and which considered the applicability of constitutional protections to United States territories administered under the territorial clause.[61] The Supreme Court in those cases held that the Constitution applied by its own force to "incorporated territories," intended for statehood from the time of acquisition, while only "fundamental constitutional rights" apply automatically to "unincorporated territories," not intended for statehood. *Balzac v. Puerto Rico*, 258 U.S. 298, 314 (1922); *Downes v. Bidwell*, 182 U.S. 244, 287 (1901); *Dorr v. United States*, 195 U.S. 138, 148-149 (1904).

The Claims Court held that the "Trust Territory is not a territory of the United States, either incorporated or unincorporated," and the "unique relationship" recognized by this Court in *Porter*, between the Trust Territory and United States, distinguishes it from the Insular Cases. 6 Cl. Ct. at 457 (App. 45). Despite this ruling, and without reference to authority, the court found that the unique Trust Territory relationship weighed in favor of, not against, extending constitutional protections by their own force to the Territory. Moreover, the court applied the very Insular Case analysis it had just rejected, holding that "[t]here is no suggestion that the protections of the just compensation clause in the Fifth Amendment are any less *'fundamental'* than the other protections enumerated in the Bill of Rights." *Id.* at 458 (emphasis supplied) (App. 46).

The court's resulting overbroad ruling, which would extend constitutional protections abroad under virtually any circumstances, is incorrect, and fails to account for the unique trusteeship

---

61 Article IV, section 3, clause 2, grants Congress power "to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States."

62 The Ninth Circuit found in *Commonwealth of the Northern Mariana Islands v. Atalig*, 723 F.2d 682, 691 n.28 (9th Cir.), cert. denied, 476 U.S. 1244 (1984), that even in the case of the Northern Mariana Islands, which chose commonwealth status under United States sovereignty, "there is merit to the argument that the NMI is different from areas previously treated as unincorporated territories," and that the Constitution may apply with even less force than to unincorporated territories.

relationship the court itself acknowledged.[62] Courts have recognized that there are specific situations in which nonresident aliens may invoke United States constitutional protections. See *Cardenas v. Smith*, 733 F.2d 909, 915-917 (D.C. Cir. 1984); *In re Aircrash in Bali, Indonesia on April 22, 1974*, 684 F.2d 1301, 1308 n.6 (9th Cir. 1982). But in each case, the courts have carefully examined the specific relationship of the claimants to the United States, and have carefully limited the scope of their rulings to those circumstances. *Cardenas v. Smith*, 733 F.2d at 916-917.[63] The United States is aware of no case holding that constitutional rights extend to nonresident aliens whenever the United States acts abroad.

The Claims Court itself correctly distinguished holdings by this Court relating to constitutional protections afforded foreign citizens. 6 Cl. Ct. at 455-456 (App. 43-44). The Court in *Porter*, 496 F.2d at 591-592, and *Fleming v. United States*, 352 F.2d 533, 537 (Ct.Cl. 1965), did not reach the question of whether the Fifth Amendment applies to the Trust Territory. Plaintiff in *Seery v. United States*, 127 F. Supp. 601, 602 (Ct.Cl. 1955) was a United States citizen, not a foreign citizen. And while the Court in *Turney v. United States*, 115 F.Supp. 457, 464 (Ct.Cl. 1953), rejected the contention that the Fifth Amendment is inapplicable in foreign countries, that decision, as the Claims Court found (App. 44), was based on precedent applying to property of United States citizens which was located abroad, or foreign-owned property in the United States (*ibid.*), and also involved the government of the Philippines, which the Claims Court found differed "in significant respects from the relationship of the United States to the TTG." 6 Cl. Ct. at 456 (App. 44).

This Court need not define the parameters of the Fifth Amendment's applicability to actions by the United States abroad.

---

[63] In addition, the court in *In re Aircrash in Bali, Indonesia*, held that the Fifth Amendment could apply in that case, which raised claims by residents and nonresident aliens, simply because the Fifth Amendment "surely does not permit in a case such as this one, the application of different rules of decision to residents and nonresidents suing on the same cause of action in the same court." 684 F.2d at 1308 n.6. That holding, made in a footnote with no analysis or authority, is incorrect.

It is clear that the Claims Court's broad holding in this respect is without precedent, and incorrect. The Just Compensation Clause does not extend to claimants who were citizens of the United Nations Trust Territory, and dismissal of the claims below may be affirmed on that basis.

## CONCLUSION

For the foregoing reasons, the final judgments of the Claims Court entered on November 12, 1987, should be affirmed.

Respectfully submitted,

ROGER J. MARZULLA
*Assistant Attorney General*

JACQUES B. GELIN
GARY B. RANDALL
JOHN T. STAHR
*Attorneys, Department of Justice*
*Land & Natural Resources Division*
*Washington, D.C. 20530*
*(202) 633-2956*

OF COUNSEL:

HOWARD L. HILLS
*United States Department of State*
*Washington, D.C.*

JUNE 1988

90-1-23-2455
90-1-23-2485
90-1-23-2542

## CERTIFICATE OF SERVICE

I certify that copies of the foregoing Consolidated Brief of Appellee The United States have today been served upon counsel, by placing same in the United States mail, postage prepaid, properly addressed, this 24th day of June, 1988 to:

Jonathan M. Weisgall, Chartered
1300 - 19th Street, N.W.
Suite 407
Washington, D. C. 20036

Lloyd N. Cutler
David R. Anderson
Andrew B. Weissman
Wilmer, Cutler & Pickering
2445 M Street, N.W.
Washington, D. C. 20037-1420

E. Cooper Brown
Marshall Islands Atomic Testing
Litigation Project
6935 Laurel Avenue
Takoma Park, Maryland 20912

JOHN T. STAHR
Attorney, Department of Justice
Washington, D. C. 20530
(202) 633-2956