# In the United States Court of Federal Claims

No. 06-289L
(Filed August 2, 2007)

| | |
|---|---|
| **ISMAEL JOHN, *et al.*, for Themselves and for a Class Consisting of the People of Enewetak,**<br><br>Plaintiffs,<br><br>v.<br><br>**THE UNITED STATES,**<br><br>Defendant. | Takings; contracts; 28 U.S.C. § 2501 (2000); subject matter jurisdiction; statute of limitations; equitable tolling; equitable estoppel; Compact of Free Association Act, Pub. L. No. 99-239, 99 Stat. 1770 (1986); res judicata; withdrawal of jurisdiction; doctrine of constitutional avoidance; political question. |

Davor Pevec, Honolulu, HI, for plaintiffs. John Van Dyke, Law Offices, of counsel.

Bruce K. Trauben, Washington, DC, with whom were Acting Assistant Attorney General Ronald J. Tenpas, Environment & Natural Resources, and Peter D. Keisler, Assistant Attorney General, Civil Division, for defendant. Kathryn A. Bleecker, Assistant Director, Civil Division, of counsel.

## OPINION AND ORDER

**MILLER**, Judge.

This case, a resurrection of proceedings before the court in the late 1980s, is before the court after argument on defendant's dispositive motion. Following the filing of plaintiffs' amended complaint on August 10, 2006, defendant moved to dismiss pursuant to RCFC 12(b)(1) and 12(b)(6). The instant case, along with its companion, People of Bikini v. United States, No. 06-288C (Fed. Cl. filed Apr. 11, 2006), 1/ puts before the court the nature of the legal responsibility undertaken by the United States for the post-World War II

---

1/ The opinion in the companion case also is issued this date.

testing of thermonuclear bombs on the island homelands of plaintiffs. This program obliterated or compromised the land and caused the relocation of the islands' inhabitants, who have sought redress in political, judicial, and special-purpose fora over the last sixty years. Argument has been held, and two rounds of supplemental briefing have been completed. 2/

## BACKGROUND

Plaintiffs include seventeen persons with land rights on Enewetak who were members of the Enewetak community during their initial evacuation by the United States in December 1947. Pursuant to RCFC 23, plaintiffs bring this suit in the United States Claims Court, now the United States Court of Federal Claims, on their own behalf and on behalf of a class that

> consists of all living persons who were members of the Enewetak community at the time of the 1947 evacuation of Enewetak Atoll, all living descendants of those members, and all other persons who by traditional law and custom are recognized as members of the Enewetak people. . . . There are currently more than 2000 members of the Enewetak people.

Am. Compl. filed Aug. 10, 2006, ¶ 14. Plaintiffs include a Senator for the people of Enewetak; the Mayor of the people of Enewetak; members of the Enewetak/Ujelang Council; and the Iroji, or chiefs, of the ri-Enewetak; and the ri-Enjebi.

Plaintiffs plead six counts against the United States for occupation and use of portions of Enewetak Atoll. Plaintiffs allege: (1) a temporary taking of Enewetak Atoll by the United States between December 1947 and October 1980 and of select portions within Enewetak from October 1980 through the next twenty to fifty years ("Count I"); (2) breach of an implied-in-fact contract formed by the conduct of the United States, which constituted "a commitment to care for [plaintiffs'] physical, economic, educational, cultural, and other needs until it returned their atoll in substantially the condition in which it had received it or paid compensation for any significant changes," Am. Compl. ¶ 192 ("Count II"); (3) a taking of plaintiffs' taking claim for the use and occupation of Enewetak Atoll by the United States in failing to fund the Nuclear Claims Tribunal so as to deny just compensation ("Count III"); (4) an unlawful taking of plaintiffs' property interest manifested in their implied-in-fact contract claim for failure to provide for adequate funding of the Nuclear Claims Tribunal ("Count IV"); (5) a taking of Enewetak Atoll through the formation of the Compact of Free

---

2/ By order entered on March 28, 2007, this case and Bikini were consolidated for purposes of argument only.

Association in 1986 ("Count V"); and (6) a breach of implied-in-fact contract fiduciary duties through formation of the Compact of Free Association ("Count VI").

## FACTS

Judge Kenneth R. Harkins presided over these cases during the 1980s. He labored on them conscientiously and painstakingly for years. The undersigned, a new and young judge at the time, witnessed his dedicated efforts. The United States Court of Appeals for the Federal Circuit acknowledged the thoroughness of Judge Harkins's opinions. Judge Harkins fully addressed the factual backdrop of this case; the Federal Circuit affirmed his decision, see People of Enewetak v. United States, 864 F.2d 134, 135 (Fed. Cir. 1988), aff'g Peter v. United States, 13 Cl. Ct. 691 (1987) (also stating facts relevant to plaintiffs' complaint in Tomaki Juda *et al.* v. United States, No 172-81L (Cl. Ct. filed Mar. 16, 1981)); and the parties neither have adduced new facts nor offered insight into the facts of record over the last nineteen years that would change them. This court adopts and restates, with minor modifications, the facts as found by Judge Harkins. See Peter v. United States, 6 Cl. Ct. 768, 770-73 (1984) (Enewetak Atoll; granting and denying, in part, motion to dismiss) ("Peter I"); Juda v. United States, 6 Cl. Ct. 441, 446-69 (1984) (Bikini Atoll; denying motion to dismiss) ("Juda I"). The facts subsequent to 1987 are undisputed, except where noted otherwise.

### I. Nuclear tests in the Marshall Islands

#### 1. History of the Marshall Islands

During the period June 30, 1946, to August 18, 1958, the United States conducted a series of nuclear tests in the Marshall Islands that included detonation of twenty-three atomic and hydrogen bombs at Bikini Atoll and forty-three atomic and hydrogen bombs at Enewetak Atoll. These tests necessitated removal of the inhabitants and their relocation to other islands and resulted in severe physical destruction at the atolls directly involved, as well as radioactive contamination at other parts of the Marshall island chain. The effects of the testing program included: annihilation of some islands and vaporization of portions of others; permanent resettlement with substantial relocation hardships to some inhabitants; exposure to high levels of radiation by some inhabitants; and widespread contamination from radioactivity that renders some islands unuseable by man for indefinite future periods.

The Marshall Islands are a part of Micronesia, formerly a United Nations Trust Territory administered by the United States. The component parts of the Trust Territory of the Pacific Islands (the "Trust Territory") were the Marshall, Caroline, and Mariana island chains. The Trust Territory includes more than 2,000 islands and atolls dispersed throughout the Pacific Ocean, within an area approximately the size of the continental United States.

Until World War II, Micronesia was administered by Japan under a League of Nations Mandate. The islands came under the United States' control by military occupation in 1944. The United Nations and its Trusteeship Council were given jurisdiction over non-self-governing territories, and trusteeship agreements were executed between the United Nations and those signatory powers in de facto possession of such territories.

The United States was designated "administering authority" over the Trust Territory pursuant to an agreement ratified by the United Nations Security Council on April 2, 1947, and approved by Congressional joint resolution on July 18, 1947. 61 Stat. 3301, T.I.A.S. No. 1665. In 1947 military government was terminated, and administration of the Trust Territory was delegated to the Secretary of the Navy. Exec. Order No. 9,875, 3 C.F.R. 658 (1943-48 comp.). In 1951 some administrative responsibilities were transferred to the Interior Department. Exec. Order No. 10,265, 3 C.F.R. 766 (1949-53 comp.). By the Act of June 30, 1954, as amended (48 U.S.C. § 1681 (1982)), Congress directed:

> (a) Until Congress shall further provide for the government of the Trust Territory of the Pacific Islands, all executive, legislative, and judicial authority necessary for the civil administration of the Trust Territory shall continue to be vested in such person or persons and shall be exercised in such manner and through such agency or agencies as the President of the United States may direct or authorize.

Prior to 1962 responsibility for administration of the Trust Territory was divided between the Interior and Navy Departments. Effective July 1, 1962, the authority for civil administration of the Trust Territory was redelegated to the Secretary of the Interior, with the direction to carry out the obligations assumed by the United States as the administering authority "under the terms of the Trusteeship Agreement and the Charter of the United Nations." Exec. Order No. 11,021, 3 C.F.R. 600 (1959-63 comp.). See generally Porter v. United States, 496 F.2d 583, 587-90 (Ct. Cl. 1974), cert. denied, 420 U.S. 1004 (1975). Pursuant to this authority, the Secretary of the Interior established a Trust Territory Government (the "TTG"), which included executive, legislative, and judicial branches, with a High Commissioner as chief executive. Sec. Order No. 2,918, 34 Fed. Reg. 157 (1968).

In 1969 the United States began negotiations with the inhabitants of the Trust Territory directed to establishment of a framework for transition to constitutional self-government and future political relationships. During the negotiations the Trust Territory became divided into four governmental entities: Northern Mariana Islands, Republic of Palau, Federated States of Micronesia, and Republic of the Marshall Islands.

2. Occupation of Enewetak Atoll

Enewetak Atoll is composed of approximately forty islands, which have a combined land area of 2.75 square miles and enclose a lagoon of approximately 388 square miles. The largest islands are Enewetak Island, with a land area of 321.86 acres, and Engebi Island, with a land area of 290.58 acres.

The Enewetak people traditionally have been divided into two separate subcommunities, one on Engebi Island and one on Enewetak Island. Members of the two communities historically have intermarried and cooperated in certain economic activities. They now elect a common council. The Enewetak people are governed by the two chiefs (Iroij) of the subcommunities; a Magistrate; an elected Council of twelve members; a Scribe; and a Senator, who represents the Enewetak people in the legislature of the Marshall Islands government. The people of Enewetak historically were economically self-sufficient on the basis of lagoon fishing, nonintensive agriculture, and various gathering activities. Beginning in the early 20th century, copra was produced as an export crop.

During February 1944 American troops captured Enewetak Atoll from the Japanese, which at that time had several thousand personnel on Engebi. On February 24, 1944, the military governor posted Proclamation No. 1. This proclamation notified the civilian inhabitants that existing personal and property rights would be respected and existing laws and customs would remain in force and effect, except "to the extent that it is necessary for me in the exercise of my powers and duties to change them."

Later in February 1944, the Enewetak people were relocated to a camp on Aomon Island, an island in the atoll. Eventually the total civilian population of the atoll was gathered in this camp. The Army unit left on July 4, 1944; thereafter, the Navy, until June 1946, provided all supplies of food, clothing and housing for the Enewetak people. During the period February 1944 to late 1945, the Enewetak people were permitted to reside only on Aomon Island and on the adjacent Bijire Island.

On June 14, 1946, in preparation for the commencement of Operation CROSSROADS, at Bikini Atoll, the entire population of Enewetak Atoll was transported by the Navy to Kwajalein Atoll, where they were housed in temporary facilities and supplied by the Navy. On July 25, 1946, Enewetak Atoll was declared safe; on July 30, 1946, the Enewetak people were returned to Aomon and Bijire Islands at Enewetak Atoll.

During the period of residence at Kwajalein Atoll, United States officials caused the Enewetak people to believe that their removal from Enewetak would be temporary; that they would be able to return to Enewetak at the conclusion of the Bikini nuclear tests; that

temporary relocation was necessary to protect them against harm from the tests on Bikini Atoll; and that, throughout the relocation, their needs for food, shelter, and other necessities would be provided by the United States.

On December 1, 1947, Enewetak Atoll was chosen as the site for the nuclear tests in Operation SANDSTONE, and the United States Governor of the Marshall Islands notified the Enewetak people that they must leave the atoll. During December 1947 the entire population, with personal belongings, was boarded on a United States Navy LST and transported to Ujelang Atoll, where they arrived on December 21, 1947. During the period of their relocation on Ujelang Atoll, United States officials caused the Enewetak people to believe that their removal would be temporary; that they would be able to return to Enewetak at the conclusion of the United States use of Enewetak; that relocation was necessary to protect them against harm resulting from United States operations; and that, throughout the relocation, their needs for food, shelter and other necessities would be provided by the United States.

Ujelang Atoll is the westernmost and most isolated geographically of the inhabited atolls and islands that comprise the Marshall Islands. It lies 124 miles southwest of Enewetak Atoll and 617 miles west of Majuro, the administrative center and the major commercial port for the Marshall Islands. Ujelang Atoll has 0.67 square miles of dry land area and 25.47 square miles of lagoon and is rocky and relatively unproductive for agriculture.

Ujelang resources were inadequate to provide the Enewetak people with a regular supply of food and other material necessities. Infrequent and irregular ship visits resulted in severe shortages of rice, flour, and materials needed to repair buildings and boats. By 1952 most of the Enewetak people's sailing canoes were rendered unuseable as a result of severe shortage of sailcloth, paint, fishing net material, and hooks. In the mid-1960s, the island's rat population increased greatly and destroyed stored copra and supplies of rice and flour. By 1967 food was so short that the people on Ujelang had only enough for one meal each day.

On October 20, 1967, a TTG ship arrived to find the people on Ujelang with no copra to sell and no money to buy needed food and supplies. Almost all of the nearly 300 people on the atoll boarded the ship and demanded transport to Majuro to protest to the government that they were starving. A Trust Territory official, after seven hours, radioed for food and agreed to stay on Ujelang until the supply ship returned. The supply ship returned with food on November 3, 1967.

In November 1968 the people on Ujelang were totally out of rice, flour, sugar, and other imported goods. In June 1972 a typhoon destroyed the breadfruit crop, and on August 30, 1972, a supply ship found that the Enewetak people had been out of rice, flour, sugar, and canned meat for over two weeks.

The nuclear program on Enewetak Atoll extended from April 1948 to August 1958 and included forty-three atomic and hydrogen bomb tests. The program included Operation SANDSTONE (April and May 1948), Operation GREENHOUSE (April and May 1951), Operation IVY (November 1952), Operation REDWING (May through July 1956), and Operation HARDTACK (May through August 1958). The nuclear tests at Enewetak Atoll included detonations in the air, on towers, on the surface of islands and reefs, on barges, and underwater. Two plutonium tests on the island of Runit, as a result of failure to fully detonate, sprayed chunks of plutonium across the island. On August 22, 1958, the President of the United States announced a suspension of further atmospheric testing of nuclear weapons to take effect on October 31, 1958.

The Nuclear Testing Program resulted in serious damage to Enewetak Atoll. Five islands were completely or partially vaporized. Islands on the northern half of the atoll, including Engebi and Runit, were contaminated heavily with radioactivity; radioactive wreckage littered many of the islands. The lagoon was damaged seriously. Vegetation was completely stripped from many islands, and almost all plants of agricultural and economic value on the atoll were totally destroyed.

On November 5, 1956, the two hereditary chiefs, and a majority of the Enewetak people who possessed rights in the atoll, were assembled on Ujelang to discuss a settlement of past and future use of the atoll. On November 19, 1956, the High Commissioner of the TTG as one party and the two hereditary chiefs – twenty-four individuals of Enewetak and twenty-four individuals of Engebi – as the other parties executed a document captioned: "Agreement in Principle Regarding the Use of Enewetak Atoll." This document provided that the TTG would grant and convey to the Enewetak people full use rights in Ujelang atoll to continue "until such time as it may be possible for the people to return to Enewetak." The TTG was given full use rights to Enewetak Atoll "until such time as it will not be necessary to occupy and use Enewetak Atoll in the interest of the maintenance of international peace and security." The sum of $175,000 was to be conveyed to persons who possess rights in Enewetak, to be administered as follows: $25,000 paid at the time of signing to be divided by the hereditary chiefs and the remaining $150,000 to be placed in a trust fund administered by the High Commissioner. Section 5 of the document contained an assertion that the chiefs and Alabs (family heads) who signed had the "full and complete" right to represent the Enewetak people and included the following provisions with respect to claims for use of the atoll:

> Accordingly, the Chiefs and Alabs signing this agreement agree that any future claims based on the use of Enewetak by the Governments of the United States or the Trust Territory or on the moving of the people from Enewetak Atoll to Ujelang Atoll shall be against them and not against the Government.

This agreement was made voluntarily and without any compulsion or coercion whatsoever.

On June 20, 1957, a document captioned "Use and Occupancy Agreement for Land in the Trust Territory of the Pacific Islands under the Administrative Responsibility of the Department of the Interior" was recorded in Record Book No. 1 of the Marshall Islands District. This document recites that it was made as of the 2nd day of March 1944 by and between the TTG, as grantor, and the United States of America; that the TTG was "owner of exclusive use and occupancy rights for an indefinite period of time" of the Enewetak Atoll; and that the United States "desires to acquire the use and occupancy of the land" for an indefinite period of time. In the agreement the TTG conveyed to the United States the exclusive right to use and occupy Enewetak Atoll for an indefinite period of time and agreed to save the United States harmless from any and all claims, arising directly or indirectly, from such use or occupancy, except for claims arising from negligence by the United States. The section on conditions of use provided: (1) that use by the United States shall be consistent with the provisions and purposes of the Trusteeship Agreement; (2) that on or about June 30, 1961, and on a similar date each five-year period thereafter, the United States and the TTG would "jointly review and determine the need for continuing the use and occupancy," with final decision resting in the President of the United States; and (3) that, if a decision was made that a need for continued use and occupancy does not exist, the grant would terminate and "all interest in said land shall revert to" the TTG.

During the 1960s, after the prohibition of atmospheric and underwater testing, Enewetak Atoll's lagoon was used as a target for test missiles fired from Vandenberg Air Force Base in California.

In September 1971 the United States Defense Nuclear Agency and the Air Force developed plans for an operation on Enewetak Atoll to be known as the Pacific Cratering Experiments ("PACE"). The program was designed to test cratering effects of nuclear blasts by simulating such blasts with high explosives. Between September 1971 and October 1973, the United States' preparations for PACE included stripping vegetation and topsoils from one of the islands. In October 1972 the United States District Court for the District of Hawaii granted a preliminary injunction to the people of Enewetak to prohibit further work on PACE until adequate environmental impact studies were conducted. People of Enewetak v. Laird,

353 F. Supp. 811 (D. Haw. 1973). On June 8, 1973, the Air Force terminated plans for the PACE program on Enewetak.

On April 18, 1972, the United States Special Representative to the Micronesian Political Status Talks announced that the United States would return Enewetak Atoll to the people of Enewetak by the end of 1973. From 1972 until 1977, various United States government agencies engaged in studies and planning for radiological cleanup and rehabilitation programs.

On August 31, 1976, representatives of the United States executed a document captioned "Agreement Terminating Rights, Title, and Interest of the United States to Enewetak Atoll." After reciting that the United States wishes to terminate its use and occupancy in Enewetak Atoll, this document provided that all right, title, and interest of the United States in or to Enewetak Atoll "existing at noon on the day prior to the date of signature by the last party to sign this agreement are hereby terminated." The Acting High Commissioner of the TTG, the last party to sign, executed the document on September 16, 1976.

On September 16, 1976, the TTG Acting High Commissioner executed a document captioned "Release and Return of Use and Occupancy Rights to Enewetak Atoll." This document provided that the TTG does hereby "quitclaim, release and restore to all persons who hold traditional rights to the lands of Enewetak Atoll all right, title, interests and rights of use and occupancy in and to Enewetak Atoll."

From May 1977 through April 1980, the United States undertook cleanup efforts. In April 1980 the Enewetak people as a whole returned to Enewetak Atoll for permanent residence.

The Enewetak people have been able to resettle only the southern portion of the atoll. Access to several of the northern islands, including Engebi, is restricted by order of the Department of the Interior on the ground that remaining radioactivity renders these islands dangerous for habitation, agriculture, and many other uses for a period estimated to be approximately thirty years. Runit Island at present contains more than 110,000 cubic yards of plutonium-contaminated soil and debris that during the cleanup operation had been collected from throughout the atoll. This material had been mixed with cement and water to form a slurry, placed in a bomb crater on Runit, and covered by a concrete dome eighteen inches thick and 370 feet in diameter. Runit is expected to be extremely radioactive for at least the next 240,000 years.

II. Peter I, Juda I, and Nitol I

On September 15, 1982, plaintiffs first filed a complaint with the United States Claims Court, now the United States Court of Federal Claims. Johannes Peter *et al.* v. United States, No. 461-82L (Cl. Ct. filed Sept. 15, 1982). The complaint named "17 individual plaintiffs who claim on their own behalf and on behalf of a class composed of all persons recognized as the Enewetak people." Peter v. United States, 6 Cl. Ct. 768, 769 (1984) (granting and denying, in part, motion to dismiss) ("Peter I"). Plaintiffs alleged four causes of action: "(1) unlawful taking of Enewetak Atoll [for the period from December 1947 to April 1980]; (2) breach of an implied-in-fact contract that imposed upon the United States responsibilities toward the Enewetak people in the nature of a fiduciary; (3) failure to comply with the terms of the Trusteeship Agreement; and (4) breach of agreements between the United States and the Trust Territory Government." Peter v. United States, 13 Cl. Ct. 691, 691-92 (1987) ("Peter II") (dismissing complaint based on withdrawal of jurisdiction). On November 30, 1984, Judge Harkins granted defendant's motion to dismiss regarding Counts I, III, and IV and denied the motion to dismiss regarding plaintiffs' implied-in-fact contract claim. Peter I at 781.

Peter I concluded that, "[f]or purposes of application of the statute of limitations, in a claim for just compensation for a taking, August 22, 1958, must be the 'taking date' of Enewetak Atoll, in accordance with the doctrine announced in [United States v. Dickinson, 331 U.S. 745 (1947)]." Id. at 775. Based on this determination, the court dismissed plaintiffs' first cause of action for failure to comply with the six-year statute of limitations in the Tucker Act, 28 U.S.C. § 2501 (1986). Peter I dismissed the third count based on 28 U.S.C. § 1502 (1986), holding that "[t]he Trusteeship Agreement is a treaty, and it has been made with a recognized unit of foreign nations. [The Peter p]laintiffs' claim in count III clearly grows out of and is dependent upon that treaty. . . . Such relationship bars jurisdiction in this court." Id. at 779 (citing Hughes Aircraft Co. v. United States, 534 F.2d 889, 903 (Ct. Cl. 1976); S.N.T. Fratelli Gondrand v. United States, 166 Ct. Cl. 473, 478 (1964)). Regarding plaintiffs' implied-in-fact contract claim, the court held that "plaintiffs have alleged facts which for purposes of a motion to dismiss must be accepted as true. The facts, as alleged, establish conduct that is adequate to establish the requisite elements of a contract implied-in-fact." Peter I at 779; see also id. at 692 ("It was determined that plaintiffs were not barred by the statute of limitations from an offer of proof as to the origin, nature, and content of the alleged implied-in-fact contract, and that count II stated a breach of contract claim within the Tucker Act jurisdiction of this court.") Finally, the court held that count IV of plaintiffs' claims, which "alleges plaintiffs are third party beneficiaries to the overall transaction involved in the September 16, 1976, agreement between the TTG and the United States," was subject to dismissal because "the September 16, 1976, transactions did not confer rights as third party beneficiaries to plaintiffs." Peter I at 780, 781.

In conjunction with the filing of the complaint in Peter, thirteen other related cases were filed with the Claims Court regarding the effects of the Nuclear Testing Program in the Marshall Islands. Judge Harkins consolidated eleven complaints filed on September 9, 1981, and a twelfth complaint filed on July 26, 1982. See Nitol v. United States, 7 Cl. Ct. 405, 407 (1987) ("Nitol I"). The court explained:

> The claims of the inhabitants of the Bikini Atoll and Enewetak Atoll, sites used for atomic testing, factually are significantly different from each other, and both are distinguishable factually from the claims in the Nitol series of cases. For these reasons, the three types of claims have been handled separately. Only the Nitol series of cases have been consolidated.

Juda I at 446 (denying motion to dismiss).

The Nitol plaintiffs included "3,318 inhabitants of atolls and islands that were not used as nuclear test sites. These claims are based primarily on the effects of radiological fallout and contamination that resulted from the test program . . . ." Id. The Nitol plaintiffs alleged three causes of action:

> (I) an unlawful taking of plant life, fish life, fishing rights, the land, the lagoon, the waters of the lagoon, and surrounding ocean of the atoll or island; (II) breach of an implied-in-fact contract between the people of the Marshall Islands and the United States that obligated the United States as a fiduciary to protect the health, well being and economic condition of the Marshallese people; and (III) breach of fiduciary duties arising out of the Trusteeship Agreement, which is characterized as a bilateral contract between the United States and United Nations.

Nitol I at 412. Judge Harkins granted defendant's motion to dismiss as to counts II and III and denied defendant's motion as to count I. Id. at 417.

On March 16, 1981, plaintiffs in the related case of Juda filed their complaint, Tomaki Juda *et al.* v. United States, No. 172-81L (Cl. Ct. filed Mar. 16, 1981), "includ[ing] as plaintiffs the 1,004 members of the Bikini community as of May 1, 1981, and is concerned with the claims of the inhabitants of Bikini atoll." Juda I at 446. The plaintiffs in Juda alleged three causes of action:

> (1) an unlawful taking of Bikini Atoll from March 7, 1946, to January 24, 1979; (2) an unlawful taking that began on January 24, 1979, and would continue for the next 20 to 60 years; and (3) breaches of fiduciary

> responsibilities imposed in 1946, which do not depend upon the Trusteeship Agreement, but are claimed to arise from a contract implied-in-fact that obligates defendant to protect the health, well being and economic condition of the Bikini people.

Id. at 449.

Judge Harkins denied defendant's motion to dismiss in Juda I on October 5, 1984. Id. at 458. The court held, regarding counts 2 and 3, that "[s]ome of the claims clearly involve transactions that occurred after March 16, 1975. . . . Plaintiffs are not barred by limitations from an offer of proof as to the origin, nature, and content of the alleged implied-in-fact contract and fiduciary relationship, if any, with respect to these claims." Id. at 451. Regarding count 1, the court found that, "Congress has acted with respect to these plaintiffs and their rights." Id. at 458. The court concluded that "[a]ll of the restraints of the Bill of Rights are applicable to the United States wherever it has acted" and denied defendant's motion to dismiss for failure to state a claim. Id.

Juda "include[d] as plaintiffs the 1,004 members of the Bikini community as of May 1, 1981, and is concerned with the claims of the inhabitants of Bikini atoll." Juda I at 446. The plaintiffs in Juda alleged three causes of action:

> (1) an unlawful taking of Bikini Atoll from March 7, 1946, to January 24, 1979; (2) an unlawful taking that began on January 24, 1979, and would continue for the next 20 to 60 years; and (3) breaches of fiduciary responsibilities imposed in 1946, which do not depend upon the Trusteeship Agreement, but are claimed to arise from a contract implied-in-fact that obligates defendant to protect the health, well being and economic condition of the Bikini people.

Id. at 449.

Judge Harkins denied defendant's motion to dismiss on October 5, 1984. Id. at 458. The court held, regarding counts 2 and 3, that "[s]ome of the claims clearly involve transactions that occurred after March 16, 1975. . . . Plaintiffs are not barred by limitations from an offer of proof as to the origin, nature, and content of the alleged implied-in-fact contract and fiduciary relationship, if any, with respect to these claims." Id. at 451. Regarding count 1, the court ruled that "Congress has acted with respect to these plaintiffs and their rights." Id. at 458. The court concluded that "[a]ll of the restraints of the Bill of Rights are applicable to the United States wherever it has acted" and denied defendant's motion to dismiss for failure to state a claim. Id.

III. The Compact, the Section 177 Agreement, and the Nuclear Claims Tribunal

This section restates, with minor modifications, portions of the discussion in Juda v. United States, 13 Cl. Ct. 667, 671-77 (1987) (dismissing complaint based on withdrawal of jurisdiction) ("Juda II"). From the war-time occupation of Micronesia in 1944 to approval of the Trust Territory Agreement on July 18, 1947, United States military authorities controlled the Pacific Islands. In 1947 military government was terminated, and administration of the Trust Territory was delegated to the Secretary of the Navy. Some elements of the takings claims and breach of contract claims in Juda and Peter occurred during this period.

At the end of World War II, little doubt existed that Micronesia would remain under United States control. Whether to annex the area or to place it under the trusteeship system of the United Nations was debated vigorously. Military leaders and the Secretary of War urged outright annexation for strategic reasons. The Secretary of State, on the other hand, urged that Micronesia be made a trusteeship in order to implement the principle of no territorial aggrandizement that had been expressed in the Atlantic Charter and the Cairo Declaration. Disagreement within the United States Government was not resolved until structures were developed in the United Nations relationship that assured the United States would have full control and full strategic rights in the area. These concerns resulted in a procedure that provided two categories of trusteeship: (1) non-strategic trust areas, overseen by the General Assembly and the United Nations Trusteeship Council (the "UNTC"), and (2) territories designated as strategic trust areas, overseen by the Security Council and the UNTC. See generally "Foreign Relations of the United States, Diplomatic Papers: Conferences at Malta and Yalta 1945," at 92 (1955); R. Russell & J. Muther, A History of the United Nations Charter, 578 (1958).

Eleven trusteeship agreements were approved under the United Nations Charter; ten were for non-strategic trusts, and one, the Trusteeship Agreement for the Pacific Islands, was designated as a strategic trust. The Trusteeship Agreement represents the only instance where the United States has assumed responsibility for administering a foreign territory under the authority of an international organization.

The United Nations Charter, in Articles 75 through 85, provides for the international trusteeship system. Article 76(b) is a recognition of the principle that an administering authority is accountable to the international community for administration of the trust area. It obligates the administering authority to promote the political advancement of the inhabitants of the trust territories and their progressive development towards self-government or independence. Article 83 provides that the Security Council would exercise all functions of the United Nations relating to strategic areas. The Charter, however, does not authorize

specifically the Security Council to approve the termination of a strategic trusteeship agreement. Article 83 provides:

> 1. All functions of the United Nations relating to strategic areas, including the approval of the terms of the trusteeship agreements and of their alteration or amendment, shall be exercised by the Security Council.
>
> 2. The basic objectives set forth in Article 76 shall be applicable to the people of each strategic area.
>
> 3. The Security Council shall, subject to the provisions of the trusteeship agreements and without prejudice to security considerations, avail itself of the assistance of the Trusteeship Council to perform those functions of the United Nations under the trusteeship system relating to political, economic, social, and educational matters in the strategic areas.

The Trusteeship Agreement is a treaty in the nature of a bilateral contract between the Security Council and the United States. Article 6 of the Trusteeship Agreement obligates the United States, in the discharge of its obligations under Article 76(b) of the Charter, to foster the development of such political institutions as are suited to the trust territory and to promote the development of the inhabitants towards self-government or independence, as may be appropriate to the particular circumstances of the territory and its peoples. The United States agreed to give the inhabitants of the Trust Territory a progressively increasing share in the administrative services in the territory and to develop their participation in government.

Article 15 of the Trusteeship Agreement provides: "The terms of the present agreement shall not be altered, amended or terminated without the consent of the administering authority." During the negotiations leading to the agreement, the representative of the Soviet Union objected to this provision and proposed language that would have permitted the Security Council unilaterally to alter, amend, or terminate the Agreement. The United States representative refused to agree to the provision that would give the Security Council such power, and, in order to protect United States strategic interests, he insisted that no termination could occur without the consent of the United States.

During the 1960s, in administering the Trusteeship Agreement, the United States initiated efforts to prepare the people for the transition to constitutional self-government. In 1965 the Congress of Micronesia was created, and elected leaders from all parts of the Trust Territory met to discuss common problems and to explore the concept of political unity. Initially, the United States encouraged, and the Trust Territory leaders explored, the

possibility of commonwealth status for the various island groups. This proposal was not accepted generally. Further, differences in geography, history, and culture made it difficult to create a single governmental unit that included all of the inhabitants of the Trust Territory. Four separate political entities ultimately were established.

On March 24, 1976, the United States approved the "Covenant To Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America." Pub. L. No. 94-241, 90 Stat. 263 (1976) (codified as amended at 48 U.S.C. § 1681 (1982)). The constitution for the Federated States of Micronesia (the "FSM") was ratified on July 12, 1978. The Republic of the Marshall Islands (the "RMI") approved its constitution in a referendum on March 1, 1979, and inaugurated a parliamentary constitutional government on May 1, 1979. The constitution for the Republic of Palau was approved at a United Nations-observed referendum on July 9, 1979. The Palau legislature subsequently voided the results of this referendum, and a second referendum was scheduled. The constitution was defeated in a referendum held October 23, 1979. In April 1980 the High Commissioner approved a Palau public law that provided a timetable for the installation of a government under the original constitution. Under the terms of the bill, the Palau constitution took effect on January 1, 1981.

After July 1, 1962, the Secretary of the Interior had exercised all necessary powers of civil government provided by the Trusteeship Agreement. On April 25, 1979, the Secretary recognized the new governmental entities of the Federated States of Micronesia, the Marshall Islands, and Palau and delegated to each the executive, legislative, and judicial functions of the government of the Trust Territory of the Pacific Islands. Secretary Order No. 3039, Apr. 25, 1979. Order No. 3039 provided that the High Commissioner shall continue to exercise all authority necessary to carry out United States' obligations under the 1947 Trusteeship Agreement. This retained authority specifically listed eight categories of administrative functions, including Budget, Accounting, Relations with other United States Government Agencies, and Foreign Governments. All laws of the three governmental units were required to be submitted to the High Commissioner for approval.

A Compact of Free Association was negotiated with each of the individual states. The governments of the United States and the Marshall Islands and the governments of the United States and the Federated States of Micronesia initialed the Compact of Free Association on October 31, 1980. The Compact of Free Association with the government of Palau was initialed on November 17, 1980. Further reviews followed, and the final version of the Compact of Free Association with the Republic of Palau was signed on August 26, 1982, and with the Federated States of Micronesia, on October 1, 1982. The United States and the RMI signed the Compact and its related agreements on June 25, 1983.

After execution by the signatory governments, the Compacts of Free Association were presented to the people in plebiscites monitored by international observers from the United Nations Trusteeship Council. The Federated States of Micronesia plebiscite was held in June 1983, and the Compact was approved by seventy-nine percent. The RMI plebiscite was held in September 1983, and the Compact was approved by fifty-eight percent. In Palau plebiscites were held on February 10, 1983, and on modified versions on September 4, 1984, and February 1, 1986. On February 24, 1986, the President of the Republic of Palau certified to the United States that the Compact of Free Association had been approved.

The Compact was submitted to Congress on March 30, 1984. Action on the legislation was not completed in the 98th Congress, and the Compact was resubmitted to the 99th Congress on February 20, 1985. Hearings were held in each body, and each passed differing versions. The legislation was not referred to a conference committee; differences were resolved in meetings between representatives from each body and from the Administration. The final version, House Joint Resolution No. 187, was presented without a Conference Report; it was approved by the House of Representatives on December 11, 1985, and by the Senate on December 13, 1985. It was signed by the President on January 14, 1986. Pub. L. No. 99-239, 99 Stat. 1770 (1986). By its terms (Section 471(c)), the Compact has the force and effect of a statute under the laws of the United States.

The legislation that approves the Compact of Free Association with the RMI and the FSM bears the title "Compact of Free Association Act of 1985" (the "Compact Act"). It contains Titles I through V. Title I includes provisions that relate to approval of the Compact; interpretation of, and United States policies regarding, the Compact; and supplemental provisions. Title II contains the terms of the Compact of Free Association as signed by the parties and approved in the plebiscites. Compact Titles III, IV, and V relate to Pacific policy reports, clarification of certain trade and tax provisions, and the Compact with the Republic of Palau.

A number of provisions relate to the effective date of the Compact. Section 101(b) of the Compact Act provides:

> (b) MARSHALL ISLANDS.-The Compact of Free Association set forth in title II of this joint resolution between the United States and the Government of the Marshall Islands is hereby approved, and Congress hereby consents to the subsidiary agreements as set forth on pages 115 through 391 of House Document 98-192 of March 30, 1984, as they relate to such Government. Subject to the provisions of this joint resolution, the President is authorized to agree, in accordance with section 411 of the Compact, to an effective date for and thereafter to implement such Compact, having taken into account any

> procedures with respect to the United Nations for termination of the Trusteeship Agreement.
>
> Section 411 of the Compact provides:
>
> This Compact shall come into effect upon mutual agreement between the Government of the United States, acting in fulfillment of its responsibilities as Administering Authority of the Trust Territory of the Pacific Islands, and the Government of the Marshall Islands or the Federated States of Micronesia and subsequent to the completion of the following:
>
> (a) Approval by the Government of the Marshall Islands or the Federated States of Micronesia in accordance with its constitutional processes.
>
> (b) Conduct of the plebiscite referred to in Section 412.
>
> (c) Approval by the Government of the United States in accordance with its constitutional processes.

Section 171 of the Compact suspends the laws of the United States to the Trust Territory on the effective date. Section 171 provides:

> Except as provided in this Compact or its related agreements, the application of the laws of the United States to the Trust Territory of the Pacific Islands by virtue of the Trusteeship Agreement ceases with respect to the Marshall Islands and the Federated States of Micronesia as of the effective date of this Compact.
>
> Section 127 of the Compact provides:
>
> Except as otherwise provided in this Compact or its related agreements, all obligations, responsibilities, rights and benefits of the Government of the United States as Administering Authority which have resulted from the application pursuant to the Trusteeship Agreement of any treaty or other international agreement to the Trust Territory of the Pacific Islands on the day preceding the effective date of this Compact are no longer assumed and enjoyed by the Government of the United States.

Section 177 of the Compact provides a procedure for the disposition of claims that have resulted from the Nuclear Testing Program. A separate agreement between the United

States and the RMI is authorized to provide for the settlement of all such claims (the "Section 177 Agreement"). Section 177 provides that "[t]his separate agreement shall come into effect simultaneously with this Compact and shall remain in effect in accordance with its terms." Article XIII, section 1 of the Section 177 Agreement provides: "This Agreement shall come into effect simultaneously with the Compact in accordance with Section 177 of the Compact."

> Section 177 of the Compact provides:
>
> (a) The Government of the United States accepts the responsibility for compensation owing to citizens of the Marshall Islands, or the Federated States of Micronesia (or Palau) for loss or damage to property and person of the citizens of the Marshall Islands, or the Federated States of Micronesia, resulting from the nuclear testing program which the Government of the United States conducted in the Northern Marshall Islands between June 30, 1946, and August 18, 1958.
>
> (b) The Government of the United States and the Government of the Marshall Islands shall set forth in a separate agreement provisions for the just and adequate settlement of all such claims which have arisen in regard to the Marshall Islands and its citizens and which have not as yet been compensated or which in the future may arise, for the continued administration by the Government of the United States of direct radiation related medical surveillance and treatment programs and radiological monitoring activities and for such additional programs and activities as may be mutually agreed, and for the assumption by the Government of the Marshall Islands of responsibility for enforcement of limitations on the utilization of affected areas developed in cooperation with the Government of the United States and for the assistance by the Government of the United States in the exercise of such responsibility as may be mutually agreed. This separate agreement shall come into effect simultaneously with this Compact and shall remain in effect in accordance with its own terms.
>
> (c) The Government of the United States shall provide to the Government of the Marshall Islands, on a grant basis, the amount of $150 million to be paid and distributed in accordance with the separate agreement referred to in this Section, and shall provide the services and programs set forth in this separate agreement, the language of which is incorporated into this Compact.

The Compact Act approves Compact Section 177 and, by reference, specifically incorporates the provisions of the Section 177 Agreement into the Compact Act. Section 103(g) of the Compact Act provides:

> (g) ESPOUSAL PROVISIONS.-(1) It is the intention of the Congress of the United States that the provisions of section 177 of the Compact of Free Association and the Agreement between the Government of the United States and the Government of the Marshall Islands for the Implementation of Section 177 of the Compact (hereafter in this subsection referred to as the "Section 177 Agreement") constitute a full and final settlement of all claims described in Articles X and XI of the Section 177 Agreement, and that any such claims be terminated and barred except insofar as provided for in the Section 177 Agreement.
>
> (2) In furtherance of the intention of Congress as stated in paragraph (1) of this subsection, the Section 177 Agreement is hereby ratified and approved. It is the explicit understanding and intent of Congress that the jurisdictional limitations set forth in Article XII of such Agreement are enacted solely and exclusively to accomplish the objective of Article X of such Agreement and only as a clarification of the effect of Article X, and are not to be construed or implemented separately from Article X.

The Section 177 Agreement provides for the establishment and operation by the RMI of a Claims Tribunal (the "Claims Tribunal"). The Claims Tribunal was given "jurisdiction to render final determination upon all claims past, present and future, of the Government, citizens and nationals of the Marshall Islands which are based on, arise out of, or are in any way related to the Nuclear Testing Program. . . ." Article IV, section 1(a) of the Section 177 Agreement includes the following limitation: "This section confers in the Claims Tribunal no jurisdiction over the United States, its agents, employees, contractors, citizens or nationals with respect to claims of the Government, citizens or nationals of the Marshall Islands arising out of the Nuclear Testing Program."

Article X, Section 1 of the Section 177 Agreement provides:

> Section 1–Full Settlement of All Claims
>
> This Agreement constitutes the full settlement of all claims, past, present and future, of the Government, citizens and nationals of the Marshall Islands which are based upon, arise out of, or are in any way related to the Nuclear Testing Program, and which are against the United States, its agents, employees,

> contractors and citizens and nationals, and of all claims for equitable or any other relief in connection with such claims including any of those claims which may be pending or which may be filed in any court or other judicial or administrative forum, including the courts of the Marshall Islands and the courts of the United States and its political subdivisions.

Article XII of the Section 177 Agreement provides:

> All claims described in Articles X and XI of this Agreement shall be terminated. No court of the United States shall have jurisdiction to entertain such claims, and any such claims pending in the courts of the United States shall be dismissed.

On May 28, 1986, the UNTC, in Resolution No. 2183, reaffirmed that the peoples of the Northern Mariana Islands, the RMI, the FSM, and Palau had "freely exercised their right to self-determination in plebiscites observed by visiting missions of the Trusteeship Council." The UNTC determined that the United States as the Administering Authority "has satisfactorily discharged its obligations under the terms of the Trusteeship Agreement and that it is appropriate for that Agreement to be terminated." The UNTC requested that the United States, in consultation with the respective governments, to agree on a date no later than September 30, 1986, for the full entry into force of the Compact of Free Association and the Commonwealth Covenant and to inform the Secretary General of the United Nations of that date. The official records of the UNSC for the period ending June 30, 1986, show that UNTC Resolution No. 2183 was reported to the Security Council.

Between May and October 1986, representatives of the United States and representatives of the RMI negotiated to establish an effective date for the Compact. On October 10, 1986, the parties executed an agreement providing, pursuant to Section 411 of the Compact, that the effective date of the Compact would be October 21, 1986.

On October 16, 1986, the President issued Executive Order No. 12,569 to provide for changes in the responsibilities of United States officials when the Compact became effective. The Secretary of State was made responsible for conducting government-to-government relations with the RMI, the FSM, and the Republic of Palau. The responsibilities of the Secretary of the Interior were redefined to include:

> Sec. 2 Responsibility of the Secretary of the Interior. The Secretary of the Interior shall be responsible for seeking the appropriation of funds for and, in accordance with the laws of the United States, shall make available to the Freely Associated States the United States economic and financial assistance

> appropriated pursuant to Article I of Title Two of the Compact; the grant, service, and program assistance appropriated pursuant to Article II of Title Two of the Compact; and all other United States assistance appropriated pursuant to the Compact and its related agreements. The Secretary shall coordinate and monitor any program or any activity by any department or agency of the United States provided to the Freely Associated States and shall coordinate and monitor related economic development planning. This Section shall not apply to services provided by the Department of Defense to the Freely Associated States or to activities pursuant to Section 1 of this Order, including activities under the Peace Corps Act.

Section 8, Supersession and Savings Provisions, of the Executive Order provides:

> (a) Subject to the provisions of Section 9 of this Order, prior Executive orders concerning the former Trust Territory of the Pacific Islands are hereby superseded and rendered inapplicable, except that the authority of the Secretary of the Interior as provided in applicable provisions of Executive Order No. 11021, as amended, shall remain in effect, in a manner consistent with this Order and pursuant to section 105(c)(2) of the Act, to terminate the trust territory government and discharge its responsibilities, at which time the entirety of Executive Order No. 11021 shall be superseded.
>
> (b) Nothing in this Order shall be construed as modifying the rights or obligations of the United States under the provisions of the Compact or as affecting or modifying the responsibility of the Secretary of State and the Attorney General to interpret the rights and obligations of the United States arising out of or concerning the Compact.

By letter dated October 23, 1986, the United States Permanent Representative to the United Nations notified the Secretary General of the United Nations that, as a consequence of consultations held between the United States Government and the Government of the RMI, "agreement has been reached that October 21, 1986, is the date upon which the Compact of Free Association with the Marshall Islands enters fully into force."

On November 3, 1986, the President announced in Proclamation No. 5564 that, as of that date, the United States "has fulfilled its obligations under the Trusteeship Agreement with respect to the Commonwealth of the Northern Mariana Islands, the Republic of the Marshall Islands, and the Federated States of Micronesia, and they are self-governing and no longer subject to the Trusteeship." Proclamation No. 5564 further provided:

> Section 1. I determine that the Trusteeship Agreement for the Pacific Islands is no longer in effect as of October 21, 1986, with respect to the Republic of the Marshall Islands, as of November 3, 1986, with respect to the Federated States of Micronesia, and as of November 3, 1986, with respect to the Northern Mariana Islands. This constitutes the determination referred to in Section 1002 of the Covenant.

In keeping with its decision that the RMI was a sovereign self-governing state, on April 22, 1987, the President's nomination of the United States diplomatic representative to the Marshall Islands was announced; on May 4, 1987, the Government of the RMI was notified formally that the general relations between the two governments would be governed by international law, as reflected in the Vienna Convention on Diplomatic Relations and that the RMI representatives would be accorded status commensurate with the heads of diplomatic missions, as this expression is used in the Convention. On June 3, 1987, the United States Senate gave its consent to appointment of the President's nominee.

IV. Juda II, Peter II, Nitol II, and People of Enewetak

On March 4, 1986, defendant filed motions to dismiss in Juda, Nitol, and Peter characterizing the claims as posing a non-justiciable political question after the passage of the Compact and the execution of the Section 177 Agreement. See Juda v. United States, 13 Cl. Ct. 667, 669 (1987) ("Juda II"). On November 4, 1986, defendant filed amended motions to dismiss adding as a ground the lack of subject matter jurisdiction due to the effect of the withdrawal of jurisdiction contained in the Section 177 Agreement. Id. at 670.

On November 10, 1987, Judge Harkins dismissed the surviving claims in Juda for lack of subject matter jurisdiction, issuing dismissals of the Peter and Nitol cases on the same date that relied on the same rationale. See Juda II at 690 ("The consent of the United States to be sued in the Claims Court on plaintiffs' taking claims and breach of contract claims that arise from the United States' nuclear testing program in the Marshall Islands has been withdrawn."); see also Peter v. United States, 13 Cl. Ct. 691, 692 (1987) ("The withdrawal by the United States of its consent to be sued, as set forth in the memorandum of decision in the Juda case, applies to plaintiffs' remaining claims in this case.") ("Peter II"); Nitol v. United States, 13 Cl. Ct. 690, 691 (1987) ("Nitol II") (same as Peter II). The court found that "the Compact of Free Association, the Section 177 Agreement, and Articles X, XI, and XII of that agreement, went into effect on October 21, 1986." Juda II at 682-83. The court found that "[t]he RMI and the United States unquestionably intended that the Section 177 Agreement would be a complete settlement of all claims arising from the nuclear testing program." Id. at 684. Concluding that the Section 177 Agreement and the Compact validly withdrew consent to sue the United States in the Claims Court, the court dismissed plaintiffs'

claims. Id. at 690. Nevertheless, Judge Harkins stated that it was "premature" for the court to hear plaintiffs' objections to the adequacy of the compensation:

> Whether the compensation, in the alternative procedures provided by Congress in the Compact Act, is adequate is dependent upon the amount and type of compensation that ultimately is provided through these procedures. Congress has recognized and protected plaintiffs' rights to just compensation for takings and for breach of contract. The settlement procedure, as effectuated through the Section 177 Agreement, provides a "reasonable" and "certain" means for obtaining compensation. Whether the settlement provides "adequate" compensation cannot be determined at this time.
>
> . . . .
>
> . . . . This alternative procedure for compensation cannot be challenged judicially until it has run its course.

Id. at 689.

The Federal Circuit consolidated the appeals of the Claims Court in Peter II, Juda II, and Nitol II in People of Enewetak v. United States, 864 F.2d 134 (Fed. Cir. 1988). The appeal of Juda II was dismissed with prejudice "upon the unopposed motion of claimants, following the enactment of special legislation which appropriated funds for the benefit of the People of Bikini." People of Enewetak, 864 F.2d at 135 n.1; see People of Bikini v. United States, 859 F.2d 1482 (Fed. Cir. 1988) (order dismissing case).

The settlement in People of Bikini was signed into law on September 27, 1988, and provided:

> That in full satisfaction of the obligation of the United States to provide funds to assist in the resettlement and rehabilitation of Bikini Atoll by the People of Bikini, to which the full faith and credit of the United States is pledged pursuant to section 103(l) of Public Law 99-239, the United States shall deposit $90,000,000 into the Resettlement Trust Fund for the People of Bikini established pursuant to Public Law 97-257, and governed pursuant to the terms of such trust instrument, such deposit to be installments of $5,000,000 on October 1, 1988; $22,000,000 on October 1, 1989; $21,000,000 on October 1, 1990; $21,000,000 on October 1, 1991; and $21,000,000 on October 1, 1992: Provided further, That the terms of such Resettlement Trust Fund are hereby modified to provide that corpus and income may be expended for rehabilitation

> and resettlement of Bikini Atoll, except that the Secretary may approve expenditures not to exceed $2,000,000 in any year from income for projects on Kili or Ejit: Provided further, That one year prior to completion of the rehabilitation and resettlement program, the Secretary of the Interior shall report to Congress on future funding needs on Bikini Atoll. Unless otherwise determined by Congress, following completion of the rehabilitation and resettlement program, funds remaining in the Resettlement Trust Fund in excess of the amount identified by the Secretary as required for future funding needs shall be deposited in the United States Treasury as miscellaneous receipts. Upon completion of those needs, the Resettlement Trust Fund shall be extinguished and all remaining funds shall be deposited in the United States Treasury as miscellaneous receipts. The payment and use of funds in accordance herewith is for the sole purpose of implementing and fulfilling the terms of the Section 177 Agreement referred to in section 462(d) of the Compact of Free Association between the United States and the Republic of the Marshall Islands, including Article VI, section 1, and Articles X and XII, thereof. Payments pursuant hereto shall be made only upon: One, voluntary dismissal with prejudice of Juda et al. v. the United States, No. 88-1206 (Fed. Cir.); and two, submission of written notice to the United States and the Republic of the Marshall Islands, executed by duly-authorized representatives acting on their behalf, that the People of Bikini accept the obligations and undertaking of the United States to make the payments prescribed by this Act, together with the other payments, rights, entitlements and benefits provided for under the Section 177 Agreement, as full satisfaction of all claims of the People of Bikini related in any way to the United States nuclear testing program in accordance with the terms of the Section 177 Agreement.

Pub. L. No. 100-446, 102 Stat. 1774, 1798 (1988).

The Federal Circuit affirmed the decisions of the Claims Court in Peter II and Nitol II, holding:

> The [Compact] Act and the section 177 Agreement, provide, in perpetuity, a means to address past, present and future consequences, including the resolution of individual claims, arising from the United States nuclear testing program in the Marshall Islands between June 30, 1946 and August 18, 1958. Congress intended the alternative procedure to be utilized, and we are unpersuaded that judicial intervention is appropriate at this time on the mere speculation that the alternative remedy may prove to be inadequate.

People of Enewetak, 864 F.2d at 136. The court stated that a determination of the adequacy of the alternative procedure for compensation was not required "in advance of the exhaustion of the alternative provided" and adopted the "[Claims Court's] more extensive analysis in Juda v. United States, 13 Cl. Ct. 667 (1987), relating to the issues discussed." People of Enewetak 864 F.2d at 137.

On August 22, 1983, approximately 3,000 present and former residents of the RMI located downwind from the nuclear test sites filed a claim seeking damages for personal injuries and death pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2674 (2000) (the "FTCA"). The district court held that "the RMI's espousal and settlement of the claims were not reviewable by the courts of the United States and that the Court lacked 'jurisdiction over plaintiffs' claims, pursuant to valid law and in conjunction with non-reviewable foreign relations decisions.'" Antolok v. United States, 873 F.2d 369, 372 (9th Cir. 1989) (quoting Antolok v. United States, No. 83-2471, slip op. at 8 (D.D.C. Jun. 16, 1987)). The United States Court of Appeals for the District of Columbia Circuit affirmed the decision of the lower court, holding that, while "the Federal Tort Claims Act, 28 U.S.C. § 1346(b), initially provided a waiver of immunity for this tort action, Congress withdrew their consent for this type of claim in ratifying the Compact and the Section 177 Agreement . . . ." 873 F.2d at 374. The court compared the tort claim brought to a potential takings claim, stating that "even if the legislation amounted to an actual taking of property . . . then the substitution of another remedy is compensation therefor." Id. at 378. Nevertheless, the court noted that, "[i]f there is an uncompensated or inadequately compensated taking, then plaintiffs' remedy is in the Claims Court under the Tucker Act, 28 U.S.C. § 1491(a)(1), not in District Court under the Federal Tort[ Claims Act." Id. As no valid constitutional claim was before the court, it declined to review "the difficult question of whether inferior courts may be barred by an act of Congress from review of constitutional challenges to statutes." Id. (citations omitted).

Judge Sentelle, who authored the panel's opinion, set forth his separate views 3/ with respect to the role of the political question doctrine:

> [E]ven if we err in our interpretation of [the Compact] Act, I would not reach the merits but would conclude that the District Court was without jurisdiction

---

3/ Chief Judge Wald and Judge Starr did not join Judge Sentelle as to section II.B of the opinion in Antolok, which discusses the political question doctrine. See Antolok, 873 F.2d at 379. Chief Judge Wald filed a separate opinion concurring in the result to express an alternative application of the political question doctrine. See id. at 385 (Wald, J., concurring).

> over this matter of international relations by reason of the political question doctrine.
>
> . . . .
>
> . . . . While I do not deny that the plaintiffs herein raise good faith objections to the decision of the Executive . . . , our deferral to the political branches in political questions is not limited to those where they are correct. It would require our invasion of their sphere for us to make the determination that they were wrong, and it is against that very invasion that the political question doctrine protects the political realm from judicial invasion.

Id. at 379, 383.

Then-Chief Judge Wald's special concurrence distinguished the takings claim raised in Antolok from the takings claims raised in People of Enewetak: "Plaintiffs responded to the government's defense (lack of jurisdiction) by arguing that a withdrawal of jurisdiction would constitute an uncompensated taking; the property allegedly taken here is the plaintiffs' cause of action in tort." Antolok, 873 F.2d at 393 n.15. In contrast, the takings claim in People of Enewetak involved "property allegedly taken [that included] plaintiffs' lands, homes, and businesses." Id.

V. The Nuclear Claims Tribunal decisions and Changed Circumstances Request

The Nuclear Claims Tribunal (the "NCT") was established in 1987 when the Nitijela, the legislative body of the RMI, passed the Nuclear Claims Tribunal Act. On July 16, 1990, plaintiffs filed a class action in the NCT seeking damages for loss of use of Enewetak Atoll, restoration costs for cleanup of contaminated portions of the atoll, and consequential and hardship damages for the Enewetak people.

The NCT issued its initial decision regarding plaintiffs' claim on April 13, 2000, awarding plaintiffs $324,949,311, which included "$199,154,811 for past and future loss of use of Enewetak Atoll . . . . $91,710,000 to restore Enewetak to a safe and productive state. . . . [and] $34,084,500 for the hardships suffered . . . ." See PX 5 at 34. The NCT qualified its decision by stating:

> This is not an eminent domain proceeding nor a claim under constitutional provisions for just compensation for a taking of property for public use. neither the U.S. or R.M.I. government is a party to this action, and consequently certain elements in a determination of just compensation are not

> present. Nonetheless, principles of just compensation, to the extent that they aid in a determination of what is necessary to make claimants whole, may be referenced . . . where appropriate.

PX 5 at 4. This award was the "first award for damages to property" made by the NCT. Id. at 33. The NCT's award considered various factors, including deductions from the gross award for amounts already received through the Compact and the Section 177 Agreement. Restoration costs were awarded for the following purposes: $22.5 million for removal and replacement of contaminated soil; $31.5 million for construction of a causeway for disposal of the contaminated soil; $15.5 million for potassium treatment to block radioactive Cesium 137 uptake from locally grown foods; $17.7 million for soil rehabilitation and revegetation; $10 million for plutonium cleanup on Runit Island; and $4.51 million for characterization surveys of the contaminated soil. The NCT deducted $10 million from the total restoration award, equivalent to the value of the Enjebi Trust Fund, which was established by the Compact of Free Association for restoration of portions of Enewetak, thereby yielding a net award of $91,710,000 for restoration. PX 5 at 28. Past and future loss amounts were computed based on annual rental values for the land occupied by the United States, which resulted in a gross award of $304,000,000 for past loss use.

The NCT amended its decision on May 5, 2000, including "an additional $16.1 million as the cost to restore the soil and revegetate the 558 acres subject to soil removal as part of the radiological cleanup." PX 6 at 2. The NCT again amended its decision on August 3, 2000, revising the amount of damages for loss of future use to $47,001,908 and supplementing this amount with prejudgment interest in the amount of $47,681,122. PX 7 at 5. In addition, the NCT revised its award to plaintiffs to include "interest in the amount of 7% per year . . . on the loss of use damages of $244,000,000 and restoration damages of $107,810,000." PX 7 at 5.

The NCT issued its decision regarding the claims of the inhabitants of Bikini Atoll on March 5, 2001. The NCT determined that the People of Bikini were entitled to a total of $563,315,500: $278,000,000 for past and future loss of use; $251,500,000 for restoration costs; and $33,815,500 for hardships suffered.

Thus, the total amounts awarded to the Enewetak people and the People of Bikini by the NCT include the following components:

Enewetak people:

| | |
|---|---|
| Loss of use: | $244,000,000 + 7% interest |
| Restoration: | $107,810,000 + 7% interest |

| | |
|---|---|
| Hardship: | $34,084,500 |
| **TOTAL:** | **$385,894,500 + interest** |

People of Bikini:

| | |
|---|---|
| Loss of use: | $278,000,000 + 7% interest |
| Restoration: | $251,500,000 + 7% interest |
| Hardship: | $33,815,500 |
| **TOTAL:** | **$563,315,500 + interest** |

In February 2002 the NCT made a payment of $1,078,750 to the Enewetak people and $1,491,809 to the People of Bikini, amounts which constituted 0.25% of their respective awards. In February 2003 the NCT made another partial payment of 0.125% of the total awarded amount, giving $568,733 to the Enewetak people and $787,370 to the People of Bikini. Since February 2003, the NCT has not rendered any further payments to either the Enewetak people or the People of Bikini. The NCT has exhausted the $45.75 million allocated in the Section 177 Agreement with respect to payments for personal injury awards that exceed $80 million. The $150-million trust fund established has been reduced to a current balance of less than $1.8 million.

In 2002 the RMI retained former United States Attorney General Richard Thornburgh to undertake an independent examination of the NCT's processes in response to concerns raised by the United States Government regarding the transparency of the NCT's operations. Mr. Thornburgh issued a report in January 2003 (the "Thornburgh Report") concluding "that the NCT fulfilled the task for which it was created in a reasonable, fair and orderly manner, and with adequate independence." Am. Compl. ¶ 153. The Thornburgh Report stated that "[i]t is our judgment that the $150 million trust fund initially established in 1986 is manifestly inadequate to fairly compensate the inhabitants of the Marshall Islands for the damages they suffered as a result of the dozens of U.S. nuclear tests that took place in their homeland." Am. Compl. ¶ 154 (quoting Thornburgh Report).

Article IX of the Section 177 Agreement (the "Changed Circumstances provision") provides:

> If loss or damage to property and person of the citizens of the Marshall Islands, resulting from the Nuclear Testing Program, arises or is discovered after the effective date of this Agreement, and such injuries were not and could

> not reasonably have been identified as of the effective date of this Agreement, and if such injuries render the provisions of this Agreement manifestly inadequate, the Government of the Marshall Islands may request that the Government of the United States provide for such injuries by submitting such a request to the Congress of the United States for its consideration. It is understood that this Article does not commit the Congress of the United States to authorize and appropriate funds.

Pursuant to Article IX, entitled "Changed Circumstances," the RMI presented a "Petition Presented to the Congress of the United States of America Regarding Changed Circumstances Arising from U.S. Nuclear Testing in the Marshall Islands" (the "Changed Circumstances Request") on September 11, 2000. Am. Compl. ¶ 163. The Changed Circumstances Request was resubmitted to Congress on November 14, 2001.

The Senate Energy and Natural Resources Committee and the House Resources Committee requested that an interagency group evaluate the Changed Circumstances Request. On January 4, 2005, the United States Department of State submitted the "Report Evaluating the Request of the Government of the Republic of the Marshall Islands Presented to the Congress of the United States of America" to Senator Jeff Bingaman of New Mexico. The report stated that the Changed Circumstances Request did not satisfy the requirements contained in Article IX of the Section 177 Agreement and therefore concluded that no legal basis for additional payments was raised in the Changed Circumstances Request. On July 19, 2005, the House Committee on Resources and the House Committee on International Relations Subcommittee on Asia and the Pacific held a joint hearing regarding the RMI and the Changed Circumstances Request. The court has not been made aware of any action by Congress since that date.

## DISCUSSION

Defendant has moved pursuant to RCFC 12(b)(1) and 12(b)(6) for dismissal of plaintiffs' Amended Complaint for lack of subject matter jurisdiction, or, alternatively, for failure to state a claim upon which relief can be granted. The former ground implicates the statute of limitations and withdrawal of jurisdiction in the courts; the latter, the doctrine of res judicata.

### I. Statute of limitations

Jurisdiction must be established before the court may proceed to the merits of a case. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 88-89 (1998). Any party may challenge, or the court may raise *sua sponte*, subject matter jurisdiction at any point in a proceeding,

even upon appeal. Arbaugh v. Y&H Corp., 546 U.S. 500, 506 (2006). If the jurisdictional facts alleged in the complaint are disputed, "the . . . court may consider relevant evidence in order to resolve the factual dispute." Reynolds v. Army and Air Force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988); Moyer v. United States, 190 F.3d 1314, 1318 (Fed. Cir. 1999) (holding that "[f]act-finding is proper when considering a motion to dismiss where the jurisdictional facts in the complaint . . . are challenged"); see also Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1584 (Fed. Cir. 1993) (permitting review of evidence extrinsic to pleadings, including affidavits and deposition testimony). Once the court's subject matter jurisdiction is put into question, it is "incumbent upon [plaintiff] to come forward with evidence establishing the court's jurisdiction. We agree that [plaintiff] bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence." Reynolds, 846 F.2d at 748; McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936) (holding that, "[i]f [plaintiff's] allegations of jurisdictional facts are challenged by his adversary in any appropriate manner, he must support them by competent proof").

The statute of limitations set forth in the Tucker Act requires that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501 (2000). The six-year statute of limitations "set forth in § 2501 [of Title 28] is a jurisdictional requirement." Bianchi v. United States, 475 F.3d 1268, 1274 (Fed. Cir. 2007); John R. Sand & Gravel v. United States, 457 F.3d 1345, 1354 (Fed. Cir. 2006), cert. granted, 127 S. Ct. 2877 (2007) (No. 06-1164, 2007 Term) ("The six-year statute of limitations set forth in section 2501 is a jurisdictional requirement for a suit in the Court of Federal Claims."); Martinez v. United States, 333 F.3d 1295, 1316 (Fed. Cir. 2003) (en banc) ("It is well established that statutes of limitations for causes of action against the United States, being conditions on the waiver of sovereign immunity, are jurisdictional in nature."). Because it is jurisdictional, the requirement of section 2501 cannot be waived. John R. Sand & Gravel, 457 F.3d at 1354 (citing Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed. Cir. 1988)).

Recent decisions of the Federal Circuit have held that claims failing to satisfy section 2501 should be dismissed for failure to state a claim, rather than for lack of subject matter jurisdiction. See, e.g., Venture Coal Sales Co. v. United States, 370 F.3d 1102, 1105 n.2 (Fed. Cir. 2004) ("The most precise ground for the trial court's decision here . . . would seem to be that [plaintiff] failed to make its claim within the required limitations period-that is not a question of subject matter jurisdiction of the court."); Ariadne Fin. Servs. Pty. Ltd. v. United States, 133 F.3d 874, 878 (Fed. Cir. 1998) ("The Court of Federal Claims has subject matter jurisdiction to adjudicate cases arising under the Tucker Act regardless of the timeliness of [plaintiff's] actions. [Plaintiff's] untimeliness can, however, bar its eligibility to invoke that jurisdiction."). Panels of the Federal Circuit continue to disagree on this issue,

as evidenced by Judge Newman's dissent in John R. Sand & Gravel, 457 F.3d at 1361, now on review by the Supreme Court. In dissenting from the majority's holding that the statute of limitations contained in section 2501 is jurisdictional, Judge Newman stated:

> [T]he Court of Federal Claims, without dispute, had jurisdiction of the parties and the subject matter. . . . The text of the statute confirms that the limitations period is applied to claims of which the Court of Federal Claims already "has jurisdiction". . . .
>
> Contrary to the position of the panel majority, the limitations period is not itself a matter of jurisdiction.

Id. at 1361-62 (citations omitted); see also Martinez, 333 F.3d at 1320 (Mayer, C.J., Plager, Newman, Gajarsa, Linn, & Dyk, JJ., dissenting). Despite a nascent shift in the more recent appellate decisions, the court follows the binding precedent that a motion to dismiss a complaint as time-barred by the statute of limitations properly is considered as a motion to dismiss for lack of subject matter jurisdiction, given the en banc decision in Martinez and the majority opinion in John R. Sand & Gravel. 4/

In response to defendant's invocation of the Tucker Act's six-year statute of limitations, plaintiffs counter that defendant should be estopped from raising the statute of limitations or, alternatively, that the statute of limitations should be equitably tolled because the failure of the "alternative claims procedure to provide adequate compensation for the loss of [plaintiffs'] land[] . . . was unknowable until August 3, 2000, the date of the NCT decision . . . ." Pls.' Br. filed Dec. 18, 2006, at 43. Plaintiffs assert that

> [p]rior to that date, there had been no determination of what constituted "just compensation" in this matter, and any claims challenging the procedure would have been deemed "premature" or unripe, as was found by this Court in Juda, 13 Cl.Ct. at 689, and affirmed by the Federal Circuit in People of Enewetak, 864 F.2d at 136.

Id.

---

4/ *Certiorari* was granted by the Supreme Court of the United States on May 29, 2007, "limited to Question 1 presented by the petition," John R. Sand & Gravel Co. v. United States, 127 S. Ct. 2877 (2007), which asks "[w]hether the statute of limitations in the Tucker Act limits the subject matter jurisdiction of the Court of Federal Claims." Petition for Writ of Certiorari, John R. Sand & Gravel, 127 S. Ct. 2877 (2007) (No. 06-1164).

"A claim accrues when all events have occurred that fix the alleged liability of the Government and entitle the plaintiff to institute an action." Alliance of Descendants of Tex. Land Grants v. United States, 37 F.3d 1478, 1481 (Fed. Cir. 1994); see Hopland Band of Pomo Indians, 855 F.2d at 1577 (stating that cause of action accrues "only when all the events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence"). A cause of action accrues, when a plaintiff is "armed with the facts about the harm done to him." United States v. Kubrick, 444 U.S. 111, 123 (1979). "A claimant under the Fifth Amendment must show that the United States, by some specific action, took a private property interest for a public use without just compensation." Alliance of Descendants of Tex. Land Grants, 37 F.3d at 1481.

In Count III of their Amended Complaint, plaintiffs allege that defendant has not provided just compensation as required by the Fifth Amendment by "failing to adequately fund the Tribunal so that it could pay Plaintiffs' award." Am. Compl. ¶ 203. Framed another way, plaintiffs allege that the Government took their claims in violation of their Fifth Amendment right to just compensation because Congress has failed to act on the Changed Circumstances Request. A report to Congress does not constitute a governmental action that could be considered a taking of any interest. A report merely supplies Congress with information that may justify or prompt further action. Congress has made no final determination on plaintiffs' petition, and the apparent lack of action after two years cannot establish a taking until plaintiffs can show that Congress no longer is considering their petition. Therefore, the court finds that no government act has taken place within the last six-years that relates to the asserted taking of plaintiffs' private property interest.

In Count IV of their Amended Complaint, plaintiffs allege that "[defendant's] fail[ure] to adequately fund the Tribunal so that it could pay Plaintiffs' award has taken Plaintiffs' implied contract claim without providing the just compensation as required by the Fifth Amendment to the United States Constitution." Am. Compl. ¶ 207. As in Count III, plaintiffs have not alleged any action on the part of the United States Government occurring within the last six years that could be considered a breach of plaintiffs' claimed implied-in-fact contract with the United States. While Congress has not yet acted on plaintiffs' petition, that circumstance does not constitute an action on the part of the Government sufficient to meet the requirements of the statute of limitations.

Count V alleges that "[t]he Compact agreements constitute a taking of Enewetak Atoll or, as applied, constitute a taking of Enewetak Atoll." Am. Compl. ¶ 210. Count VI alleges that "[t]he Compact agreements constitute breaches of fiduciary obligations imposed by the creation of a contract implied-in-fact between defendant and plaintiffs." Id. ¶ 214. Plaintiffs have failed to allege a government act that occurred within the last six years. Any breach of the implied-in-fact contract or duties or covenants would have occurred in 1986 when the Act

became effective. Nothing has changed since 1986 when all of the events occurred to fix the alleged liability of the Government.

Plaintiffs argue that "Counts III – VI of plaintiffs' Amended Complaint are based on the failure of the alternative claims procedure to provide adequate compensation for the loss of and damage to their lands. Although this failure was unknowable until after August 3, 2000, the date of the final NCT decision awarding plaintiffs $386 million in damages," Pls.' Br. filed Dec. 18, 2006, at 43, plaintiffs have not shown that any acts attributable to the Government occurred within the six-year statute of limitations. The susbstance of plaintiffs' dispute with the United States has been the same for the last twenty-one years: plaintiffs seek additional compensation for damages caused by the Nuclear Testing Program. The amounts specified in the settlement agreement also were known to plaintiffs in 1986. The terms and conditions of the Changed Circumstances provision were known to plaintiffs in 1986. The court cannot find now – twenty-one years after the Compact was entered into – that plaintiffs' claims are timely.

In Counts III and IV, plaintiffs allege takings claims triggered by the passage of the Compact in 1986 and the failure adequately to fund the NCT. In Juda II Judge Harkins held open the possibility of future litigation on the adequacy of the alternative remedy provided for in the Compact Act:

> Whether the compensation, in the alternative procedures provided by Congress in the Compact Act, is adequate is dependent upon the amount and type of compensation that ultimately is provided through those procedures. Congress has recognized and protected plaintiffs' right to just compensation for takings and for breach of contract. The settlement procedure, as effectuated through the Section 177 Agreement, provides a "reasonable" and "certain" means for obtaining compensation. Whether the settlement provides "adequate" compensation cannot be determined at this time.

Juda II at 689. The Federal Circuit endorsed this analysis in People of Enewetak, again acknowledging a possibility of future litigation on plaintiffs' Fifth Amendment takings claims. 864 F.2d at 136 ("[W]e are unpersuaded that judicial intervention is appropriate at this time on the mere speculation that the alternative remedy may prove to be inadequate.").

Plaintiffs maintain that these takings claims are now ripe for litigation because plaintiffs have exhausted the alternative procedure mandated in the Compact Act. They assert that "the government completely ignores this Court's prior ruling that plaintiffs' claims were unripe . . . . This Court found plaintiffs' constitutional challenge to the Compact Act 'premature' and made clear that plaintiffs could return to this Court after the alternative

procedure 'has run its course' should the compensation provided be inadequate." Pls.' Br. filed Dec. 18, 2006, at 43. The court finds that litigation on this issue is still premature. The alternative procedure in the Compact Act and in Article IX of the Section 177 Agreement included a Changed Circumstances provision, which allocated to Congress the option to "authorize and appropriate funds" in the event that "loss or damage to property and person of the citizens of the Marshall Islands, resulting from the nuclear testing program arises or is discovered after the effective date" of the Compact Act and Changed Circumstances provision.

Congress has not yet exercised its option to "authorize and appropriate funds" for the Marshall Islands. The court is in no position to find that the alternative procedure, as contemplated by the Compact Act, has run its course. Congress must consider the Changed Circumstances Request and take such action as it deems appropriate. That Congress has not acted in the seven years after the Changed Circumstances Request was first submitted would not warrant a finding of either futility or *de facto* rejection, given the court's alternate ruling on the political question that this matter presents.

1. Equitable estoppel

Plaintiffs would estop defendant from arguing that the statute of limitations bars their claims. They insist that (1) a dismissal based on the statute of limitations would be an unconstitutional "bait and switch," because the court in Peter II and People of Enewetak dismissed plaintiffs' claims as premature, and (2) the Government cannot invoke the statute of limitations now that the alternative procedure has run its course. Pls.' Br. filed Dec. 18, 2006, at 38.

"Estoppel is an equitable doctrine invoked to avoid injustice in particular cases." Heckler v. Cmty. Health Servs., 467 U.S. 51, 59 (1984). To succeed on the grounds of equitable estoppel, generally a plaintiff must show that it "relied on its adversary's conduct 'in such a manner as to change his position for the worse,' and that reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." Id. (footnotes omitted). This general rule, however, is not applicable against the Government: "[I]t is well settled that the Government may not be estopped on the same terms as any other litigant." Id.

> Although the Supreme Court has not adopted a per se rule prohibiting the application of equitable estoppel against the government under any circumstances, . . . the Court has suggested that if equitable estoppel is available at all against the government some form of affirmative misconduct must be shown in addition to the traditional requirements of estoppel. . . .While

> the Supreme Court has not squarely held that affirmative misconduct is a prerequisite for invoking equitable estoppel against the government, this court has done so.

Zacharin v. United States, 213 F.3d 1366, 1371 (Fed. Cir. 2000) (internal citations omitted); see also Frazer v. United States, 288 F.3d 1347, 1352-53 (Fed. Cir. 2002); Tefel v. Reno, 180 F.3d 1286, 1303 (11th Cir. 1999); Henry v. United States, 870 F.2d 634, 637 (Fed. Cir. 1989).

Plaintiffs interpose constitutional limits to defendant's arsenal of objections: "[T]he Federal government cannot, consistent with due process, hold out the prospect of a later challenge to the adequacy of the NCT process and then declare that such a challenge necessarily comes too late." Pls.' Br. filed Dec. 18, 2006, at 37-38 (citing Reich v. Collins, 513 U.S. 106, 108 (1994)).

During oral argument and in their first supplemental brief, plaintiffs argued that defendant misled plaintiffs, and presumably the Federal Circuit, by assuring the Federal Circuit in 1988 during argument in People of Enewetak that, "'should changed circumstances arise which would prevent the program from functioning as planned, Congress would need to consider possible additional funding.'" Pls.' Br. filed May 23, 2007, at 16. "In contrast to its earlier assurances, despite evidence of substantial uncompensated and unforeseen harm, the government told Congress that 'the facts . . . do not support a funding request under the 'changed circumstances' provision . . .'" Id. (quoting 2005 Report Evaluating the Request of the Government of the Republic of the Marshall Islands Presented to the Congress of the United States of America).

Review of the Consolidated Brief of Appellee the United States, People of Enewetak v. United States, Nos. 88-1206, -1207 & -1208 (Fed. Cir. June 24, 1988) (the "Appellee Brief"), shows that, while he served as Assistant Attorney General of the Lands and Natural Resources Division of the United States Department of Justice, Roger J. Marzulla advocated on behalf of the United States that plaintiffs might avail themselves of the Changed Circumstances provision in these circumstances. 5/

---

5/ For example, the Government stated in the Appellee Brief: "The Section 177 Agreement, signed in conjunction with the Compact on June 25, 1983, has created a comprehensive, integrated compensation plan 'to provide, in perpetuity, a means to address past, present and future consequences of the nuclear Testing Program' (App. 332)." Appellee Brief at 9.

---

5/ (Cont'd from page 35.)

The Government elaborated upon this argument in Section III.A of the Appellee Brief, discussing the limited nature of the Changed Circumstances provision of the Section 177 Agreement:

> The objective of the Agreement is "to create and maintain *in perpetuity*, a means to address past, present and future consequences of the Nuclear Testing Program, including the resolution of resultant claims" (App. 331, emphasis supplied). As the cornerstone funding, the United States on October 30, 1986, immediately after the Compact took effect, paid $150 million to the Marshall Islands government to create the compensation Fund established by Article 1 (App. 1241). The Agreement requires, however, that the Fund be permanently invested, with an investment goal of at least $18 million per year (App. 332), and with all distributions for compensation programs and claims adjudication to come from the proceeds (App. 332). The Fund's principal may be drawn only if proceeds will not meet annual distribution schedules (App. 336). The Section 177 Agreement's funding structure is thus designed to operate as long as necessary until all consequences of the nuclear testing program are addressed. The United States and Marshall Islands drafted the Agreement to provide continuous funding to *resolve*, not avoid, those consequences.
>
> *It is, of course, conceivable that the Fund could become depleted because of radical long-term investment difficulties, or substantial unforeseen damages. The Agreement expressly provides as to "Changed Circumstances," however, that (App. 341-342):*
>
>> If loss or damage to property and person of the citizens of the Marshall Islands, resulting from the Nuclear Testing Program, arises or is discovered after the effective date of this Agreement, *and* such injuries were not and could not reasonably have been identified as of the effective date of this Agreement, and if such injuries render the provisions of this Agreement manifestly inadequate, the Government of the Marshall Islands may request that the Government of the United States provide for such injuries by submitting such a request to the Congress of the United States for its consideration. It is understood that this

---

5/ (Cont'd from page 36.)

> Article does not commit the Congress of the United States to authorize and appropriate funds.
>
> *In any case, it was the best judgment of the United States and Marshall Islands government that the compensation plan as structured in the Agreement will equitably address all consequences of the nuclear testing program.* The Agreement is designed to operate "in perpetuity," is currently operating effectively to address long-term needs, and fulfills the intent that complex problems stemming from the testing program be resolved on a permanent basis.

Appellee Brief at 34-35 (emphasis added; footnotes omitted). Thus, defendant told the appeals court that long-term investment difficulties might occur to render the Agreement's provisions "manifestly inadequate," but then quotes the language of the provision that requires that changed circumstances had to be unforeseeable. Note 33 of the Appellee Brief appears to assuage concerns regarding the adequacy of funding:

> As appellants note (Br. 44 n.47), disbursements were made from the Fund during its initial year in light of the recent stock market "correction" affecting all investors. That disbursement in no way impairs, nor do appellants suggest that it impairs, the long-term performance and viability of the Fund. Indeed, prior to the stock market disruption, the Fund was achieving an annual return of 20 percent. The amounts disbursed have since been partially restored, and it is anticipated will be fully restored in the near future. The Fund continues to operate as a long-term investment program, providing "a perpetual means of addressing the special and unique circumstances" arising from the nuclear testing program. (App. 332).

Id. at 34 n.33.

Among the "changed circumstances" identified by counsel for plaintiffs in People of Bikini, No. 06-288C, was the ambitious, if not unrealistic, assumption that the Trust Fund had to generate a return of 12% per year to finance the $18 million earmarked for the various programs and specific financial commitments for each listed in the Compact, only one of which was the NCT. Counsel reasonably speculated that "[i]t was pretty hard when you've got to throw off 12 percent a year to make that corpus grow." Transcript of Proceedings at

In its brief filed nineteen years ago, defendant argues that the financial vagaries in the investment program – arguably including mismanagement – could qualify as a separate changed circumstance, apart from loss or damage. That is because the Appellee Brief acknowledges depletion of the Fund due to "long-term investment difficulties, or substantial unforeseen damages." Appellee Brief at 34; see note 5 *supra*. Nonetheless, the shift in defendant's position does not merit its proscription as affirmative misconduct.

The argument in the Appellee Brief certainly includes statements that could be construed as assurances of the availability of future funding should the $150 million trust fund not prove sufficient. Yet, defendant did not misrepresent the Compact or the Section 177 Agreement. References to a "permanent alternative remedy," see Appellee Brief at 14, are accompanied by citations, either general or specific, to the language of the Section 177 Agreement. The language of the Changed Circumstances provision of Section 177 is not a blanket guarantee of future funding for the people of the Marshall Islands. The Changed Circumstances provision provides relief conditioned upon 1) the discovery of loss or damage to property after the effective date of the Agreement, 2) an unforeseeable qualifying event and 3) approval of Congress. While defendant did not misrepresent the terms of the Compact, the Federal Circuit was persuaded by defendant's argument and arguably overstated the breadth of the Changed Circumstances provision. See People of Enewetak, 864 F.2d at 135-36.

In any event, this rationale was not the predicate for the appeals court's affirmance of the Claims Court. Even if defendant was not forthcoming in its argument, invocation of equitable estoppel is not warranted. The Compact, in plain language, required a dual showing, not an alternative one; defendant quoted the Compact accurately; defendant argued that the Trust Fund was structured to be renewable in perpetuity. Plaintiffs were well aware of the terms of the Changed Circumstances provision and had ample opportunity to argue to the Federal Circuit that the clause did not allow recourse to the courts should the Claims Tribunal render an award that could not be funded. 6/

---

5/ (Cont'd from page 37.)

146, People of Bikini v. United States, No. 06-288C, and John v. United States, No. 06-289L (Fed. Cl. Apr. 23, 2007).

6/ Implicit in plaintiffs' reliance on defendant's advocacy is their objection that the RMI did not represent the inhabitants of the Marshall Islands, because the RMI had no power or right to accede to the Compact until the RMI became a recognized governmental entity. Judge Harkins in Juda II ruled that the validity of the espousal in Article X did not impact the withdrawal of claims effected by Article XII. See Juda II at 686-89; see also People of Entewetak, 864 F.2d at 137 (adopting Judge Harkins's "more extensive analysis.").

2. Equitable tolling

Plaintiffs' alterative position, that the statute of limitations is subject to equitable tolling, also does not succeed, as plaintiffs do not meet the requirements of the doctrine with respect to Counts III, IV, V, and VI. Irwin v. Department of Veteran Affairs, 498 U.S. 89 (1990), established the current law involving the doctrine of equitable tolling against the Government:

> A waiver of sovereign immunity "'cannot be implied but must be unequivocally expressed.'" United States v. Mitchell, 445 U.S. 535, 538 (1980) (quoting United States v. King, 395 U.S. 1, 4 (1969)). Once Congress has made such a waiver, we think that making the rule of equitable tolling applicable to suits against the Government, in the same way that it is applicable to private suits, amounts to little, if any, broadening of the congressional waiver. . . .
>
> . . . Federal courts have typically extended equitable relief only sparingly. We have allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass. We have generally been much less forgiving in receiving late filings where the claimant failed to exercise due diligence in preserving his legal rights.

Id. at 95-96 (footnotes omitted); Scarborough v. Principi, 541 U.S. 401, 420-21 (2004) (discussing Court's rejection of "'unduly restrictive' construction of the statute of limitations under the Tucker Act" in Franconia Associates v. United States, 536 U.S. 129 (2002)); Mapu v. Nicholson, 397 F.3d 1375, 1379-80 (Fed. Cir. 2005) (denying equitable tolling of period for appeal).

Equitable tolling would be inappropriate in this case because plaintiffs neither filed a defective pleading during the statutory period, nor has the Government either induced or tricked plaintiffs into allowing the filing deadline to pass. In fact, the situation is to the contrary. Plaintiffs had a suit pending in the Claims Court when the RMI and the United States entered into the Compact in 1986. In Peter II plaintiffs had full opportunity to litigate the issue of subject matter jurisdiction in the Claims Court. Peter II at 692; see also Juda II at 689. Ultimately, the court found that jurisdiction had been withdrawn, but left open the question of whether the "settlement provides 'adequate' compensation" until the "amount and type of compensation that ultimately is provided" has been determined. Juda II at 689. Thus, the record does not disclose a basis for finding that the earlier pleadings were somehow

defective, such that the court now can consider equitable tolling with respect to Counts III, IV, V, and VI.

The essence of plaintiffs' argument concerning the statute of limitations is that the court in Peter II and Juda II ruled premature the issue of whether the Nuclear Claims Tribunal's process would provide just compensation to plaintiffs. Judge Harkins stated:

> This court, plaintiffs say, cannot uphold the constitutionality of Article XII without first making a determination that the settlement procedure, and Claims Tribunal established under the Section 177 Agreement, satisfy these constitutional requirements.
>
> These assertions are premature. Whether the compensation, the alternative procedure provided by Congress in the Compact Act is adequate is dependent upon the amount and type of compensation that ultimately is provided through those procedures. Congress has recognized and protected plaintiffs' rights to just compensation for takings and for breach of contract. The settlement procedure, as effectuated through the Section 177 Agreement, provides a "reasonable" and "certain" means for obtaining compensation. Whether the settlement provides "adequate" compensation cannot be determined at this time.

Juda II at 689. The Claims Court dismissed plaintiffs' claim for breach of implied-in-fact contract because Congress intended to withdraw its consent to sue, a decision affirmed by the Federal Circuit. Peter II at 692; People of Enewetak at 136. It is a mischaracterization of the holdings in People of Enewetak and Juda II to argue that all of the claims originally pleaded can be reviewed.

II. Failure to state a claim

Defendant argues that Counts III, IV, V, and VI would be subject to dismissal under RCFC 12(b)(6) for failure to state a claim upon which relief can be granted.

Count III and Count V plead a taking. The standard for determining whether a Fifth Amendment taking has occurred, as articulated in American Pelagic Fishing Co. v. United States, 379 F.3d 1363 (Fed. Cir. 2004), follows:

> First, as a threshold matter, the court must determine whether the claimant has established a property interest for purposes of the Fifth Amendment. Maritrans, 342 F.3d at 1351. "It is axiomatic that only persons

> with a valid property interest at the time of the taking are entitled to compensation." Wyatt, 271 F.3d at 1096 (citing, *inter alia*, Almota Farmers Elevator Warehouse Co. v. United States, 409 U.S. 470, 473-74 (1973); Cavin v. United States, 956 F.2d 1131, 1134 (Fed. Cir. 1992)) . . . .
>
> Second, after having identified a valid property interest, the court must determine whether the governmental action at issue amounted to a compensable taking of that property interest. Chancellor Manor v. United States, 331 F.3d 891, 902 (Fed. Cir. 2003) (citing [M & J Coal Co. v. United States, 47 F.3d 1148, 1154 (Fed. Cir. 1995)]).

Id. at 1372.

Defendant charges that plaintiffs have not alleged the "occurrence of any Federal Government act since 1986 that has deprived them of any property interest." Def.'s Br. filed Sept. 18, 2006, at 33. Indeed, no acts on the part of the Government are alleged that could entitle plaintiffs to additional funds. The Compact and the Trust Fund established pursuant to settlement of plaintiffs' claims did not guarantee plaintiffs additional funding. See Changed Circumstances provision. Moreover, plaintiffs have alleged no affirmative government act that deprives them of any property interest in additional funding from the United States. See D.R. Smalley & Sons, Inc. v. United States, 372 F.2d 505, 508 (Ct. Cl. 1967) ("All of the acts and omissions complained of by plaintiffs were those of the State of Ohio. It does not allege a single affirmative act on the part of defendant that deprived it of any of its property nor that interfered with or disturbed its property rights in any way. Without such allegation, plaintiff cannot recover damages from defendant on this theory.").

For similar reasons plaintiffs cannot establish the existence of an implied-in-fact contract for additional funds. In Count IV and Count VI plaintiffs allege a breach of implied-in-fact contracts based on the acts of the Government beginning in 1946 when the Government moved the People of Bikini off of their atoll. Any implied-in-fact contract that may have existed between the United States and the Enewetak people, as will be discussed, was terminated in 1986 by the Compact. Plaintiffs attempt to distinguish their new claims by arguing that defendant objects no new events are pleaded to "demonstrate[] the government's failure to acknowledge the new causes of action in plaintiffs' complaint," Pls.' Br. filed Dec. 18, 2006, at 48, which devolves to the tautology that something new must have occurred.

In order to maintain a claim based on an implied-in-fact contract, a plaintiff must show: "(1) mutuality of intent to contract; (2) consideration; (3) an unambiguous offer and acceptance; and (4) *actual authority on the part of the government's representative to bind*

*the government*." Flexfab, L.L.C. v. United States, 424 F.3d 1254, 1265 (Fed. Cir. 2005). Any implied-in-fact contract pleaded in Count IV that may have existed before the Compact became effective was terminated by Section 127 of the Compact Act, which provides:

> Except as otherwise provided in this Compact or its related agreements, all obligations, responsibilities, rights and benefits of the Government of the United States as Administering Authority which have resulted from the application pursuant to the Trusteeship Agreement of any treaty or other international agreement to the Trust Territory of the Pacific Islands on the day preceding the effective date of this Compact are no longer assumed and enjoyed by the Government of the United States.

Because the Section 177 Agreement "constitute[d] the full settlement of all claims, past present and future," a mutual intent to contract beyond the terms of the Compact and the Section 177 Agreement has not been pleaded that could avoid this all-encompassing language. See Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1965-66 (2007); Alliance of Descendants of Tex. Land Grants, 37 F.3d at 1483.

Count VI, plaintiffs' claim arguing that the Compact itself constituted a breach of an implied-in-fact contract, cannot withstand judicial scrutiny. "The overall purpose of the Compact Act must not be lost sight of. The thrust of the Compact Act is to discharge United States obligations to promote the development of the Marshall Island peoples toward self-government." Juda II at 683. As will be discussed, the United States validly withdrew its consent to be sued in the courts of the United States. See Section 177 Agreement, art. X § 1. Therefore, plaintiffs cannot pursue their implied-in-fact contract claim in Count IV or Count VI.

III. Res judicata

The task of a federal court when reviewing the sufficiency of the complaint for failure to state a claim "is necessarily a limited one." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Id. When a complaint properly is within its jurisdiction, a court is to accept as true the facts alleged in the complaint, Davis v. Monroe County Board of Education, 526 U.S. 629, 633 (1999), and to entertain all reasonable inferences in favor of the non-movant, Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995). In Twombly the Supreme Court circumscribed the rule set in Conley v. Gibson, 355 U.S. 41, 45-46, that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Twombly rejected a literal application of the language

of Conley, stating that "the complaint warranted dismissal because it failed *in toto* to render plaintiffs' entitlement to relief plausible." 127 S. Ct. at 1973 n.14.

Peter II dismissed the claims of plaintiffs because jurisdiction had been withdrawn and remitted them to an alternative remedy. In its motion to dismiss, defendant insists that "[p]laintiffs are barred by the doctrine of res judicata from relitigating the validity and effect of the jurisdiction-withdrawing provision of the Compact Act and Section 177 Agreement." Def.'s Br. filed Jan. 30, 2007, at 7 (citing Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n.5 (1979), and Young Eng'rs, Inc. v. United States Int'l Trade Comm'n, 721 F.2d 1305, 1314 (Fed. Cir. 1983). Plaintiffs counter that "[t]he distinction between jurisdictional dismissals and dismissals on the merits is firmly established. . . . Jurisdictional dismissals are not claim preclusive." Pls.' Br. filed Dec. 18, 2006, at 33 (citing Hughes v. United States, 71 U.S. 232, 237 (1866); Bell v. Hood, 327 U.S. 678, 682-83 (1946); Doe v. United States, 463 F.3d 1314 (Fed. Cir. 2006); Do-Well Machine Shop, Inc. v. United States, 870 F.2d 637, 640 (Fed. Cir. 1989); Vink v. Hendrikus Johannes Schif, Rolkan, N.V., 839 F.2d 676, 677 (Fed. Cir. 1988); and Spruill v. Merit Sys. Prot. Bd., 978 F.2d 679, 687 n.10 (Fed. Cir. 1992)).

In Nevada v. United States, 463 U.S. 110 (1983), the Supreme Court stated:

> Simply put, the doctrine of *res judicata* provides that when a final judgment has been entered on the merits of a case, "[it] is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose." Cromwell v. County of Sac, 94 U.S. 351, 352 (1877). The final "judgment puts an end to the cause of action, which cannot again be brought into litigation between the parties upon any ground whatever." Commissioner v. Sunnen, 333 U.S. 591, 597 (1948). See Chicot County Drainage District v. Baxter State Bank, 308 U.S. 371, 375, 378 (1940).

Id. at 129-30; see also Epic Metals Corp. v. H.H. Robertson Co., 870 F.2d 1574, 1576 (Fed. Cir. 1989). "[B]ecause res judicata can also be used in the sense of any preclusion of litigation arising from a judgment, including collateral estoppel, when discussing the different concepts, courts, including the Ninth Circuit and [the Federal] Circuit, for clarity have substituted the terms 'claim preclusion' and 'issue preclusion.'" Foster v. Hallco Mfg. Co., 947 F.2d 469, 478 (Fed. Cir. 1991). The Federal Circuit has defined claim preclusion: "[W]hen a judgment is rendered in favor of a party to litigation, the plaintiff may not thereafter maintain another action on the same 'claim,' and defenses that were raised or *could have been* raised by the defendant in that action are extinguished." Id. at 478. Whether a claim is barred by the doctrine of claim preclusion is an issue of law for the court to

determine based upon the facts of the case. Faust v. United States, 101 F.3d 675, 677 (Fed. Cir. 1996).

> The doctrine of *res judicata,* in its claim preclusion form, provides that final judgment on a claim extinguishes "'all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.'" Young Eng'rs, Inc. v. United States Int'l Trade Comm'n, 721 F.2d 1305, 1314 (Fed. Cir. 1983) (quoting Restatement (Second) of Judgments § 24 (1982)).

Hornback v. United States, 405 F.3d 999, 1001 (Fed. Cir. 2005); see Container Transport Int'l, Inc. v. United States, 468 F.2d 926, 928-29 (Ct. Cl. 1972).

Issue preclusion, or collateral estoppel, "bars litigation of an issue if an identical issue was actually litigated and necessarily decided in a prior case where the interests of the party to be precluded were fully represented." Simmons v. Small Business Admin., 475 F.3d 1372, 1374 (Fed. Cir. 2007). "Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." Allen v. McCurry, 449 U.S. 90, 94 (1980). Issue preclusion "cannot apply when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate that issue in the earlier case." Id. at 95 (citing Montana v. United States, 440 U.S. 147, 153 (1979), and Blonder-Tonque Labs., Inc. v. Univ. of Ill. Found., 402 U.S. 313, 328-29 (1971)).

Plaintiffs emphasize two Federal Circuit cases, Do-Well, 870 F.2d at 640, and Spruill, 978 F.2d at 687 n.10, for the proposition that the doctrine of res judicata does not bar their claims because Juda II is not a decision on the merits. In Do-Well the Federal Circuit noted in *dicta* that a "dismissal on the merits carries *res judicata* effect and dismissal for want of jurisdiction does not." Id. at 640 (citing Vink, 839 F.2d at 677). Likewise, in Spruill the Federal Circuit stated in *dicta*, "[w]hile the practical result of a dismissal for want of jurisdiction may in some cases be the same as a dismissal for failure to state a claim, the legal consequences can be substantially different. The application of the principle of *res judicata* is just one example." 978 F.2d at 687 n.10.

Based on the following analysis, 7/ the court concludes that the applicable bar is collateral estoppel, that the bar has been recognized to apply to dismissals for want of subject matter jurisdiction, and that it should be applied in this case.

It is well established that a dismissal for lack of jurisdiction does not constitute a final judgment on the merits and therefore has no res judicata effect. See Media Techs. Licensing, LLC v. Upper Deck Co., 334 F.3d 1366, 1369-70 (Fed. Cir. 2003) (holding that res judicata does not apply to dismissals based on lack of standing: "Because standing is jurisdictional, lack of standing precludes a ruling on the merits.") 8/ ; Schafer v. Dep't of Interior, 88 F.3d 981, 990 (Fed. Cir. 1996) ("This is a decision on the merits which, unlike dismissal for want of jurisdiction, has a res judicata effect."); Vink, 839 F.2d at 677 ("A dismissal for lack of subject matter jurisdiction . . . is not a disposition on the merits and thus permits a litigant to refile in an appropriate forum."). The only possible bar that could be elicited from Peter I, Peter II, and People of Enewetak would arise from collateral estoppel. The question then becomes whether a plaintiff is collaterally estopped from litigating the question of subject matter jurisdiction and/or standing based on materially indistinguishable allegations in a complaint that a court in a prior action had ruled to be insufficient to establish jurisdiction.

The Federal Circuit addressed this issue under slightly different circumstances. In Ammex, Inc. v. United States, 384 F.3d 1368, 1371-72 (Fed. Cir. 2004), the Federal Circuit ruled that a sister circuit's determination of a party's standing to pursue a tax refund claim for an amount that the party paid to its suppliers and not to the Federal Government collaterally estopped the taxpayer from pursuing the same claim for different tax years in the Court of Federal Claims. While Ammex can be read to give preclusive effect to threshold determinations such as standing, it should be noted that Ammex recognized that an appeals court determination provided the preclusive effect. See id.

Even if Ammex does not stand for the broad proposition, ample authority supports such a result. The Restatement (Second) of Judgments, which the Federal Circuit endorses in this context, Foster v. Hallco Manufacturing Co., 947 F.2d 469, 477 n.7 (Fed. Cir. 1991),

---

7/ The analysis is taken almost verbatim from this court's decision in Saladino v. United States, 62 Fed. Cl. 782, 790-91 (2004).

8/ Although the Federal Circuit applied the law of the Ninth Circuit, this statement was set forth as a general proposition derived from Supreme Court precedent. See Media Techs. Licensing, 334 F.3d at 1369-70 (citing United Food & Commercial Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 551 (1996)). Under the Federal Circuit's formulation of res judicata, see Mother's Rest. v. Mama's Pizza, Inc., 723 F.2d 1566 (Fed. Cir. 1983), the result would be the same.

explicitly adopts the rules of issue preclusion to dismissals for lack of jurisdiction despite their lack of claim-preclusive effects. See Restatement (Second) of Judgments § 20, comment b (1982); id. § 12, comment c ("When the question of the tribunal's jurisdiction is raised in the original action, in a modern procedural regime there is no reason why the determination of the issue should not thereafter be conclusive under the usual rules of issue preclusion.").

The Federal Circuit has issued rulings consistent with this result. See, e.g., Dana v. E.S. Originals, Inc., 342 F.3d 1320, 1323 (Fed. Cir. 2003) (applying Eleventh Circuit law and quoting the Restatement (Second) of Judgments § 13, which states that, "for purposes of issue preclusion . . . final judgment includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect"). In International Air Response v. United States, 302 F.3d 1363 (Fed. Cir. 2002), the Federal Circuit quoted broad language from a Supreme Court case stating that "the 'principles of res judicata also apply to jurisdictional determinations-both subject matter and personal.'" 302 F.3d at 1368 (quoting Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702 n.9 (1982)). However, the Federal Circuit applied this language narrowly to rule that the Government could not collaterally attack the issuance of a stay – a judgment on the merits – by now arguing that the prior court lacked jurisdiction to provide the requested relief. Id. at 1369 (foreclosing Government from arguing that claim not timely because district court had issued stay under All Writs Act, thereby tolling one-year statute of limitations). 9/ The language taken from the Supreme Court, moreover, appeared in the context of a discussion on collateral attacks: "A party that has had an opportunity to litigate the question of subject-matter jurisdiction may not . . . reopen that question in a collateral attack upon on adverse judgment." See Ins. Corp. of Ireland, 456 U.S. at 702 n.9.

Even without this case law, this court would not be ruling in a legal environment devoid of guidance, as many federal courts preclude parties from relitigating the issue of subject matter jurisdiction or other threshold matters even though the prior dismissal did not adjudicate the merits of the case. See, e.g., Matosantos Commercial Corp. v. Applebee's Int'l, Inc., 245 F.3d 1203, 1209-12 (10th Cir. 2001) (prohibiting relitigation of personal jurisdiction); Cortes v. Intermedics, Inc., 229 F.3d 12, 14-15 (1st Cir. 2000) (same for jurisdiction on basis of federal preemption); DiGiore v. Ryan, 172 F.3d 454, 466 (7th Cir. 1999) (justiciability issues), overruled on other grounds by Whetsel v. Network Prop. Servs., LLC, 246 F.3d 897 (7th Cir. 2001); N. Ga. Elec. Membership Corp. v. City of Calhoun, 989 F.2d 429, 433 (11th Cir. 1993) (subject matter jurisdiction); Boone v. Kurtz, 617 F.2d 435,

---

9/ But see Christopher Vill., L.P. v. United States, 360 F.3d 1319, 1330-33 (Fed. Cir. 2004) (refusing to grant preclusive effect to sister circuit's judgment that issued without jurisdiction by excepting from bar judgments that, if allowed to stand, would "substantially infringe the authority of another tribunal" (quoting Restatement (Second) of Judgments, § 12(2))).

436 (5th Cir. 1980) (jurisdiction); cf. Okoro v. Bohman, 164 F.3d 1059, 1062-64 (7th Cir. 1999) (allowing party to avoid bar of collateral estoppel from dismissal of prior action ruled frivolous because bar applied only to the precise ground of dismissal). Standing, a threshold matter like jurisdiction, is also entitled to issue-preclusive effect. See, e.g., Cutler v. Hayes, 818 F.2d 879, 888-89 (D.C. Cir. 1987); Planned Parenthood Ass'n v. Kempiners, 700 F.2d 1115, 1138 (7th Cir. 1983) (Posner, J., concurring); McCarney v. Ford Motor Co., 657 F.2d 230, 233 (8th Cir. 1981); Mrazek v. Suffolk County Bd. of Elections., 630 F.2d 890, 896 n.10 (2d Cir. 1980).

In accord with these authorities, this court applies collateral estoppel to "the precise issue of jurisdiction that led to the initial dismissal." GAF Corp. v. United States, 818 F.2d 901, 912 (D.C. Cir.1987).

Wright, Miller & Cooper have contributed a succinct justification for this result apropos of plaintiffs' claims for a taking of property that were resolved previously:

> [C]ourts have found it convenient to identify the judgments that warrant preclusive effect as "final" or as "on the merits." Little harm is done by such phrases in themselves, but they may obscure the fundamental proposition that different requirements are appropriate to different preclusive effects. Dismissal of a suit for want of federal subject-matter jurisdiction, for example, should not bar an action on the same claim in a court that does have subject matter jurisdiction, but *ordinarily should preclude relitigation of the same issue of subject-matter jurisdiction in a second federal suit on the same claim*.

18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure Jurisdiction (Second) § 4402 (2007) (emphasis added). Thus, while plaintiffs are correct that the dismissal in Peter II for want of subject matter jurisdiction would not bar their claims filed in federal district court, the rule does not allow plaintiffs to renew suit in the Court of Federal Claims in order to relitigate the issue of subject matter jurisdiction with respect to reframed claims from the original Peter case.

Judge Harkins held in Juda II:

> In *Lynch*, the Supreme Court recognized the sweep of Congressional power to withdraw the consent of the United States to be sued. That consent can be withdrawn at any time. Congressional power to provide, or withdraw, remedies against the United States is virtually without a limit. The Sovereign's immunity from suit exists whatever the character of the proceeding, or the source of the right to be enforced. It applies alike to causes of action arising

> under acts of Congress and to those arising from some violation of rights conferred upon the citizens by the Constitution. Withdrawal of consent to sue on plaintiffs' claims does not imply repudiation. As long as the obligations are recognized, Congress may direct fulfillment without the interposition of either a court or an administrative tribunal. Lynch v. United States, 292 U.S. [571, 582 (1934)].

13 Cl. Ct. at 688-89. From this analytical premise, Judge Harkins concluded:

> Article XII of the Section 177 Agreement by necessary implication amends the Tucker Act. The consent of the United States to be sued in the Claims Court on plaintiffs' taking claims and breach of contract claims that arise from the United States' nuclear testing program in the Marshall Islands has been withdrawn.

Juda II at 690. In People of Enewetak, the Federal Circuit affirmed the holding in Peter II and Nitol II, and "adopt[ed the Claims Court's] more extensive analysis in Juda v. United States, 13 Cl. Ct. 667 (1987), relating to the issues discussed above." 864 F.2d at 137.

The above rulings preclude plaintiffs from relitigating subject matter jurisdiction regarding claims that were dismissed on the same grounds in prior litigation. Thus, Count I of plaintiffs' complaint is subject to dismissal based on the doctrine of collateral estoppel, as it is identical to Count I in Peter I, which was subject to dismissal for failure to allege a government act that occurred within six years of the filing of the claim. See Peter I at 775. Also, Count II is subject to dismissal on collateral estoppel grounds, as the Federal Circuit affirmed the dismissal by the Claims Court for lack of subject matter jurisdiction due to the withdrawal of jurisdiction contained in the Section 177 Agreement. See People of Enewetak, 864 F.2d at 137.

Plaintiffs object that dismissal of their claims would "ignore[] the Federal Circuit's holding that such claims were 'premature.'" Pls.' Br. filed Dec. 18, 2007, at 11 (quoting People of Enewetak, 864 F.2d at 136). Plaintiffs rely on the Federal Circuit's adoption of the language in Juda II "[w]hether the settlement provides 'adequate' compensation cannot be determined at this time." Juda II at 689. Defendant responds that the Claims Court "merely concluded that it need not deal with an unripe issue" and that the Federal Circuit's statement did not hold that judicial intervention would be appropriate at a future date. Def.'s Br. filed Jan. 30, 2007, at 4. The court is not persuaded by defendant's argument that the express statements of the Federal Circuit and Claims Court were of no import. If all of plaintiffs' claims are subject to dismissal on the ground of collateral estoppel based upon the withdrawal of jurisdiction contained in the Section 177 Agreement, the statements by both

the Federal Circuit and the Claims Court are rendered superfluous, so it would not be prudent to infer that either court commented without reason upon the prematurity of plaintiffs' claims for just compensation. This court concludes that the language of the People of Enewetak and Juda II opinions anticipated that plaintiffs might return to court on a claim regarding the adequacy of the compensation. At the same time, the affirmance of the dismissal due to the withdrawal of jurisdiction forecloses re-examination of the identical claims raised in Peter, thereby preserving the collateral estoppel effect of the dismissal of Count I and Count II of plaintiffs' Amended Complaint.

The court interprets Counts III (unlawful taking of plaintiffs' just compensation claim) and IV (unlawful taking of plaintiffs' implied-in-fact contract claim) as challenging the adequacy of relief provided by the Compact of Free Association and the Section 177 Agreement to be contrary to the just compensation requirement of the Takings Clause: "The United States by failing to adequately fund the Tribunal so that it could pay Plaintiffs' award has taken Plaintiffs' . . . claim without providing the just compensation as required by the Fifth Amendment to the United States Constitution." Am. Compl. ¶ 203; Am. Compl. ¶ 207 (same). Therefore, these claims, while subject to dismissal for lack of subject matter jurisdiction, are not subject to dismissal under the issue preclusion component of res judicata. The language of the People of Enewetak and Juda II opinions indicates that no final judgment was reached regarding a challenge to the adequacy of the alternative relief; therefore, plaintiffs would not be barred from litigating this issue before this the Court of Federal Claims absent the statute of limitations.

IV. Withdrawal of jurisdiction

Defendant argues that the withdrawal of jurisdiction contained in Article XII of the Section 177 Agreement requires dismissal of plaintiffs' claims. The scope of the withdrawal of jurisdiction is "determined primarily by Compact Act §§ 103(g)(1) and (2), Compact § 177 and § 471(c), and the Section 177 Agreement, Article X, § 1 and Article XII." Juda II at 683. As the D.C. Circuit noted in Antolok:

> It is axiomatic in our federal jurisprudence that inferior courts . . . have only that jurisdiction afforded them by Congress. . . . In 1850, a unanimous Supreme Court held that
>
> > [t]he Constitution has defined the limits of the judicial power of the United States, but has not prescribed how much of it shall be exercised by the [inferior] Court[s]; consequently, the statute which does prescribe the limits of their jurisdiction, cannot be

> in conflict with the Constitution, unless it confers powers not enumerated therein.

873 F.2d at 373-74 (quoting Sheldon v. Still, 49 U.S. 441, 449 (1850)).

It is "well settled . . . [t]hat the United States, when it creates rights in individuals against itself, is under no obligation to provide a remedy through the courts." United States v. Babcock, 250 U.S. 328, 331 (1919) (citations omitted). "[A]lthough a vested cause of action is property and is protected from arbitrary interference, . . . no property, in the constitutional sense, [exists] in any particular form of remedy; all that . . . is guaranteed by the Fourteenth Amendment is the preservation of [a] substantial right to redress by some effective procedure." Gibbes v. Zimmerman, 290 U.S. 326, 332 (1933) (citations omitted).

The Supreme Court reviewed the breadth of jurisdiction granted to the Court of Claims in Schillinger v. United States, 155 U.S. 163, 166 (1894). "The United States cannot be sued in their courts without their consent, and in granting such consent Congress has an absolute discretion to specify the cases and contingencies in which the liability of the Government is submitted to the courts for judicial determination." Id. at 166. Based upon the doctrine of sovereign immunity, the Court reasoned:

> It is said that the Constitution forbids the taking of private property for public uses without just compensation; that, therefore, every appropriation of private property by any official to the uses of the government, no matter however wrongfully made, creates a claim founded upon the Constitution of the United States, and within the letter of the grant in the act of 1887 of the jurisdiction to the Court of Claims. If that argument be good, it is equally good applied to every other provision of the Constitution as well as to every law of Congress. This prohibition of the taking of private property for public use without compensation is no more sacred than that other constitutional provision that no person shall be deprived of life, liberty, or property without due process of law. Can it be that Congress intended that every wrongful arrest and detention of an individual, or seizure of his property by an officer of the government, should expose it to an action for damages in the court of claims? If any such breadth of jurisdiction was contemplated, language which had already been given a restrictive meaning would have been carefully avoided.

Id. at 168. This view was supported in Lynch, where the Supreme Court stated that "'contracts between a Nation and an individual are only binding on the conscience of the sovereign and have no pretensions to compulsive force. They confer no right of action

independent of the sovereign will.' The rule that the United States may not be sued without its consent is all-embracing." 292 U.S. at 580-81 (quoting The Federalist No. 81 (Alexander Hamilton)).

1. Withdrawal of jurisdiction in Article X of the Section 177 Agreement

The withdrawal of jurisdiction regarding claims that arise from the Nuclear Testing Program is an unambiguous express provision of the Section 177 Agreement. Article X, Section 1 of the Section 177 Agreement, quoted again for context, recites:

> This Agreement constitutes the full settlement of all claims, past, present and future, of the Government, citizens and nationals of the Marshall Islands which are based upon, arise out of, or are in any way related to the Nuclear Testing Program, and which are against the United States, its agents, employees, contractors and citizens and nationals, and of all claims for equitable or any other relief in connection with such claims including any of those claims which may be pending or which may be filed in any court or other judicial or administrative forum, including the courts of the Marshall Islands and the courts of the United States and its political subdivisions.

Article XII of the Section 177 Agreement provides:

> All claims described in Articles X and XI of this Agreement shall be terminated. No court of the United States shall have jurisdiction to entertain such claims, and any such claims pending in the courts of the United States shall be dismissed.

2. Implied-in-fact contract claims and claims based on breach of fiduciary duty

Plaintiffs allege a breach of implied-in-fact contract and breach of fiduciary duties in Count II and Count VI, claims that are based upon the conduct of the United States in its treatment and care of the people of the RMI during the Nuclear Testing Program and other subsequent uses of Enewetak Atoll. While the court concludes that Count II is subject to dismissal under the doctrine of collateral estoppel and Count VI is subject to dismissal for failure to satisfy the six-year statute of limitations, the court addresses these counts under the alternative ground of withdrawal. In order to come within the jurisdiction of the Court of Federal Claims, the scope of claims covered by the withdrawal of jurisdiction contained in Article XII of the Section 177 Agreement must not reach these claims.

Count II alleges a breach of implied-in-fact contract created by the conduct of the United States in its treatment of plaintiffs following the occupation of the Marshall Islands in 1944. Plaintiffs allege that an implied-in-fact contract was formed by the "course of dealing between the parties and the circumstances of the removal placed obligations upon the United States toward the Enewetak people." Am. Compl. ¶ 194. They argue that "[t]he United States has breached its contract with the Enewetak people by failing to compensate them for the use of their atoll by the United States and failing to compensate them for the continued denied use of over half the land and lagoon of the atoll" following the Nuclear Testing Program. Id. ¶ 196.

Count VI alleges a breach of implied-in-fact fiduciary duties through formation of the Compact and the failure to fund the award issued by the NCT on March 5, 2001. A claim challenging the failure to fund the NCT is a claim that, on its face, is related directly to the Nuclear Testing Program.

Both Count II and Count VI involve claims that are based upon the Nuclear Testing Program and therefore are subject to dismissal pursuant to the withdrawal of jurisdiction contained in Article X and Article XII of the Section 177 Agreement. The withdrawal of jurisdiction over a claim based on an implied-in-fact contract against the United States, particularly in circumstances which implicate foreign relations, falls squarely within the power of Congress. See, e.g., Lynch, 292 U.S. at 581 ("The rule that the United States may not be sued without its consent is all-embracing.").

3. Fifth Amendment claims

Plaintiffs assert four claims that are based upon their Fifth Amendment right to just compensation for private property taken for public use. Count I alleges a temporary taking of Enewetak Atoll beginning in December 1947 and extending through the next twenty to fifty years, based upon the Nuclear Testing Program and resulting damage done to Enewetak Atoll. Count III alleges a taking of plaintiffs' takings claim for the use and occupation through funding of the NCT with insufficient funds to provide just compensation. Count IV alleges an unlawful taking of plaintiffs' implied-in-fact contract by failing to fund the NCT. Count V alleges a taking of Enewetak Atoll through the formation of the Compact.

As the court has concluded that Counts V and VI fall outside of the Tucker Act's six-year statute of limitations and that Count I is barred by collateral estoppel, consideration of these claims is foreclosed. However, as the Claims Court and the Federal Circuit indicated that review of the adequacy of relief provided was not ripe in Peter II and People of Enewetak, the court addresses an alternative ground for dismissal should it be determined that Counts III and IV satisfy the applicable statute of limitations.

1) Taking of implied-in-fact contract claim

As support for Count IV, plaintiffs' claim for just compensation based upon the implied-in-fact contract created by the conduct of the United States following its occupation of the RMI in 1944, plaintiffs rely on the Supreme Court's holding in Lynch:

> Valid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States. Rights against the United States arising out of a contract with it are protected by the Fifth Amendment. When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals.

292 U.S. at 579 (internal citations omitted).

Because plaintiffs' constitutional claims, by their terms, are included in "all claims, past, present and future, of the Government, citizens and nationals of the Marshall Islands which are based upon, arise out of, or are in any way related to the Nuclear Testing Program," Section 177 Agreement, art. X, § 1, defendant places plaintiffs' constitutional claims within the scope of the withdrawal of jurisdiction effected by Article XII of the Section 177 Agreement. Plaintiffs counter that, even if their claims are related to the Nuclear Testing Program, they constitute a property right that mandates the payment of just compensation under the Fifth Amendment and that their constitutional claims cannot be withdrawn from judicial review. Acknowledging that Congress may provide for an alternative forum for compensation, plaintiffs maintain that a Tucker Act claim challenging the constitutionality of the alternative relief has been preserved as a final resort for a Fifth Amendment claim for just compensation.

Defendant offers the binding precedent of the Court of Claims in Gold Bondholders Protective Council, Inc. v. United States, 676 F.2d 643 (Ct. Cl. 1982), in which plaintiff argued for Fifth Amendment compensation based upon the United States' failure to redeem a bond in gold. The court viewed Lynch as rejecting this proposition. "[T]he Supreme Court ruled directly to the contrary in its landmark decision in Lynch v. United States," Gold Bondholders, 676 F.2d at 647, and cited to Lynch for the proposition that

> [a]lthough consent to sue was thus given when the policy issued, Congress retained power to withdraw the consent at any time. For consent to sue the United States is a privilege accorded; not the grant of a property right protected by the Fifth Amendment. The consent may be withdrawn, although given after much deliberation and for a pecuniary consideration.

Id. (citing Lynch, 292 U.S. at 581). Based on this precedent, the court concludes that Count IV is subject to dismissal, as Congress validly withdrew jurisdiction from the court under the Section 177 Agreement.

2) Taking of plaintiffs' takings claim

Plaintiffs also have alleged an improper taking of their right to just compensation under the Fifth Amendment in Count III, a claim based upon a constitutional right, not a contract. This claim is thus distinguishable from Lynch and Gold Bondholders, and plaintiffs cite to case law in support of the proposition that the Court of Federal Claims must retain jurisdiction to review the adequacy of the alternative relief in the Section 177 Agreement.

The doctrine of constitutional avoidance is a rule of statutory construction that requires the court to "avoid [constitutional] problems unless such construction is plainly contrary to the intent of Congress. This cardinal principle has its roots in Chief Justice Marshall's opinion for the [Supreme] Court in Murray v. The Charming Betsy, 2 Cranch 64, 118 (1804), and has for so long been applied by this Court that it is beyond debate." Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. and Const. Trades, 485 U.S. 568, 575 (1988) (citations omitted). Plaintiffs' claim for the taking of Enewetak Atoll following its occupation, Count III of plaintiffs' complaint, must be dismissed based upon the statute of limitations. Because plaintiffs' claim for the taking of Enewetak Atoll cannot proceed, the constitutionality of foreclosing plaintiffs' legal suit is not reviewable. In other words, plaintiffs do not have a takings claim, so no taking of a non-existent takings claim could be actionable. The court declines to address "the difficult question of whether inferior courts may be barred by an act of Congress from review of constitutional challenges to statutes." Antolok, 873 F.2d at 378.

V. Political question

While discussion of the political question doctrine is not essential to decision due to the dispositive impediments to review of plaintiffs' claims, the court relies, as an alternative ground for dismissal, on application of the political question doctrine to plaintiffs' challenge to the adequacy of relief contained in the Compact and the Section 177 Agreement. Thus, assuming, *arguendo*, that plaintiffs could prosecute a valid claim for review of the adequacy of the alternative relief provided by the Compact and the Section 177 Agreement that was not barred by the statute of limitations, was not subject to collateral estoppel, and would not be subsumed in the withdrawal of jurisdiction, the political question doctrine nevertheless would bar review of their claims.

The political question doctrine is founded upon the long-standing recognition that certain actions of the Government are committed to its political branches. See, e.g., Marbury v. Madison, 5 U.S. 137, 167 (1803).

> The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch. The Judiciary is particularly ill suited to make such decisions, as "courts are fundamentally underequipped to formulate national policies or develop standards for matters not legal in nature."

Japan Whaling Ass'n v. Am. Cetacean Soc., 478 U.S. 221, 230 (1986) (quoting United States *ex rel.* Joseph v. Cannon, 642 F.2d 1373, 1379 (D.C. Cir. 1981) (footnote omitted)). The Supreme Court has emphasized the breadth of the doctrine's application to the arena of foreign relations, stating that "[t]he conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative – 'the political' – Departments of the Government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." Oetjen v. Cent. Leather Co., 246 U.S. 297, 302 (1918) (citations omitted). "[A]ny policy toward aliens is vitally and intricately interwoven with . . . the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." Harisiades v. Shaughnessy, 342 U.S. 580, 588-89 (1952). The subject of foreign policy, according to the Court, is one not readily conducive to judicial review:

> [T]he very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. They are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.

Chicago & S. Air Lines v. Waterman S. S. Corp., 333 U.S. 103, 111 (1948) (citations omitted). In the seminal case, Baker v. Carr, 369 U.S. 186 (1962), the Supreme Court held that a political question was nonjusticiable – not competent subject matter for decision by the courts. Id. at 198-99. At the same time, the Court cautioned that

> it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance. Our cases in this field seem invariably to show a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action.

369 U.S. at 211-12.

1. Rulings of the Claims Court and the Federal Circuit

Although defendant has pressed the political question doctrine throughout the procedural history of these companion cases, it has not been addressed in the context of plaintiffs' challenge to the adequacy of the alternative relief provided by the Compact and the Section 177 Agreement. Juda I spoke to this issue, as follows:

> Defendant also specifically reserves its right to raise the defense that plaintiffs' claims are not justiciable in this court because they present a political question that is to be resolved in the context of government-to-government negotiations between the United States and the Republic of the Marshall Islands. Defendant points out that since 1979 the Bikinians have had a popularly elected constitutional government. In connection with the political question issue, it is noted that the Court of Claims, in recognition of the complexities and costs in time and effort inherent in claims based on government conduct of the type involved here, suggested special jurisdictional legislation that would permit a morally satisfactory resolution of ancient wrongs. Kabua, Kabua v. United States, 546 F.2d 381, 385 (Ct. Cl. 1976), cert. denied, 434 U.S. 821 (1977).
>
> Neither the political question issue nor the espousal issue is decided at this time. The ratification process for the Compact has not been completed, and neither issue has been briefed fully.

Juda I at 445-46.

In Juda II Judge Harkins carried the procedural history forward:

> On March 4, 1986, in each case defendant filed motions to dismiss on the ground that the claims were non-justiciable because they now involve a political question. After objections from plaintiffs to piecemeal disposition of

> the remaining jurisdictional issues, a new schedule was established to provide a vehicle for accelerated briefing of all remaining jurisdictional issues that would ripen after the Compact became effective.
>
> On November 4, 1986, defendant filed amended motions to dismiss in each case. The amended motions added lack of jurisdiction over the subject matter as a ground for dismissal and argued that the Section 177 Agreement divested the court of jurisdiction over plaintiffs' claims.

Juda II at 669-70. The Claims Court in Peter II, Juda II, and Nitol II dismissed the claims of the people of the Marshall Islands on jurisdictional grounds without addressing the political question doctrine.

On appeal to the Federal Circuit, defendant raised the political question doctrine as "an alternative, and fundamental, ground for affirming the decisions below." Appellee Brief at 14-26. The Federal Circuit in People of Enewetak, however, declined to discuss the political question doctrine, stating that "[b]ecause we affirm the decision of the Claims Court to dismiss appellants' complaints for lack of subject matter jurisdiction, we need not address other issues." 864 F.2d at 136 n.4.

2. Ruling of the D.C. Circuit

Although the Claims Court and Federal Circuit did not rule on defendant's invocation of the political question doctrine, other courts in related cases have spoken to this issue. In Antolok v. United States, 873 F.2d 369 (D.C. Cir. 1989), the court gave the following preamble:

> The Ninth Circuit is holding in abeyance Antolok v. Brookhaven Nat'l Laboratories, No. 88-5749 (9th Cir. ordered held in abeyance Oct. 19, 1988), pending outcome of the instant appeal. In the lower court proceeding in that case, the District Court dismissed plaintiffs' claims as raising a nonjusticiable political question. Antolok v. Brookhaven Nat'l Laboratories, Nos. CV 82-2364, CV 82-4978 (C.D. Cal. Jan. 6, 1988).

Id. at 372 n.3. The D.C. Circuit in Antolok affirmed the dismissal of the tort claims brought pursuant to the FTCA by the lower court. 873 F.2d at 369. The D.C. Circuit held that, "[i]f there is an uncompensated or inadequately compensated taking, then plaintiffs' remedy is in the Claims Court under the Tucker Act, 28 U.S.C. § 1491(a)(1), not in District Court under the Federal Tort[] Claims Act." Id. at 378. Chief Judge Wald's concurring opinion distinguished the claims addressed in Antolok from those raised in the case at bar. See id.

at 393 n.15 ("This takings claim should be distinguished from the takings claim at issue in People of Enewetak v. United States, 864 F.2d 134 (Fed. Cir. 1988). . . . Here the plaintiffs' cause of action is a tort claim under the Federal Tort Claims Act.") (Wald, J., concurring). Nevertheless, a close parallel can be drawn between the FTCA claims brought in Antolok and the breach of implied-in-fact contract claims in this case, as they do not raise issues of constitutional dimension.

Judge Sentelle offered the lone caveat in Antolok concerning the political questions implicated: "[E]ven if we err in our interpretation of that Act, I would not reach the merits but would conclude that the District Court was without jurisdiction over this matter of international relations by reason of the political question doctrine." Id. at 379. 10/

Judge Sentelle reasoned that the application of

> the three inquiries more recently formulated by Justice Powell as defining the analysis [are] necessary to determine the application of the political question doctrine.
>
> (i) Does the issue involve resolution of questions committed by the text of the Constitution to a coordinate branch of Government? (ii) Would resolution of the question demand that a court move beyond areas of judicial expertise? (iii) Do prudential considerations counsel against judicial intervention?
>
> Goldwater v. Carter, 444 U.S. 996, 998 (1979) (Powell, J., concurring).

Antolok, 873 F.2d at 381.

Judge Sentelle concluded, under the first criterion, that "the decision of the political branches expressed in the Compact negotiated and entered by the Executive and approved by the Legislative Branch is within the area of foreign relations committed by the Constitution to the political branches." Id. at 381. He analogized the circumstances to the "Litinov Assignment" at issue in United States v. Pink, 315 U.S. 203 (1942), and United States v. Belmont, 301 U.S. 324 (1937), categorizing the claims as challenging the recognition of foreign governments and therefore committed to the "'political department of the government.'" Antolok, 873 F.2d at 382 (quoting Guaranty Trust Co. v. United States, 304 U.S. 126, 137 (1938)). In applying the second criterion, Judge Sentelle rejected

10/ See *supra* note 3.

characterization of the claims as addressing "simpl[e] questions of tort liability and damages." Id. at 383. Rather, "[i]t is the political nature of the recognition question, not the tort nature of the individual claims, that bars our review and in which the Judiciary has no expertise." Id. at 383-84. Finally, with respect to the third criterion, Judge Sentelle concluded that "prudential considerations underline the necessity for the application of the [political question] doctrine in this case." Id. at 384. He reasoned that, "[f]or the courts of the United States to find the political branches, acting together, to have been impotent in the entry of recognition of the Marshall Islands would not only drain that voice of its power, but could 'imperil the amicable relations between governments and vex the peace of nations.'" Id. at 384 (quoting Oetjen v. Cent. Leather Co., 246 U.S. 297, 304 (1918)).

Chief Judge Wald, concurring in the result, stated, "I believe that Judge Sentelle's political question analysis is deeply flawed." Id. at 390 (Wald., J., concurring). "If the plaintiffs were attacking the espousal on the ground that the purported government of the Marshall Islands was not truly sovereign, then I would agree that a political question had been posed. . . . I also believe that any challenge to the adequacy of the settlement is nonjusticiable." Id. at 391. Nonetheless, she concluded that plaintiffs' challenge to the espousal based upon international law that "forbids the espousal of claims held by persons who were not nationals of the espousing state at the time the claims arose . . . . [is] entirely suitable for judicial resolution." Id. Chief Judge Wald distinguished plaintiffs' challenge as a "pure question of law which requires no foreign policy expertise and implicates no uniquely political concerns." Id. She demurred nevertheless that "this court is precluded from inquiring into the adequacy of the settlement," id. at 392, and that "[s]uch a dispute would seem to lie beyond the purview of this court, both because this court lacks the authority to inquire into the adequacy of another government's representation of its own people, and because the United States Government cannot in any event be held responsible for another government's failings." Id. Importantly, Chief Judge Wald commented on the practical consequences of judicial examination of the award:

> [A]ny inquiry into the adequacy of the settlement figure would require, in essence, that the district court try the lawsuit. The adequacy of the settlement, after all, depends both on the extent of the plaintiffs' injuries – a very difficult determination in itself – and on the likelihood of their collecting a judgment in the face of the government's formidable defenses. The whole point of the espousal, however, was to achieve expeditious settlement of these claims and avoid protracted litigation. I believe that Congress did intend for the withdrawal of federal jurisdiction over the tort claims to be contingent on the validity of the espousal. But it would seem to me a bizarre result if we could uphold the espousal only after completing the sort of extended inquiry which the settlement was designed to prevent.

Id. at 393 (footnote omitted).

3. Political question doctrine applied to the case at bar

The Federal Circuit has adopted the six-factor inquiry set forth by the Supreme Court in Baker v. Carr:

> In Baker v. Carr, 369 U.S. 186, 217 (1962), the Supreme Court set forth six tests for the presence of a nonjusticiable political question:
>
> > [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of the government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.
>
> . . . .
>
> The decision that a question is nonjusticiable is not one courts should make lightly. Although each Baker test is independent, id., we must satisfy ourselves that at least one of the six Baker tests is inextricably present in the facts and circumstances in this case before we may conclude that it presents a nonjusticiable political question, Baker, 396 U.S. at 217.

El-Shifa Pharm. Indus. Co. v. United States, 378 F.3d 1346, 1361-62 (Fed. Cir. 2004); see also Schneider v. Kissinger, 412 F.3d 190, 194 (D.C. Cir. 2005). Defendant characterizes plaintiffs' claims as involving an "attack upon the Compact and the Section 177 Agreement–agreements that were negotiated and executed by the Executive Branch and approved by Congress–[calling] into question the conduct of U.S. foreign relations." Def.'s Br. filed Sept. 18, 2006, at 21. Defendant would subject plaintiffs' claims to dismissal under the political question doctrine because they implicate the first, fourth, and sixth Baker factors.

Because defendant sees "a textually demonstrable constitutional commitment of the issue to a coordinate political department" to conduct of foreign relations involving the United States. Baker, 369 U.S. at 217, defendant advocates Judge Sentelle's application of the political question doctrine as an alternative ground for dismissal in Antolok. See Antolok, 873 F.2d at 379-94 (opinion of Sentelle, J.). Defendant highlights Judge Sentelle's reliance on the Supreme Court's treatment of the "Litinov Assignment" in Belmont, 301 U.S. at 330, and Pink, 315 U.S. at 229, as pretermitting judicial review regarding the formation of international agreements or recognition of foreign governments.

Plaintiffs respond with case law that supports the adjudication of takings claims as a core judicial function, "one traditionally and historically committed to the judiciary for resolution." Pls.' Br. filed Dec. 18, 2006, at 34. Plaintiffs rely upon Lagenegger v. United States, 756 F.2d 1565 (Fed. Cir. 1985), for the proposition that "consideration of land taking claims is clearly the role of the judiciary according to the Constitution, Amendment V, and ascertainment of 'just compensation' is a judicial function." Id. at 1569 (citing United States v. New River Colleries, 262 U.S. 341, 343 (1923)). The Supreme Court viewed the issue in Lynch somewhat differently:

> Contracts between individuals or corporations are impaired within the meaning of the Constitution (article 1, s 10, cl. 1) whenever the right to enforce them by legal process is taken away or materially lessened. A different rule prevails in respect to contracts of sovereigns. Compare Principality of Monaco v. Mississippi, 292 U.S. 313 [(1934)]. ["]The contracts between a Nation and an individual are only binding on the conscience of the sovereign and have no pretensions to compulsive force. They confer no right of action independent of the sovereign will.["] The rule that the United States may not be sued without its consent is all-embracing.

292 U.S. at 580-81 (footnotes omitted). This binding precedent translates to the proposition that withdrawal of jurisdiction regarding plaintiffs' claims for breach of implied-in-fact contract does not create a claim for just compensation under the Fifth Amendment.

Plaintiffs place great reliance on Dames & Moore v. Regan, 453 U.S. 654 (1981), purportedly factually similar to their case, as authority that their claims do not pose a nonjusticiable political question. Dames & Moore is distinguishable from this case. As the Supreme Court delineated in its opinion, resolution of the issue on review was limited to the "narrowest possible ground capable of deciding the case. . . . We attempt to lay down no general 'guidelines' covering other situations not involved here, and attempt to confine the opinion only to the very questions necessary to decision of the case." 453 U.S. at 660-61. Judge Sentelle's treatment of a similar argument raised in Antolok is instructive:

> Dames & Moore is not authority for the proposition that we can review the political decision to recognize the government of the Republic of the Marshall Islands on terms including the settlement condition but rather is new authority for the old proposition that we are not the overseers of the political branches in the exercise of their governing responsibility.

873 F.2d at 384.

The dispute precipitating Dames & Moore arose out of an agreement entered into between the United States and the Islamic Republic of Iran on January 19, 1981, which secured the release of American hostages. The pivotal issues in the litigation "involve[d] various Executive Orders and regulations by which the President nullified attachments and liens on Iranian assets in the United States, directed that these assets be transferred to Iran, and suspended claims against Iran that may be presented to an International Claims Tribunal." 453 U.S. at 660. A United States corporation had filed suit against the Islamic Republic of Iran, the Atomic Energy Organization of Iran, and Iranian banks for services performed under a contract with the Atomic Energy Organization. The petitioners in Dames & Moore had no involvement in the negotiation of the Executive Orders and regulations, nor did they ratify them through a democratic process. In contrast, plaintiffs are not United States citizens; they are foreign nationals who participated in both the negotiation of the Compact through their representatives and in the espousal of their claims by expressing support for the agreement through plebiscite in September 1983.

Defendant admonishes that resolution of the issues raised by plaintiffs would manifest a lack of respect due the Executive and Legislative branches of government. Defendant warns that judicial intervention would "signal to Congress this Court's belief that Congress will not appropriately act upon the Marshall Islands' changed circumstances request." Def.'s Br. filed Sept. 18, 2006, at 24. Also, defendant predicts that the court may "render a decision that directly conflicts with Congress' disposition of the Changed Circumstances Request, causing confusion, embarrassment, and more litigation." Id. Plaintiffs rejoin that their claims involve the payment of just compensation for use of private property, not foreign policy concerns. Plaintiffs cite to United States v. Munoz-Flores, 495 U.S. 385 (1990), in which the Supreme Court recognized:

> The Government may be right that a judicial finding that Congress has passed an unconstitutional law might in some sense be said to entail a "lack of respect" for Congress' judgment. But disrespect, in the sense the Government uses the term, cannot be sufficient to create a political question. If it were, *every* judicial resolution of a constitutional challenge to a congressional enactment would be impermissible.

Id. at 390.

While respectful of Judge Sentelle's analysis, the court concludes that adoption of portions of Chief Judge Wald's discussion of the political question doctrine regarding the FTCA is more appropriate to the resolution of plaintiffs' claims under the Tucker Act. As quoted above, Chief Judge Wald cautioned in Antolok that

> any inquiry into the adequacy of the settlement figure would require, in essence, that the district court try the lawsuit. The adequacy of the settlement, after all, depends both on the extent of the plaintiffs' injuries – a very difficult determination in itself – and on the likelihood of their collecting a judgment in the face of the government's formidable defenses. The whole point of the espousal, however, was to achieve expeditious settlement of these claims and avoid protracted litigation. I believe that Congress did intend for the withdrawal of federal jurisdiction over the tort claims to be contingent on the validity of the espousal. But it would seem to me a bizarre result if we could uphold the espousal only after completing the sort of extended inquiry which the settlement was designed to prevent.

873 F.2d at 393 (Wald, J., concurring) (footnotes omitted).

Exploring plaintiffs' challenges to the adequacy of the alternative relief would require a trial on the merits of plaintiffs' claims and scrutiny of an international agreement that both recognized the formation of a foreign state and espoused claims of its nationals. As Chief Judge Wald explained, a challenge narrowly based upon a "purely legal question[]," such as the challenge to the ability of a foreign state validly to espouse claims of its nationals under international law, would not be subject to the political question doctrine. Antolok, 873 F.2d at 392. Resolution of plaintiffs' claims concerning the adequacy of the alternative relief, in contrast, would call for the court to retry plaintiffs' claims before the NCT in order to determine the adequacy of the award as a constitutional measure. Judicial resolution of complex issues of fact to determine whether the NCT's award constitutes just compensation and whether the United States is obligated to pay just compensation (either based on that award or its judicial proxy), would run counter to the final resolution of all plaintiffs' claims embodied in the Compact and the Section 177 Agreement.

The court recognizes "a textually demonstrable constitutional commitment of the issue to a coordinate political department," based upon the factual similarities to the Supreme Court's treatment to the Litinov Assignment in Belmont, 301 U.S. at 330, and in Pink, 315 U.S. at 229. See Baker, 369 U.S. at 217. Review of plaintiffs' claims regarding the adequacy of compensation under the Section 177 Agreement and the NCT would explore the

formation of an international agreement and recognition of a foreign government, responsibilities charged to the Executive and Legislative branches of government.

In Belmont the Supreme Court reviewed the impact of the political question doctrine upon the challenge to the Litinov Assignment, which "br[ought] about a final settlement of the claims and counterclaims between the Soviet government and the United States; and it was agreed that the Soviet government would take no steps to enforce claims against American nationals; but all such claims were released and assigned to the United States." 301 U.S. at 326. Similar to the circumstances in this case, "coincident with the assignment set forth in the complaint, the President recognized the Soviet government, and normal diplomatic relations were established between that government and the government of the United States." Id. at 330. The Supreme Court's description of the nature of the agreement aids in placing plaintiffs' claims in their proper context:

> The recognition, establishment of diplomatic relations, the assignment, and agreements with respect thereto, were all parts of one transaction, resulting in an international compact between the two governments. That the negotiations, acceptance of the assignment and agreements and understandings in respect thereof were within the competence of the President may not be doubted. Governmental power over internal affairs is distributed between the national government and the several states. Governmental power over external affairs is not distributed, but is vested exclusively in the national government. And in respect of what was done here, the Executive had authority to speak as the sole organ of that government.

Id.

Plaintiffs' objections to the adequacy of the settlement's terms call for an examination of the terms of the "international compact between the two governments" and investigation of complex issues of fact, not a narrow legal issue. See id. at 326. In Ozanic v. United States, 188 F.2d 228 (2d Cir. 1951), Judge Learned Hand addressed the ability of the President to settle foreign claims arising out of the recognition of the Yugoslav government:

> The constitutional power of the President extends to the settlement of mutual claims between a foreign government and the United States, at least when it is an incident to the recognition of that government; and it would be unreasonable to circumscribe it to such controversies. The continued mutual amity between the nation and other powers again and again depends upon a satisfactory compromise of mutual claims; the necessary power to make such

> compromises has existed from the earliest times and been exercised by the foreign offices of all civilized nations.

Id. at 231 (footnote omitted). These factors support the conclusion that plaintiffs' claims impinge on the conduct of foreign affairs that the Constitution delegates to the Executive and Legislative branches. Moreover, the approval of the settlement terms by plebiscite in September 1983 would support a ruling that any dissatisfaction with the terms of the Compact and the Section 177 Agreement should be directed to the government of the RMI, not that of the United States.

Even if plaintiffs' claims could survive the bar of the statute of limitations, the preclusive effect of collateral estoppel, and withdrawal of jurisdiction, the political question doctrine mandates declining judicial review of a challenge to the adequacy of the alternative relief afforded and delimited by the Compact Act and the Section 177 Agreement.

## CONCLUSION

Based on the foregoing, defendant's motion is granted, and the Clerk of the Court shall dismiss Count III, IV, V, and VI of plaintiffs' Amended Complaint without prejudice for lack of subject matter jurisdiction and shall enter judgment for defendant with respect to Counts I and II.

**IT IS SO ORDERED.**

No costs.

s/ Christine O.C. Miller

________________________________

**Christine Odell Cook Miller**
Judge